No. 15-1368

# In the United States Court of Appeals for the Seventh Circuit

MARIA STAPLETON, et al.,

*Plaintiffs-Appellees,*

v.

ADVOCATE HEALTH CARE NETWORK, an Illinois Non-Profit Corporation, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 1:14-cv-01873. The Honorable **Edmond E. Chang**, Chief Judge Presiding.

## BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLANTS


AMY L. BLAISDELL
DANIEL J. SCHWARTZ
HEATHER M. MEHTA
GREENSFELDER, HEMKER & GALE, P.C.
Ten South Broadway, Suite 2000
St. Louis, Missouri 63102
(314) 516-2642

DAVID B. GOODMAN
GREENSFELDER, HEMKER & GALE, P.C.
200 West Madison Street
Suite 2700
Chicago, Illinois 60606
(312) 419-9090

*Attorneys for Defendants-Appellants Benefit Plan Administrative Committee for the Church Plans of Advocate Health Care Network, and Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network, each an individual*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Advocate Health Care Network (a non-profit corporation); Kevin R. Brady; The Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network; (Continued on Attached Page)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Greensfelder, Hemker & Gale, P.C.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Amy L. Blaisdell Date: April 6, 2015

Attorney's Printed Name: Amy L. Blaisdell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X **No** ____

Address: Greensfelder, Hemker & Gale, P.C.; 10 South Broadway, Suite 2000; St. Louis, MO 63102

Phone Number: 314-241-9090 Fax Number: 314-241-8624

E-Mail Address: apb@greensfelder.com

## Attachment to Rule 26.1 Disclosure Statement

John and Jane Does 1-20, Members of the Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network;

The Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 21-40, Members of the Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 41-60;

*"Advocate Health Care Network and Subsidiaries" is not a legal entity and has been dismissed from the case.* (Dkt. #40, June 10, 2014)

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Advocate Health Care Network (a non-profit corporation); Kevin R. Brady; The Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network; (Continued on Attached Page)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Greensfelder, Hemker & Gale, P.C.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ David B. Goodman Date: April 6, 2015

Attorney's Printed Name: David B. Goodman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ______ **No** X

Address: Greensfelder, Hemker & Gale, P.C.; 200 West Madison; Suite 2700; Chicago, IL 60606

Phone Number: 312-419-9090 Fax Number: 312-419-1930

E-Mail Address: dbg@greensfelder.com

## Attachment to Rule 26.1 Disclosure Statement

John and Jane Does 1-20, Members of the Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network;

The Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 21-40, Members of the Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 41-60;

*"Advocate Health Care Network and Subsidiaries" is not a legal entity and has been dismissed from the case.* (Dkt. #40, June 10, 2014)

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Advocate Health Care Network (a non-profit corporation); Kevin R. Brady; The Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network; (Continued on Attached Page)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Greensfelder, Hemker & Gale, P.C.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Daniel J. Schwartz Date: April 6, 2015

Attorney's Printed Name: Daniel J. Schwartz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: Greensfelder, Hemker & Gale, P.C.; 10 South Broadway, Suite 2000; St. Louis, MO 63102

Phone Number: 314-241-9090 Fax Number: 314-241-8624

E-Mail Address: djs@greensfelder.com

## Attachment to Rule 26.1 Disclosure Statement

John and Jane Does 1-20, Members of the Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network;

The Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 21-40, Members of the Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 41-60;

*"Advocate Health Care Network and Subsidiaries" is not a legal entity and has been dismissed from the case.* (Dkt. #40, June 10, 2014)

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Advocate Health Care Network (a non-profit corporation); Kevin R. Brady; The Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network; (Continued on Attached Page)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Greensfelder, Hemker & Gale, P.C.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Heather M. Mehta Date: April 6, 2015

Attorney's Printed Name: Heather M. Mehta

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** _____ **No** X

Address: Greensfelder, Hemker & Gale, P.C.; 10 South Broadway, Suite 2000; St. Louis, MO 63102

Phone Number: 314-241-9090 Fax Number: 314-241-8624

E-Mail Address: hmm@greensfelder.com

## Attachment to Rule 26.1 Disclosure Statement

John and Jane Does 1-20, Members of the Benefit Plan Administrative Committee for Church Plans of Advocate Health Care Network;

The Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 21-40, Members of the Compensation and Benefits Committee of the Board of Directors of Advocate Health Care Network;

John and Jane Does 41-60;

*"Advocate Health Care Network and Subsidiaries" is not a legal entity and has been dismissed from the case.* (Dkt. #40, June 10, 2014)

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ........................................ i

TABLE OF AUTHORITIES ........................................................................ xi

STATEMENT CONCERNING ORAL ARGUMENT .................................. xix

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..........................3

STATEMENT OF THE CASE ........................................................................5

I. Facts ........................................................................................6

A. History of ERISA's "church plan" exemption ....................................6

B. Advocate Health Care Network ........................................................14

C. The Advocate Health Care Network Pension Plan..........................16

II. Procedural History ........................................................................18

SUMMARY OF THE ARGUMENT..............................................................19

STANDARD OF REVIEW ............................................................................25

ARGUMENT..................................................................................................26

I. The 'Church Plan' Definition Includes Plans of Organizations Controlled By or Associated With a Church. ................................................26

A. ERISA § 3(33)(C) expands the categories of plans that qualify as church plans.............................................................................................29

B. Plans maintained by administrative committees of church-associated organizations qualify as church plans pursuant to ERISA § 3(33)(C)(i). ...........................................................................................46

C. The First Amendment precludes review of a church's determination that an organization is associated with it pursuant to ERISA § 3(33)(C)(iv). ..........................................................................50

II. The Legislative History Supports Advocate's Interpretation. ..............53

III. The Longstanding Interpretation Adopted By the Agencies Charged With Administering ERISA is Entitled to Deference...................................60

IV. The District Court's Interpretation Raises Serious Constitutional Concerns. .........................................................................................................69

CONCLUSION ..........................................................................................74

## TABLE OF AUTHORITIES

**Cases**

*ABC Rentals of San Antonio, Inc. v. Comm'r*, 142 F.3d 1200 (10th Cir. 1998) ..62

*Anderson v. Thompson*, 658 F.2d 1205 (7th Cir. 1981) ........................................56

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................25

*Bankers Life & Cas. Co. v. United States*, 142 F.3d 973 (7th Cir. 1998) ..............62

*Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322 (7th Cir. 1997) ..........................................................................................................48

*Bellas v. CBS, Inc.*, 221 F.3d 517 (3d Cir. 2000) ......................................................62

*Bethel Conservative Mennonite Church v. Comm'r of Internal Revenue*, 746 F.2d 388 (7th Cir. 1984) ........................................................................................52

*Carver v. Presence Health Network*, No. 15-cv-02905 (N.D. Ill.) ........................ xi

*Catholic Charities of Maine, Inc. v. City of Portland*, 304 F. Supp. 2d 77 (D. Me. 2004) ..........................................................................................................38

*Chavies v. Catholic Health East*, No. 13-cv-1645 (E.D. Pa.) ................................ xi

*Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006) ..................................42

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................................42

*Coleman-Edwards v. Simpson*, No. 03CV3779DLIVVP, 2008 WL 820021 (E.D.N.Y. Mar. 25, 2008) *aff'd,* 330 F. App'x 218 (2d Cir. 2009) ...................49

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ........... 61, 68

*Corley v. United States*, 556 U.S. 303 (2009) ..........................................................49

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ..................................................................................... 72, 73

*Cottage Savings Ass'n v. C.I.R.*, 499 U.S. 554 (1991) .......................................... 67

*Davis v. United States*, 495 U.S. 472 (1990) .................................................. 65, 66

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840 (7th Cir. 2012).................. 71

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)....................... 30

*Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976)...................... 55

*First Chicago NBD Corp. v. C.I.R.*, 135 F.3d 457 (7th Cir. 1998)........................ 61

*Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121 (7th Cir. 2008)........... 54

*Fornalik v. Perryman*, 223 F.3d 523 (7th Cir. 2000) ............................................ 66

*Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969 (N.D. Ill. 1999) .................. 42, 52

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997) ........................................................................................................ 26

*Griffith v. Providence Health Systems*, No. 14-cv-1720 (W.D.Wa.) ................... xi

*Groman v. Comm'r of Internal Revenue*, 302 U.S. 82 (1937) ............................... 31

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) ....................................... 29, 30

*Hall v. USAble Life*, 774 F. Supp. 2d 953 (E.D. Ark. 2011) ............................... 39

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).................................... 26, 46

*Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987) ........................ 73

*Hosanna–Tabor Evangelical Lutheran Church & School v. EEOC*, —— U.S. ——, 132 S.Ct. 694 (2012) ............................................................................................ 53

*Hubbard v. United States*, 514 U.S. 695 (1995) ................................................... 48

*Humphrey v. Sisters of St. Francis Health Servs., Inc.*, 979 F. Supp. 781 (N.D. Ind. 1997)................................................................................................ 42, 67

*Idaho First Nat. Bank v. C.I.R.*, 997 F.2d 1285 (9th Cir. 1993), *as clarified* (Aug. 4, 1993) .......... 62

*In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276 (7th Cir. 1996) .......... 25

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) .......... 31, 32

*Kaplan v. Saint Peter's Healthcare Sys.*, No. CIV.A. 13-2941, 2014 WL 1284854 (D.N.J. Mar. 31, 2014) .......... xi, 41, 66

*Kaplan v. St. Peter's Healthcare Sys.*, No. 14-8125, Dkt. #003111840647 (3d. Cir. Jan. 7, 2015) .......... 41

*Khan v. United States*, 548 F.3d 549 (7th Cir. 2008), *as amended* (Dec. 4, 2008) .......... 53

*Lann v. Trinity Health*, No. 14-cv-2237 (D. Md.) .......... xi, 40

*Larson v. Valente*, 456 U.S. 228 (1982) .......... 45, 71

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .......... 24, 71, 72

*Lorillard v. Pons*, 434 U.S. 575 (1978) .......... 45

*Lown v. Cont'l Cas. Co.*, 238 F.3d 543 (4th Cir. 2001) .......... 42

*McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013) .......... 50, 52

*Medina v. Catholic Health Initiatives*, No. 13CV-01249-REB-KLM, 2014 WL 4244012 (D. Colo. Aug. 26, 2014) .......... passim

*Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449 (7th Cir. 1998) .......... 26

*Morris v. Daughters of Charity Health Systems*, No. 14-cv-04681 (N.D. Cal.) .......... xi

*Morris v. Hoffa*, 361 F.3d 177 (3d Cir. 2004) .......... 25

*Nathel v. C.I.R.*, 615 F.3d 83 (2d Cir. 2010) .......... 62

*NLRB v. Catholic Bishops*, 440 U.S. 490 (1979) ............................................ 53, 69

*Omni Tech Corp. v. MPC Solutions Sales, LLC,* 432 F.3d 797 (7th Cir. 2005)...25

*Overall v. Ascension,* 23 F. Supp. 3d 816 (E.D. Mich. 2014) ..................... passim

*Owens v. Saint Anthony's Medical Center*, No. 14-cv-4068 (N.D. Ill.) ............. xi

*Pittway Corp. v. United States*, 102 F.3d 932 (7th Cir. 1996)..............................27

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969) ........................................................53

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004) ..................................................................................................................62

*Rinehart v. Life Ins. Co. of N. Am.*, No. C08-5486 RBL, 2009 WL 995715 (W.D. Wash. Apr. 14, 2009)......................................................................... 38, 67

*Rollins v. Dignity Health*, 19 F. Supp. 3d 909 (N.D. Cal. Dec. 12, 2013)... xi, 41, 66

*Rollins v. Dignity Health*, No. 13-CV-01450-TEH, 2014 WL 3613096 (N.D. Cal. July 22, 2014)........................................................................... 40, 41

*Rollins v. Dignity Health*, No. 13-CV-01450-TEH, 2014 WL 6693891 (N.D. Cal. Nov. 26, 2014) ..........................................................................................41

*Rollins v. Dignity Health*, No. 14-80177, Dkt. #9436742 (9th Cir. Feb. 26, 2015) ..................................................................................................................41

*Rumpke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235 (7th Cir. 1997).3

*Russello v. United States*, 464 U.S. 16 (1983)........................................... 35, 57, 59

*Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) .............53

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .................................... 23, 60, 62, 63

*Taxation With Representation Fund v. I. R. S.*, 646 F.2d 666 (D.C. Cir. 1981) .10, 11

*Taylor v. Sisters of St. Francis Health Servs., Inc. Ltd. Trust Health Benefit Plan*, No. 1:05-CV-0671-DFH-VSS, 2006 WL 2457202 (S.D. Ind. Aug. 23, 2006) 42

*Thom v. United States*, 283 F.3d 939 (8th Cir. 2002) ..........................................62

*Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119 (D. Minn. 2011) ................................................................ 39, 47, 48, 67

*Tucker v. Baptist Health System, Inc.*, No. 15-cv-392 (N.D. Ala.) ...................... xi

*United States v. Cotton*, 535 U.S. 625 (2002) .......................................................50

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ........................................ 61, 62

*United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001) .....................70

*United States v. Wisconsin Power & Light Co.*, 38 F.3d 329 (7th Cir. 1994) 61, 62

*Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970) ..........................73

*Ward v. Unum Life Ins. Co. of Am.*, No. 09-C-431, 2010 WL 4337821 (E.D. Wis. Oct. 25, 2010)........................................................................................... 40, 42

*Welsh v. Ascension Health*, No. 3:08CV348/MCR/EMT, 2009 WL 1444431 (N.D. Fla. May 21, 2009)...........................................................................38

*Worldwide Equip., Inc. v. United States*, 605 F.3d 319 (6th Cir. 2010)...............62

*Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996) .............................3

**Statutes**

26 U.S.C. § 401(a) ......................................................................................... 7, 38

26 U.S.C. § 414(e) ......................................................................................passim

26 U.S.C. § 501(a) ..................................................................................................7

26 U.S.C. § 501(c)(3) ....................................................................................14

26 U.S.C. § 6110(k)(3) ...................................................................................62

26 U.S.C. § 7801 ......................................................................................... 7, 60

28 U.S.C. § 1292(b) ......................................................................... 1, 2, 18, 25

28 U.S.C. § 1331 ...............................................................................................1

ERISA § 101, 29 U.S.C. § 1021 ........................................................................7

ERISA § 102, 29 U.S.C. § 1022 ........................................................................7

ERISA § 103, 29 U.S.C. § 1023 ........................................................................7

ERISA § 104, 29 U.S.C. 1024 ............................................................................7

ERISA § 105, 29 U.S.C. § 1025 ........................................................................7

ERISA § 203, 29 U.S.C. § 1053 ........................................................................7

ERISA § 3, 29 U.S.C. § 1002 ...................................................................... 21, 30, 32

ERISA § 3(5), 29 U.S.C. § 1002(5) ..................................................................30

ERISA § 3(10), 29 U.S.C. § 1002(10) ..............................................................30

ERISA § 3(12), 29 U.S.C. § 1002(12) ..............................................................30

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) ............................................... 30, 31

ERISA § 3(32), 29 U.S.C. § 1002(32) ........................................................ 30, 32

ERISA § 3(33), 29 U.S.C. § 1002(33) ........................................................ passim

ERISA § 302, 29 U.S.C. § 1082 ........................................................................7

ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2) ..........................................................5

ERISA § 4, 29 U.S.C. § 1003 .........................................................................3, 7

ERISA § 502, 29 U.S.C. § 1132(e)(1)....1

ERISA § 514(c)(2), 29 U.S.C. § 1144.... 31, 32

ERISA Code §§ 401(a) and 410(c)(2)....7

Pub. L. 106-244 (2000)....14

Pub. L. 96-364 (Sept. 26, 1980).... 11, 13

**Rules**

Fed. R. Civ. Pro. 12(b)(6).... 2, 18

Fed. R. Civ. Proc. 12(b)(1)....18

**Regulations**

29 C.F.R. § 2509.08-1....74

Prop. Treas. Reg. § 1.414(e)-1, 42 Fed. Reg. 18,621 (April 8, 1977).... 8, 9, 54

Treas. Reg. § 1.414(e)-(1)(f), 45 Fed. Reg. 20,796 (March 31, 1980)....59

**Other Authorities**

124 Cong. Rec. 12,106-08 (May 2, 1978).... 55, 57, 72

124 Cong. Rec. 16,522-23 (July 7, 1978)....58

125 Cong. Rec. 10,052-58 (May 7, 1979).... passim

126 Cong. Rec. 20,180 (July 29, 1980)....56

EMPLOYEE BENEFITS LAW (BNA 3d ed. 2012)....7

ERISA FIDUCIARY LAW, *Chapter 12 Social Investment Quandary* (BNA 2d Ed. 2006)....73

I.R.S. Gen. Couns. Mem. 37,266, 1977 WL 46200 (Sept. 22, 1977).... 10, 54, 63

I.R.S. Gen. Couns. Mem. 39,007, 1983 WL 197946 (Nov. 2, 1982) ..... 13, 48, 64

I.R.S. Priv. Ltr. Rul. 199904041, 1999 WL 36831 (Jan. 29, 1999) ............... 16, 66

I.R.S. Priv. Ltr. Rul. 201505048, 2015 WL 389734 (Jan. 30, 2015) ....................66

I.R.S. Priv. Ltr. Rul. 9122078, 1991 WL 778797 (May 31, 1991) ................ 16, 66

I.R.S. Priv. Ltr. Rul. 9217045, 1992 WL 801475 (Apr. 24, 1992) .......................49

Miller, G. Danny, "The Church Plan Definition—A Reply to Norm Stein," ABA Section of Labor and Employment Law, Employee Benefits Committee Newsletter (Fall 2014), http://www.americanbar.org/content/newsletter/groups/labor_law/ebc_newsletter/14_fall_ebc_news/church.html (last visited March 18, 2015). ...12

Mr. Laurence A. Hansen, D.O.L. Op. Ltr. 96-09A, 1996 WL 386100 (1996)..49

Mr. Stephen D. Lowry, D.O.L. Op. Ltr. 85-01A, 1985 WL 32792 (1985) .......67

*Obtaining Private Guidance From the Internal Revenue Service, in* U.S.C. TAX LAW INST. (2002)..........................................................................................69

P.B.G.C. Op. Ltr. 78-1, 1978 WL 5724 (1978) .....................................................69

Rev. Proc. 2015-1..........................................................................................................6

S. Fin. Comm. Hearing (June 12, 1980) ..................................................... 12, 55

S. Fin. Comm. Rep., No. 93-383 (1973) ......................................................... 8, 72

Saltzman, Michal I. & Book, Leslie, TAX PRACTICE AND PROCEDURE (2014)....6

THOMAS E. POJE ET AL., COVERAGE AND NONDISCRIMINATION ANSWER BOOK, Q 19:32 (4th Ed. 2009)...........................................................................7

## STATEMENT CONCERNING ORAL ARGUMENT

Defendants-Appellants (collectively "Advocate") respectfully submit that this case warrants oral argument. The case involves the proper interpretation of the "church plan" definition in the Employee Retirement Income Security Act of 1974 ("ERISA"). Church plans are exempt from ERISA. Historically, federal courts and agencies consistently interpreted the definition to include plans of church-associated organizations, such as Advocate. However, Plaintiffs-Appellees ("Plaintiffs") argue Advocate's plan is not exempt because a church plan must be established by a church. This argument is the basis of 11 other pending suits, including two in this Circuit, and is before three other circuit courts.[1]

---

[1] *Overall v. Ascension*, No. 13-cv-1139 (E.D. Mich.), No. 14-1735 (6th Cir.); *Kaplan v. St. Peter's Healthcare Sys.*, No. 13-cv-2941 (D.N.J.), No. 15-1172 (3d. Cir.); *Rollins v. Dignity Health*, No. 13-cv-01450 (N.D. Cal.), No. 15-15351 (9th Cir.); *Medina v. Catholic Health Initiatives*, No. 13-cv-01249 (D. Colo.); *Chavies v. Catholic Health East*, No. 13-cv-1645 (E.D. Pa.); *Owens v. Saint Anthony's Medical Center*, No. 14-cv-4068 (N.D. Ill.); *Lann v. Trinity Health*, No. 14-cv-2237 (D. Md.); *Griffith v. Providence Health Systems*, No. 14-cv-1720 (W.D.Wa.); *Morris v. Daughters of Charity Health Systems*, No. 14-cv-04681 (N.D. Cal.); *Tucker v. Baptist Health System, Inc.*, No. 15-cv-392 (N.D. Ala.); *Carver v. Presence Health Network*, No. 15-cv-02905 (N.D. Ill.).

## JURISDICTIONAL STATEMENT

Plaintiffs allege the United States District Court for the Northern District of Illinois ("District Court") has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under ERISA. The United States Court of Appeals for the Seventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(b). The case involves the interpretation of a federal statute: ERISA § 3(33), 29 U.S.C. § 1002(33).

Appellant Advocate is a non-profit corporation incorporated in Illinois with its primary place of business in Illinois.

This is an appeal pursuant to 28 U.S.C. § 1292(b) from an order denying a motion to dismiss. The complaint, filed March 17, 2014 ("Complaint"), asserts violations of the provisions of ERISA from which church plans are exempt (Counts I–IX) and, in the alternative, alleges that ERISA's "church plan" exemption is unconstitutional (Count X). On June 2, 2014, Advocate sought dismissal of Counts I through IX pursuant to Fed. R.

Civ. Pro. 12(b)(6) because the Advocate Health Care Network Pension Plan ("Plan") is exempt from ERISA as a church plan. Advocate sought dismissal of Count X because the Plaintiffs lack standing and the "church plan" exemption is constitutional. On December 31, 2014, the District Court denied the motion to dismiss, finding that a church plan must be established by a church. Therefore, all of the counts remain for disposition.

On January 8, 2015, Advocate moved for interlocutory appeal of the District Court's order pursuant to 28 U.S.C. § 1292(b). The District Court granted the motion in a minute entry on January 13, 2015, and issued a written order on January 21, 2015. Within 10 days of the minute entry, Advocate filed its Petition for Leave for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) ("Petition") on January 23, 2015. The District Court issued an order clarifying its certifying order on February 2, 2015.

This Court granted the Petition on February 18, 2015. This appeal timely followed. The question on appeal—the proper interpretation of the "church plan" definition—controls whether Counts I-IX of the Complaint are viable.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The District Court certified the following question for interlocutory appeal:

> **In order for an employee benefit plan to qualify as a "church plan" under ERISA, 29 U.S.C. § 1003(b)(2) and § 1002(33),[2] must the plan be established by a church (or by a convention or association of churches)?**

When a district court certifies an order for interlocutory appeal, the "appellate court may address any issue fairly included within the certified order because 'it is the *order* that is appealable…'" *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis original); *see also Rumpke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1239 (7th Cir. 1997) (considering whether a suit was viable under both of the plaintiff's theories of recovery when the district court had only addressed one). Therefore, the proper interpretation of the "church plan" definition found in ERISA § 3(33), 29 U.S.C. § 1002(33), and Internal Revenue Code § 414(e),

[2] The District Court incorrectly cited the definition as 29 U.S.C. § 1033.

26 U.S.C. § 414(e),[3] is "fairly included within the certified order," including the following:

- whether ERISA § 3(33)(C) expands the definition of "church plan" found in ERISA § 3(33)(A) to exempt from ERISA's requirements plans of organizations controlled by or associated with a church or a convention or association of churches;[4] and
- whether the exemption is constitutional.

[3] Going forward this brief will refer only to the definition in ERISA § 3(33), 29 U.S.C. § 1002(33), but this reference is meant to include the parallel definition in the Internal Revenue Code.

[4] This brief will use the word "church" to refer to "a church or a convention or association of churches," as used in the definition.

## STATEMENT OF THE CASE

This case presents the question of the proper construction of the definition of "church plan" in ERISA § 3(33), 29 U.S.C. § 1002(33). The question is of great importance because church plans are exempt from ERISA's requirements pursuant to ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2). At issue is the interaction of ERISA § 3(33)(A) and (C):

> (A) The term "church plan" means a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.
>
> (C) For purposes of this paragraph--
> (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(A) and (C). For more than 30 years, federal courts and agencies have interpreted the definition to include plans of organizations controlled by or associated with a church within the exemption. Advocate

and hundreds of other religious organizations have relied on this consistent interpretation of the statute and on Internal Revenue Service ("IRS") private letter rulings[5] issued directly to them finding that their plans are church plans. Plaintiffs advance a divergent, more restrictive construction requiring that a church plan be established by a church. The viability of the Complaint depends largely on the proper interpretation of ERISA § 3(33)—the prevailing interpretation or the one argued by Plaintiffs.

## I. Facts

### A. History of ERISA's "church plan" exemption

Prior to ERISA's enactment, benefit plans were primarily regulated by the Internal Revenue Code ("Code") and state trust and contract law. Congress enacted ERISA in 1974 in response to known problems with pension plans sponsored by for-profit employers and unions. *See* EMPLOYEE

---

[5] A private letter ruling "interprets and applies the tax laws to the taxpayer's specific set of facts and is given when appropriate in the interest of sound administration." Saltzman, Michal I. & Book, Leslie, TAX PRACTICE AND PROCEDURE ¶ 3.05, 3-70 (2014); Rev. Proc. 2015-1, § 2.01. Qualification for "church plan" status is one of the retirement plan issues on which the IRS grants private letter rulings. Rev. Proc. 2015-1, § 5.15(1).

BENEFITS LAW, 1-9 (BNA 3d ed. 2012). Title I of ERISA imposes certain funding, vesting, reporting, and disclosure requirements on benefit plans and falls under the jurisdiction of the Department of Labor ("DOL"). *See, e.g.*, ERISA §§ 101, 102, 103, 104, 105, 203, 302; 29 U.S.C. §§ 1021, 1022, 1023, 1024, 1025, 1053, 1082. Title II of ERISA amended the Code to include similar provisions and is regulated by the Department of the Treasury ("Treasury"). *See* 26 U.S.C. § 7801 (giving Treasury authority to administer and enforce Title 26).[6]

From its inception, ERISA exempted from its requirements certain plans, including governmental plans, excess benefit plans, and church plans. ERISA § 4, 29 U.S.C. § 1003. As originally enacted, the definition of "church plan" in ERISA § 3(33)(A) meant only plans "established and maintained for its employees by a church or a convention or association of

[6] Although "church plans" are exempt from ERISA, they remain subject to certain Code provisions. In addition, to maintain tax-favored treatment under Code §§ 401(a) and 501(a), church plans must comply with the coverage, participation, vesting, and funding requirements found in the Code prior to January 1, 1974, including pre-ERISA Code §§ 401(a) and 410(c)(2). *See* THOMAS E. POJE ET AL., COVERAGE AND NONDISCRIMINATION ANSWER BOOK, Q 19:32 (4th Ed. 2009).

churches. . .” 29 U.S.C. § 1002(33)(A) (1976) (ADD1).[7] Church plans were exempted from ERISA to relieve governmental entanglement with churches. *See* S. Fin. Comm. Rep., No. 93-383, at 81 (1973) (ADD3). Subsection (33)(C) of the original definition provided transitional relief for plans that covered employees of church organizations and treated those plans as church plans, but the provision did not apply after December 31, 1982. 29 U.S.C. § 1002(33)(C) (1976) (ADD1).

On April 8, 1977, Treasury and the IRS issued a proposed regulation under Code § 414(e), the parallel “church plan” definition. Prop. Treas. Reg. § 1.414(e)-1, 42 Fed. Reg. 18,621 (April 8, 1977) (ADD4). The regulation explained that “[f]or the purposes of this section the term ‘church’ includes a religious order or religious organization if such order or organization (1)

[7] Advocate will cite to the Addendum using the format “ADD” followed by a page number. For example, “ADD1” refers to the first page of the Addendum. Similarly, “APP1” refers to the first page of the Appendix. Advocate will cite to the District Court docket using the format of docket number, a brief descriptor of the document, and the page, paragraph, article, or section number of the original document. For example, “Dkt. #35-2, Plan § 1.1” refers to Section 1.1 of the Plan, which is the second exhibit to Defendants Memorandum in Support of its Motion to Dismiss (Dkt. #35).

is an integral part of a church, and (2) is engaged in carrying out the functions of a church." Prop. Treas. Reg. § 1.414(e)-1(e), 42 Fed. Reg. at 18,623 (ADD6). Under the proposed regulation, religious orders and organizations would be considered "churches," *i.e.*, they could establish and maintain church plans, if they met the two requirements.

Many churches found that the "church plan" definition was "too restrictive" and that "the proposed regulations issued by the Internal Revenue Service create[d] serious problems." *See* 125 Cong. Rec. 10,054-58 (May 7, 1979) (Sen. Talmadge, publishing letters (letters of the General Board of Pensions of the United Methodist Church and Missionaries Benefit Board of the American Baptist Churches)) (ADD9, ADD 13, ADD11). The most repeated concern was the churches' objection to the "intrusion of the Internal Revenue Service into the affairs of church groups and their agencies by presuming to define what is and what is not an integral part of these religious groups."[8] The General Conference of

---

[8] 125 Cong. Rec. 10,054-56 (letters from the Rabbinical Pension Board, The American Lutheran Church, Annuity Board of the Southern Baptist Convention, Christian Reformed Church in North America Ministers'

Seventh-Day Adventists noted that "[t]he efforts of the Internal Revenue Service to define what constitutes a church and what does not in our opinion is a violation of the principle of separation of church and state . . ." 125 Cong. Rec. 10,057 (ADD12).

The churches' concern proved well-founded when the IRS first interpreted the definition and Proposed Treasury Regulation and found that a plan established and maintained by religious orders was not a church plan. I.R.S. Gen. Couns. Mem. 37,266, 1977 WL 46200, at *4-6 (Sept. 22, 1977).[9] The religious orders operated hospitals as part of their mission.

---

Pension Fund, and The Church Pension Fund (General Convention of the Episcopal Church)) (ADD9-11); *see also*, 125 Cong. Rec. 10,054-55 (letters from Worker Benefit Plans (Lutheran Church-Missouri Synod) and Church of Jesus Christ of Latter Day Saints) (ADD9-ADD10); 125 Cong. Rec. 10,058 (letter from the Catholic Mutual Relief Society of America) (ADD13).

[9] The IRS issued its guidance in the form of a general counsel memorandum. General counsel memoranda "are memoranda from the Chief Counsel to the Commissioner written originally for the purpose of guiding the Assistant Commissioner (Technical) concerning substantive issues on proposed revenue rulings, private letter rulings, and technical advice memoranda." *Taxation With Representation Fund v. I. R. S.*, 646 F.2d 666, 682 (D.C. Cir. 1981). A general counsel memorandum "contains a lengthy legal analysis of the substantive issues, and the recommendations and opinions of the Office of Chief Counsel." *Id.* at 669. General counsel

*Id.* The IRS found that "while these activities are functions of the Catholic Church, they are not 'church functions'" despite the "fact that an activity is required by the tenets of the church." *Id.* at *6. The IRS found the orders were not a church and their plan was not a church plan. *Id.*

In response to the churches' concern, Congress amended the "church plan" definition as part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPA"), Pub. L. 96-364 (Sept. 26, 1980). The co-sponsor of the "church plan" amendment, Senator Herman E. Talmadge of Georgia, recognized that the original "church plan" definition was so narrow that it did not reflect the way church plans were operated. 125 Cong. Rec. 10,052 (ADD7). He noted that organizations that care for the sick and needy or provide religious instruction are essential to a church's mission and are "part of the churches." *Id.* (ADD7).

In a June 12, 1980, hearing of the Senate Finance Committee, Daniel Halperin, Deputy Assistant Secretary of Treasury, explained that Treasury's "most serious concern" with the bill was that it would exempt

---

memoranda are "an expression of agency policy" and "function as a body of 'working law' within the IRS." *Id.* at 682.

plans of church-affiliated hospitals and schools from ERISA's coverage. S. Fin. Comm. Hearing, at 40-41 (June 12, 1980) (ADD16-17). Senator Talmadge noted, "I think we have got a question of separation of church and state here," and the committee unanimously passed the bill without addressing Treasury's objection. *Id.* at 41-42 (ADD17-18).

The amendment retained the original definition in ERISA § 3(33)(A)[10] but addressed the churches' concerns by replacing Subsection (33)(C). *See* full text of 29 U.S.C. § 1002(33) (ADD19). The concerns addressed included those noted by the District Court—whether the definition included plans maintained by pension boards[11] and the effect of the 1982 sunset on plans of church agencies—but also included the removal of government

---

[10] Subsection (33)(A) was retained because "the Roman Catholic Church had signed off on the original church plan definition." Miller, G. Danny, "The Church Plan Definition—A Reply to Norm Stein," ABA Section of Labor and Employment Law, Employee Benefits Committee Newsletter (Fall 2014), http://www.americanbar.org/content/newsletter/groups/labor_law/ebc_newsletter/14_fall_ebc_news/church.html (last visited March 18, 2015).

[11] Pension boards are organizations that administer benefit plans. The use of pension boards is common in churches with a congregational structure, *e.g.*, Baptist and Jewish faiths, but less common for hierarchical churches like the Roman Catholic Church. *See* 125 Cong. Rec. 10,052 (statement of Sen. Talmadge) (ADD7).

interference with the way in which a church structured its affairs. The new provisions, among other things: (1) state the "church plan" definition "includes" a plan maintained by an organization controlled by or associated with a church that has the primary purpose of administering or funding a plan, ERISA § 3(33)(C)(i); (2) state the term "employee of a church" "includes" employees of tax-exempt organizations controlled by or associated with a church, ERISA § 3(33)(C)(ii)(II); (3) deem the church to be the employer of employees of tax-exempt organizations controlled by or associated with a church, ERISA § 3(33)(C)(iii); and (4) define association with a church, ERISA § 3(33)(C)(iv).

Shortly after the passage of MPPA, the same religious orders again asked the IRS whether their plan was a church plan. *See* I.R.S. Gen. Couns. Mem. 39,007, 1983 WL 197946, at *1-2 (Nov. 2, 1982). Despite Treasury's earlier objection to MPPA, the IRS found, "because of the passage of the MPPA, church plan status no longer hinges on whether an order is a church" and revoked its earlier opinion. *Id.* at *6. Since then, the IRS and the DOL have issued more than 500 private letter rulings and opinion

letters following this interpretation and determining that plans of organizations controlled by or associated with a church are church plans. (*See* Dkt. #74-2 (collecting opinion letters and private letter rulings).)

Since 1982, Congress has amended ERISA many times, including clarifying the "church plan" definition and status of church welfare plans in 2000. *See* Church Plan Parity and Entanglement Protection Act, Pub. L. 106-244. None of the amendments to ERISA have sought to upset the agencies' longstanding construction of the statute.

**B. Advocate Health Care Network**

Advocate is a non-profit corporation organized under the laws of the state of Illinois and is a Code § 501(c)(3) tax-exempt organization. (Dkt. #1, Complaint ¶ 20; Dkt. # 35-1, Bylaws Art. I.) Advocate was formed in 1995 from the merger of two religious health systems—Lutheran General HealthSystem and Evangelical Health Systems. (Dkt. #1, Complaint ¶ 40; Dkt. #35-2, § 1.1; Dkt. #35-3, History.) Lutheran General HealthSystem was founded as the Norwegian Lutheran Deaconess Home and Hospital in 1897 in Chicago. (Dkt. #35-3, History.) Evangelical Health System was

formed in Chicago in 1906 by the Evangelical Synod of North America to operate the German Evangelical Deaconess Hospital in Chicago. (*Id.*)

More than 100 years later, Advocate remains affiliated with the current incarnations of the two churches. (APP1; Dkt. #1, Complaint ¶ 48.) The Evangelical Lutheran Church in America and the United Church of Christ both include Advocate in their annual church yearbooks, which serve as directories of the churches. (Dkt. #35-6, UCC Yearbook pgs. 883-84; Dkt. #35-7, ELCA Yearbook pgs. 604, 610.) Both the Metropolitan Chicago Synod of the Evangelical Lutheran Church in America and the Illinois Conference of the United Church of Christ are parties to contractual relationships with Advocate—called Covenantal Agreements—in which they "affirm their ministry in health care and the covenantal relationship they share with one another." (Dkt. #35-8, ELCA Covenant pg. 1; Dkt. #35-9, UCC Covenant pg. 1.)[12]

---

[12] The ELCA Covenant also is published on the Chicago Metropolitan Synod's website. *See Covenantal Agreement, Chicago Metropolitan Synod ELCA/Advocate Health Care Network*, Chicago Metropolitan Synod of the Evangelical Lutheran Church in America,

### C. The Advocate Health Care Network Pension Plan

Advocate sponsors the Plan, a defined benefit pension plan. (Dkt. #1, Complaint ¶ 57; Dkt. #35-2, Plan § 1.2.) The Plan is fully funded. (Dkt. #35-4, Financial Statement pg. 34.) A predecessor of Evangelical Health Systems established the Plan as the Evangelical Hospital Association Employees Pension Plan effective January 1, 1973. (Dkt. #35-2, Plan § 1.1.) The Plan received a private letter ruling dated March 7, 1991, from the IRS finding that the Plan is a church plan. (Dkt. #35-11, EHS PLR pg. 10); *see also*, I.R.S. Priv. Ltr. Rul. 9122078, 1991 WL 778797 (May 31, 1991). Lutheran General HealthSystem also maintained a pension plan, the Lutheran General HealthSystem Basic Retirement Plan ("Lutheran General Plan"). (Dkt. #35-12, Advocate PLR pg. 18.) Following the merger, Advocate received an IRS private letter ruling dated November 3, 1998, finding that the Lutheran General Plan was also a church plan. (Dkt. #35-12, Advocate PLR pg. 18); *see also*, I.R.S. Priv. Ltr. Rul. 199904041, 1999 WL 36831 (Jan. 29, 1999). After receiving confirmation that the Lutheran General Plan was also a church

---

http://www.mcselca.org/forms/Adocate_Synod_Covenant.pdf (last visited March 6, 2015).

plan, Advocate merged the Lutheran General Plan into the existing Plan on December 31, 1998. (Dkt. #35-2, Plan § 1.1.)

An organization controlled by Advocate, the Benefit Plan Administrative Committee for Church Plans ("Administrative Committee"), administers the Plan. (Dkt. #1, Complaint ¶ 22; Dkt. #35-2, Plan §§ 2.31, 10.3, 10.6.) The Administrative Committee is appointed by the Compensation and Benefits Committee, which is appointed by and composed of members of the board of directors of Advocate. (Dkt. #35-2, Plan § 10.1; Dkt. #35-1, Bylaws §§ 4.1(a), 4.5.) Advocate and the Administrative Committee are required to take direction from the churches "with respect to issues of Plan administration." (Dkt. #35-2, Plan § 1.2.)

Advocate provides notice to employees that the Plan is a church plan and that the requirements of the ERISA do not apply to the Plan. (Dkt. #35-10, Summary Plan Description pg. 26.)

## II. Procedural History

Plaintiffs filed the purported class action Complaint on March 17, 2014. (Dkt. #1, Complaint.) The Complaint alleges Advocate has violated ERISA and that the exemption is unconstitutional. (Dkt. #1, Complaint.)

On June 2, 2014, Advocate sought dismissal of the Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6) and 12(b)(1) for failure to state a claim and lack of standing, respectively. (Dkt. #34, 35.)

On December 31, 2014, the District Court denied Advocate's motion to dismiss and determined the Plan is not a church plan as a matter of law. (APP20.) The District Court, therefore, did not reach the constitutionality issue. (APP19-20.) On January 8, 2015, Advocate moved for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (Dkt. #69, 74.) The District Court granted the motion, issuing a minute entry on January 13, 2015 (APP21), a written order on January 21, 2015 (APP22.), and a clarifying order on February 2, 2015. (APP24.)

Advocate filed its Petition on January 23, 2015. This Court granted the Petition on February 18, 2015. This appeal timely followed.

## SUMMARY OF THE ARGUMENT

Many churches consider their religious schools, hospitals, and charities to be part of the church in the same way that the brick-and-mortar "steeple" church on the corner is a part of the church. The original definition of "church plan" in ERISA did not include church-associated organizations except for a limited transitional period. Thus, employee benefit plans covering employees of a "steeple" church were exempt from ERISA coverage, but benefit plans covering employees engaged in healing ministries and religious education, for example, were subject to ERISA's coverage. Churches identified this attempt to define what is a part of the church as a violation of the First Amendment. Therefore, they successfully advocated for a broader, amended definition that, once passed, treated "steeple" churches, religious orders, and religious organizations as part of the same church. For more than 30 years, the federal courts and the governmental agencies that administer and enforce ERISA—the IRS and the DOL—have interpreted the amended "church plan" definition to

include plans of organizations that are controlled by or associated with churches, such as schools, hospitals, and charities.

Plaintiffs, however, have alleged that a church plan must be established by a church—an interpretation that would remove from the definition, and thus the exemption, many plans of church-associated organizations. Although the District Court adopted this interpretation, it is incorrect because (1) the language of the definition *includes* plans maintained by organizations controlled by or associated with a church if the principal purpose of the organization is administration or funding a benefit plan and *includes* employees of tax-exempt organizations controlled by or associated with a church as church employees; (2) the legislative history supports that a primary goal of the 1980 amendment of ERISA § 3(33) was to create a broad definition that would end government intrusion on defining what is a part of the church; (3) the longstanding agency interpretation of the statute and the private letter rulings issued to Advocate are entitled to deference; and (4) the District Court's interpretation raises serious constitutional concerns.

1. Under the language of the statute, a plan of an organization controlled by or associated with a church is a church plan. ERISA § 3(33)(A) defines "church plan" as a plan established and maintained by a church. 29 U.S.C. § 1002(33)(A). By repeating the definition of "church plan" in the beginning of ERISA § 3(33)(C)(i), Subsection (33)(C)(i) effectively states that the term "church plan" includes a plan maintained by an organization with the principal purpose of administration or funding the plan and which is controlled by or associated with a church. Consistent with the way "includes" is used in other definitions in ERISA § 3, as used in ERISA § 3(33)(C)(i), the word "includes" expands the types of plans that qualify as church plans. Furthermore, because ERISA § 3(33)(C)(ii) "includes" employees of tax-exempt, church-associated organizations within the definition of "employees of a church," ERISA § 3(33)(C) allows a church-associated organization to maintain a church plan covering employees of a tax-exempt, church-associated organization, such as Advocate. (Section I.A., pgs. 26-46.)

The language of ERISA § 3(33)(C)(i) broadly describes "an organization whether a civil law corporation or otherwise" and, therefore, includes plans administered by pension administrative committees, such as the Administrative Committee of the Plan. (Section I.B., pgs. 46-49.)

Although the "church plan" definition defines "associated with" a church, 29 U.S.C. § 3(33)(C)(iv), the Court does not have jurisdiction to review whether an organization is associated with a church if the church has already decided the issue. Church documents, of which the Court can take judicial notice, demonstrate that the churches have definitively determined that Advocate is associated with them. (Section I.C., pgs. 50-53.)

2. The legislative history demonstrates that the "church plan" definition was amended to accommodate plans maintained by organizations controlled by or associated with a church regardless of whether the church or the organization established them. By excluding church-associated organizations, the original definition and a Treasury Regulation impermissibly defined what was part of a church in violation of

the principle of separation of church and state. The overriding intent of the amendment was to stop the government's intrusion into defining how churches structured their missions. (Section II., pgs. 53-60.)

3. The longstanding construction of the "church plan" definition by the IRS and DOL supports Advocate's interpretation. The interpretation of the definition found in private letter rulings, a general counsel memorandum, and advisory opinions should be given deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), because it is contemporaneous, thorough, well-reasoned, and consistently applied for more than 30 years. Furthermore, the longstanding interpretation is due respect because Congress has not amended the definition to upset the IRS's construction despite amending ERISA and referencing the definition in other legislation. (Section III., pgs. 60-69.)

4. The District Court's interpretation raises serious constitutional concerns and cannot be correct. The District Court's interpretation leads to the government preferring one denomination over another by basing qualification for the exemption on a church's structure and governance.

Although Plaintiffs have alleged a violation of the Establishment Clause, their claim fails under the prevailing test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). (Section IV., pgs. 69-74.)

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's order denying the motion to dismiss. *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 279 (7th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (internal quotation marks and citation omitted).

When reviewing an order pursuant to 28 U.S.C. § 1292(b), the appellate court "may resolve the appeal on any proper legal ground—for it is the order, and not the district judge's opinion, that is on appeal." *Omni Tech Corp. v. MPC Solutions Sales, LLC,* 432 F.3d 797, 800 (7th Cir. 2005); *see also, Morris v. Hoffa,* 361 F.3d 177, 196 (3d Cir. 2004) (stating on

interlocutory appeal the court "may consider any grounds justifying reversal").

The Court may consider documents appended to a motion to dismiss if the documents are referred to in the complaint and are central to the claim. *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (considering plan document, summary plan description, and trust document). In addition, the Court can take judicial notice of historical documents, documents in the public record, and reports of administrative bodies. *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). This allows courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the Rule 12(b)(6) standard. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997).

## ARGUMENT

### I. The 'Church Plan' Definition Includes Plans of Organizations Controlled By or Associated With a Church.

Plans of organizations controlled by or associated with a church, such as Advocate, are included within the "church plan" definition through

several parts of ERISA § 3(33)(C). First, Subsection (33)(C)(i) "includes" within the term "church plan" plans maintained by organizations controlled by or associated with a church and that have the primary purpose of administering the plan, such as the Administrative Committee of the Plan. Subsection (33)(C)(ii) "includes" within the term "employees of a church" employees of tax-exempt organizations controlled by or associated with a church, such as Advocate.

It is a fundamental canon that "all statutory interpretation begins with the language of the statute itself, and where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Pittway Corp. v. United States,* 102 F.3d 932, 934 (7th Cir. 1996) (internal quotations omitted). ERISA § 3(33), states in relevant part:

> (A) The term "church plan" means a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.
>
> . . .
>
> (C) For purposes of this paragraph--
>
> (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches *includes a plan maintained by an organization,* whether a civil law corporation or otherwise, the

> principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, *if such organization is controlled by or associated with a church or a convention or association of churches.*
>
> (ii) The term employee of a church or a convention or association of churches *includes*--
>
> . . .
>
> > (II) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches; . . .

29 U.S.C. § 1002(33) (emphasis added) (ADD19-20). An organization is "associated with" a church if it "shares common religious bonds and convictions with that church or convention or association of churches." ERISA § 3(33)(C)(iv), 29 U.S.C. § 1002(33)(C)(iv) (ADD20). The church is deemed to be the employer of employees of tax-exempt, church-associated organizations. ERISA § 3(33)(C)(iii), 29 U.S.C. § 1002(33)(C)(iii) (ADD20). Subsection (33)(D) provides the opportunity to cure any failure to meet the requirements. ERISA § 3(33)(D), 29 U.S.C. § 1002(33)(D) (ADD20-21).

### A. ERISA § 3(33)(C) expands the categories of plans that qualify as church plans.

The first part of ERISA § 3(33)(C)(i) repeats the language found in Subsection (33)(A): "a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches." Identical words used in different parts of the same act are intended to have the same meaning. *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 570 (1995). In Subsection (33)(A), this language is the definition of "church plan." (*See* APP9 ("The prefatory text should look familiar because it is essentially word-for-word the same as the definition of a 'church plan' in subsection 33(A) . . .")). Thus, the District Court correctly determined that "subsection 33(C)(i), in a roundabout way, in effect starts out by saying, 'A church plan [includes] . . .'" (APP9.)

Because Subsection (33)(C)(i) effectively states the term "church plan" includes a plan maintained by an organization described therein, a plan qualifies as a "church plan" if it meets the requirements of Subsection (33)(C)(i). "Under the plain language the plan 'is established and maintained by a church' if it meets the other requirements of Section (C)(I)

[*sic*].” *Overall v. Ascension,* 23 F. Supp. 3d 816, 829 (E.D. Mich. 2014); *see Medina v. Catholic Health Initiatives,* No. 13CV-01249-REB-KLM, 2014 WL 4244012, at *3 (D. Colo. Aug. 26, 2014) (“[S]ubsection (C) describes a particular way in which a church plan may meet” the requirements of Subsection (33)(A).)

The District Court, however, erred by concluding that the word “includes” creates “a *subset* of plans that qualify for the church plan exemption as defined by subsection (33)(A).” (APP9 (emphasis original)). The District Court’s interpretation is contrary to the use of “includes” throughout ERISA § 3 and is, therefore, erroneous. *See, e.g.,* 29 U.S.C. § 1002(5), (10), (12), (21)(A), (32), (33)(C)(ii). The word “includes” must be read in the context of the definitional provisions and given the same meaning in ERISA § 3(33)(C)(i) as it has in other parts of ERISA § 3. *See FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) (“It is a ‘fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.’”); *Gustafson*, 513 U.S. at 570. In other ERISA definitions,

"includes" *adds* a new category or thing to a defined term that does not otherwise meet the definition, often using the structure of "A=B, A includes C" wherein A is the term, B is the definition, and C is the thing being added. *See, e.g.,* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (defining "fiduciary" as a person who meets one of three requirements but stating the term "includes" anyone named as a fiduciary in a plan document, thus, adding a named fiduciary to the definition regardless of whether the person meets one of the requirements); *see also, Groman v. Comm'r of Internal Revenue,* 302 U.S. 82, 86 (1937) (finding "includes" is intended to enlarge the connotation of a term or phrase beyond common usage). The Supreme Court found this structure, used in a different provision of ERISA, expanded the original definition. *See Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 141 (1990). In *McClendon*, the Court examined the definition of "State" in ERISA § 3(10) and ERISA § 514(c)(2), which explains "The term 'State' includes" certain state agencies and instrumentalities. *Id.* The Court found "Section 514(c)(2) expands, rather than restricts, that definition for pre-emption purposes in order to '*include*' state agencies and

instrumentalities whose actions might not otherwise be considered state law." *Id.* (emphasis original).

The reading of the word "includes" in *McClendon*, *Medina*, and *Overall* is consistent with the way in which the word "includes" functions in other definitions in ERISA § 3. For example, ERISA § 3(32) defines "governmental plan" as:

> a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. The term "governmental plan" also *includes* any plan to which the Railroad Retirement Act of 1935, or 1937 applies, and which is financed by contributions required under that Act and any plan of an international organization which is exempt from taxation under the provisions of the International Organizations Immunities Act. The term "governmental plan" *includes* a plan which is established and maintained by an Indian tribal government (as defined in section 7701 (a)(40) of title 26), a subdivision of an Indian tribal government (determined in accordance with section 7871 (d) of title 26), or an agency or instrumentality of either . . .

29 U.S.C. § 1002(32) (emphasis added). Here, the first part of the definition gives the requirements for a governmental plan—that it be established or maintained by a U.S. or state governmental entity. But the word "includes"

then adds entirely different plans that would not otherwise be considered governmental plans, *e.g.* plans described in the Railroad Retirement Act and plans established and maintained by Indian tribes. Neither railroad nor Indian tribal plans meet the original requirements that a governmental plan be established or maintained by the government, but the use of the word "includes" brings them into the definition and thus the exemption. In addition, within the "church plan" definition, the word "includes" is used to add three categories of employees, who would not otherwise meet the definition, to the term "employee of a church," including ministers not employed directly by a church, employees of church-associated organizations, and former employees. 29 U.S.C. § 1002(33)(C)(ii).

Rules of grammar further support the conclusion that the interpretation adopted by *Overall* and *Medina* is correct. Based on the structure of the sentence—A includes C—the language contained in Subsection (33)(C)(i) after the word "includes" adds to the clause preceding "includes"—the entire "church plan" definition. Therefore, "under the rules of grammar and logic, A is not a 'gatekeeper' to C; rather if A is

exempt and A includes C, then C is also exempt." *Overall,* 23 F. Supp. 3d at 828-29. If ERISA § 3(33)(C)(i) only modified who can maintain a church plan, the language would have to state that "a plan maintained by a church . . . includes a plan maintained by an organization . . ." but it does not. Thus, the District Court erred by finding that the language of Subsection (33)(C)(i) "merely adds an alternative means of meeting *one* of subsection 33(A)'s two elements—and nothing more." (APP10 (emphasis original).)

The District Court also erred by concluding that, as a subset of Subsection (33)(A), one of the elements of (A)—that a church must establish the plan—must be inferred in Subsection (33)(C). The plain language of Subsection (33)(C) contains no requirement that a church must be the entity that establishes a church plan, and Subsection (33)(A) contains more than two elements, only some of which are similar to Subsection (33)(C)(i)'s various elements. Thus, Subsection (33)(C)(i) fails to meet the definition of a subset.

Subsection (33)(C)(i) does not state who must establish the plan, nor does it state that it is "subject to" Subsection (33)(A). *Overall*, 23 F. Supp. 3d

at 828 ("The problem with this interpretation is that section (C) uses the word 'includes' not 'subject to.'") "[T]he plain language clearly supports the conclusion that a plan that meets the requirements of subsection (C)(i) putatively qualifies for the exemption—without further, separate proof of establishment by a church—if the remaining requirements of the statute are otherwise met." *Medina,* 2014 WL 4244012, at *2. If Congress had intended to require a plan described in Subsection (33)(C)(i) to be established by a church, Congress could have drafted the Subsection to state that a church plan "includes a plan *established by a church* and maintained by an organization . . ." However, Congress omitted who must establish a plan described in Subsection (33)(C)(i). When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983).

In addition, the elements of Subsections (33)(A) and (C)(i) are different. By definition, all of the elements of a subset are also elements of

the set. Here, to be a subset, all of the elements of Subsection (33)(C)(i) also would have to be elements of Subsection (A), but they are not. Consequently, Subsection (33)(C)(i) is not a subset of Subsection (33)(A). Subsection (33)(A) requires four elements—[1] a plan [2] established and [3] maintained by a church [4] for its employees. Subsection (33)(C)(i) includes two of the four elements of (A) (the first and fourth, a plan for its employees) but changes who can maintain the plan and entirely omits who must establish the plan. Subsection (33)(C)(i) also adds elements not found within Subsection (33)(A): that the organization must be controlled by or associated with a church and must have the principal purpose of administration or funding the plan. Therefore, ERISA § 3(33)(C)(i) cannot be a subset of § 3(33)(A). Instead, as in other instances in ERISA § 3, the word "includes" adds a different type of plan to the definition of "church plan" that would not otherwise qualify as a church plan.

Similarly, "includes" is used in ERISA § 3(33)(C)(ii)(II) to add an employee of a tax-exempt organization that is controlled by or associated with a church to the term "employee of a church," further expanding the

definition. The term “employee of a church” is used in ERISA § 3(33)(C)(i) and, thus, the two subsections should be read together. Reading the two together, the subsections state the term “church plan” “includes a plan maintained by an organization . . . the principal purpose or function of which is the administration or funding of a plan . . . for the employees of a tax-exempt organization that is controlled by or associated with a church, if such organization is controlled by or associated with a church.” ERISA § 3(33)(C)(iii) deems the church to be the employer of employees of tax-exempt organizations that are controlled by or associated with the church, further demonstrating that church-associated organizations are to be treated as part of the church. Therefore, employees of a tax-exempt, church-associated organization, such as Advocate, may participate in a church plan maintained by a church-associated organization with the primary purpose of administering the plan, such as the Administrative Committee.[13]

---

[13] Some courts have interpreted Subsection (33)(C)(ii)(II) as clarifying that church-associated organizations can establish and maintain church plans. *Welsh v. Ascension Health*, No. 3:08CV348/MCR/EMT, 2009 WL 1444431, at

Under Advocate's interpretation, ERISA § 3(33)(A) and (C) both have meaning. (*Contra* APP9-10 (stating under Advocate's interpretation "the 'established by' requirement" of Subsection (33)(A) "would become meaningless"). Subsection (33)(A) contains the basic definition, describing the four elements necessary for a church plan of a "steeple" church, including that it be established by a church. Subsection (33)(C) describes how plans of church-associated organizations qualify as church plans. The plan must be maintained by an organization described in Subsection (33)(C)(i) and must be for the benefit of "employees of a church."

The omission of "established by" in Subsection (33)(C)(i) does not render the use of the same language in Subsection (33)(A) meaningless because Subsection 33(C)(i) implicitly contains a similar requirement. Subsection (33)(C)(i) requires that the plan benefit "employees of a church." An employer can establish a plan only for the benefit of its

---

*7 (N.D. Fla. May 21, 2009); *Rinehart v. Life Ins. Co. of N. Am.*, No. C08-5486 RBL, 2009 WL 995715, at *4 (W.D. Wash. Apr. 14, 2009) ("[ERISA § 3(33)(C)(ii)(II)] necessarily increases the types of organizations which may establish and maintain 'church plans.'"); *Catholic Charities of Maine, Inc. v. City of Portland*, 304 F. Supp. 2d 77, 85 (D. Me. 2004).

employees.[14] Therefore, a church plan qualifying pursuant to Subsection (33)(C)(i) can be established only by an organization that employs "employees of a church"—a church or, pursuant to ERISA § 3(33)(C)(ii)(II), a tax-exempt organization controlled by or associated with a church. Consequently, the "established by" language in Subsection (33)(A) has meaning when defining a church plan of a "steeple" church, but the omission of "established by" in Subsection (33)(C)(i) also has meaning—it allows plans maintained by church-associated organizations to be established by a church or a tax-exempt, church-associated organization.

The exact statutory interpretation theory advanced by Plaintiffs—that a church plan must be established by a church—has been rejected by six district courts, including one within this Circuit. *Medina*, 2014 WL 4244012, at *2; *Overall*, 23 F. Supp. 3d at 833; *Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1126 (D. Minn. 2011); *Hall v. USAble Life*, 774 F. Supp. 2d 953, 958-60 (E.D. Ark. 2011) (rejecting defendant's argument that a plan was not a church plan because

[14] This requirement, referred to as the "exclusive benefit rule," is found in Code § 401(a) and is required for a plan to receive tax-favored status.

it was established by a hospital and not a church); *Ward v. Unum Life Ins. Co. of Am.*, No. 09-C-431, 2010 WL 4337821, at *2 (E.D. Wis. Oct. 25, 2010) ("[T]he key question is whether the plan at issue here is a 'plan established ... by a church.' 29 U.S.C. § 1002(33)(A). . . But the statute also provides that plans established by non-church corporations may be 'church plans' if the organization 'is controlled by or associated with a church.' 29 U.S.C. § 1002(33)(C)(I).") Most recently, the United States District Court for the District of Maryland granted defendants' partial motion to dismiss a similar complaint, "holding that 29 U.S.C. § 1002(33) permits an organization that is 'controlled by or associated with a church or convention of churches' to establish a 'church plan.'" *Lann v. Trinity Health Corp.*, No. 8:14-cv-02237, Dkt. #54 (D. Md. February 24, 2015).

Two other district courts have applied reasoning similar to the District Court's finding that a church plan must be established by a church, but both courts also certified their orders for interlocutory appeal. *Rollins v. Dignity Health*, No. 13-CV-01450-TEH, 2014 WL 3613096, at *6 (N.D. Cal. July 22, 2014) *motion to certify appeal granted*, No. 13-CV-01450-TEH, 2014

WL 6693891 (N.D. Cal. Nov. 26, 2014);[15] *Kaplan v. Saint Peter's Healthcare Sys.*, No. CIV.A. 13-2941, 2014 WL 1284854, at *7 (D.N.J. Mar. 31, 2014) *motion to certify appeal granted*, No. CIV.A. 13-2941, 2014 WL 4678059 (D.N.J. Sept. 19, 2014). The cases are now pending in the Third and Ninth Circuits. *Kaplan v. St. Peter's Healthcare Sys.*, No. 14-8125, Dkt. #003111840647 (3d. Cir. Jan. 7, 2015) (granting petition for interlocutory appeal); *Rollins v. Dignity Health*, No. 14-80177, Dkt. #9436742 (9th Cir. Feb. 26, 2015) (same).

Prior to the recent rash of litigation regarding whether a church plan must be established by a church, federal courts almost uniformly interpreted the "church plan" definition to include plans of church-associated organizations, including the only two circuit courts that have analyzed the definition. *See Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 547 (4th

---

[15] The court initially denied Dignity Health's motion to dismiss and motion for interlocutory appeal. *Rollins v. Dignity Health*, 19 F. Supp. 3d 909, 917 (N.D. Cal. Dec. 12, 2013) *motion to certify appeal denied,* No. 13-CV-01450-TEH, 2014 WL 1048637 (N.D. Cal. Mar. 17, 2014). The court granted partial summary judgment in favor of the plaintiff, reaffirming its holding that only a church can establish a church plan. *Rollins*, 2014 WL 3613096. The court then invited Dignity Health to seek interlocutory appeal and certified its order. *Rollins*, 2014 WL 6693891, at *1.

Cir. 2001); *Chronister v. Baptist Health*, 442 F.3d 648, 651-52 (8th Cir. 2006). The Fourth Circuit stated:

> [A] plan established by a corporation associated with a church can still qualify as a church plan. The statute defines church plans to include plans 'maintained by an organization, whether a civil law corporation or otherwise, ... if such organization is controlled by or associated with a church or a convention or association of churches.'

*Lown*, 238 F.3d at 547 (*citing* 29 U.S.C. § 1002(33)(C)(i)). Four district courts within the Seventh Circuit concluded that plans of healthcare organizations associated with churches fell within the "church plan" definition. *Ward*, 2010 WL 4337821, at *2; *Taylor v. Sisters of St. Francis Health Servs., Inc. Ltd. Trust Health Benefit Plan*, No. 1:05-CV-0671-DFH-VSS, 2006 WL 2457202, at *2 (S.D. Ind. Aug. 23, 2006); *Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969, 972 (N.D. Ill. 1999); *Humphrey v. Sisters of St. Francis Health Servs., Inc.*, 979 F. Supp. 781, 786 (N.D. Ind. 1997).

Finally, the District Court's interpretation cannot be correct because it "would produce an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998). The following "holy corners" illustration underscores how the District Court's

interpretation impermissibly dictates whether a plan qualifies as a church plan based on a church's structure and governance. Four churches—A, B, C, and D—are located at an intersection in a town and each has an associated elementary school. Church A is one organization and established and maintains a plan that covers both church and school employees. Church B is composed of two separate corporations—a church and a school. The church appoints the board of directors of the school. Employees of both entities participate in a plan maintained by a pension board. The plan was established many years ago by a church that was a member of the same convention but that has since shut its doors. Church C has the same corporate structure as Church B. Church C established and maintains a plan for church employees. The associated school established and maintains a plan for its employees. Church D has the same corporate structure as Churches B and C, and, like B, its employees participate in a plan maintained by a pension board. However, the plan was also established by the pension board.

To an outsider standing on the street, all four churches would appear the same—with ministers and school employees fulfilling the mission of the church. However, the District Court's construction would treat the churches, their employees, and their benefit plans differently based on their church structure and governance and the happenstance of who established the plan. All of the employees of Church A and Church B would be participants in church plans. However, for Church C, only employees who work in the "steeple" church would participate in a church plan. Despite the intimate connection between the two organizations, the employees of the associated school would be participants in a plan subject to ERISA because the plan was established by the school (and not the church). Finally, none of the employees of Church D—not even the ministers—would participate in a church plan because the plan was established not by a church but by a pension board.

Not only does the District Court's construction produce an absurd result, but also it raises a potential violation of the Establishment Clause of the First Amendment when instead of being A, B, C, and D, the churches

are named Anglican, Baptist, Catholic, and Daoist. Whether the plans of a church—and its associated organizations—qualify as church plans should not, and indeed cannot, be based on how the church is organized and governed. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.") Here, the District Court's interpretation excludes social and health ministry organizations, such as Advocate, from the Evangelical Lutheran Church in America and United Church of Christ and their plans from the "church plan" definition because the churches decided the organizations can be operated as distinct corporations. However, based solely on a church's decision about the structure of its mission, organizations providing similar services as a division of the church would be treated as part of the church and their plans as church plans. This cannot be the result Congress intended. Because the District Court's interpretation raises serious constitutional concerns, it cannot be correct. *See Lorillard v. Pons*, 434 U.S. 575, 577 (1978) ("[I]t is a cardinal principle that this Court will first ascertain whether a

construction of the statute is fairly possible by which the [constitutional] question may be avoided.")

### B. Plans maintained by administrative committees of church-associated organizations qualify as church plans pursuant to ERISA § 3(33)(C)(i).

An "organization whether a civil law corporation or otherwise" may maintain a church plan pursuant to ERISA § 3(33)(C)(i). 29 U.S.C. § 1002(33)(C)(i). This broad language includes any type of organization, including an organization that is not separately incorporated, if it meets the other requirements of the subsection. Thus, "the church plan exemption includes plans sponsored by church-affiliated organizations, such as hospitals or schools, if these plans are administered by plan committees (1) whose principal function is to administer the plan, (2) if the plan committee is controlled by or associated with a church." *Overall*, 23 F. Supp. 3d at 829.

Here, the Plan is administered by the Administrative Committee (Dkt. #35-2, Plan §§ 2.31, 10.4),[16] which is appointed by a committee of Advocate's board. (*Id.* at § 10.1.) The Plan requires that both Advocate and

[16] The Court can consider the Plan document because it is referred to in the Complaint and central to the claims. *Hecker*, 556 F.3d at 582-83.

the Administrative Committee take direction from the churches through the board of directors. (Dkt. #35-2, Plan § 1.2.) Thus, the Administrative Committee has the primary purpose of administration of the Plan and is associated with the church,[17] meeting the requirements of ERISA § 3(33)(C)(i). *See Overall*, 23 F. Supp. 3d at 829 (finding a plan sponsored by a Catholic healthcare system and administered by a similar pension committee met the definition in ERISA § 3(33)(C)(i)).

However, the District Court found that Subsection (33)(C)(i) limits the "church plan" exemption solely to plans maintained by pension boards and established by churches. (APP15-16.) Nothing in the plain language of the statute suggests either that Subsection (33)(C)(i) describes *only* pension boards or requires plans maintained by pension boards—or any similar church-associated organization—to be established by a church. *Thorkelson*, 764 F. Supp. 2d at 1126 (rejecting an argument that church plans could be

---

[17] *See* Dkt. #35-7, ELCA Yearbook pgs. 604, 610 and Dkt. #35-8 ELCA Covenant (demonstrating the Evangelical Lutheran Church in America's decision to be associated with Advocate); Dkt. #35-6, UCC Yearbook pgs. 883-84 and Dkt. #35-9 UCC Covenant (demonstrating the United Church of Christ's decision to be associated with Advocate).

established only by churches or by pension boards and finding "no support for Plaintiffs' position"). The language of the statute does not use the term "pension board" and, therefore, cannot be read to exclusively describe pension boards. *See Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997) *citing Hubbard v. United States,* 514 U.S. 695 (1995) ("[Courts] are prohibited from reading into clear statutory language a restriction that Congress itself did not include.") In addition, "there is no basis to differentiate a Pension Committee from a Pension Board." *Thorkelson*, 764 F. Supp. 2d at 1129. Indeed, the IRS requires plans sponsored by tax-exempt, church-associated organizations to be administered by pension committees. *See* I.R.S. Gen. Counsel Mem. 39,007, 1983 WL 197946, at *5. Pension administrative committees and pension boards are "organizations whether a civil law corporation or otherwise" that are associated with a church and that administer plans, and, thus, both meet the requirements of ERISA § 3(33)(C)(i).

Furthermore, the District Court's construction ignores the fact that many pension boards both establish and maintain their plans. *See, e.g.*,

*Coleman-Edwards v. Simpson*, No. 03CV3779DLIVVP, 2008 WL 820021, at *12 (E.D.N.Y. Mar. 25, 2008) *aff'd,* 330 F. App'x 218 (2d Cir. 2009) (finding a plan *established and maintained by a pension board* to benefit ministers was a church plan under ERISA § 3(33)(C)(i)); Mr. Laurence A. Hansen, D.O.L. Op. Ltr. 96-09A, 1996 WL 386100 (1996) and I.R.S. Priv. Ltr. Rul. 9217045, 1992 WL 801475 (Apr. 24, 1992) (both issued to Christian Brothers Services, a Catholic pension board that established its church plan). Under the District Court's interpretation, the pension plan at issue in *Coleman-Edwards* would not qualify as a "church plan" because it was not established by a church despite the fact that it was maintained by a pension board and was solely for the benefit of ministers of a Baptist convention. The District Court's interpretation is so narrow that it "would render section (C) meaningless." *Overall,* 23 F. Supp. 3d at 829; *see also, Corley v. United States,* 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.")

### C. The First Amendment precludes review of a church's determination that an organization is associated with it pursuant to ERISA § 3(33)(C)(iv).

"An authoritative church ruling on an issue . . . removes the issue from the jurisdiction of that court." *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013).[18] Here, the United Church of Christ and the Evangelical Lutheran Church in America have determined that Advocate is associated with them. This decision is not subject to judicial review. The District Court noted that Advocate "is affiliated with the two Christian denominations." (APP1); (*see also*, Dkt. #1, Complaint ¶ 48.) But Plaintiffs also alleged that Advocate's actions demonstrate that it shares insufficient common religious bonds and convictions with the churches to be associated with them pursuant to ERISA § 3(33)(C)(iv)—for example, by not imposing a denominational requirement on employees and patients. (Dkt. #1, Complaint ¶¶ 54-55, 95-99.) Whether Advocate complies with church

---

[18] In addition to being an issue fairly included in the Order, the challenge to Advocate's association with the churches is within the scope of the appeal because it raises a jurisdictional question. *See United States v. Cotton*, 535 U.S. 625, 630 (2002) (stating that subject-matter jurisdiction "involves a court's power to hear a case" and can be raised at any time).

doctrine is not a factual or legal issue but a religious question, and the First Amendment prohibits the courts from answering.

Official church documents demonstrate that the churches have decided that Advocate is associated with them. The Evangelical Lutheran Church in America Yearbook includes Lutheran Social Ministry Organizations and notes that all those listed—including Advocate—are "affiliated with the Evangelical Lutheran Church in America." (Dkt. #35-7, ELCA Yearbook pg. 609.) Advocate is listed in The United Church of Christ Yearbook and Directory as part of the Council for Health and Human Service Ministries, which are "facilities and programs affiliated with the United Church of Christ." (Dkt. #35-6, UCC Yearbook pg. 875.) The leader of the regional congregations of each church—the Bishop of the Chicago Metropolitan Synod of the Evangelical Lutheran Church in America and the Illinois Conference Minister of the United Church of Christ—signed contracts with Advocate, binding Advocate to the churches through their shared mission. (Dkt. #35-8, ELCA Covenant pg. 1; Dkt. #35-9, UCC Covenant pg. 1.)

This Court can take judicial notice of these church documents. *See Bethel Conservative Mennonite Church v. Comm'r of Internal Revenue,* 746 F.2d 388, 392 (7th Cir. 1984) (finding church documents about a church's history or beliefs are "clearly the kind for which judicial notice by an appellate court is appropriate"); *see also, Overall*, 23 F. Supp. 3d at 824 (taking judicial notice under Fed. R. Evid. 201 of a listing in the Official Catholic Directory, a similar church directory); *Friend*, 68 F. Supp. 2d at 971 (noting a listing in a church directory).

A secular court may decide whether Advocate is correct in asserting that there is an authoritative church ruling on this issue but cannot question the church's resolution. *McCarthy*, 714 F.3d at 976. The Complaint invites the Court to be the arbiter of whether Advocate's conduct is within the doctrine of the Evangelical Lutheran Church in America and United Church of Christ. However, the First Amendment "forbids the government to make religious judgments," and the "harm of such a governmental intrusion into religious affairs would be irreparable." *Id.* What is church doctrine, whether someone is sufficiently compliant with that doctrine, or

how a church should enforce its doctrine are subjects for the church, not the courts. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–20, (1976); *see also, Hosanna–Tabor Evangelical Lutheran Church & School v. EEOC,* ––– U.S. ––––, 132 S.Ct. 694, 704 (2012). The First Amendment forbids courts to inquire into a claim that a party has departed from church doctrine. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449-50 (1969); *NLRB v. Catholic Bishops*, 440 U.S. 490, 502 (1979). The churches have determined that Advocate is associated with them, and the First Amendment prohibits the federal courts from considering Plaintiffs' challenge to this determination.

## II. The Legislative History Supports Advocate's Interpretation.

Although the language of ERISA § 3(33)(C)(i) includes plans maintained by certain church-associated organizations, the recent split in district court opinions suggests an ambiguity in the statute. *See Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008), *as amended* (Dec. 4, 2008) ("When there are two plausible but different interpretations of statutory language, there is ambiguity.") If this Court finds the language of the

statute is ambiguous, resort to the legislative history is appropriate. *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1128 (7th Cir. 2008). The legislative history supports a broad reading of the "church plan" definition that avoids raising potential First Amendment issues.

When ERISA was enacted, the "church plan" definition was limited to plans established and maintained by a church. 29 U.S.C. § 1002(33)(A) (ADD1). A Proposed Treasury Regulation defined "church" to include a religious order or organization if it "(1) is an integral part of a church, and (2) is engaged in carrying out the functions of a church." Prop. Treas. Reg. § 1.414(e)-1(e), 42 Fed. Reg. at 18,623 (ADD6). However, the IRS interpreted the "church plan" definition and Proposed Treasury Regulation narrowly to find that Catholic religious orders that operated hospitals were not performing functions that were sufficiently religious to qualify them as a church and their plan as a church plan. I.R.S. Gen. Couns. Mem. 37,266, 1977 WL 46200 at *4-6.

Because of the problems created by the definition and Proposed Treasury Regulation, more than 25 churches of various denominations

began working with Congress to amend the definition in a way that would stop the IRS from "presuming to define what is and what is not an integral part of these religious groups' mission." *See* 125 Cong. Rec. 10,054-56 (ADD9-11). The co-sponsor Senator Talmadge recognized that the definition violated "the principle of separation of church and state." S. Fin. Comm. Hearing, at 41 (ADD17). The amendment's co-sponsors both stated that the amended definition would include plans of church-associated organizations. "Church agencies are essential to the churches' mission. They care for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches." 125 Cong. Rec. 10,052 (statement of co-sponsor Sen. Talmadge) (ADD7); *see also*, 124 Cong. Rec. 12,107 (May 2, 1978) (statement of co-sponsor Rep. Conable) ("Present law fails to recognize that the church agencies are parts of the church in its work of disseminating religious instruction and caring for the sick, needy and underprivileged.") (ADD22). A "statement of one of the legislation's sponsors . . . deserves to be accorded substantial weight in interpreting the statute." *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976);

*see also*, *Anderson v. Thompson*, 658 F.2d 1205, 1212 (7th Cir. 1981). Senator Jacob Javits, who co-authored ERISA, also noted that he was not happy that the "church plan" exemption was being expanded to cover participants who work for schools and other church-related institutions, but that it was necessary to pass the bill. 126 Cong. Rec. 20,180 (July 29, 1980) (ADD28).

The amended definition was designed to be broad enough to encompass all churches—including their religious orders and organizations—regardless of how they chose to organize and define their ministry. The churches recognized that "no two religious denominations are organized or function in exactly the same manner." 125 Cong. Rec. 10,057 (letter from the General Board of Pensions of the United Methodist Church) (ADD12). To accommodate these differences, Congress modified more restrictive drafts of the legislation. An earlier draft of the bill amending the definition in Code § 414(e) stated that the definition "shall include a plan *established* and maintained by an organization . . ." instead of the final language, "includes a plan maintained by an organization . . ." 124

Cong. Rec. 12,108 (emphasis added) (ADD24). Although this language would have included plans established and maintained by certain church-associated organizations, it would have excluded those established by a church and maintained by the church-associated organization. "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello*, 464 U.S. at 23-24. Therefore, Congress did not intend to limit church plans covering employees of a church-associated organization only to plans established by the organization or to those established by the church. The legislative history never states that church plans described in Subsection (33)(C)(i) must be established by a church. By specifically omitting the "established by" language from Subsection (33)(C)(i), Congress avoided unintentionally discriminating against churches based on their polity and crafted a definition that encompasses plans of church-associated organizations—regardless of whether the church or the organization established the plan.

The District Court's interpretation of the statute is based on a selective reading of the legislative history, focusing on only two of the problems the amended definition sought to correct but ignoring the most prevalent concern—that the government should not be defining how a church is structured or carries out its mission. The legislative history shows that Subsection (33)(C)(i) should not be construed so narrowly as to be limited to pension boards. Congress intentionally omitted the term "pension board" from the amended definition. When Senator Talmadge first introduced the legislation, he explained:

> A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501.

124 Cong. Rec. 16,523 (June 7, 1978) (ADD30). However, the statute replaces "pension board" with the much broader term "organization" and, therefore, should not be read to be limited to pension boards. *See Russello*,

464 U.S. at 23-24. Subsection (33)(C)(i) is meant to add more church-associated organizations to the definition than just pension boards.

By the time Congress passed the amendment, the final Treasury Regulation already clarified that "a plan which otherwise meets the provisions of this section shall not lose its status as a church plan because of the fact that it is administered by a separately incorporated fiduciary such as a pension board or a bank." Treas. Reg. § 1.414(e)-(1)(f), 45 Fed. Reg. 20,796, 20,796-98 (March 31, 1980) (ADD31, ADD33). This regulation accomplishes the precise goal the District Court found that Subsection (33)(C)(i) was designed to achieve—clarifying that a plan that otherwise qualified under Subsection (33)(A) can be maintained by a pension board. The District Court's construction would make the amended Subsection (33)(C)(i) redundant with the Treasury Regulation. However, reading of the amended definition as applying to other church-associated organizations gives Subsection (33)(C)(i) meaning beyond repeating the Treasury Regulation. Indeed, the amended Subsection (33)(C)(i) uses much broader language than the Treasury Regulation. First, instead of using the

term "pension board," Subsection (33)(C)(i) uses language that can describe a pension board but also describes other religious organizations. The Treasury Regulation also requires that the plan "otherwise meets the provisions of this section." The definition, however, does not contain this same restrictive language, and the District Court erred by inferring this requirement.

## III. The Longstanding Interpretation Adopted By the Agencies Charged With Administering ERISA is Entitled to Deference.

The agencies' interpretation of the "church plan" definition advanced in IRS private letter rulings[19] issued directly to Advocate—and in hundreds of similar rulings and DOL advisory opinions[20]—is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The IRS concluded the Plan is a church plan after applying its longstanding construction of the statute, which it first articulated in a 1982 general counsel memorandum. Because the agencies' interpretation is longstanding and consistent and

---

[19] The IRS has authority to administer and enforce the Code, including Section 414(e) as amended by ERISA Title II. *See* 26 U.S.C. § 7801.
[20] The DOL has jurisdiction over Title I of ERISA and can issue advisory opinions pursuant to ERISA Procedure 76-1.

Congress has chosen not to alter the definition, it is deemed to reflect Congress's intent. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

This Court has not addressed the level of deference due to the IRS's consistent interpretation of a statute that is articulated in general counsel memorandum and private letter rulings and the DOL's consistent interpretation advanced in advisory opinions.[21] "[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and . . . considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ...." *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001) (internal quotations and citations omitted). The Supreme Court has found that, under *Skidmore*, a DOL advisory opinion interpreting ERISA "merits

---

[21] *But see United States v. Wisconsin Power & Light Co.*, 38 F.3d 329, 334 (7th Cir. 1994) ("[General counsel memoranda] are helpful in interpreting the Tax Code" in the absence of case law.); *First Chicago NBD Corp. v. C.I.R.*, 135 F.3d 457, 458-59 (7th Cir. 1998) (finding an IRS opinion contained in a single revenue ruling "is entitled to respectful consideration").

the Judiciary's respectful consideration," *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 18-21 (2004), and some circuit courts have afforded general counsel memoranda a similar level of respect.[22]

Here, *Skidmore* provides the appropriate framework for analyzing the level of deference owed to the agencies' interpretation. *See Mead Corp.*, 533 U.S. at 226-27.[23] Under *Skidmore*, the weight of the agencies' "judgment in a

---

[22] *See Worldwide Equip., Inc. v. United States*, 605 F.3d 319, 324, n. 3 (6th Cir. 2010) (finding "IRS General counsel memoranda are entitled to some deference"); *Idaho First Nat. Bank v. C.I.R.*, 997 F.2d 1285, 1290 (9th Cir. 1993), *as clarified* (Aug. 4, 1993) (same); *but cf. Nathel v. C.I.R.*, 615 F.3d 83, 93 (2d Cir. 2010); *Bellas v. CBS, Inc.*, 221 F.3d 517, 532 (3d Cir. 2000).

[23] Although *Mead* left open the possibility that an agency opinion that was not advanced as part of a notice-and-comment rulemaking procedure may still be entitled to deference under *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inv.*, 467 U.S. 837 (1984), for reasons similar to the tariff ruling in *Mead*, it is unlikely that private letter rulings and general counsel memorandum are entitled to *Chevron* deference. *See Mead*, 533 U.S. at 232-33. Like the tariff rulings, private letter rulings and general counsel memoranda may not be used as precedent. *See Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998) (private letter rulings); *Wisconsin Power & Light Co.*, 38 F.3d at 334 (general counsel memoranda). However, a private letter ruling may be relied upon by the taxpayer to whom it was issued. 26 U.S.C. § 6110(k)(3); Rev. Proc. 2015-1, § 11. Courts may use private letter rulings as an instructive tool. *Thom v. United States*, 283 F.3d 939, 943, n. 6 (8th Cir. 2002); *see ABC Rentals of San Antonio, Inc. v. Comm'r*, 142 F.3d 1200, 1207, n. 5 (10th Cir. 1998) ("[Private letter rulings] may be cited as evidence of administrative interpretation.")

particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. The agencies' interpretation of the "church plan" definition is contemporaneous, thorough, well-reasoned, and consistently applied and, thus, is entitled to deference and considerable weight.

From the beginning, the Treasury understood what the amendment to the "church plan" definition was intended to accomplish and despite having expressed concern during the Congressional debates, ultimately (through the IRS) interpreted the amended definition consistent with Congress's intent. The IRS construed the original "church plan" definition narrowly as excluding plans of church-associated organizations, such as hospitals and schools. I.R.S. Gen. Couns. Mem. 37,266, 1977 WL 46200. The Treasury objected to the expansion of the definition to cover these organizations. S. Fin. Comm. Hearing, at 41. However, when the IRS first interpreted the amended "church plan" definition shortly after its passage,

the IRS recognized that Congress had abrogated its earlier interpretation through legislation. *See* I.R.S. Gen. Counsel Mem. 39,007, 1983 WL 197946. The IRS reasoned:

> Since religious orders can now have their employees covered by a church plan without a determination that such orders are churches, this nonchurch status is not fatal. To have a qualified 'church plan', the sisters must establish that their employees are deemed employees of the Catholic Church through section 414(e)(3)(C) [*see also* 29 U.S.C. § 3(33)(C)(iii)] by virtue of the order's affiliation with the church and that the fund will be administered by one of the organizations described in the statute.
>
> . . .
>
> Therefore, the plan for a religious order must be maintained either by the Catholic Church, which does qualify as a church, or by an organization described in section 414(e)(3)(A) [*see also* 29 U.S.C. § 3(33)(C)(i)]. To be described in section 414(e)(3)(A), an organization must have as its principal purpose administering the fund and must also be controlled by or associated with a church.

*Id.* at *4-5. The IRS based its analysis on a thorough reading of all of the subsections of Code § 414(e) [ERISA § 3(33)] and the legislative history of the amendment. *Id.* The IRS found that an administrative committee could administer a church plan pursuant to Code § 414(e)(3)(A) [ERISA § 3(33)(C)(i)] provided the committee was controlled by or associated with a

church. *Id.* at *5. This interpretation is thorough and well-reasoned and thus warrants respect.

In addition, the agencies' interpretation is entitled to more weight because it is contemporaneous and consistent. The District Court was not persuaded by Advocate's private letter ruling and failed to address the fact that the interpretation contained in the ruling reflected the contemporaneous and longstanding position of the IRS. "Although the Service's interpretive rulings do not have the force and effect of regulations, we give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States*, 495 U.S. 472, 484 (1990) (internal citation omitted).

In *Davis*, the IRS first interpreted a section of the Code approximately two years after it was amended. *Id.* at 481-82. The IRS "adhered to its interpretation . . . in subsequent rulings," and "[n]umerous judicial decisions . . . relied on this interpretation." *Id.* at 482. Furthermore,

Congress reenacted that statute using the same language, indicating "its apparent satisfaction with the prevailing interpretation of the statute." *Id.*

Here, the IRS's interpretation of the "church plan" definition also should be given "considerable weight." The IRS first interpreted the current "church plan" definition within two years after it was amended and has consistently adhered to this interpretation. Applying the same reasoning as the general counsel memorandum, the IRS has issued nearly 500 private letter rulings over the course of more than 30 years, including the two to Advocate and Evangelical Health System, the Plan's current and prior sponsor, respectively. (*See* Dkt. #74-2; #35-11, Advocate PLR; #35-12, EHS PLR[24]); *see also,* I.R.S. Priv. Ltr. Rul. 9122078; I.R.S. Priv. Ltr. Rul. 199904041. Since the adverse rulings in *Rollins* and *Kaplan*, the IRS has maintained its interpretation by continuing to issue "church plan" private letter rulings. *See, e.g.,* I.R.S. Priv. Ltr. Rul. 201505048, 2015 WL 389734 (Jan. 30, 2015). From 1985 until 2004, the DOL issued 67 advisory opinions,

[24] This Court may take judicial notice of Advocate's private letter rulings because "it is well-established that executive and agency determinations are subject to judicial notice" *Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000).

relying on an interpretation similar to the IRS's construction. (*See* Dkt. #74-2); *see, e.g.,* Mr. Stephen D. Lowry, D.O.L. Op. Ltr. 85-01A, 1985 WL 32792, at *3 (1985). Many courts, including one within this circuit, have relied on the agencies' determination that a plan is a church plan. *See Humphrey*, 979 F. Supp. at 786 (relying on a private letter ruling as evidence of "church plan" status); *Rinehart*, 2009 WL 995715, at *4 (citing private letter ruling and DOL opinion letter as evidence of the plan's "church plan" status); *see also, Thorkelson*, 764 F. Supp. 2d at 1126 (D. Minn. 2011). Finally, Congress reenacted the Code in 1986 using the same language.

Indeed, by choosing not to amend the definition, Congress is deemed to have approved the IRS's interpretation. *See, e.g., Cottage Savings Ass'n v. C.I.R.*, 499 U.S. 554, 561 (1991). "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Schor*, 478 U.S. at 846. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and

to adopt that interpretation when it re-enacts a statute without change." *Lorillard*, 434 U.S. at 580. "So too, where . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.* at 581.

Since 1982 when the IRS first construed the amended "church plan" definition, Congress has amended the statute many times, including specifically amending the "church plan" definition in 2000. *See* Church Plan Parity and Entanglement Prevention Act, Pub. L. 106-244. In addition, Congress has adopted laws that cross-reference the "church plan" definition. *See, e.g.*, 15 U.S.C. § 80a-3(c)(14) (adopted by Congress in 1996 to exclude church plans from the definition of "investment companies" in the Investment Company Act of 1940). Yet Congress has done nothing to change the IRS's prevailing construction, and, therefore, it is deemed to reflect Congress's intended interpretation. *Schor*, 478 U.S. at 846.

Finally, ignoring the IRS's determination that the Plan is a church plan would undermine the system the government has developed for

administering the ERISA exemption. Not only taxpayers but also government agencies rely on the IRS's determination of "church plan" status. "This general policy of allowing taxpayers to rely upon PLRs is the foundation of the PLR process. Without it, PLRs would not be worth the paper they are written on." *Obtaining Private Guidance From the Internal Revenue Service, in* U.S.C. TAX LAW INST. 17-15, ¶ 1704.6 (2002)). The Pension Benefit Guarantee Corporation, which insures ERISA plans, defers to the IRS's determination of church plan status. P.B.G.C. Op. Ltr. 78-1, 1978 WL 5724, at *1 (1978).

## IV. The District Court's Interpretation Raises Serious Constitutional Concerns.

The District Court's interpretation is not correct because it raises serious constitutional concerns. *See Catholic Bishop of Chicago*, 440 U.S. at 499-504. Although Plaintiffs argued that the doctrine of constitutional avoidance supported their interpretation, it does not. Plaintiffs' argument that Advocate's interpretation raises constitutional concerns is based on their allegation that the exemption violates the Establishment Clause, which fails to state a claim. (*See* Dkt. #1, Complaint Count X.) Although the

District Court did not reach Plaintiffs' Establishment Clause theory (APP19, *citing United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001)), the District Court's interpretation raises greater constitutional concerns than those alleged in the Complaint. The District Court's interpretation resurrects the same separation of church and state issue that the amended "church plan" definition was designed to correct. By finding that only a "steeple" church can establish a church plan, the District Court—like the original "church plan" definition—has construed the statute in way that allows the government to define what is a church and how it should structure its mission.

The District Court's interpretation results in "church plan" status being based on a church's structure and governance, which leads to impermissible preference for some religions—for example, hierarchical churches—over others—for example, congregational churches, such as the United Church of Christ. The District Court's interpretation implicitly finds that Advocate, a church-associated organization, should not be treated the same as the "steeple" churches with which it is associated but that other

church-associated organizations should be considered part of their churches, depending on how churches are structured and who happened to establish their plans. Therefore, the construction violates the foundational principle of the Establishment Clause. *See Larson*, 456 U.S. at 244. An interpretation of the "church plan" definition that would exempt some religions but not others cannot be the proper construction of the statute. *See Lorillard*, 434 U.S. at 577.

By comparison, the allegations in Count X of the Complaint do not state a violation of the Establishment Clause. The test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), remains the prevailing Establishment Clause analytical tool. *See Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012). The *Lemon* factors include: "(1) whether the government's predominant purpose was secular; (2) 'whether the government action has the purpose or effect of endorsing religion,' and (3) whether the action fosters 'an excessive entanglement with religion.'" *Lemon*, 403 U.S. at 612-13.

First, to have a secular purpose "does not mean that the law's purpose must be unrelated to religion-that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987) (internal citations and quotations omitted). Congress's stated purpose when enacting the church plan exemption was to avoid government entanglement with religion. *See* S. Fin. Comm. Rep., No. 93-383, at 81 (ADD3); 124 Cong. Rec. 12,106 (statement of Rep. Conable) (ADD22). The Supreme Court has found that avoiding government entanglement with religion is a secular purpose. *Amos*, 483 U.S. at 335.

Second, under *Lemon*, the church plan exemption does not have the purpose or effect of endorsing religion, and Plaintiffs do not claim otherwise. "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under *Lemon,* it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Amos*,

483 U.S. at 337 (emphasis original). Congress has a long history of exempting religious organizations without the purpose of advancing religion. *See Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675-80 (1970); *see also, Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.")

Finally, the church plan exemption relieves government entanglement with religion rather than creating it. By including religious tax-exempt organizations within the "church plan" exemption, the government avoids entangling itself in defining what acts of a church are sufficiently religious. *See Amos*, 483 U.S. at 335-36. Furthermore, the government avoids imposing burdens on churches and church-associated organizations, for example, by limiting their ability to use socially responsible investing practices. *See, e.g.*, ERISA FIDUCIARY LAW, *Chapter 12 Social Investment Quandary*, 501-514 (BNA 2d Ed. 2006) (explaining DOL's position that ERISA fiduciaries cannot use socially responsible investment

criteria to exclude profitable investments from a plan); 29 C.F.R. § 2509.08-1. (*See also*, Dkt. #35-4, Financial Statement pg. 8 (explaining that Advocate's financial decisions are consistent with its mission and values).)

## CONCLUSION

For the reasons stated herein, the judgment of the District Court should be reversed.

Dated: April 6, 2015

Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By s/ Amy L. Blaisdell

Amy L. Blaisdell
Daniel J. Schwartz
Heather M. Mehta
10 South Broadway, Suite 2000
St. Louis, Missouri 63102
Telephone: 314-241-9090
Facsimile: 314-345-4792

David B. Goodman
200 West Madison Street, Suite 2700
Chicago, IL 60606
Telephone: 312-345-5008
Facsimile: 312-241-8624

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing Brief and Short Appendix of Defendants-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 97-2003 in 14 point Palatino Linotype font.

Dated: April 6, 2015

s/ Amy L. Blaisdell

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2015 the Brief and Short Appendix of Defendants-Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

The following participant in the case is a registered CM/ECF user and will be served by the appellate CM/ECF system:

James B. Zouras
STEPHAN ZOURAS, LLP
Suite 2560
205 N. Michigan Avenue
Chicago, IL 60601

s/ Amy L. Blaisdell

# ADDENDUM

# ADDENDUM


| | |
|---|---|
| Full Text of Original "Church Plan" Definition, 29 U.S.C. § 1002(33) (1974) | ADD1 |
| S. Fin. Comm. Rep., No. 93-383, at 81 (1973) | ADD2 |
| Proposed Treasury Regulation § 1.414(e)-1, 42 Fed. Reg. 18,621 (April 8, 1977) | ADD4 |
| 125 Cong. Rec. 10,052-58 (May 7, 1979) | ADD7 |
| Senate Finance Committee Hearing, at 39-42 (June 12, 1980) | ADD14 |
| Full Text of "Church Plan" Definition, 29 U.S.C. § 1002(33) | ADD19 |
| 124 Cong. Rec. 12,106-08 (May 2, 1978) | ADD22 |
| 126 Cong. Rec. 20,177-80 (July 29, 1980) | ADD25 |
| 124 Cong. Rec. 16,522-23 (June 7, 1978) | ADD29 |
| Treasury Regulation § 1.414(e)-(1)(f), 45 Fed. Reg. 20,796 (March 31, 1980) | ADD31 |

PL 93–406, SEPTEMBER 2, 1974, 88 Stat 829

UNITED STATES PUBLIC LAWS
93rd Congress - Second Session
Convening January 21, 1974

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)
Additions and Deletions are not identified in this document.

PL 93–406 (HR 2)
SEPTEMBER 2, 1974

AN ACT TO PROVIDE FOR PENSION REFORM.

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED,

SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. THIS ACT MAY CITED AS “EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974”. (TABLES OMITTED ON PAGES 1, 2, 3, 4,)

TITLE I—PROTECTION OF EMPLOYEE BENEFIT RIGHTS
SUBTITLE A—GENERAL PROVISIONS

DEFINITIONS //29 USC 1002.//

SEC. 3. FOR PURPOSES OF THIS TITLE:

. . .

(33) (A) THE TERM “CHURCH PLAN” MEANS(I) A PLAN ESTABLISHED AND MAINTAINED FOR ITS EMPLOYEES BY A CHURCH OR BY A CONVENTION OR ASSOCIATION OF CHURCHES WHICH IS EXEMPT FROM TAX UNDER SECTION 501 OF THE INTERNAL REVENUE CODE OF 1954, //26 USC 501.// OR (II) A PLAN DESCRIBED IN SUBPARAGRAPH (C).

(B) THE TERM “CHURCH PLAN” (NOTWITHSTANDING THE PROVISIONS OF SUBPARAGRAPH (A)) DOES NOT INCLUDE A PLAN—,

(I) WHICH IS ESTABLISHED AND MAINTAINED PRIMARILY FOR THE BENEFIT OF EMPLOYEES (OR THEIR BENEFICIARIES) OF SUCH CHURCH OR CONVENTION OR ASSOCIATION OF CHURCHES WHO ARE EMPLOYED IN CONNECTION WITH ONE OR MORE UNRELATED TRADES OR BUSINESSES (WITHIN THE MEANING OF SECTION 513 OF THE INTERNAL REVENUE CODE OF 1954), //26 USC 513.// OR

(II) WHICH IS A PLAN MAINTAINED BY MORE THAN ONE EMPLOYER, IF ONE OR MORE OF THE EMPLOYERS IN THE PLAN IS NOT A CHURCH (OR A CONVENTION OR ASSOCIATION OF CHURCHES) WHICH IS EXEMPT FROM TAX UNDER SECTION 501 OF THE INTERNAL REVENUE CODE OF 1954.

(C) NOTWITHSTANDING THE PROVISIONS OF SUBPARAGRAPH (B) (II), A PLAN IN EXISTENCE OF JANUARY 1, 1974, SHALL BE TREATED AS A “CHURCH PLAN” IF IT IS ESTABLISHED AND MAINTAINED BY A CHURCH OR CONVENTION OR ASSOCIATION OF CHURCHES FOR ITS EMPLOYEES AND EMPLOYEES OF ONE OF MORE AGENCIES OF SUCH CHURCH (OR CONVENTION OR ASSOCIATION) FOR THE EMPLOYEES OF SUCH CHURCH (OR CONVENTION OR ASSOCIATION) AND THE EMPLOYEES OF ONE OR MORE AGENCIES OR SUCH CHURCH (OR CONVENTION OR ASSOCIATION), AND IF SUCH CHURCH (OR CONVENTION OR ASSOCIATION) AND EACH SUCH AGENCY IS EXEMPT FORM TAX UNDER SECTION 501 OF THE INTERNAL REVENUE CODE OF 1954. THE FIRST SENTENCE OF THIS SUBPARAGRAPH SHALL NOT APPLY TO ANY PLAN MAINTAINED FOR EMPLOYEES OF AN AGENCY WITH RESPECT TO WHICH THE PLAN WAS NOT MAINTAINED ON JANUARY 1, 1974. THE FIRST SENTENCE TO THIS SUBPARAGRAPH SHALL NOT APPLY WITH RESPECT TO ANY PLAN FOR ANY PLAN YEAR BEGINNING AFTER DECEMBER 31, 1982.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 

Calendar No. 361

93D CONGRESS, 1st Session — SENATE — REPORT No. 93-383

# PRIVATE PENSION PLAN REFORM

## REPORT

OF THE

## COMMITTEE ON FINANCE

UNITED STATES SENATE

TOGETHER WITH ADDITIONAL AND SUPPLEMENTAL VIEWS

ON

S. 1179

AUGUST 21, 1973.—Ordered to be printed
Filed under authority of the order of the Senate on August 1, 1973

U.S. GOVERNMENT PRINTING OFFICE
20-243 O WASHINGTON : 1973

tinuation may arise, for example, when a plan of one employer is merged into another plan of that employer (with or without a reorganization involving the employer) or is merged into a multiemployer plan.

Excluded from participation in the insurance program are: money purchase, profit-sharing, and stock bonus plans; government plans; and (under certain circumstances) church plans.

Money purchase, profit-sharing, and stock bonus plans are excluded from the insurance program since they generally are characterized by some type of promise with regard to contributions and no promise with regard to benefits—the participant is merely entitled to benefits determined by reference to his own account. Since no particular benefits are promised in these cases there appears to be no appropriate amount to insure. A collective bargaining plan where defined benefits are determined under a process in which the employers in the aggregate have a voice (e.g., under sec. 302(c)(5)(B) of the Labor Management Relations Act of 1947, where employers are required to have a substantial voice) in the determination of the forms and levels of benefits, is not to be treated as a money purchase plan for these purposes (in the insurance provisions, and elsewhere under the committee bill where distinctions are made between defined benefit plans and money purchase or other kinds of defined contributions plans), even though the collective bargaining agreement may specify only the level of employer contributions into the plan. Thus, these collective bargaining plans are covered by the insurance program.

In the case of government plans, it is believed that the ability of the governmental entities to fulfill their obligations to employees through their taxing powers is an adequate substitute for termination insurance.

At the option of an exempt church (or of a convention or association of churches), plans covering its employees may be included in the insurance coverage. The committee is concerned that the examinations of books and records that may be required in any particular case as part of the careful and responsible administration of the insurance system might be regarded as an unjustified invasion of the confidential relationship that is believed to be appropriate with regard to churches and their religious activities. However, if the church itself has determined to consent to such examinations, to the premium tax payments, and to the contingent employer liabilities, then it may elect to have the insurance program apply to its plan or plans. The Corporation is to prescribe the manner and time of the elections.

The insurance system is to apply to a church plan, even in the absence of such an election, if the plan is only for employees of the church's unrelated trades or businesses, or if the plan is a multiemployer plan and one of the employers in the plan is not a church.

*Benefits covered.*—In general, the insurance under the bill covers vested benefits, but not more than $750 per month and not more than 50 percent of wages (sec. 422). This limitation is placed on the insurance coverage because the insurance is not intended as a full replacement of a pension plan, but rather as covering the basic retirement benefits provided under it. However, in practice, it is expected that this will fully cover the great bulk of all benefit payments. In addition, there is an advantage in not fully covering all pension bene-

# proposed rules

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF AGRICULTURE

Agricultural Marketing Service

[ 7 CFR Part 918 ]

[Docket No. AO-162-A5]

### FRESH PEACHES GROWN IN GEORGIA

Recommended Decision and Opportunity To File Written Exceptions to Proposed Further Amendment of Marketing Agreement and Order

*Correction*

In FR Doc.77-7214, appearing at page 13557 of the issue for Friday, March 11, 1977:

1. In the third line of the second full paragraph, third column, page 13558, "nicurred" should read "incurred".

2. In the ninth line of the paragraph numbered (3), middle column, page 13559, "upon hearings" should read "upon which hearings".

3. In § 918.10(a), third column, page 13559, in the second line, "Quitman Coffee" should read "Quitman, Coffee"; and in the thirteenth line, "Camden Lowndes" should read "Camden, Lowndes".

## SECURITIES AND EXCHANGE COMMISSION

[ 17 CFR Part 240 ]

[Release No. 34-13420; File No. S7-613]

### RECORDS WITH RESPECT TO BENEFICIAL OWNERSHIP OF ACCOUNTS CARRIED BY BROKERS AND DEALERS

AGENCY: Securities and Exchange Commission.

ACTION: Extension of Time for Comment.

SUMMARY: The time for comment on a proposed amendment to Securities Exchange Act Rule 17a-3(a)(9) is being extended. The comment period expires on April 1, 1977.

DATES: Comments must be received on or before May 2, 1977.

ADDRESSES: Interested persons should submit six copies of their written views and comments to George A. Fitzsimmons, Secretary, Securities and Exchange Commission, Washington, D.C. 20549 and should refer to File No. S7-613. All submissions will be made available for public inspection in the Commission's Public Reference Section, Room 6101, 1100 L Street NW., Washington, D.C.

FOR FURTHER INFORMATION CONTACT:

Charles M. Horn, Esq., Office of the Chief Counsel, Division of Market Regulation, Securities and Exchange Commission, Washington, D.C. 20549, 202/755-8747.

SUPPLEMENTARY INFORMATION: On January 27, 1976, the Commission published Securities Exchange Act Release No. 12055,[1] which, among other things, proposed for comment an amendment to Securities Exchange Act Rule 17a-3(a)(9), 17 CFR 240.17a-3(a)(9). Interested persons were invited to submit written views and comments on the proposed amendment not later than May 1, 1976.[2]

Subsequently, the Commission instituted a general inquiry into the rules of national securities exchanges relating to foreign access[3] and disapproved two rules of the New York Stock Exchange, Inc.[4] establishing certain restrictions on foreign access. In both instances consideration was given to the proposed amendment to Rule 17a-3(a)(9).

On January 10, 1977, the Commission republished for comment the proposed amendment to Rule 17a-3(a)(9)[5] to clarify, in some respects, the intended operation of the proposed amendment. Interested persons were again invited to submit comments with an initial deadline of March 4, 1977, that was subsequently extended to April 1, 1977.[6]

The Securities Industry Association has requested a further thirty-day extension, based on the "extremely serious implications of the Commisson's proposal."[7] While the comment period will be somewhat longer than customary,[8] the Commission recognizes that resolution of difficult policy issues may not always be possible on rigid time schedules and that, therefore, it should not in all cases attempt or be required to act on every rule proposal within a set period of time.[9] Accordingly, the Commission, in the interest of assuring that the comments of all interested persons will receive maximum consideration, hereby extends the comment period for the proposed amendment to Rule 17a-3(a)(9) until May 2, 1977.

By the Commission.

Dated: March 31, 1977.

GEORGE A. FITZSIMMONS,
*Secretary.*

[FR Doc.77-10466 Filed 4-7-77;8:45 am]

[1] 41 FR 8075 (Feb. 24, 1976).

[2] On April 28, 1976, the Commission extended the comment period to June 15, 1976. Securities Exchange Act Release No. 12378, 41 FR 18432 (May 4, 1976).

[3] Securities Exchange Act Release No. 12157 (Mar. 2, 1976), 41 FR 10662 (Mar. 12, 1976).

[4] Securities Exchange Act Release No. 12737 (Aug. 25, 1976), 41 FR 38847 (Sept. 13, 1976).

[5] Securities Exchange Act Release No. 13149, 42 FR 3312 (Jan. 18, 1977).

[6] Securities Exchange Act Release No. 13347 (Mar. 9, 1977), 42 FR 14737 (Mar. 16, 1977).

[7] Letter dated March 25, 1977, from the Securities Industry Association. The SIA indicated that, on February 24, 1977, it had "hired special counsel to assist in the preparation of detailed comments" and that several more weeks will be required to complete this process [of research and drafting] and for review by the appropriate SIA committees.

[8] With the extension granted hereby, 463 days will have elapsed from the time the rule amendment was first proposed.

[9] *Cf.* Securities Exchange Act Release No. 13347 (Mar. 9, 1977), 42 FR 14737 (Mar. 16, 1977), n. 6.

## DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Food and Drug Administration

[ 21 CFR Parts 431, 514 ]

[Docket No. 77P-0002]

### CERTIFICATION OF ANTIBIOTIC DRUGS

Revision of Sampling Procedures

*Correction*

In FR Doc. 77-9036 appearing at page 16638 in the issue for Tuesday, March 29, 1977, the third line of the second full paragraph in the third column should Read: "(21 U.S.C. 357, 360b(n)) and under au- * * *"

## DEPARTMENT OF THE TREASURY

Internal Revenue Service

[ 26 CFR Part 1 ]

### DEFINITION OF THE TERM "CHURCH PLAN"

Proposed Rule Making

AGENCY: Internal Revenue Service, Treasury.

ACTION: Notice of proposed rulemaking.

SUMMARY: This document contains proposed regulations relating to the determination of whether a retirement plan is a church plan. Changes to the applicable tax law were made by the Employee Retirement Income Security Act of 1974. The regulations would provide persons responsible for the administration of retirement plans with the guidance needed to determine whether their plan is entitled to the benefits afforded church plans under that Act.

DATES: Written comments and requests for a public hearing must be delivered or mailed by May 23, 1977. The amend-

ments are proposed to be effective on September 2, 1974.

ADDRESS: Send comments and requests for a public hearing to: Commissioner of Internal Revenue, Attention: CC:LR:T, Washington, D.C. 20224.

FOR FURTHER INFORMATION CONTACT:

David Jacobson of the Legislation and Regulations Division, Office of the Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue NW., Washington, D.C. 20224 (Attention: CC:LR:T) (202-566-3923).

BACKGROUND

SUPPLEMENTARY INFORMATION: This document contains proposed amendments to the Income Tax Regulations (26 CFR Part 1) under section 414 (e) of the Internal Revenue Code of 1954. These amendments are proposed to conform the regulations to section 1015 of the Employee Retirement Income Security Act of 1974 (88 Stat. 925) and are to be issued under the authority contained in section 7805 of the Internal Revenue Code of 1954 (68A Stat. 917; 26 U.S.C. 7805).

EXPLANATION OF PROPOSED REGULATIONS

Section 414 (e) provides the requirements for what constitutes a church plan. Essentially a church plan is a plan established and maintained by a church for its employees. However, a plan maintained primarily for employees employed in connection with an unrelated trade or business is not a church plan. The regulations provide rules for determining when a person is considered primarily employed in connection with an unrelated trade or business. In addition, this document includes rules for determining whether an organization is an agency of a church for purposes of the special transition rule of section 414(e)(3).

COMMENTS AND REQUESTS FOR A PUBLIC HEARING

Before adopting these proposed regulations, consideration will be given to any written comments that are submitted (preferably six copies) to the Commissioner of Internal Revenue. All comments will be available for public inspection and copying. A public hearing will be held upon written request to the Commissioner by any person who has submitted written comments. If a public hearing is held, notice of the time and place will be published in the FEDERAL REGISTER.

DRAFTING INFORMATION

The principal author of these proposed regulations was David Jacobson of the Legislation and Regulations Division of Revenue Service. However, personnel from other offices of the Internal Revenue Service and Treasury Department participated in developing the regulation, both on matters of substance and style.

PROPOSED AMENDMENTS TO THE REGULATIONS

The proposed amendments to 26 CFR Part 1 are as follows:

The following sections are inserted in the appropriate place:

§ 1.414(e) Statutory provisions; definitions and special rules.

Sec. 414. *Definitions and special rules.*

* * *

(e) *Church plan*—(1) *In General.* For purposes of this part the term "church plan" means—

(A) A plan established and maintained for its employees by a church or by a convention or association of churches which is exempt from tax under section 501, or

(B) A plan described in paragraph (3).

(2) *Certain unrelated business or multiemployer plans.* The term "church plan" does not include a plan—

(A) Which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513), or

(B) Which is a plan maintained by more than one employer, if one or more of the employers in the plan is not a church (or a convention or association of churches) which is exempt from tax under section 501.

(3) *Special temporary rule for certain church agencies under church plan.*

(A) Notwithstanding the provisions of paragraph (2) (B), a plan in existence on January 1, 1974, shall be treated as a church plan if it is established and maintained by a church or convention or association of churches and one or more agencies of such church (or convention or association) for the employees of such church (or convention or association) and the employees of one or more agencies of such church (or convention or association), and if such church (or convention or association) and each such agency is exempt from tax under section 501.

(B) Subparagraph (A) shall not apply to any plan maintained for employees of an agency with respect to which the plan was not maintained on January 1, 1974.

(C) Subparagraph (A) shall not apply with respect to any plan for any plan year beginning after December 31, 1982.

(Sec. 414(e) as added by sec. 1015, Employee Retirement Income Security Act of 1974 (88 Stat. 925).)

§ 1.414(e)-1 Definition of church plan.

(a) *General rule.* For the purposes of part I of subchapter D of chapter 1 of the Code and the regulations thereunder, the term "church plan" means a plan established and at all times maintained for its employees by a church or by a convention or association of churches (hereinafter included within the term "church") which is exempt from tax under section 501(a), provided that such plan meets the requirements of paragraphs (b) and (if applicable) (c) of this section. If at any time during its existence a plan is not a church plan because of a failure to meet the requirements set forth in this section, it cannot thereafter become a church plan.

(b) *Unrelated businesses*—(1) *In general.* A plan is not a church plan unless it is established and maintained primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses (within the meaning of section 513).

(2) *Establishment or maintenance of a plan primarily for persons not employed in connection with one or more unrelated trades or businesses.* (i) (A) A plan, other than a plan in existence on September 2, 1974, is established primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses if on the date the plan is established the number of employees employed in connection with the unrelated trades or businesses eligible to participate in the plan is less than 50 percent of the total number of employees of the church eligible to participate in the plan.

(B) A plan in existence on September 2, 1974, is to be considered established as a plan primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses if it meets the requirements of both paragraphs (b) (2) (ii) (A) and (B) (if applicable) in either of its first 2 plan years ending after September 2, 1974.

(ii) For plan years ending after September 2, 1974, a plan will be considered maintained primarily for the benefit of employees of a church who are not employed in connection with one or more unrelated trades or businesses if in 4 out of 5 of its most recently completed plan years—

(A) Less than 50 percent of the persons participating in the plan (at any time during the plan year) consist of, and in the same year

(B) Less than 50 percent of the total compensation paid by the employer during the plan year (if benefits or contributions are a function of compensation) to employees participating in the plan is paid to,

employees employed in connection with an unrelated trade or business. The determination that the plan is not a church plan will apply to the second year (within a 5 year period) for which the plan fails to meet paragraph (b)(2)(ii) (A) or (B) (if applicable) and to all plan years thereafter unless, taking into consideration all of the facts and circumstances as described in paragraph (b) (2)(iii) of this section, the plan is still considered to be a church plan. A plan that has not completed 5 plan years ending after September 2, 1974, shall be considered maintained primarily for the benefit of employees not employed in connection with an unrelated trade or business unless it fails to meet paragraphs (b)(2)(ii) (A) and (B) in at least 2 such plan years.

(iii) Even though a plan does not meet the provisions of paragraph (b)(2)(ii) of this section, it nonetheless will be considered maintained primarily for the benefit of employees who are not em-

ployed in connection with one or more unrelated trades or businesses if the church maintaining the plan can demonstrate that based on all of the facts and circumstances such is the case. Among the facts and circumstances to be considered in evaluating each case are:

(A) The margin by which the plan fails to meet the provisions of paragraph (b) (2) (ii) of this section, and

(B) Whether the failure to meet such provisions was due to a reasonable mistake as to what constituted an unrelated trade or business or whether a particular person or group of persons were employed in connection with one or more unrelated trades or businesses.

(iv) For purposes of this section, an employee will be considered eligible to participate in a plan if such employee is a participant in the plan or could be a participant in the plan upon making mandatory employee contributions to the plan.

(3) *Employment in connection with one or more unrelated trades or businesses.* An employee is employed in connection with one or more unrelated trades or businesses of a church if a majority of such employee's duties and responsibilities in the employ of the church are directly or indirectly related to the carrying on of such trades or businesses. Although an employee's duties and responsibilities may be insignificant with respect to any one unrelated trade or business, such employee will nonetheless be considered as employed in connection with one or more unrelated trades or businesses if such employee's duties and responsibilities with respect to all of the unrelated trades or businesses of the church represent a majority of the total of such person's duties and responsibilities in the employ of the church.

(c) *Plans of two or more employers.* The term "church plan" does not include a plan which, during the plan year, is maintained by two or more employers unless—

(1) Each of the employers is a church, that is exempt from tax under section 501(a), and

(2) With respect to the employees of each employer, the plan meets the provisions of paragraph (b) (2) (ii) of this section or would be determined to be a church plan based on all the facts and circumstances described in paragraph (b) (2) (iii) of this section.

Thus, if with respect to a single employer the plan does not meet the provision of paragraph (c) (2) of this section the provisions of this paragraph are not met with respect to the entire plan.

(d) *Special rule.* (1) Notwithstanding paragraph (c) (1) of this section, a plan maintained by a church and one or more agencies of such church for the employees of such church and of such agency or agencies, that is in existence on January 1, 1974, shall be treated as a church plan for plan years ending after September 2, 1974, and beginning before January 1, 1983, provided that the plan is described in paragraph (c) of this section without regard to paragraph (c) (1) of this section, and the plan is not maintained by an agency which did not maintain the plan on January 1, 1974.

(2) For the purposes of section 414(e) and this section, an agency of a church means an organization which is exempt from tax under section 501 and which is either controlled by, or associated with, a church. For example, an organization, a majority of whose officers or directors are appointed by a church's governing board or by officials of a church, is controlled by a church within the meaning of this paragraph. An organization is associated with a church if it shares common religious bonds and convictions with that church.

(e) *Religious orders and religious organizations.* For the purpose of this section the term "church" includes a religious order or a religious organization if such order or organization (1) is an integral part of a church, and (2) is engaged in carrying out the functions of a church, whether as a civil law corporation or otherwise.

(f) *Cross reference.* (1) For rules relating to treatment of church plans, see section 410(d), 411(e), 412(h), 4975(g), and the regulations thereunder.

(2) For rules relating to church plan elections, see section 410(d) and the regulations thereunder.

WILLIAM E. WILLIAMS,
*Acting Commissioner of Internal Revenue.*

[FR Doc.77-10471 Filed 4-7-77;8:45 am]

clusion allowance for ministers and lay employees of the church, and to amend sections 403(b)(2)(B), 415(c)(4), 415(d)(1), and 415(d)(2) and to add a new section 415(c)(8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

LEGISLATION REGARDING CHURCH PENSION PLANS AND RELATED REFORM OF ERISA

● Mr. TALMADGE. Mr. President, with my colleagues Senators BENTSEN and BOREN, I am reintroducing legislation to amend the definition of "church plan" found at section 414(e) of the Internal Revenue Code and section 3(33) of the Employee Retirement Income Security Act of 1974, which I introduced in the 95th Congress. All of the major church denominations in this country—Protestant, Catholic, and Jewish—are of one accord in this matter. They need and desire relief.

When we enacted ERISA in 1974, we set 1982 as the date beyond which a church plan could no longer provide retirement and welfare benefits for employees of church agencies. We also forbade the church plans to provide any new agency coverage after 1974. Moreover, as I will explain later, the church plan definition is so narrow that it almost completely fails to consider the way our church plans have for decades operated. At this moment our churches are justifiably concerned that their plans do not meet the church plan requirements and are, therefore, subject to ERISA. In 1974, we did not recognize the unique character and needs of our church plans.

The church plans in this country have historically covered both ministers and lay employees of churches and church agencies. These plans are some of the oldest retirement plans in the country. Several date back to the 1700's. The average age of a church plan is at least 40 years. To comply with ERISA by 1982, the churches must divide their plans into two so that one will cover church employees and the other, agency employees. It is no small task to break up a plan that has been in existence for decades, even centuries.

The estimated legal, actuarial, and accounting costs of the initial division of church plans and the additional continuing costs of maintaining two separate plans are so significant that reduced retirement and other benefits may result unless they can be assimilated. To offset these additional costs, the churches are confronted with a very large, and possibly not absorbable, economic burden, merely to provide pre-ERISA level of benefits. There is no imposition by ERISA of such moment on the plans of other organizations.

Church agencies are essential to the churches' mission. They are for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA has made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

Ministers and lay employees have a unique need to be covered by one plan. Employment is extremely fluid within our denominations. A minister will frequently move from church to agency, or wherever his services are most needed. If he cannot be covered by one plan, gaps in coverage may occur because the agency may not have a plan or may have a waiting period before participation. If the church plan definition is allowed to remain, ministers and lay employees will not be able to pursue their missions nearly as freely as they have in the past. It is inescapable that the way our churches have functioned will be directly affected.

As I mentioned earlier, the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated. For example, this definition can be interpreted to require a minister or lay employee of a church to be a current employee. Many ministers serve their faith outside the denominational structure—as chaplains in prisons, hospitals, universities, and elsewhere. Evangelist ministers are usually self-employed and have no employer. There is no valid reason for denying these persons the benefits of retirement and welfare coverage.

This type of problem is less apt to occur in a hierarchical denomination because a minister may continue to be considered an employee even though he is serving outside the church structure.

Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination. Under the church plan definition, there is a question whether the plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. In this type of church, the denomination has little, if any, control over the local churches. Some differences in plan provisions occur, because the denomination cannot enforce uniformity, and the question whether the plan is maintained by the denomination or by the local churches is raised.

The inability of a congregational denomination to control its agencies makes it difficult to see how the church agency plan could meet the requirements of ERISA. In a corporate structure lines of authority are clear. One plan covering the employees of a parent and its subsidiaries can easily meet the requirements of law because of the control executed by the parent. As I have stated, a congregational denomination cannot force the agencies to observe the requirements of ERISA. Accordingly, there is little hope that a plan established by a congregational church for its agencies could comply with ERISA.

Mr. President, these and other problems over the church plan definition under present law confront the churches today. They are worried that their plans do not now meet the church plan requirements and concerned over the impending restructuring of their plans. It is time we remove the churches from this statutory cloud. If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive Government entanglement with religion.

Under the provisions of our proposals, effective as of January 1, 1974, a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan. Our legislations retains the definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churchs exempt from tax under section 501. However, to accommodate the differences in beliefs, structures, and practices among our religious denominations, all employees are deemed to be employed by the denomination. The term employee is also redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and third, certain former employees who participated in the church plan before separation from service.

Under our legislation an organization is "associated" with a church if it shares common religious bonds and convictions with that church. Thus, by including an ordained minister as an employee without the requirement of an actual employment relationship, the church plan may continue to cover a minister who serves outside of the denominational structure, provided the service is in the exercise of his ministry. Accordingly, a minister serving as a prison chaplain or teaching religious studies at a university or an evangelist minister by who no employer would be entitled to participate in the church plan.

Under our legislation a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. There

is no real reason why a church plan should be forced to pay a former employee his accrued benefit in cash and, thus, destroy his retirement benefits. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service. A minister or lay employee may reach a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the church. During this period the denomination may permit the individual to continue to be covered by the church plan even though he is separated from service. Under our legislation a church plan may continue to receive contributions for an individual who is a participant in the church plan at the time of his separation from service but only for a period of 5 years. A time limit is not placed upon employees who separated from service because of disability.

A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501. No church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in the plan provisions among the local employers.

Our legislation also corrects a very harsh position taken by the Treasury Department in its proposed regulations defining church plans. These proposed regulations provide that once a church plan fails to meet the requirements of church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

Our proposals provide a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the legislation is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. President, with my distinguished colleagues Senators BENTSEN and BOREN, I today reintroduce legislation to amend several provisions of the Internal Revenue Code that inequitably prevent the satisfactory accumulation of retirement benefits for the majority of clergymen and lay employees of church denominations in this country. This legislation is a large step in the direction of assuring our ministers and lay employees of an adequate retirement allowance.

It is well known that clergymen and lay employees are not well compensated. The beginning salary for a minister may be from $5,000 to $10,000 a year. Prior to retirement his salary may have increased to $15,000 or $20,000. Lay employees generally receive less compensation than ministers. Moreover, the retirement incomes of ministers and lay employees from church retirement plans are very small, being on the order of from $2,000 to $3,000 a year.

Most of our church denominations provide for the retirement of their ministers and lay employees in the form of annuities governed by section 403(b) of the code. The amount that can be contributed for the purchase of such an annuity, without income tax consequences to the employee, is limited by the "exclusion allowance" of section 403(b)(2). The amount of the exclusion allowance for any year is the excess of (1) 20 percent of the employee's includable compensation for the year times the employee's years of service with his or her employer over (2) the aggregate tax-sheltered contributions made by the employer for the employee in prior years. The exclusion allowance is designed to permit larger than usual retirement annuity contributions to be made late in the employee's career to compensate for the years when contributions may not have been possible. These are called catchup contributions. The opportunity for making catchup contributions is extremely important to poorly paid persons such as ministers and lay employees. A minister who is paid $7,500 a year at the beginning of his career will need all of his income for many years to support his family and educate his children. During these years, because of the minister's low level of salary, pension contributions made on his behalf by his church will be minimal. However, when he reaches 50 years or so, his living expenses will tend to decrease. Then he or his employer may be in a position to make significant catchup contributions to his retirement annuity.

However, two provisions of the code inequitably prevent the making of catchup contributions in the case of many ministers and lay employees. In 1974 when we enacted section 415(c)(1) of the code, we placed a limitation on the amounts that can be contributed to a defined contribution plan, such as a 403(b) annuity arrangement. This limitation, which operates independently of the exclusion allowance, is the lesser of $25,000 (adjusted by increases in the cost of living) or 25 percent of the participant's compensation. In imposing this limitation, we recognized that it would have a serious effect on the ability to make catchup contributions and provided in section 415(c)(4) certain elections that a participant could make in order to override the 25-percent ceiling. However, these elections are available only to employees of educational organizations, hospitals, and home health service agencies. Obviously, we were not then aware of the extensive use of section 403(b) annuities by our churches.

The second problem area is the provision in section 403(b)(2) which limits the "years-of-service" factor of the exclusion allowance to years of service with the employee's current employer. In computing the exclusion allowance for any year, the employee is not given credit for any years of service with prior employers. It is common in many denominations for a minister or lay employee to move from one church to another within the denomination or among various agencies of the denomination during the course of their careers. Under current law each church or denominational agency for which the minister or lay employee works is treated as a separate employer for purposes of the years-of-service factor. The minister or lay employee is accordingly not given credit for all of his or her services with the denomination in the computation of the exclusion allowance. For an employee who has changed jobs frequently, as do the ministers and lay employees of many denominations, this rule severely reduces the exclusion allowance and the ability to make catchup contributions.

Mr. President, our legislation would correct the first inequity by extending the right to make the elections in section 415(c)(4) to employees of churches, and their agencies. We believe that these persons should have the right to make the same elections as employees of educational organizations, hospitals, and home health service agencies. Our legislation also provides a de minimis amount of $10,000 which may be contributed, subject to the exclusion allowance, without the necessity of making the section 415(c)(4) elections. This de minimis amount is parallel to the de minimis amount provided for defined benefit plans in section 415(b)(4) of the code. The term "agency" of a church is also defined in our legislation as an exempt organization which is either controlled by or associated with a church or a convention or association of churches. We further provide that an organization is "associated" with a church or a convention or association of churches if it shares common religious bonds and convictions with that church.

Our legislation also would treat the service of a minister or lay employee with any church or church agency of a religious denomination as the service with a single employer for purposes of computing the exclusion allowance. All

the years of service of a minister or lay employee for churches or agencies of the denomination would be aggregated in determining the exclusion allowance for taxable years beginning after 1977. It would make no difference whether the years of service being aggregated occurred before 1978 or after 1977. Our legislation will enable contributions to be made by and on behalf of ministers and lay employees in order to provide them with retirement benefits based upon the years of service with the denomination, rather than with the current employer.

Mr. President, I have received numerous letters from officials of various denominations endorsing the legislative proposals I am making today regarding church pension plans and related reform of ERISA. I ask unanimous consent that they be printed at this point in the RECORD.

There being no objection, the letters were ordered to be printed in the RECORD, as follows:

THE RABBINICAL PENSION BOARD,
*New York, N.Y., May 2, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Union of American Hebrew Congregations was incorporated in 1873 by an act of the Ohio Legislature for the purpose of . . .

"To encourage and aid the organization and development of Jewish Congregations.

To promote Jewish education and to enrich and intensify Jewish life.

To maintain the Hebrew Union College-Jewish Institute of Religion."

Some 35 years ago, the Union of American Hebrew Congregations and the Central Conference of American Rabbis organized the Rabbinical Pension Board for the purpose of administering pensions and other group insurance plans for the benefit of rabbis, religious educators, congregational administrators and other synagogue professionals who are engaged in work on behalf of the Reform Jewish Movement within the United States.

The Rabbinical Pension Board, through its two parent bodies, represents some eight hundred Reform Jewish congregations and some eleven hundred participating rabbis and other congregational professionals. The Rabbinical Pension Board is managed by a Board of Trustees elected by the Board of the Union of American Hebrew Congregations and the Central Conference of American Rabbis.

Mr. Robert L. Adler of Chicago, the chairman of the Rabbinical Pension Board, and I, share a great concern about the facts of the Employee Retirement Income Security Act of 1974 ("ERISA") on our retirement annuity and welfare benefit program. We are particularly concerned about the "intrusion of the Internal Revenue Service into the affairs of church groups and their agencies by presuming to define what is and what is not an integral part of these religious groups" and we are supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that agencies such as ours are recognized as part of a church or convention of churches and are entitled to participate in such a church plan."

We appreciate your introducing and co-sponsoring with Senator Lloyd Bentsen last year legislation designed to clarify and define the church plan and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced in this legislative session in the House of Representatives by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA, of which we are a member, during this session of the Congress will be most appreciated.

We feel that it is most important that this be accomplished as speedily as possible.

Sincerely,

THEODORE K. BROIDO,
*Secretary, Rabbinical Pension Board.*

JOINT RETIREMENT BOARD,
OF RABBINICAL ASSEMBLY,
*New York, N.Y., April 27, 1979.*

Senator HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I wish to thank you for having introduced legislation in the 95th session of Congress sponsored by the Church Alliance for Clarification of ERISA and showing your interest in helping the millions of participants in Church and Synagogue sponsored pension plans.

I would very much appreciate it and would deem it an honor if you could find time to introduce and sponsor similar legislation in the 96th session of Congress.

If there is any way we can be of help, please do not hesitate to let us know.

Sincerely,

LEO. J. LANDES.

WORKER BENEFIT PLANS,
*St. Louis, Mo., April 20, 1979.*

Hon. HERMAN E. TALMADGE,
*U.S. Senate*
*Washington, D.C.*

DEAR SENATOR TALMADGE: First, I want to express on behalf of our church body my deep appreciation to you for the interest and efforts you demonstrated on behalf of the church pension programs by introducing legislation in the last session of Congress which would have benefited the many workers presently enrolled in the various denominational pension programs.

If the present definition of "church plan" as same is contained in the Employee Retirement Income Security Act of 1974 ("ERISA") is not changed as was outlined in the legislation you introduced into the Senate last year, the pension program of The Lutheran Church-Missouri Synod will have to be divided into two programs, one for ministers who are serving church agencies and another for those ministers serving what the present definitions call "church". This splitting up of our programs is going to be a costly procedure and can only be borne out of the program monies, which means out of the pension monies available to our already underpaid church workers. Our church body certainly does not look favorably upon the fact that the Internal Revenue Service is attempting to define what is and what is not "church" and how the mission of the church is to be carried out.

Senator Talmadge, The Lutheran Church-Missouri Synod pension programs are not the only church pension programs facing a problem over the effects of ERISA. All major denominations are involved as evidenced by the formation of the Church Alliance for Clarification of ERISA. Your assistance is needed and we certainly hope you will again introduce and co-sponsor legislation to clarify the church plan definition of ERISA and also allow church workers to have greater retirement benefits.

Your continued interest and support in this matter is greatly appreciated.

Sincerely yours,

EARL E. HAAKE,
*Administrator.*

PRESBYTERIAN CHURCH IN AMERICA,
*Columbus, Ga., April 27, 1979.*

Senator HERMAN TALMADGE
*Washington, D.C.*

DEAR MR. TALMADGE: The Presbyterian Church in America has expressed its support of the various bills being suggested to exempt the church pension funds from the provisions of ERISA.

Whatever you can do to help us would be greatly appreciated.

Yours truly,

Dan M. Moore,
*Business Administrator.*

THE BOARD OF PENSIONS,
*Philadelphia, Pa., April 18, 1979.*

Hon. HERMAN E. TALMADGE,
*U.S. Senate,*
*Washington, D.C.*

MY DEAR SENATOR: On behalf of the Board of Pensions of the United Presbyterian Church in the U.S.A., may I express to you our sincere appreciation for your introduction and co-sponsorship last year of legislation designed to clarify the ERISA definition of a "church plan." From the standpoint of this Board and similar units of other religious denominations, such clarifying legislation is essential to remove the present uncertainty concerning the intent of this definition.

Absent the needed clarification, church plans will be unable to serve all employees of churches and church agencies without becoming subject to the administrative requirements of ERISA. The expenses that would result from meeting these administrative requirements would necessarily result in a reduction of the pension benefits that would otherwise be payable to plan beneficiaries. Because of the low salaries paid to church workers, their pensions are already small—they can ill afford to be reduced.

We believe that the legislation you sponsored last year would correct important defects of ERISA. Therefore, we urge you to reintroduce and co-sponsor similar legislation in the present session of Congress. In so doing you will be helping to assure that church pension plans will be able to maintain their service to church workers and their families on an efficient, cost-effective basis.

Very truly yours,

ARTHUR W. BROWN,
*President, Board of Pensions.*

BOARD OF PENSIONS,
LUTHERAN CHURCH IN AMERICA,
*Minneapolis, Minn., April 18, 1979.*

SENATOR HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Last year you introduced and co-sponsored legislation with Senator Lloyd Bentsen designed to clarify the church plan definition of the Employee Retirement Income Security Act of 1974 (ERISA) and to allow denominational workers to have greater retirement annuity benefits. Clergy and lay members of the Board of Pensions of the Lutheran Church in America appreciate your efforts and only regret that the legislation failed to be enacted.

Companion legislation has now been reintroduced in this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578.

You have already received a summary statement of some of the problems related to ERISA and church plans that require legislative attention. An additional copy of that

summary prepared by the 25 denominational members of the Church Alliance for Clarification of ERISA is enclosed for your review.

We are deeply concerned about the effects of ERISA on our denomination's retirement annuity benefit programs. Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA in this session will be appreciated.

Such support will be considerable help to us and other church pension plans in utilizing as much of available resources as possible for the benefit of our many retired ministers and church lay workers.

Sincerely,

MANFRED HOLCK, Jr.,
*Comptroller.*

---

PENSION FUND OF
THE CHRISTIAN CHURCH,
*Indianapolis, Ind., April 12, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Every religious communion that has been around long has a church pension plan. One needn't wonder why for long, when they understand the nature and commitment of the ministry and others who serve the Church, plus the desire of the Church to be true to its teachings in social and economic practices. This, I am confident, is true for all groups, be they Catholic, Protestant, or Hebrew.

By and large these institutions are served by devoted persons who make sacrifices—rarely own property—live on limited income—and serve wherever they are called.

Early in our history, the need arose for the provisions for them in case of their age or disability or their survivors in time of death. Consequently, Church pension plans are older than the life insurance industry in the United States.

Because the communion I serve is one of the younger communions, our Board began its operation in 1895 and has operated under a charter here in Indiana since then.

Because of certain things included and also omitted in the Employee Retirement and Income Security Act of 1974 (ERISA), this denomination, along with most other denominations, has become increasingly aware of the effect that is occurring upon our church pension plan and benefit programs.

The effect is a strange one. As a matter of fact, in regard to vesting and funding, our plans exceed the requirements expected under ERISA. However, in regard to reporting requirements in relationship to the units serving the Church in its various benevolent, missionary and educational enterprises, the law as now written would separate us from almost a century of service to such institutions by 1982. In addition to that, there are other injustices placed upon ministers and church employees who are not accorded the same retroactive computation advantages for their employers to build up their pensions in their final years that are accorded employees of other institutions.

This concern was registered and expressed by a resolution passed in the last General Assembly of the Christian Church (Disciples of Christ) meeting in Kansas City, Missouri in October, 1977.

We are grateful to you and Senator Bentsen, as well as Representative Conable, of New York, for introducing legislation in the last session that would have corrected many of these ills. We are calling upon many of our concerned senators and representatives to join you in this session to see that this matter does have the legislative correction so sorely needed. Along with representatives of some twenty-five or thirty other denominations participating in the Church Alliance for Clarification of ERISA, we have been attempting to express a mutual concern, since we have no regular Church organization of this broad base—Catholic, Protestant and Jewish, in order to make such a presentation to those who can correct this situation by legislation.

Your introduction and co-sponsoring of the legislation needed in this session is most appreciated.

Cordially yours,

WILLIAM MARTIN SMITH.

---

THE AMERICAN LUTHERAN CHURCH,
*Minneapolis, Minn., April 18, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Lutheran Church (ALC) has been established as a "union of congregations to which the Gospel of reconciliation has been given," the specific purposes to be "the proclamation and propagation of the christian faith, and the quickening and sanctification of the members of its congregations through the use of the means of Grace."

A copy of the stated purpose, chapter 2 of the Constitution of The ALC, is enclosed with this letter for your information. Please note that Section 2.28 specifically recognizes the establishment and maintenance of the work of the Board of Pensions by The ALC.

Many people of our 2.4 million member church body are deeply concerned about the seeming intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan." We share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been introduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of our twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA. Our Pension Board is an active participant.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

HENRY F. TREPTOW,
*Executive Secretary.*

---

REORGANIZED
CHURCH OF JESUS CHRIST,
OF LATTER DAY SAINTS,
*April 27, 1979.*

Re: Church Plans
Hon. HERMAN E. TALMADGE,
*U.S. Senate, Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Reorganized Church of Jesus Christ of Latter Day Saints was organized in accordance with the laws of New York on June 6, 1830 as a religious organization. Since the early days of the Church, ministers and other denominational workers have been provided for prior to and upon retirement.

As Presiding Bishop and Chief Financial Officer of the Reorganized Church of Jesus Christ of Latter Day Saints, I have a concern about the effects of the Employee Retirement Income Security Act of 1979 (ERISA) on our denomination's retirement annuity and welfare benefit programs. We are also concerned about the Internal Revenue Service's attempt to define what is and what is not a part of our denomination's mission.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits. Comparable legislation has been reintroduced this session by Representative Barber B. Conable, Jr. of New York as HB 1576, 1577, and 1578 which we support.

Your introduction and co-sponsoring the legislation is supported by the Reorganized Church of Jesus Christ of Latter Day Saints and is most appreciated.

Sincerely,

F. E. HANSEN,
*Presiding Bishop.*

---

THE PENSION BOARDS,
UNITED CHURCH OF CHRIST,
*April 17, 1979.*

Re: Employee Retirement Income Security Act of 1974 and church plans
Hon. HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Pension Boards of the United Church of Christ include three pension corporations and a common investment corporation that had been individually or jointly serving the ministry and the employees of the United Church of Christ since 1914.

The United Church of Christ is a denomination formed out of the merger of the Congregational Christian Church and the Evangelical and Reformed Church. Both of these denominations date back to colonial times, the Congregational Christian Church growing out of the church of the Pilgrims, while the Evangelical and Reformed Church grew out of the colonial settlers coming from Germany and other parts of middle Europe.

Over the years that the Pension Boards have served the ministers and employees of the United Church of Christ, their record has been outstanding in providing benefits for those participants who are covered under the program. The Pension Boards have been ahead of their time in facing up to the responsibility of providing retirement income for their employees and have maintained standards that, in most areas, were ahead of those required by the Employee Retirement Income Security Act of 1974, long before that Act was even contemplated by the Congress. When that Act was ultimately passed by the Congress, one of the first actions by the Pension Boards was to review that Act and assure that we met the standards of vesting and non-discrimination established by the Act, even though, as a church plan, we were probably not covered by the Act during the current years.

Notwithstanding our general compliance with the intent of the Act, many of the Act's provisions would be a substantial detriment to the Pension Boards, and a dissipation of the funds of the Pension Boards for administrative detail that will neither serve the participants, nor the Government. In addition, the Pension Boards carry on a substantial relief function of the Church which cannot be accommodated within the strict provisions of ERISA. For these reasons, and others, we greatly appreciated your introducing and co-sponsoring during the last session of the Congress, legislation intended

to clarify the exemption of churches from the provisions of ERISA and to provide for the coverage of church agencies and ministers, wherever carrying out their ministry, within the church plan.

As you are aware, Senator Talmadge, the major religious denominations have a substantial concern over the effects of ERISA, and have joined together to form the Church Alliance for the Clarification of ERISA. The legislation desired by the Church Alliance for the Clarification of ERISA, which you introduced in the Senate last year, and which was introduced in the House last year by Representative Barber B. Conable, Jr. of New York, has been reintroduced in the House by Barber Conable in this legislative session. We sincerely hope that you will introduce and co-sponsor that legislation in the Senate during this session. Copies of the legislation have been forwarded to you by Mr. Darold H. Morgan, President of the Annuity Board of the Southern Baptist Convention.

Thank you for your consideration in this matter.

Sincerely,

JOHN D. ORDWAY,
*Executive Vice President.*

---

THE PENSION DEPARTMENT OF THE A.M.E. CHURCH,
*Nashville, Tenn., April 17, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I am writing you in reference to bill H.R. 1576 as it relates to Church Pension Plans and ERISA. We appreciate your efforts heretofore in meeting with church representatives to get a clear understanding of difficulties imposed on the church by the government. Your effort on our behalf has been deeply appreciated and we continue to ask your support in the passage of bill H.R. 1576 in this Congress.

Yours sincerely,

J. M. GRANBERRY, Jr.,
*Secretary-Treasurer.*

---

ANNUITY BOARD OF THE SOUTHERN BAPTIST CONVENTION,
*Dallas, Tex., April 4, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Southern Baptist Convention was incorporated in 1845 by an act of the Georgia legislature for "the purpose of eliciting, combining, and directing the energies of the Baptist Denomination of Christians for the propagation of the gospel."

In 1918, what is now the Annuity Board of the Southern Baptist Convention was chartered to provide relief, support benefits and annuities for ministers of the gospel and other denominational workers within the of the Southern Baptist Convention. Our Annuity Board is managed by a Board of Trustees elected annually by action of the Southern Baptist Convention.

Dr. Jimmy Allen, the President of the Southern Baptist Convention (the present pastor of the First Baptist Church of San Antonio), Dr. Porter Routh, the Executive Secretary of the Executive Committee of the Southern Baptist Convention headquarters in Nashville, Tennessee, and I share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

The messengers to the 1976 annual session of the Southern Baptist Convention adopted resolutions (copies enclosed) protesting "the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission" and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Enclosed as exhibits to this letter are texts of remarks made last year when similar legislation was first introduced. Also enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

DAROLD H. MORGAN,
*President, Annuity Board of the Southern Baptist Convention.*

---

CHRISTIAN REFORMED CHURCH IN N.A. MINISTERS' PENSION FUND,
*April 25, 1979.*

Re Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Christian Reformed Church was determined to be exempt from Federal Income Tax under section 501 (c) (2) on October 7, 1971 as a non-profit corporation organized for the purpose of propagation of the Christian gospel.

As of January 1, 1970, the Christian Reformed Synod appointed a Ministers' Pension Committee to administer for Synod a pension plan for retired and disabled ministers or their widows.

Our Christian Reformed Church Ministers' Pension Committee is responsible to the Christian Reformed Synod. It is greatly concerned about the effects of the Employee Retirement Income Security Act of 1974 (ERISA) on our denomination's benefit programs. The Christian Reformed Church Ministers' Pension Committee asked me as Administrator of the Ministers' Pension Plan to register our protest against a possible intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We sincerely appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement benefits.

We are pleased that companion legislation has been reintroduced this legislative session in the House by Representative Barber D. Conable, Jr. of New York as HR 1576, 1577 and 1578. Our church envisions problems related to ERISA particularly in the administrative details required.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

GARRETT C. VAN DE RIET,
*Administrator.*

---

THE MINISTERS AND MISSIONARIES BENEFIT BOARD OF THE AMERICAN BAPTIST CHURCHES,
*New York, N.Y., April 23, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Baptist Churches Ministers and Missionaries Benefit Board serves ministers, missionaries and lay employees of churches and institutions related to the American Baptist Churches. Our denomination is composed of approximately 6,000 churches with 1½ million members. The Ministers and Missionaries Benefit Board provides a variety of benefits for the protection of over 9,000 active and retired members, including surviving spouses and dependent children. These benefits include the ABC Retirement Plan, The Annuity Supplement, the Death Benefit Plan, The American Baptist Medical Plan and a wide variety of non-contractual supplementary benefits funded by the Board's endowment.

We were most appreciative of your leadership in introducing and co-sponsoring legislation with Senator Bentsen last year which, if enacted, would clarify the implication of ERISA for the American Baptist Churches. Present ER'SA legislation and the proposed regulations issued by the Internal Revenue Service creates serious problems for us. Unless clarified by legislation, the proposed regulations could result in reduced benefits for our members. Your remarks in introducing this legislation last year, as published in the Congressional Record, indicated an understanding of these problems.

We are writing to encourage you to reintroduce this legislation in the Senate as a companion to H.R. 1576, 1577 and 1578 introduced in the House by Representative Barber B. Conable, Jr. of New York with whom we have been working.

We join with the members of the Church Alliance for the Clarification of ERISA, which represents every major religious group in the United States, in expressing our appreciation for assisting us in this effort.

Sincerely yours,

DEAN R. WRIGHT,
*Executive Director.*

---

THE CHURCH PENSION FUND,
*April 27, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: In 1914, The Church Pension Fund was created by The General Convention of The Episcopal Church to provide pension benefits for aged and disabled ministers of the Episcopal Church. Our Board is managed by a Board of Trustees elected triennially by action of the General Convention.

We share the concern of all denominational pension boards about the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission. We completely supported the introduction in the last legislative session of legislation to

amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan.

We greatly appreciated your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Members of over twenty-five religious denominations have expressed their concerns about the effects of ERISA on traditional church pension programs through the Church Alliance for Clarification of ERISA.

On behalf of the Trustees of The Church Pension Fund and the active and retired ministers of the Episcopal Church, I most earnestly appeal for your continued support of all clergy and all religious organizations by reintroducing and co-sponsoring in this session the legislation supported by the Church Alliance for Clarification of ERISA.

Sincerely,

ROBERT A. ROBINSON,
*President.*

---

UNITARIAN UNIVERSALIST ASSOCIATION,
*Boston, Mass., April 30, 1979.*

Re Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Last year the Universalist Association (UUA) joined the Church Alliance for Clarification of ERISA because of its concern about the many questions raised of the impact of ERISA on church pension plans, such as the one maintained by the UUA.

Your support of the clarifying legislation last year was greatly appreciated; and the dicision by you to reintroduce the legislation this year would also be much appreciated.

I am scheduled to meet with the Pension Plan Study Committee that was appointed by the UUA Board of Trustees at its January 26, 1979 meeting on May 24, 1979. If you have decided to re-file the legislation prior to that date, please let me know so that I can inform the Committee members of our favorable action.

Thank you for your consideration of these matters.

Very truly yours,

WILLIAM B. DUFFY, Jr.,
*General Counsel.*

---

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS,
*Washington, D.C., April 18, 1979.*

Subject: Church Retirement Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Seventh-day Adventist Church was one of the first religious or business organizations to initiate a private pension plan for the benefit of its employees. Our retirement plan was started in 1911 and has been a continuous operation since then. As of December 31, 1978 approximately 35,000 clergy and lay employees of our church and agencies were covered by this plan and 5,600 were receiving retirement benefits. During 1978 benefit payments amounted to just over $26 million.

Our retirement plan is a "promise to pay" type plan and would technically be classified as an "unfunded" type retirement plan since we do not keep individual accounts for covered employees and no attempt has been made to fund the liabilities on an accrual basis. The cost of the yearly benefits is considered a current operating expense of the Church. However, a reserve equivalent to three years benefit expense is kept on hand at all times. Our Church feels that it is just as much obligated to pay retirement benefits as to pay the salaries of active employees. The entire assets of the Church are back of the retirement plan and its has always lived up to its obligations in this regard.

The Seventh-day Adventist Church, along with over twenty-five other religious denominations, has a major concern about the effects that the Employee Retirement Income Security Act 1974 (ERISA) would have on the operation of our retirement plan. We have been an active member of the Church Alliance for the Clarification of ERISA and fully support the efforts of this association to effect needed changes in the Act. For one thing, the funding requirements would be a major problem for us if we have to comply with ERISA requirements. They would place an oppressive burden on the Church as large sums of money would have to be taken from the funding of other church ministries and used instead to fund the past service liabilities for the retirement benefits of employees of church agencies.

The possibility of having to separate the employees of the so-called church agencies from our retirement plan is another of our major concerns.

Our Church has always considered its agencies as directly involved in the total ministry and outreach of the Church. In our theology and philosophy of church operations our institutions have from their inception been integral parts of the Church, direct instruments in the carrying out of its divine commission. Those who serve in these institutions of the Church, whether in the fields of publishing, health, education, or any other, have dedicated their lives to the Church's mission. To separate these workers from the Church plan will create a problem of portability as there is considerable movement of employees from one type of organization to another.

The efforts of the Internal Revenue Service to define what constitutes a church and what does not in our opinion is a violation of the principle of separation of church and state, but has characterized our nation from its beginning. If the church can be trusted to administer pension benefits for its ministers and other employees who in the opinion of government are working directly for the church, it would seem that the church could also be trusted to provide retirement benefits for employees of its agencies without being regulated by the government.

Our Church plan is presently being revised to comply with nearly all of the standards of ERISA regarding eligibility and benefits. In addition it provides many additional benefits that are not mandated by ERISA, such as an annual cost of living increase. Coming under the jurisdiction of ERISA will not really benefit our employees, but instead the excessive administration and reporting burdens would no doubt result in a reduction in the pension benefits of our employees.

We appreciated very much your introducing and co-sponsoring legislation with Senator Lloyd Bentson last year designed to clarify the church plan definition of ERISA and to bring about other needed corrections in this Act. Your introducing and co-sponsoring similar legislation in this session of Congress will be greatly appreciated.

Sincerely,

K. H. EMMERSON,
*Treasurer.*

---

GENERAL BOARD OF PENSIONS OF
THE UNITED METHODIST CHURCH,
*Evanston, Ill., May 1, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The general United Methodist denomination is a voluntary religious movement and connectional network of millions of persons, known as "members," and literally tens of thousands of units, variously designated as local churches, charges, conferences, boards, commissions, councils, and agencies. These many units operate in religious service and mission throughout the United States of America and numerous foreign countries. They are related and brought together in worship and service through local Church, Charge, District, Annual, Jurisdictional (regional), and the General Conference in a connectional manner which is fundamentally characteristic of the denomination in its entirety. To assist in its work, the denomination known as the United Methodist Church, through an "Administrative Order," has created certain organizations at a denominational level to assist all other units in performing certain specialized tasks. One such General Agency is the General Board of Pensions of the United Methodist Church. In writing to you in support of legislation proposed by the Church Alliance for Clarification of ERISA, the General Board of Pensions of the United Methodist Church is acting within its specific and delegated authority, on behalf of all persons and organizations which comprise the denomination known as the United Methodist Church.

A fundamental tenet of the United Methodist doctrine is that the "wholeness of the gospel is manifest in the totality of the Church." From its earliest days, United Methodists have been active in the support of many institutions, of education, health care, and in other areas, and millions of persons have benefited from these efforts over the years. The legislation which we now support, in our opinion, will aid our denomination and other religious denominations in continuing such work (much of which is of such special benefit to individual persons in this country).

We would not presume to suggest that, because the United Methodist denomination is identified as a "church," it is therefore "above the law," "outside the law," or entitled to "special treatment by the law". Nevertheless, the fact remains that churches, even more than non-profit organizations in general, by their very nature, organization, and function are unique. I daresay that no two religious denominations are organized or function in exactly the same manner. Efforts, by legislatures or other bodies, to lump all "churches" together for identical treatment, particularly when legislation has been drafted initially to deal primarily with the commercial or business world, pose very serious and, we presume, generally unintended difficulties for such church groups. We respectfully submit that the Congress has a clear and justifiable interest in seeing that legislation passed by it presents no unnecessary handicap to *bona fide* religious denominations for the work of their denominations in the areas affected by such laws. If, because of the unique structure and operation of the various individual churches, specific legislation is required in order to minimize or eliminate such undue restrictions on churches, then we feel that specific legislation should receive the prompt and careful attention of all members of the Congress.

In the interest of time, we shall mention only two (of the many) instances in which the proposed legislative changes would be of special significance with respect to the United Methodist denomination. "The itinerant system is the accepted method of The United Methodist Church by which ministers are appointed by the bishops to fields of labor." As presently provided, the law would require the General Board of Pensions of the United Methodist Church to switch its ordained clergy in and out of differing pension plans each time such ministers changed appointments from local churches into what

are known as "special appointments," in such areas as the chaplaincy, church-related and other educational institutions, and other areas of work. Such a requirement—to move a person in and out of a "church plan"—is unduly burdensome and provides no benefit for the individual involved. The proposed legislation would permit the inclusion of ordained ministries in a single pension plan regardless of where those ministers are serving at any given point in time.

Along the same line, the present definition of a "church plan" is too restrictive. The present definition simply will not accommodate the needs of the United Methodist denomination in its efforts to provide pensions for its ordained clergy and lay employees of churches and church-related institutions. The United Methodist Church has licensed clergy, two levels of ordination, a separate Diaconal ministry classification, and lay employees in various degrees of relationship to the various units of the church. To require a multitude of different pension plans, each having to be tailored for the specific status of each such group is again unduly burdensome and provides no benefits for the individuals concerned. The legislation proposed, by broadening the definition of a "church plan" would permit the General Board of the General Board of the United Methodist Church to consolidate the number of different pension plans it must administer, thus providing a multitude of benefits for the plan participants.

For these, and other similar reasons, we urge your support of the legislation proposed and submitted under the Church Alliance for Clarification of ERISA.

Yours sincerely,

JAMES M. WALTON-MYERS.

---

BOARD OF PENSIONS OF THE CHURCH OF GOD,
*Anderson, Ind., April 17, 1979.*

Re Church Plans.
Senator HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Thank you for introducing in last year's Senate the legislation supported by the Church Alliance for Clarification of ERISA. Since the Senate did not have time to act on this legislation, it is our hope and prayer that you will reintroduce the legislation this year.

The Church of God Pension Plan came into existence in 1948. We are a small church in comparison to many large denominations, yet our heritage dates back 100 years. We have approximately 4,000 ministers and congregations. Our ministers have never earned large salaries, and retirement benefits for them will be minimal in comparison to many persons who have worked for industry and who have gone on pension.

If our church plan is required to abide by all the demands of ERISA after 1982, we will have to lower our retirees' retirement income even more for there is no way we can take on added work-loads without increasing the operational costs to run our plan.

Since our plan is only 30 years old, and a voluntary plan, many of our ministers have a very small accumulation in their retirement fund. Our hope is that Government regulations will permit churches like educational institutions to make retro-active (tax-sheltered) contributions to a minister's retirement account for years of service when he was not a member of the voluntary pension program sponsored by his denomination.

If the Senate does not permit Church Agencies to remain a part of our Church Pension Plan, our office will find it necessary to run two pension programs. Operational costs will nearly double and our low income church employees and ministers will again be made to suffer.

From the foregoing information, you can readily see the frustrations we face as Church Pension Plans. Our ministers and church employees, even though academically qualified and often highly trained have been underpaid during their working days because they found themselves in service oriented positions, and they will also find themselves short-changed in retirement.

Our Communion and I'm sure all churches affiliated with the Alliance for Clarification of ERISA will be most appreciative for any help you give us in the Legislature pertaining to these matters.

Sincerely yours,

HAROLD A. CONRAD,
*Executive Secretary.*

---

CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA,
*Omaha, Nebr., May 3, 1979.*

Re: Church Plan
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Catholic Mutual Relief Society is a nonprofit, charitable, religious and benevolent association organized in 1889 by an ecclesiastical body of members of the hierarchy of the Roman Catholic Church in North America for the purpose of protecting and preserving properties of such Church and to further aid and assist the Members of the Hierarchy and Religious in the discharge of their Canonical Duties. The management of this Society is vested in a Board of Trustees, all of whom must be Archbishops or Bishops of the Roman Catholic Church. Currently there are twenty-one Bishops and Archbishops acting as Trustees of the Society.

Through its many members, the Society has learned of the concern of church groups and their agencies for their continued operation in the face of increasing interference by the Internal Revenue Service. As a service to our members, we have helped support the Church Alliance For The Clarification of ERISA in its attempts to amend ERISA to at least recognize the present state of church retirement plans for churches and their agencies.

We thank you for your co-sponsorship of the legislation with Senator Bentsen in the last session of Congress attempting to clarify the church plan definition contained in ERISA and allowing greater retirement annuity benefits to those people working within the denominations. While ours is a Roman Catholic organization, our association with the Church Alliance has made us aware of the many problems caused by ERISA to our brothers in the Protestant and Jewish organizations.

You are aware of the many problems created by ERISA which the Church Alliance has addressed. Your continued support and co-sponsorship of legislation proposed by the Church Alliance For The Clarification of ERISA is very much appreciated. We would respectfully urge you to reintroduce the Church Alliance legislation in this session of Congress.

Sincerely,

THOMAS J. HANRAHAN,
*Executive Vice President.*

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that a bill introduced by Mr. TALMADGE, for himself and others, relating to ERISA, be jointly referred to the Committee on Finance and the Committee on Labor and Human Resources.

The PRESIDING OFFICER. Without objection, it is so ordered.

By Mr. PRESSLER (for himself and Mr. MATHIAS):

S.J. Res. 74. Joint resolution authorizing and requesting the President to issue a proclamation designating May 11, 1979, as "CARE Day"; considered and passed.

(The remarks of Mr. PRESSLER when he introduced the joint resolution appear elsewhere in today's proceedings.)

---

## ADDITIONAL COSPONSORS

S. 80

At the request of Mr. NELSON, the Senator from Kentucky (Mr. HUDDLESTON) was added as a cosponsor of S. 80, a bill to amend section 201 of the Agricultural Act of 1949, as amended, to extend until September 30, 1981, the requirement that the price of milk be supported at not less than 80 per centum of the parity price thereunder.

S. 199

At the request of Mr. INOUYE, the Senator from Virginia (Mr. WARNER) was added as a cosponsor of S. 199, a bill to amend the Shipping Act, 1916, to strengthen the provisions prohibiting rebating practices in the U.S. foreign trades.

S. 446

At the request of Mr. WILLIAMS, the Senator from Iowa (Mr. JEPSEN) was added as a cosponsor of S. 446, the Equal Employment Opportunity for the Handicapped Act of 1979.

S. 582

At the request of Mr. NELSON, the Senator from California (Mr. CRANSTON) was added as a cosponsor of S. 582, the Farm Entry Assistance Act.

S. 715

At the request of Mr. BELLMON, the Senator from West Virginia (Mr. RANDOLPH) was added as a cosponsor of S. 715, a bill to authorize the Robert A. Taft Institute of Government Trust Fund.

S. 819

At the request of Mr. PRESSLER, the Senator from Indiana (Mr. LUGAR) and the Senator from Nevada (Mr. LAXALT) were added as cosponsors of S. 819, a bill to amend the Clean Air Act to promote the use of alcohol as a motor fuel and as an additive to motor vehicle fuels, and for other purposes.

S. 918

At the request of Mr. HUDDLESTON, the Senator from Arkansas (Mr. BUMPERS), the Senator from Montana (Mr. BAUCUS), the Senator from Alabama (Mr. STEWART), the Senator from Michigan (Mr. LEVIN), the Senator from Utah (Mr. HATCH), the Senator from New Mexico (Mr. SCHMITT), and the Senator from Montana (Mr. MELCHER) were added as cosponsors of S. 918, a bill to authorize the Small Business Administration to establish small business development centers.

S. 1006

At the request of Mr. COCHRAN, the Senator from North Dakota (Mr. YOUNG), the Senator from Texas (Mr. TOWER), and the Senator from Alabama (Mr. HEFLIN) were added as cosponsors of S. 1006, to permit the emergency use of the pesticide mirex on imported fire ants in accordance with health and safety standards of the EPA.

EXECUTIVE SESSION

- - -

THURSDAY, JUNE 12, 1980

- - -

United States Senate,
Committee on Finance,
Washington, D. C.

The committee convened at 10:05 a.m., in Room 2221, Dirksen Senate Office Building, the Hon. Herman Talmadge presiding.

Present: Senators Talmadge, Nelson, Bentsen, Moynihan, Matsunaga, Baucus, Boren, Bradley, Dole, Packwood, Heinz, Chafee, and Durenberger.

Senator Talmadge. The committee will please come to order. We have two back-to-back votes in the Senate at 12:00. That means for all practical purposes we will have to try to finish this bill by 12:00. I would suggest that we follow the procedure of letting the staff proceed as they did on Tuesday, with the staff recommendations, and then vote on them, and then vote on any amendments that may be offered by members of the committee. Is that agreeable?

Senator Packwood. Mr. Chairman, that is agreeable if we can finish this by 12:00. I am going to Oregon this afternoon for some hearings on the damage to the Columbia River because of the Mt. St. Helens eruption. If there is a possibility. If we get to about eleven o'clock and it appears we might not make it, I

over a private transit system, in the State of New Jersey. And the state will not accept the responsibility for the unfunded pension payments. The private corporation that is selling it says that they will. I just want to nail down that when the state takes over the stock of the company and the private company says they will continue to assume the liability for the unfunded pension payments, that when they make those payments they will be able to get that tax deduction.

Senator Bentsen. Mr. Chairman, that certainly appears to be equitable.

Senator Talmadge. Any objection? Without objection it is agreed to. Now, Senator Packwood I believe had something.

Senator Packwood. My amendment relates to Senator Durenberger's presentation, and I will wait until he comes back.

Senator Talmadge. All right. Now I have one. I will state it very briefly. This is cosponsored by Senator Bentsen and Boren, working closely with representatives of 27 major church denominations from across the nation. I introduced this 1090 and its companion tax bill, S. 1091, to protect the viability of church retirement plans.

The problem that church plans face is one of definition. Under current law, both ERISA and the Internal Revenue Code, define such plans to include not only church plans covering church employees but also plans covering employees of church-affiliated organizations.



300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

For example, the church plan might cover the employees of a church-related hospital, university or retirement home. As you might expect, this is a common practice of many churches throughout the United States. However, unless we act to preserve the longstanding definition of church plans, the law as it currently reads will phase out this definition beginning in 1983.

S. 1090 and S. 1091 make the amendments necessary to continue the current church plan definition. The definition would also be expanded to include church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church.

In addition, the definition of the term "employee of a church" would be expanded to include a church minister in the exercise of his or her ministry regardless of the source of compensation, as well as certain former church plan participants.

The bills would also create a notice and correction procedure for the amendment of a church plan.

Senator Dole.

Senator Dole. I just want to say as a cosponsor I support everything you said.

Senator Talmadge. Any objection? Mr. Halperin of the Treasury Department.

Mr. Halperin. Mr. Chairman, we have objected to certain provisions of that bill, and let me just point out what we see

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

as the most serious concern.

What that bill would permit, it would exclude church agencies from the protection of ERISA, and that would mean that if somebody works for a hospital or a school that happens to be affiliated with a church it would be permissible for that plan to provide no retirement benefits unless they work until age 65, for example.

So it could deny benefits for people who might have 20 or 30 or even more years of service with the school or the hospital. Now maybe they don't want to go that far, and we have had conversations with these people for a number of years and we have always offered to talk about each particular provision of ERISA and find out which of them create problems for them because it certainly would be reasonable to modify some of them to deal with the particular problems of churches. But to say that the vesting provisions, the eligibility provisions do not apply across the board so that we can return to the situation where long-service employees get no pensions seems to us to be objectionable, Mr. Chairman.

Senator Talmadge. I think we have got a question of separation of church and state here, number one, gentlemen, and, number two, I don't believe we ought to get a row with every religious faith in the country -- Jewish, Catholic, Protestant, and otherwise.

All in favor please say "aye."



300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

National Archives



(A chorus of "ayes.")

Opposed, "no."

(No response.)

The "ayes" have it, and the amendment is agreed to.

Senator Dole. Mr. Chairman?

Senator Talmadge. Senator Dole.

Senator Dole. I was going to propose, I don't see it in the staff recommendations, and that would be a sunset date on this legislation of June 30, 1983. I think what we are looking about we talked about sunset legislation in the general sense. I am not certain this legislation will answer all the concerns we have. It will force Congress to take another look at it, give us time to see how it works, and give us time to make any necessary changes. I might add that 1983 is a nonpolitical year.

We want to make certain that we provide income security to employees, but if employers cannot survive, then we are going to have a question of PBGC paying substantial benefits. This may require very high premiums or could even in some circumstances lead to going to the general revenues for funding.

I haven't discussed this amendment with the staff or with PBGC, but I think what we need to --

Senator Talmadge. What date in 1983 do you suggest, Senator Dole?

Senator Dole. June 30.



300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

United States Code Annotated
Title 29. Labor
Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
Subtitle A. General Provisions

29 U.S.C.A. § 1002

§ 1002. Definitions

Currentness

For purposes of this subchapter:

. . .

**(33)(A)** The term "church plan" means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

**(B)** The term "church plan" does not include a plan**--**

**(i)** which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of Title 26), or

**(ii)** if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C) (or their beneficiaries).

**(C)** For purposes of this paragraph**--**

**(i)** A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

**(ii)** The term employee of a church or a convention or association of churches includes--

**(I)** a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

**(II)** an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches; and

**(III)** an individual described in clause (v).

**(iii)** A church or a convention or association of churches which is exempt from tax under section 501 of Title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

**(iv)** An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

**(v)** If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches, the church plan shall not fail to meet the requirements of this paragraph merely because the plan--

**(I)** retains the employee's accrued benefit or account for the payment of benefits to the employee or his beneficiaries pursuant to the terms of the plan; or

**(II)** receives contributions on the employee's behalf after the employee's separation from such service, but only for a period of 5 years after such separation, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7) of Title 26) at the time of such separation from service.

**(D)(i)** If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26 fails to meet one or more of the requirements of this paragraph and corrects its failure to meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this paragraph for the year in which the correction was made and for all prior years.

**(ii)** If a correction is not made within the correction period, the plan shall be deemed not to meet the requirements of this paragraph beginning with the date on which the earliest failure to meet one or more of such requirements occurred.

**(iii)** For purposes of this subparagraph, the term “correction period” means--

**(I)** the period ending 270 days after the date of mailing by the Secretary of the Treasury of a notice of default with respect to the plan’s failure to meet one or more of the requirements of this paragraph; or

**(II)** any period set by a court of competent jurisdiction after a final determination that the plan fails to meet such requirements, or, if the court does not specify such period, any reasonable period determined by the Secretary of the Treasury on the basis of all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or

**(III)** any additional period which the Secretary of the Treasury determines is reasonable or necessary for the correction of the default,

whichever has the latest ending date.

. . .

29 U.S.C.A. § 1002, 29 USCA § 1002
Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved 12-19-2014

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

legislation which provides the vehicle for establishing integrated resource and environmental data on the natural and managed rivers as well as other North Coast watersheds and tributaries. The investigations and surveys we have underway are:

Northern California Streams.

The Humboldt Bay Baseline Survey.

The Russia River Basin Comprehensive Investigation.

The Eel River Streambank Erosion Demonstration Project.

Eel River Delta Alternatives to Levees.

The Eel River Comprehensive Basin Investigation.

The latter study and the Russian Comprehensive were unique in that it provided the Corps a new role in water resource planning and assistance. These basin resolutions direct the Corps to investigate all facets of the watershed, from forestry and fishing to water quality and flood control.

For the Eel Delta, we've authorized the Corps to evaluate and develop non-structural flood control alternatives such as flood proofing of buildings, possible relocation, dredging, channel stabilization and cattle evacuation plans. While it would not control a major flood such as in 1964, it could minimize damage and afford some protection and security from the lesser floods that occur.

In Lake County, there has also been a concentrated effort to deal with the water quality and supply problems at Clear Lake with nonstructural alternatives. In this endeavor, EDA, EPA, Bureau of Reclamation and the Corps have all been involved.

These ideas of a new and more flexible role for the Corps are being accepted. Recently, Lt. General John Morris, Chief of Engineers, in a speech to the Water Resources Congress, entitled "Where are We Headed" noted, "Water resources problems will continue to arise from population growth, economic expansion and unpredictable natural events will force more effective national water conservation measures supported by a proper blend of structural and non-structural solutions which are well engineered and developed. The key to resolving water resource problems is the formulation of clear, comprehensive national water policies which are in tune with today's public and national objectives." These changes in thinking by the Corps are indicative of the re-evaluations of National Water Policy currently taking place in the Congress and the Administration. One administration report advises the President to propose laws and adopt procedures that would require federal and state planners to consider much more carefully the building of huge government-financed water projects. This same report also recommends that states should be required to pay in advance 10% of the cost of the new water projects that they want built. Of course, Congress would have to assist and/or approve the establishment of any new water policy.

This Congress has approved our committee's new "clean water" program which authorizes comprehensive waste water management and includes my new innovative technology incentives amendments for communities that develop re-cycling, re-use and land treatment management alternatives.

The implications of all of this are far-reaching. For sure, it points to the need for building a cohesive political support group in the North Coast that will be able to articulate representative and clearly defined positions on the water related issues that affect you. I believe that your joint-powers agreement is the first step toward meeting that objective. Your program is a program *of*, *by* and *for* the areas of origin on the North Coast . . . you have perceived the potential for action by other interests in the state and you are taking early-on action to make sure that our interests are protected. It is not a narrow, parochial, "them versus us" interest, but the legitimate interest in seeing that you have a say in what affects our communities . . . and the North Coast.

Your joint-powers agreement is properly predicated on the strong role that local government should and must play in determining public policy that you will establish and implement and I totally support the fundamental concepts of your agreement. The real challenge to all of us will come when we develop the specifics of our plan of action.

The Miami and Muskingum watershed conservancy programs in Ohio are excellent examples of what can be done by local units of government joining together to address common water resource related problems. These organizations were initially formed to control the tremendous floods that used to frequent the Miami and Muskingum Valleys in Ohio. Over the years, they have matured into multi-purpose water management organizations whose primary goal was flood control and the maintenance of water quality in their regions. They are actively involved in waste management, flow-augmentation, stream appearance, recreation facilities and other problems that affect water quality. I would strongly recommend that those who will be immediately involved in directing your joint-powers agreement look to the Miami and Muskingum programs as models of what can be done.

The Corps will cooperate with you in developing its studies and resource inventories. Last week in Washington I met with Colonel John Atsid, of the San Francisco District. We talked of this joint-powers agreement and he re-affirmed his commitment to provide support. He also indicated that Charlie Elmore, whom most of you know and who is here today, would be designated as the Corps' liaison person to work directly with you. I think the Corps is the best federal agency to provide coordination in this area because of its long-standing knowledge of our region and its water resources.

We also have in our own area tremendous talent and human resources that you can tap in developing your information base. I have discussed with the Presidents of Humboldt State, Sonoma State and the Community Colleges in the North Coast the idea of involving their forestry, fishery, remote sensing, environmental science and biology departments in your efforts. They have all expressed a ready willingness to participate.

Given such a broad-based support effort we can continue to work at the Federal level to provide a mechanism to consolidate the tremendous amount of information that would be forthcoming. Several ideas that I have in mind might be the construction of a hydrology model of our North Coast, similar to the San Francisco Bay Model that the Corps operates in Sausalito. Or a computer simulation model of the region, like the one used to monitor water quality in the Miami Conservancy Program.

Only after the establishment of such a data base and resource inventory will you be in a position to make the kinds of management and policy decisions that you envision in your joint-powers agreement.

So, in conclusion, let us restate our purposes and objectives.

As I stated in my 1971 speech advocating the Basin Watershed Conservancy concept, "The challenge to the North Coast is to strike a balance between conservation and development of our natural resources. The present and future economy of our area is tied directly to the way in which we meet this challenge."

I want to assure you that I fully support your actions to date and I believe we are in unison toward meeting this challenge.

The purposes of the Watershed Conservancy program is to provide information, direction and expertise necessary for the continued management, development, use and treatment of the surface and ground water of the Russian and Eel Basin so as to meet the water quality standards set by the State and approved by the federal government under our "Clean Water" program.

Simply put, our objectives are to say that the waters of the Russian and Eel Watersheds must be suitable for all uses at all places at all times.

Water quality is everybody's business.

Water management is our mutual responsibility.

Water is one of this nation's treasures. We cannot survive without it.

A nation is no more than the sum of its natural resources and its people and only when the people and their governments properly manage their natural resources can they or the nation survive.

Working together, we, on the North Coast of California, can demonstrate to our people the kind of enlightened leadership required to meet this challenge. The people we are privileged to represent have a right to expect the best from all of us. Give us at the state and federal level a vehicle to work with and maybe we can supply some of the fuel. But, you the elected representatives of the North Coast will be in the drivers seat.

In addition to the water management I've discussed, I look forward to working with you on transportation and economic development programs that will revitalize and diversify the economies of our area.●

---

## PENSION PLANS OF CHURCHES AND CHURCH-RELATED ORGANIZATIONS

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from New York, (Mr. CONABLE) is recognized for 10 minutes.

● Mr. CONABLE. Madam Speaker, I wish to discuss a bill, H.R. 12172, which I recently introduced to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan. The major church denominations of this country all agree that they are seriously affected by the definition of church plan we provided in section 414(e) of the Internal Revenue Code.

For many years our church plans have been operating responsibly and providing retirement coverage and benefits for the clergymen and lay employees of the churches and their agencies. Some of the church plans are extremely old, dating back to the 1700's. The median age of church plans is at least 40 years. Churches are among the first organizations to found retirement plans in the United States.

In 1974, when we enacted the Employee Retirement Income Security Act of 1974, popularly called ERISA, we exempted church plans from the provisions of the act to avoid excessive Government entanglement with religion in violation of the first amendment to the Constitution. We provided that a church plan is a plan established and maintained for its employees by a church or by a convention

or association of churches which is exempt from tax under section 501. At the same time we provided that a church plan, if it were to continue to be identified as such, could not provide coverage to employees of church agencies not participating in the plan in 1974, nor could it provide coverage for employees of any agencies after 1982.

Mr. Speaker, I believe that our definition of church plan should be revised. It does not take into account the special needs of our churches, ministers, and lay persons, or the structural differences of our denominations.

Under the existing definition of church plan, the churches must by 1982 divide their plans into two parts, one covering employees of the church and one covering employees of church agencies. Present law fails to recognize that the church agencies are parts of the church in its work of disseminating religious instruction and caring for the sick, needy, and underprivileged. Estimates of the initial costs of the division of church plans that have been in existence for many years and of the additional continuing costs of maintaining two separate plans are so significant that reduced benefits may result.

Some of these additional costs must of necessity be shifted to the local churches and agencies. Churches and church agencies are often very small and operate marginally, being staffed by two or three persons who work at a personal sacrifice. Plan contributions for churches and agencies are generally dependent upon tithes and offerings. There is virtually no way to pass on higher plan costs to the consumer as businesses can. If forced by the 1982 deadline to establish a retirement plan separate from the denominational plan and to comply with the paperwork and other requirements of ERISA, many of the agencies might decide to abandon their retirement plans.

Mr. Speaker, the division of the church plans will also hurt the work of our churches. The churches consider their agencies as an extension of their mission. A significant number of ministers and lay employees move frequently from church to agency and back in pursuance of their careers. A church may ask a rabbi to serve in an agency where his services are most needed. The rabbi may then return to pulpit work. The present definition of church plan does not satisfy the unique need of our churches to cover continuously their employees in one plan. If ministers and lay persons cannot be continuously covered by one plan, gaps in coverage will result, and they will not be free to pursue their work for the denomination as they should.

Also, many ministers serve their faith outside of the denominational structure as chaplains in prisons, universities, hospitals, and elsewhere. In some cases the employment relationship is not easily discernible or does not exist. For example, evangelist ministers may have no employer. The present definition of church plan could be interpreted to exclude them from coverage either now or in 1982.

One of the most important binding influences within a religious denomination is the pension and welfare benefits program. The division of the church plans may lessen the unity of the church. Some churches fear that division of their plans will destroy the sense of oneness within the church and weaken the dedication of agency employees to the denomination.

Moreover, in a congregational denomination, if the plan covering the agencies is required to comply with ERISA, the denomination would not be able to require an agency either to join in the plan or to observe the requirements of ERISA. In the congregational type of denomination, the local churches and agencies are self-governing. Unlike corporate structures, no lines of authority exist from the denomination.

The existing definition of church plan has also created many technical problems. The large majority of church plans of the congregational denominations are administered by a pension board, a unit separate from, but controlled by, the denomination. It is not clear whether a plan administered by a pension board of a congregational church is a plan established and maintained for its employees by a church. A pension board is usually incorporated because the church does not want the funds set aside for retirement purposes to be subject to the general creditors of the church.

This structure raises a question whether a plan maintained by a pension board is maintained by a church. In the congregational denominations, ministers and lay employees are considered employees of the local churches and other units, rather than of the denomination. As mentioned, congregational churches have little control over local churches and agencies. Some differences in plan provisions, therefore, necessarily occur, and the question is also raised whether the plan is maintained by the church (denomination) for its employees or by a local church for its employees.

Under section 1 of the bill, effective as of January 1, 1974, a church plan may continue after 1982 to cover the employees of its church-associated organizations, both those participating in 1974 and those that begin participation after 1974. This recognizes the special nature of church agencies and of their special problems in complying with ERISA. It also recognizes the unique needs of ministers and denominational employees to move about within the denominational structure and still stay within the church plan.

The bill achieves this result by retaining the basic definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churches exempt from tax under section 501. The term "employee", however, is redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and third, certain former employees who participated in a church plan before separation from service. Under the bill an organization is "associated" with a church if it shares common religious bonds and convictions with that church.

For purposes of section 414(e), all such employees are deemed to be employed by the denomination. The combined effect of these provisions is to treat both hierarchical and congregational denominations in the same manner for purposes of the church plan definition. The bill, thus, accommodates the differences in beliefs, structures, and practices among our religious denominations.

By including ordained ministers within the definition of employee without requiring an employment relationship, the bill permits a church plan to continue to cover a minister who serves in the exercise of his ministry outside of the denominational structure. Thus, a minister serving as a prison chaplain or teaching religious studies in a university could receive coverage. An evangelist minister who has no employer would also be entitled to participate in the church plan.

The bill provides that a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service.

A typical example would be a minister or lay employee who reaches a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the denomination. During such a transitional period, the denomination may permit the individual to continue to be covered by the church plan for a time even though he has separated from service.

The bill would permit a church plan to continue to receive contributions for an individual who is a participant in a church plan at the time of his separation from service, but only for a period of 5 years. No such time limit is placed upon employees who are separated from service because of disability.

The bill also recognizes pension boards as acceptable funding media for church plans. A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of this organization is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church.

The organization must also be controlled by or associated with a church exempt from tax under section 501(a). It is intended that no church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in plan provisions among the local employers.

The bill also corrects a very harsh position taken by the Treasury Department

in its proposed regulations defining church plan which provide that once a church plan fails to meet the requirements of a church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

My bill provides a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the bill is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. Speaker, I believe that when we enacted ERISA, we required far more of our churches than we intended. We certainly did not in 1974 intend to draft a definition of church plan that fails to take into consideration the way our church plans are operated or that is disruptive of church affairs. Our 1974 legislation requires the church plans to reconstitute their plans after decades, even centuries, of responsible experience.

The problems the churches face are immediate. They are concerned today that their plans may be presently disqualified as church plans. This is a matter we must not put off until 1982.

Therefore, Mr. Speaker, I urge my distinguished colleagues to support this measure, and I ask unanimous consent that the bill be printed in the RECORD.

The bill follows:

H.R. 12172

A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. Section 414(e) of the Internal Revenue Code of 1954 is amended to read, as follows:

"(e) CHURCH PLAN.—

"(1) IN GENERAL.—For purposes of this part the term 'church plan' means a plan established and maintained (to the extent required in paragraph (2)(B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501.

"(2) CERTAIN PLANS EXCLUDED.—The term 'church plan' does not include a plan—

"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513); or

"(B) which includes individuals less than substantially all of whom are described in paragraphs (1), (3)(B), or (3)(E) (or their beneficiaries).

"(3) DEFINITIONS AND OTHER PROVISIONS.—For purposes of this subsection—

"(A) A plan established and maintained by a church or by a convention or association of churches shall include a plan established and maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

"(B) The term 'employee' of a church or a convention or association of churches shall include—

"(i) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

"(ii) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 and which is controlled by or associated with a church or a convention or association of churches; and

"(iii) an individual described in paragraph (3)(E).

"(C) A church or a convention or association of churches which is exempt from tax under section 501 shall be deemed the employer of any individual included as an employee under paragraph (3)(B).

"(D) An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

"(E) If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization described in clause (ii) of paragraph (3)(B), the church plan shall not fail to meet the requirements of this subsection merely because it—

"(i) retains his accrued benefit or account for the payment of benefits to him or his beneficiaries pursuant to the terms of the plan; or

"(ii) receives contributions on his behalf after his separation from such service, but only for a period of five years after the employee's separation from service, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7)) at the time of such separation from service.

"(4) CORRECTION OF FAILURE TO MEET CHURCH PLAN REQUIREMENTS.—If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 fails to meet one or more of the requirements of this subsection and corrects its failure to meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this subsection for the year in which the correction was made and for all prior years. If a correction is not made within the correction period, the plan shall not be deemed to meet the requirements of this subsection beginning with the date on which the earliest failure to meet one or more of such requirements occurred. The term 'correction period' means the period ending with the later of the following: (1) 270 days after the date of mailing by the Secretary of a notice of default with respect to the plan's failure to meet one or more of the requirements of this subsection; (2) such period as may be set by a court of competent jurisdiction after a determination that has become final that the plan fails to meet such requirements, or, if the final court determination does not specify such period, a reasonable period depending upon all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or (3) any additional period which the Secretary determines is reasonable or necessary for the correction of the default."

SEC. 2. The amendments made by this Act shall be effective as of January 1, 1974.●

## HALL PEOPLE

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Illinois (Mr. MICHEL) is recognized for 15 minutes.

● Mr. MICHEL. Madam Speaker, yesterday I inserted in the RECORD a Washington Post article that gave a disturbing and enlightening look at Washington, D.C., education. Today I am going to offer the second in that series. This time we follow the aimless wanderings of a student called "Frank." Frank wants to be famous, rich, and successful. But he feels he should not be asked to work or study or in any way make any serious effort to accomplish his goals. He skips most of his classes and spends most of his time in the hallways of his school avoiding schoolwork. He is yet another in a generation that has been led to believe life owes him fame and fortune. At the same time he has been given the impression that working for such success is a sign of shame.

Perhaps we should call Frank a member of the "time-bomb" generation. The inevitable frustration he will feel when he discovers his current values are useless in dealing with reality will eventually explode in anti-societal behavior. And he is not alone.

At this point I wish to insert in the RECORD, "Hall People Are Rarely in Class," from the Washington Post, May 1, 1978:

[From the Washington Post, May 1, 1978]

"HALL PEOPLE" ARE RARELY IN CLASS

(By Juan Williams)

Frank rolled over and sighed. His eyes quickly opened, then closed. Something had awakened him. "... Get up, Frank, you'll be late," his mother yelled again. He let his eyes slide back into a light sleep. She yelled upstairs once more, and he pulled the blanket tight. Frank was going to be late again for the start of classes at Eastern High School.

"We can't get him in the bed and when we get him in . . ." Frank's father said, "we can't get him out of bed."

Out of bed and standing in Eastern High's hallway in an olive Army fatigue jacket, smoking cigarettes, maybe a joint, or looking

ployer plans, the bill makes some important changes in current law. Unavoidable insolvency will be the only insurable event, rather than plan termination. Plan termination will still be possible, but employers must continue to fund the plan.

In addition, in order to remove incentives for employers to withdraw from multiemployer plans, the bill imposes withdrawal liability on withdrawing employers. There are special withdrawal provisions that address the specific problems of plans in the construction industry and the entertainment industry.

The bill includes a presumptive rule for determining the share of a plan's unfunded liabilities that is allocated to a withdrawn employer, but allows a plan, within limits, to adopt a different rule. The committees have also provided rules which will insure that plans treat all employers in an evenhanded fashion.

In order to balance the needs of employers and the plan, this compromise bill limits the liability of employers that are bankrupt or undergoing liquidation. Also, the compromise provides a special "deductible" rule that benefits employers whose withdrawal liability is relatively small.

As a final relief measure, the bill provides a 20-year cap on employer withdrawal liability payments. However, relief measures are not available when all the employers have abandoned the plan in a "mass withdrawal."

As I have stated, the committees wish to promote the financial health of all multiemployer plans. The bill generally requires multiemployer plans to fund benefit increases over 30 years. These are the same requirements that apply to single-employer plans. Also, the bill identifies plans that are headed for financial trouble and places them in "reorganization." These plans must satisfy tougher funding requirements designed to keep the plan solvent.

Of course, the committees realize that increased funding requirements can burden the employers. A special provision phases-in the stricter funding rules, and plans with large numbers of retirees are given a special credit against funding requirements.

All of these elements of this legislation—faster funding of benefits, a process of "reorganization" for financially troubled plans, withdrawal liability for employers that leave plans, and the change of the insurable event from plan termination to plan insolvency—are essential to the success of the program. However, the most important aspect of this legislation is that it provides a substantial guarantee of the pension benefits of American workers covered by multiemployer plans. I emphasize in this regard that the premium payments that support this guarantee are raised entirely from the pension plans that benefits from the program. No general revenues are used to finance the program.

Mr. President, the provisions of current law will automatically go into effect in the very near future, and mandatory coverage under current law will seriously injure the stability of the multiemployer pension plan system. It is therefore imperative that we enact this long overdue reform legislation before this threat becomes reality. The 8 million workers covered under multiemployer plans are entitled to an effective, workable pension insurance system.

Mr. President, Mr. JAVITS, whom I mentioned earlier, has been certainly one of the most creative forces here and one of the most productive forces behind ERISA and our response to this situation that involves multiemployer plans. It is a pleasure to work with the Senator on these plans.

(Mr. BUMPERS assumed the chair.)

Mr. JAVITS. Mr. President, I reciprocate exactly as Senator WILLIAMS said, that our original creative partnership brought ERISA into being. I think succeeding generations will view it to be a blessing to millions upon millions of workers. It now covers some 30 million workers and the plan assets involved are estimated at close to $300 billion—a colossal investment fund. I thank him for the cooperation which he has now extended over all of these years—about 7 years, taking into consideration this bill.

I also express my appreciation to Senator BENTSEN of Texas and Senator NELSON of Wisconsin for their distinguished and invaluable cooperation as members of the Committee on Finance.

I thank Senator LONG for his cooperation and participation as chairman of the Committee on Finance, and Senator DOLE for comparable cooperation as ranking member. I also thank both of them for having expressed a certain confidence in us whom I have already named to work out the finite details of this highly complex legislation.

Mr. President, also, because our staffs are so important and I would rather do this at the beginning than at the end, I express my appreciation for the work of Senator WILLIAMS' staff, Steve Sacher and Gary Ford, and of my staff, Peter Turza, and our labor counsel, Don Zimmerman, now also having an assistant in David Dunn.

We now come to the Senate, Mr. President, with a single ERISA bill, jointly approved by the Senate Labor and Human Resources Committee, chaired by Senator WILLIAMS, and by the Senate Finance Committee, chaired by Senator LONG. I also express my appreciation to Senator SCHWEIKER, who took my place as ranking member of the Senate Labor and Human Resources Committee, for his cooperation in bringing out this bill and for his confidence in Senator WILLIAMS and myself in respect thereof.

The bill before us, the Multiemployer Pension Plan Amendments Act of 1980, was approved by the Senate Labor Committee on March 24 and June 27 of this year and by the Committee on Finance on June 12 and July 24, and is the product of almost 3 years of hard work and close interaction among the administration, the Congress, and numerous interested groups from the private sector.

When, with Senator WILLIAMS, I developed ERISA, enacted by Congress in 1974, we realized that there was some uncertainty about the impact of title IV of the original bill, which dealt with plan termination insurance for multiemployer plans. Because we realized what a difficult problem that was, where the liability of one group of employers could, for reasons often beyond the control of any one of those employers, be imposed upon other employers in a multiemployer plan, and we realized that certain types of business had to have multiemployer plans—a very striking example, of course, being the building industry—we deferred the mandatory insurance coverage for this type of plan—to wit, the effective date of such coverage—until January 1, 1978. During the interim period, the Pension Benefit Guaranty Corporation (PBGC) was to use its discretion to cover terminations that occurred prior to that date.

On August 4, 1977, I announced that I had information that a number of multiemployer plans intended to terminate on or about January 1, 1978, thereby shifting possibly hundreds of millions of dollars of liability to the PBGC insurance system. On that day, I introduced S. 2019 which would have postponed the mandatory coverage date for 1 year until January 1, 1979. The legislation which was eventually enacted in late 1977 (Public Law 95-214) delayed the effective date until July 1, 1979 (see Oversight of ERISA, 1977: Hearings on S. 2125 before the Subcommittee on Labor of the Senate Human Resources Committee, 95th Cong., 1st sess. (1977)). It also directed the PBGC to prepare a comprehensive study of multiemployer plan termination insurance by July 1, 1978.

The PBGC engaged in a full-scale reappraisal of title IV's applicability to multiemployer plans and after extensive discussions and interaction with interested parties across the country, issued a report on July 1, 1978 containing new ideas and options for redesigning the multiemployer plan termination insurance program. On that date, the PBGC also released a status report on contingent employer liability insurance.

On February 27, 1979, the PBGC issued legislative policy recommendations for consideration by the Congress. These recommendations were later embodied in Senate legislative text on May 3, 1979, when, at the request of the administration, Senators WILLIAMS, LONG, and I introduced S. 1076 (H.R. 3904). Hearings on this administration bill were held by the Senate Labor Committee on June 26 and 27, 1979 (see Multiemployer Pension Plan Amendments Act of 1979: Hearings on S. 1076 before the Senate Committee on Labor and Human Resources, 96th Cong., 1st sess. (1979)). In order to give the Congress additional time to study and shape the legislation, H.R. 3915 was enacted to delay the mandatory coverage date from July 1, 1979 to May 1, 1980. Two additional delay bills were subsequently enacted.

Now, it has been properly said that this is a very complicated bill and, indeed, the subject of pensions and pension law, as well as pension agreements, is extremely complicated. But that should not make us shrink from undertaking the responsibility of dealing with it, and we have not backed away from it.

We have sought to have a consensus of the administration, the Congress, and private interests including employers and employees.

The organizations which we have brought into agreement on this legislation become a very significant part of commending this legislation to the Senate.

In other words, the quality of those organizations, their capacities for judging what is just and unjust, and their constituencies, all are critical in an evaluation by Senators as to the passage of this legislation.

I am very pleased to say that that consensus has been very well arrived at.

The amendments which the Senate Labor Committee and the Senate Finance Committee have agreed upon are essentially the original administration bill with the addition of a number of improvements which the committees thought necessary. Both the administration's bill and the Senate committees' bill reflect the extensive input of many diverse organizations in the private sector.

Groups which have had a significant impact on and generally support the plan termination insurance amendments include the National Coordinating Committee for Multiemployer Plans, the National Construction Employers Council, the United Food and Commercial Workers International Union, the Western Conference of Teamsters Pension Trust Fund, the United Mine Workers of America, the Food Marketing Institute, the Bituminous Coal Operators Association, and the AFL–CIO.

In addition to the foregoing groups, other organizations which have had an impact on S. 1076 include the American Association of Retired Persons, the Graphic Arts Supplemental Retirement and Disabilities Fund, and the Associated General Contractors of America. The general plan termination insurance principles of the bill are supported by the ERISA Industry Committee, the American Bankers Association, the American Council on Life Insurance, the National Association of Manufacturers, and the U.S. Chamber of Commerce.

S. 1076 is necessarily a complex bill, both substantively and politically, and in order to develop a consensus in support of the legislation, it was necessary to make compromises. I doubt that any one group that had an impact on this legislation is pleased with all of it. Personally, I have reservations about certain provisions of the bill, but I believe that as the Nation needs this legislation, it should be enacted, and I commend it to the Senate.

The establishment and implementation of plan termination insurance, which we championed in the 1974 ERISA legislation, was and still is the right thing to do. Its purpose is to assure that working men and women receive the pensions for which they worked over a long span of years even if their plan terminates. All of us know about the disappointment and hardships endured by thousands who lost their jobs, or who were fired, or who were the subject of other exigencies, thereby losing all or much of their pensions.

Indeed, the most striking horror story is that of Studebaker Motors, which closed its doors before ERISA's passage. The plan termination insurance is, of course, the key to the fact that the promise of a pension benefit will be kept.

If the plan (and the employer or related industry) is hit by hard times, the PBGC insurance system will be there to guarantee that plan participants and beneficiaries receive what they earned—their pension benefits.

It appears that the single-employer plan termination insurance program is working quite well. I think, however, there is general agreement that ERISA's present scheme for multiemployer plan termination insurance is not doing well and that it must be redesigned. Unlike some who have proposed in one way or another, to abolish multiemployer termination insurance, I am firmly committed to protecting workers and retirees covered by pension plans through the pension insurance system. I believe that we must try our best, in the face of limited resources and large unfunded liabilities, to develop an insurance system that will be as protective and yet as fair as our social system can carry. I believe that the bill approved by the Senate Labor Committee and the Senate Finance Committee is such an effort to do the best we can under difficult circumstances.

Two basic purposes of the bill are to protect participants and beneficiaries in multiemployer plans and to eliminate problems that impede the maintenance and growth of such plans. To carry out these purposes, the bill contains a number of provisions of general applicability to multiemployer plans.

For example, the bill would require 30-year, rather than the present 40-year amortization of certain unfunded past service liabilities. It would also speed up the present 20-year amortization of net experience gains or losses to 15 years. These faster funding requirements, which are the present norms for single-employer plans, will help assure that plan assets are sufficient to cover emerging liabilities.

Under the bill, an employer who withdraws from a multiemployer plan would be liable to the plan for a proportionate share of the unamortized amount of the plan's unfunded vested benefits. In the absence of effective withdrawal liability, an employer could withdraw from a plan leaving unfunded benefit obligations for his employees which must be paid by the remaining employers in the plan. If the plan, or related industry in which it is located, is experiencing or in the foreseeable future will experience financial difficulty, the absence of effective withdrawal liability would encourage a "last man out" mentality, with employers withdrawing from plans to avoid possible plans termination liability.

So we provide, as a very important element of this bill, certain definitions of withdrawal; and in particular industries, those definitions are especially designed to deal with the problems of the industry.

A withdrawal would generally occur when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. A special definition of withdrawal is provided for certain employees in the building and construction industry as well as in certain segments of the entertainment industry, where we believe there is a comparable situation. In such industries, a withdrawal occurs if an employer ceases to have an obligation to contribute under the plan and the employer continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required.

This special definition is justified on the grounds that in both industries an employer's leaving the plan jurisdiction or going out of business does not typically reduce the contribution base. An employer would reduce the contribution base if it continued the same kind of work in the bargaining agreement's jurisdiction without having an obligation to contribute to the plan.

The bill would also provide another special definition of withdrawal, under certain circumstances, for employers in the trucking industry. I will not go into the details of that, because they are fully set forth in the bill.

S. 1076 also imposes liability for an employer's partial withdrawal from a plan in two circumstances. The first is where, as a result of a decline in an employer's covered operations, the number of the employer's contribution base units has for 3 consecutive plan years declined by at least 70 percent from previous levels.

The second circumstance is where there is a partial cessation of the employer's contribution obligation. At the request of labor and management in the retail food industry, a stricter partial withdrawal rule with abatement protections is permitted for that industry.

To impose withdrawal liability in an equitable and feasible manner, the bill contains a number of "employer relief" provisions. To help small employers, the bill provides a mandatory de minimis rule under which a plan must provide that the employer's liability is reduced by a computed amount.

In addition, a discretionary de minimis rule permits a plan to provide for the reduction of employer liability by an amount larger than that required under the mandatory rule. The bill establishes certain objective criteria for permitting an employer who engages in a bona fide,

arm's-length sale of assets to an unrelated party to be relieved of his liability.

In order to encourage new employers to join multiemployer plans, a "free look" rule is provided under which a new employer who does not contribute for more than 6 consecutive plan years may leave a plan without incurring liability when several conditions are satisfied.

The bill imposes a periodic payment cap on the amount of withdrawal liability of 20 annual payments of an amount determined on the basis of the employer's contributions over the 5 years preceding the withdrawal. Additionally, liability limitations are provided as follows: First, the liability of an insolvent employer undergoing liquidation or dissolution would be limited to the sum of 50 percent of the liability plus that portion of 50 percent of the liability which does not exceed the liquidation or dissolution value; second, the liability of an individual (sole proprietor or partner) would not reach personal assets exempt under bankruptcy law; and third, where all or substantially all of an employer's assets are transferred in a bona fide sale in an arm's-length transaction to an unrelated party, the liability would not exceed, where the liquidation or dissolution value of the employer does not exceed $2 million, the greater of first, 30 percent of the liquidation or dissolution value or second, the liability attributable to the employer's employees.

For sales in which the liquidation value exceeds $2 million, the 30-percent limitation would be incrementally increased as in a tax table so that it would reach 80 percent for a liquidation value exceeding $10 million. Any dispute over an employer's withdrawal liability must be resolved through arbitration.

The bill provides for three types of withdrawal liability—related funds in which a multiemployer may voluntarily participate. The first is a PBGC fund to reimburse plans for withdrawal liability that is uncollectible because an employer is involved in bankruptcy or insolvency proceedings. The second is a reinsurance fund which may be established by plan sponsors to relieve employers of portions of withdrawal liability that would have been paid by other employers had it not been forgiven, by the 20-year periodic payment cap, de minimus rule, and so forth, or which are unattributable, uncollectible, or attributable to the employer. The bill also permits the establishment of a third type of reinsurance fund in which employers in the construction industry may participate.

The effective date for the imposition of withdrawal liability is April 29, 1980. The committees decided in part to move up the date from February 27, 1979, the date contained in earlier versions of the bill, because the original purpose of a retroactive effective date—namely, to avoid encouragement of employer withdrawals while the bill was being considered—has been achieved. It should also be noted that the April 29 effective date is the product of strong political pressures by certain withdrawing employers who were caught by the earlier date. I realize that permitting these employers to avoid liability only increases the burdens of those employers remaining with the plans in question, but it appears necessary to accept the April 29 date in order to enact the bill before the August 1 deadline for action.

The bill also contains provisions dealing with mergers and transfers of assets and liabilities as well as with plan partitions. In those cases where an employer withdrew from a multiemployer plan prior to the effective date of withdrawal liability, the PBGC would continue to have its partition authority under ERISA section 4063(d) and its authority to guarantee benefits under the terminated plan under the full ERISA section 4022 single-employer plan guarantee.

For multiemployer plans experiencing financial difficulty, the bill provides mandatory reorganization under which plans are required to meet a special faster funding requirement called the minimum contribution requirement (MCR). Employers who remain with a plan in reorganization are protected from too rapid increases in funding under the MCR through an overburden credit and a safe harbor provision. The overburden credit, which is applied to reduce a plan's accumulated funding deficiency, is available to plans with more retirees than active participants for a plan year. I am pleased to note that the permissive reduction of certain recently granted benefits by plans in reorganization has been deleted in the compromise bill.

If, despite reorganization, a plan becomes unable to meet benefit payments, those payments would have to be suspended until they are supportable by employer contributions and other plan assets. If such an insolvent plan is unable to pay benefits at the levels guaranteed under the bill, the PBGC would make up the difference through financial assistance insolvency insurance.

The level of guarantee provided by the bill has been a subject of much debate. The original administration proposal was to guarantee 100 percent of the first $5 of pension accrual per month per year of service and 60 percent of the next $15 per month per year of service. The original proposal at the March 24 Senate Labor Committee markup of S. 1076 was 100 percent of the first $5 and 75 percent of the next $15. The 75 percent figure would be reduced to 65 percent for those plans which did not meet certain minimal pre-ERISA funding requirements.

At the markup, I opposed both the administration and the committee proposals and offered an amendment to raise the guarantee to 100 percent of the first $5 and 85 percent of the next $15. The 85 percent would be reduced to 80 percent for those plans which did not meet certain nominal pre-ERISA funding requirements.

My efforts to raise the guarantee were supported by the American Association of Retired Persons, the United Food and Commercial Workers International Union, and the United Mine Workers of America. With the assistance of the Senator from Rhode Island (Mr. PELL) a compromise guarantee was approved which was 100 percent of the first $5 and 80 percent of the next $15, with certain modifications in meeting special situations.

For those plans not meeting the specific pre-ERISA funding requirements, the 80-percent figure would be reduced to 70 percent. As with all compromises I was not fully satisfied with the 80–70 percent figure we settled on, but it was better than the original proposal. Subsequently, in order to get a joint bill to the Senate floor, it was unfortunately necessary to reduce the guarantee to 100 percent of the first $5 and 75 percent/65 percent of the next $15. This guarantee reduction was ameliorated somewhat by the elimination of the permissive authority of plans in reorganization to eliminate certain accrued benefits.

Even though I believe that the bill's provisions on lower guarantee levels are too severe, I believe they are the best that are possible of agreement. I urge my Senate colleagues and affected workers and retirees to join in opposing proposals for guarantees lower than the Senate committee's guarantee level, as already approved by the House of Representatives.

I should add that the bill requires the PBGC to propose a feasible supplemental guarantee program for that portion of a participant's benefit that is not guaranteed because of the partial guarantee of the accrual rate in excess of $5.

In order to pay for the proposed termination insurance program, the bill would raise the present premium of 50 cents per participant per year to $2.60 over 9 years. The PBGC would be required to increase the premium automatically if it projects that for any year its assets are less than twice what it paid out in the preceding year. The PBGC would have discretion to accelerate the premium if the board of directors determines that increased premium income is necessary to provide assistance to plans which are receiving assistance and to plans the board finds are reasonably likely to require assistance.

The premium in S. 1076 is less than the premium permitted in the Senate Labor Committee bill which could have risen to $3.40 in the 10th year. Without actual experience under a mandatory program, it is not possible to say with assurance what the premium should be. I believe that the premium settled on in the joint bill is on the low side, but only experience will tell what the appropriate premium level should be.

The bill also contains a number of proposals based upon certain provisions of S. 209, the Williams-Javits ERISA Improvements Act of 1979. These proposals treat delinquent contributions, return of mistaken contributions, the preemption of the Hawaii prepaid health care law, and severance pay and supplemental retirement income arrangements. The bill

also contains proposals on church plans and program oversight. As to the church pension plans, I might say that I am not too happy about those as it exempts those who work for schools and similar institutions which are church-related. Nonetheless, if we want a bill there where some things we had to give and that was one of them and I was very unhappy with it.

S. 1076 represents years of hard work and debate by interested parties across the country and four committees of Congress. There may be areas where the legislation can be improved, but I believe that is the best that can be produced at this time.

Multiemployer plan insurance protection in my judgment is a vital element of ERISA's basic objectives affecting over 8 million plan participants. The time has come while we still remain in balance among the many diverse interests to adopt these amendments and to enact them into law, and I am satisfied that it is best to do that to insure a pension guarantee program which provides mandatory benefit guarantees to the millions of workers who are affected.

Mr. President, that completes my statement.

Mr. MATSUNAGA. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. MATSUNAGA. Mr. President, I rise in support of the pending measure and I wish to commend and congratulate both the Senator from New Jersey (Mr. WILLIAMS) and the Senator from New York (Mr. JAVITS). They have put in a tremendous amount of work into this bill with so much understanding, with so much yielding here and yielding there to the wishes of others Senators, but always with judiciousness.

I, for one, with Hawaii particularly in mind had the occasion to appear before their committee and also to deal with them on a personal basis outside of committee meetings. I must say that I was met with only understanding and with a cooperative spirit of trying to do what was right, and for this I am truly grateful to both the Senator from New Jersey and the Senator from New York and I express on behalf of the people of Hawaii my deepest gratitude and mahalo.

I wish also to commend the chairman of the Finance Committee, the distinguished Senator from Louisiana (Mr. LONG), the ranking minority member of the committee, the distinguished Senator from Kansas (Mr. DOLE), and the chairman of the Finance Subcommittee on Pensions, the distinguished Senator from Texas (Mr. BENTSEN) for their Herculean effort in bringing to this floor a sensible, acceptable measure. To them also I extend the appreciation and thanks they so well deserve.

If the floor manager will yield further, the recourse available to multiemployer pension plans under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly.

May I inquire of the floor manager, does the bill improve the legal recourse available to plans against delinquent employers?

Mr. WILLIAMS. Yes, it does. We have appreciated the opportunity to work with the Senator in connection with a situation that arose in Hawaii that had a great deal of appeal to those of us who are on the Labor and Human Resources Committee. We, of course, had the Hawaiian preemption question before us. In the process of considering it we have had the pleasure of discussion with our good friend from Hawaii and his ideas were so well received that others wanted to join in, as a matter of fact, but it was so unique and so good that we wanted to make sure it was preserved. We deal with it that way, as exclusive to Hawaii.

Mr. MATSUNAGA. Again I express my appreciation.

Mr. WILLIAMS. On this whole question of delinquent contributions and the withdrawal liability collection, the bill provides a direct and I suggest unambiguous cause of action under ERISA to a plan against a delinquent employer.

Mr. MATSUNAGA. If I may pose a further question, in some recent cases such as the Washington Area Carpenters Fund Overhead Door Co. case, a simple collection action brought by plan trustees has been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise of contributions and the plan's entitlement to the contributions. Would the bill correct this situation?

Mr. WILLIAMS. I feel that it would correct the situation. It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises.

Further, plan participants for whom the employer promises to make pension contributions to the plan in exchange for their labor are entitled to rely on their employer's promises. The bill clarifies the law in this regard by providing a direct ERISA cause of action against a delinquent employer without regard to extraneous claims or defenses.

Mr. MATSUNAGA. The Senator, of course, will agree that the provisions for employer withdrawal liability are central to this legislation. Will these same principles apply to claims by a plan for withdrawal liability?

Mr. WILLIAMS. Affirmative. Like suits to collect delinquent contributions, it is intended that a plan's claim for withdrawal liability not be subject to extraneous claims and defenses.

Mr. MATSUNAGA. One final question, if the Senator will yield further.

The bill directs the courts in delinquency cases to award a plan which wins judgment not only the delinquent contributions, but other costs and damages as well. Do those provisions constitute a maximum as well as a minimum restriction on the relief available to plans?

Mr. WILLIAMS. Those provisions, as we drafted and intended them, are a minimum but not a maximum.

Mr. MATSUNAGA. I do appreciate the response of the floor manager. May I enter into a colloquy with the floor manager on another matter relative to the withdrawal and partial withdrawal rules as applied to the shipbuilding industry.

Mr. WILLIAMS. I would be happy to proceed with the colloquy on this part, on this impact of the legislation.

Mr. MATSUNAGA. Will the floor manager of the bill clarify the substitute provisions for withdrawal and partial withdrawal liability?

Mr. WILLIAMS. Yes.

Mr. MATSUNAGA. The original measure considered by the Senate Finance Committee contained a special rule for the construction industry. In committee, I raised the shipbuilding industry's concern with the general withdrawal and partial withdrawal provisions.

The shipbuilding industry is cyclical and has problems of intermittent employment as does the construction industry. For example, in good times with new ships being built, a shipyard will hire a number of workers; the shipyard's work force will be greatly increased. But in bad times, once the shipyard completes its existing contracts for new ships, it will begin to lay off workers; there is no work to maintain the work force.

As soon as a new order is received, the shipyard will rehire the workers. The shipyard, unlike construction sites in the building trades, will remain. The investment in docks, dock cranes, and shipbuilding equipment is not easily moved. Once shipbuilding resumes, the shipyard will increase the number of its workers, but until that time, the shipyard workers will be laid off.

Since the shipbuilding industry faces the same cyclical problem as the construction industry, I suggested that the committee broaden the construction industry rule to include ship building. Various committee members had similar concerns for other industries. Rather than specifically providing for these industries and unintentionally neglecting other industries not mentioned in committee, the staff recommended a general provision to cover all industries similarly situated.

I note that the substitute bill establishes a special withdrawal liability rule for the construction industry as an exception to the general withdrawal and partial withdrawal rules. The substitute bill in section 104 allows the Pension Benefits Guaranty Corporation to extend the special withdrawal liability rule to other industries whose characteristics make the special rule appropriate. Is it the floor manager's understanding that this provision will permit the shipbuilding industry to seek such relief from the Pension Benefit Guaranty Corporation? In other words, the Pension Benefits Guaranty Corporation may extend the special withdrawal liability rule to the shipbuilding industry upon review of the facts presented by that industry?

Am I correct?

Mr. WILLIAMS. Yes, these relief provisions permit the special withdrawal liability rules to be applied to other industries such as the shipbuilding industry.

Mr. MATSUNAGA. I thank the Senator.

Will the Pension Benefit Guaranty

secondary school credit and postsecondary programs, fine arts programs, recreation and health programs, and curriculum development for all these programs; (2) standard and innovative vocational training programs; (3) library development and services; (4) training, including inservice training, for personnel specializing in correctional education; (5) education release programs, with special emphasis on work release; (6) remodeling of education facilities especially vocational training facilities; (7) guidance programs; (8) supportive services with special emphasis upon job placement and coordination of educational services with other social services; (9) incentive programs; (10) research and experimental programs to develop new approaches and techniques in correctional education; and (11) evaluation programs to test the effectiveness of corrections education programs, particularly programs assisted under the Act.

SECTION 6—APPLICATION

Provides that for a State to receive a grant under the Act it must submit an application to the Commissioner of Education at such time, in such manner, and containing or accompanied by whatever information the Commissioner requires.

Requires that each application must: (1) provide that the programs or projects assisted under the Act will be administered or supervised by the State educational agency; (2) set forth a program for carrying out the purposes of the Act, including the methods to be used in administering the program; (3) assure that no person with responsibilities in the operation of the program will discriminate against any program participant or employee because of race, color, creed, national origin, sex, political affiliation or beliefs, (4) provide for fiscal control and fund accounting for Federal funds paid under the Act; and (5) provide for making annual program and fiscal reports required by the Commissioner of Education, and for keeping such records and for affording access to those records as the Commissioner finds necessary.

Provided that applications may be approved by the Commissioner if the Commissioner determines that the application meets all requirements set forth in the Act and the application does not exceed 90 percent of the cost of carrying out the proposed program. Contributions by or on behalf of the State may be in cash or in kind, including real or personal property or any combination thereof, or services.

SECTION 7—PAYMENTS AND WITHHOLDING

Provides that the Commissioner of Education shall pay to each State whose application has been approved an amount not to exceed 90 percent of the sum expended by the State for purposes set forth in its application.

If the Commissioner determines that any program or project which has received assistance under the Act has been changed so that it no longer complies with the Act's provisions, or that in its operation the program or project has substantially failed to comply with any of the provisions, then after reasonable notice and opportunity for a hearing, the Commissioner shall notify the State of the findings and no further payments shall be made to the State until the noncompliance has been or will promptly be corrected. Authorizes the Commissioner to continue payments to any projects funded under the Act which are not involved in the noncompliance. ●

---

By Mr. TALMADGE (for himself and Mr. BENTSEN):

S. 3172. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance.

S. 3182. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance and the Committee on Human Resources, jointly, by unanimous consent.

DEFINITION OF CHURCH PLAN

Mr. TALMADGE. Mr. President, with my colleague, Senator BENTSEN of the State of Texas, I am introducing bills to amend the definition of "church plan" found at section 414(e) of the Internal Revenue Code and section 3(33) of the Employee Retirement Income Security Act of 1974. All of the major church denominations in this country—Protestant, Catholic, and Jewish—are of one accord in this matter. They need and desire relief.

When we enacted ERISA in 1974, we set 1982 as the date beyond which a church plan could no longer provide retirement and welfare benefits for employees of church agencies. We also forbade the church plans to provide any new agency coverage after 1974. Moreover, as I will explain later, the church plan definition is so narrow that it almost completely fails to consider the way our church plans have for decades operated. At this moment our churches are justifiably concerned that their plans do not meet the church plan requirements and are, therefore, subject to ERISA. In 1974, we did not recognize the unique character and needs of our church plans.

The church plans in this country have historically covered both ministers and lay employees of churches and church agencies. These plans are some of the oldest retirement plans in the country. Several date back to the 1700's. The average age of a church plan is at least 40 years. To comply with ERISA by 1982, the churches must divide their plans into two so that one will cover church employees and the other, agency employees. It is no small task to break up a plan that has been in existence for decades, even centuries.

The estimated legal, actuarial, and accounting costs of the initial division of church plans and the additional continuing costs of maintaining two separate plans are so significant that reduced retirement and other benefits may result unless they can be assimilated. To offset these additional costs, the churches are confronted with a very large, and possibly not absorbable, economic burden, merely to provide pre-ERISA level of benefits. There is no imposition by ERISA of such moment on the plans of other organizations.

Church agencies are essential to the churches' mission. They care for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA has made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

Ministers and lay employees have a unique need to be covered by one plan. Employment is extremely fluid within our denominations. A minister will frequently move from church to agency, or wherever his services are most needed. If he cannot be covered by one plan, gaps in coverage may occur because the agency may not have a plan or may have a waiting period before participation. If the church plan definition is allowed to remain, ministers and lay employees will not be able to pursue their missions nearly as freely as they have in the past. It is inescapable that the way our churches have functioned will be directly affected.

As I mentioned earlier, the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated. For example, this definition can be interpreted to require a minister or lay employee of a church to be a current employee. Many ministers serve their faith outside the denominational structure—as chaplains in prisons, hospitals, universities, and elsewhere. Evangelist ministers are usually self-employed and have no employer. There is no valid reason for denying these persons the benefits of retirement and welfare coverage.

This type of problem is less apt to occur in a hierarchical denomination because a minister may continue to be considered an employee even though he is serving outside the church structure.

Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination. Under the church plan definition, there is a question whether the plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. In this type of church, the denomination has little, if any, control over the local churches. Some differences in plan provisions occur, because the denomination cannot enforce uniformity, and the question whether the plan is maintained by the denomination or by the local churches is raised.

The inability of a congregational denomination to control its agencies makes

it difficult to see how the church agency plan could meet the requirements of ERISA. In a corporate structure lines of authority are clear. One plan covering the employees of a parent and its subsidiaries can easily meet the requirements of law because of the control executed by the parent. As I have stated, a congregational denomination cannot force the agencies to observe the requirements of ERISA. Accordingly, there is little hope that a plan established by a congregational church for its agencies could comply with ERISA.

Mr. President, these and other problems over the church plan definition under present law confront the churches today. They are worried that their plans do not now meet the church plan requirements and concerned over the impending restructuring of their plans. It is time we remove the churches from this statutory cloud. If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive government entanglement with religion.

Under the provisions of our bills, effective as of January 1, 1974, a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan. The bills retain the definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churches exempt from tax under section 501. However, to accommodate the differences in beliefs, structures, and practices among our religious denominations, all employees are deemed to be employed by the denomination. The term employee is also redefined to include: One, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; two, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and three, certain former employees who participated in the church plan before separation from service.

Under the bill an organization is "associated" with a church if it shares common religious bonds and convictions with that church. Thus, by including an ordained minister as an employee without the requirement of an actual employment relationship, the church plan may continue to cover a minister who serves outside of the denominational structure, provided the service is in the exercise of his ministry. Accordingly, a minister serving as a prison chaplain or teaching religious studies at a university or an evangelist minister who has no employer would be entitled to participate in the church plan.

Under the bills a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. There is no real reason why a church plan should be forced to pay a former employee his accrued benefit in cash and, thus, destroy his retirement benefits. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service. A minister or lay employee may reach a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the church. During this period the denomination may permit the individual to continue to be covered by the church plan even though he is separated from service. Under the bills a church plan may continue to receive contributions for an individual who is a participant in the church plan at the time of his separation from service but only for a period of 5 years. A time limit is not placed upon employees who separated from service because of disability.

A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501. No church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in the plan provisions among the local employers.

The bill also corrects a very harsh position taken by the Treasury Department in its proposed regulations defining church plans. These proposed regulations provide that once a church plan fails to meet the requirements of church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

Our bills provide a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the bill is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Therefore, Mr. President, I urge my distinguished colleagues to support these measures and I ask unanimous consent that the bills be printed in the RECORD.

There being no objection, the bills were ordered to be printed in the RECORD, as follows:

S. 3172

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. Section 414(e) of the Internal Revenue Code of 1954 is amended to read, as follows:

"(e) CHURCH PLAN.—

"(1) IN GENERAL.—For purposes of this part the term 'church plan' means a plan established and maintained (to the extent required in paragraph (2)(B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501.

"(2) CERTAIN PLANS EXCLUDED.—The term 'church plan' does not include a plan—

"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513); or

"(B) which includes individuals less than substantially all of whom are described in paragraphs (1), (3)(B), or (3)(E) (or the beneficiaries).

"(3) DEFINITIONS AND OTHER PROVISIONS.—For purposes of this subsection—

"(A) A plan established and maintained by a church or by a convention or association of churches shall include a plan established and maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or fundng of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

"(B) The term 'employee' of a church or a convention or association of churches shall include—

"(i) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

"(ii) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 and which is controlled by or associated with a church or a convention or association of churches; and

"(iii) an individual described in paragraph (3)(E).

"(C) A church or a convention or association of churches which is exempt from tax under section 501 shall be deemed the employer of any individual included as an employee under paragraph (3)(B).

"(D) An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

"(E) If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization described

N.W., Washington, D.C. 20224 (Attention: CC:LR:T) (202-566-6618).

**SUPPLEMENTARY INFORMATION:**

### Background

Since this Treasury decision will not be detrimental to any taxpayer, it is found unnecessary to issue this Treasury decision with notice and public procedure thereon under subsection (b) of section 553 of Title 5 of the United States Code.

### Explanation of Provisions

Section 217(g) of the Internal Revenue Code provides special moving expense rules for members of the Armed Forces of the United States on active duty who move pursuant to a military order and incident to a permanent change of station. For these military members, moving expenses furnished in kind or by reimbursement need not be included in gross income, and the Secretary of Defense and the Secretary of Transportation are not required to make information reports with respect to these expenses. The regulations under section 217(g) presently provide that a permanent change of station includes a move in connection with and within 90 days of retirement or other termination of active duty.

This regulation project amends § 1.217-2(g)(3)(ii) to provide that a permanent change of station includes a move in connection with and within 1 year of retirement or other termination of active duty. The Joint Travel Regulations extend the 1-year period for members undergoing hospitalization, medical treatment, education, or training, or in other deserving cases approved by the Secretary of the appropriate branch of the Armed Forces or by the Secretary's representative. The Income Tax Regulations as amended provide a corresponding extension.

### Drafting Information

The principal author of these regulations is Barbara B. Coughlin of the Legislation and Regulations Division of the Office of Chief Counsel, Internal Revenue Service. However, personnel from other offices of the Internal Revenue Service and Treasury Department participated in developing these regulations, both on matters of substance and style.

### Adoption of Amendments to the Regulations

## PART 1—INCOME TAX; TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1953

Accordingly, 26 CFR Part 1 is amended by revising § 1.217-2(g)(3)(ii) to read as follows:

**§ 1.217-2 Deduction for moving expenses paid or incurred in taxable years beginning after December 31, 1969.**

* * * * *

(g) *Rules for members of the Armed Forces of the United States.* * * *

(3) Permanent change of station. * * *

(ii) A move from the last post of duty to home or a nearer point in the United States in connection with retirement, discharge, resignation, separation under honorable conditions, transfer, relief from active duty, temporary disability retirement, or transfer to a Fleet Reserve, if such move occurs within 1 year of such termination of active duty or within the period prescribed by the Joint Travel Regulations promulgated under the authority contained in sections 404 through 411 of title 37 of the United States Code.

* * * * *

Because this Treasury decision will not be detrimental to any taxpayer, it is found unnecessary to issue this Treasury decision with notice and public procedure thereon under subsection (b) of section 553 of title 5 of the United States Code or subject to the effective date limitation of subsection (d) of that section.

This Treasury decision is issued under the authority contained in sections 217(j) and 7805 of the Internal Revenue Code of 1954 (78 Stat. 50 and 68A Stat. 917; 26 U.S.C. 217(j) and 7805).

Jerome Kurtz,
*Commissioner of Internal Revenue.*

Approved: March 24, 1980.

Donald C. Lubick,
*Assistant Secretary of the Treasury.*

[FR Doc. 80-9680 Filed 3-28-80; 8:45 am]
BILLING CODE 4830-01-M

---

**26 CFR Part 1**

**[T.D. 7688]**

## Income Tax; Definition of the Term "Church Plan"

**AGENCY:** Internal Revenue Service, Treasury.

**ACTION:** Final regulations.

**SUMMARY:** This document provides final regulations relating to the definition of the term "church plan". Changes to the applicable tax law were made by the Employee Retirement Income Security Act of 1974 (ERISA). These regulations provide necessary guidance for determining whether a retirement plan is a church plan. If a plan is a church plan, it may obtain qualified status without meeting certain requirements required of plans which are not church plans. A retirement plan which does not meet the provisions required of a church plan may still obtain qualified status by meeting all the requirements applicable to retirement plans generally.

**EFFECTIVE DATE:** September 2, 1974.

**FOR FURTHER INFORMATION CONTACT:** Phoebe Mix of the Legislation and Regulations Division, Office of the Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, D.C. 20224, Attention: CC:LR:T, 202-566-3671, not a toll-free call.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 8, 1977, the Federal Register published proposed amendments to the Income Tax Regulations (26 CFR Part 1) under section 414 (e) of the Internal Revenue Code of 1954 (42 FR 18621). The amendments were proposed under ERISA section 1015 (88 Stat. 925). A public hearing was held on October 6, 1977. After consideration of all comments regarding the proposed amendments, those amendments are adopted as revised by this Treasury decision.

### Independent Administrators

A number of commentators requested guidance with respect to whether a plan which is administered by a separately incorporated organization such as a pension board or a bank, can still qualify as a church plan. The final regulations provide that such plans can qualify as church plans.

### Single Church Disqualification Problem

A number of persons commented that the provision in the notice of proposed rulemaking which would cause a plan to lose its church plan status if one of the churches maintaining the plan fails to meet all the requirements was too harsh. The Treasury Department agrees. Therefore the final regulations permit such a plan to retain its church plan status if the church which does not meet the requirements disassociates itself from the plan after notice from the Internal Revenue Service of its failure. § 1.414 (e)-1 (c).

Once Disqualified, Forever Disqualified

A number of commentators requested that the Service reverse the position taken in the proposed regulations which provided that once a plan ceases or fails to be a church plan, it can thereafter never become one. This position was taken in order to be consistent with section 410(d) of the Code, which permits church plans to make an irrevocable election not to be treated as a church plan. The position taken in the regulations prevents plans from avoiding the irrevocable election simply by failing the substantive requirements for church plans for a few years, and then meeting them a few years later. In addition, at the hearing it was brought out that substantial administrative problems could result if plans were permitted to enter and leave church plan status. Accordingly, the position taken in the proposed regulations is unchanged in the final regulations. § 1.414 (e)-1 (a).

Former Employees

The Service was also requested to add to the regulations special provisions for church personnel who leave the employment of the church. The final regulations do not cover this issue because it is beyond the scope of section 414(e). The rules relating to coverage of former employees are the same for all qualified plans, regardless of whether or not they are church plans. There are no provisions which treat former employees covered by church plans differently from former employees covered by other qualified plans.

Additional Changes

The final regulations delete proposed § 1.414(e) (statutory provisions). This action complies with Treasury Department policy to avoid placing in the Code of Federal Regulations material that serves little or no useful purpose. The statutory language is readily available elsewhere. Other minor clerical and clarifying changes were also made.

Additional Considerations

These regulations are needed in order to provide guidance to the public as well as government employees responsible for the implementation of section 414 (e) of the Internal Revenue Code of 1954. Considering both the direct and indirect effects of these regulations, it is believed they satisfactorily implement section 414(e) of the Code.

Evaluation of the effectiveness of the regulations after issuance will be based upon comments received from offices within the Internal Revenue Service and the Treasury Department, other governmental agencies, State and local governments, and the public.

Drafting Information

The principal author of these regulations is Phoebe Mix of the Legislation and Regulations Division of the Office of Chief Counsel, Internal Revenue Service. However, personnel from other offices of the Internal Revenue Service and Treasury Department participated in developing the regulation, both on matters of substance and style.

Authority

This Treasury decision is issued under the authority contained in section 7805 of the Internal Revenue Code of 1954 (68A Stat. 917; 26 U.S.C. 7805).

*Adoption of Amendments to the Regulations*

After careful consideration of all comments received, the amendments to the regulations as proposed are hereby adopted, subject to the following changes:

Paragraph 1. Section 1.414 (e) is deleted.

Par. 2. Section 1.414 (e)-1 (c) is amended by deleting the comma after the word "church" in paragraph (c) (1) and by deleting the last sentence and adding in its place the following:

*§ 1.414 (e)-1 Definition of a church plan*

* * * * *

(c) * * * Thus, if with respect to a single employer the plan fails to meet any provision of this paragraph, the entire plan ceases to be a church plan unless that employer ceases maintaining the plan for all plan years beginning after the plan year in which it receives a final notification from the Internal Revenue Service that it does not meet the provisions of this paragraph. If the employer does cease maintaining the plan in accordance with this paragraph, the fact that the employer formerly did maintain the plan will not prevent the plan from being a church plan for prior years.

* * * * *

Par. 3. Section 1.414 (e)-1 (f) is redesignated § 1.414 (e)-1 (g) and new paragraph (g) (1) is amended by deleting "410 (d)" and inserting in its place "410 (c)".

Par. 4. Section 1.414 (e)-1 (f) is added to read as follows:

*§ 1.414 (e)-1 Definition of a Church Plan*

* * * * *

(f) *Separately incorporated fiduciaries.* A plan which otherwise meets the provisions of this section shall not lose its status as a church plan because of the fact that it is administered by a separately incorporated fiduciary such as a pension board or a bank.

Jerome Kurtz,
*Commissioner of Internal Revenue.*

Approved: March 12, 1980.

Donald C. Lubick,
*Assistant Secretary of the Treasury.*

26 CFR Part 1 is amended by adding § 1.414(e)-1 to read as follows:

**§ 1.414(e)-1 Definition of church plan.**

(a) *General rule.* For the purposes of part I of subchapter D of chapter 1 of the Code and the regulations thereunder, the term "church plan" means a plan established and at all times maintained for its employees by a church or by a convention or association of churches (hereinafter included within the term "church") which is exempt from tax under section 501(a), provided that such plan meets the requirements of paragraphs (b) and (if applicable) (c) of this section. If at any time during its existence a plan is not a church plan because of a failure to meet the requirements set forth in this section, it cannot thereafter become a church plan.

(b) *Unrelated businesses*—(1) *In general.* A plan is not a church plan unless it is established and maintained primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses (within the meaning of section 513).

(2) *Establishment or maintenance of a plan primarily for persons not employed in connection with one or more unrelated trades or businesses.* (i) (A) A plan, other than a plan in existence on September 2, 1974, is established primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses if on the date the plan is established the number of employees employed in connection with the unrelated trades or businesses eligible to participate in the plan is less than 50 percent of the total number of employees of the church eligible to participate in the plan.

(B) A plan in existence on September 2, 1974, is to be considered established as a plan primarily for the benefit of employees (or their beneficiaries) who are not employed in connection with one or more unrelated trades or businesses if it meets the requirements of both paragraphs (b)(2)(ii) (A) and (B) (if applicable) in either of its first 2 plan years ending after September 2, 1974.

(ii) For plan years ending after September 2, 1974, a plan will be considered maintained primarily for the benefit of employees of a church who are not employed in connection with one

or more unrelated trades or businesses if in 4 out of 5 of its most recently completed plan years—

(A) Less than 50 percent of the persons participating in the plan (at any time during the plan year) consist of and in the same year

(B) Less than 50 percent of the total compensation paid by the employer during the plan year (if benefits or contributions are a function of compensation) to employees participating in the plan is paid to,

employees employed in connection with an unrelated trade or business. The determination that the plan is not a church plan will apply to the second year (within a 5 year period) for which the plan fails to meet paragraph (b)(2)(ii) (A) or (B) (if applicable) and to all plan years thereafter unless, taking into consideration all of the facts and circumstances as described in paragraph (b)(2)(iii) of this section, the plan is still considered to be a church plan. A plan that has not completed 5 plan years ending after September 2, 1974, shall be considered maintained primarily for the benefit of employees not employed in connection with an unrelated trade or business unless it fails to meet paragraphs (b)(2)(ii) (A) and (B) in at least 2 such plan years.

(iii) Even though a plan does not meet the provisions of paragraph (b)(2)(ii) of this section, it nonetheless will be considered maintained primarily for the benefit of employees who are not employed in connection with one or more unrelated trades or businesses if the church maintaining the plan can demonstrate that based on all of the facts and circumstances such is the case. Among the facts and circumstances to be considered in evaluating each case are:

(A) The margin by which the plan fails to meet the provisions of paragraph (b)(2)(ii) of this section, and

(B) Whether the failure to meet such provisions was due to a reasonable mistake as to what constituted an unrelated trade or business or whether a particular person or group of persons were employed in connection with one or more unrelated trades or businesses.

(iv) For purposes of this section, an employee will be considered eligible to participate in a plan if such employee is a participant in the plan or could be a participant in the plan upon making mandatory employee contributions to the plan.

(3) *Employment in connection with one or more unrelated trades or businesses.* An employee is employed in connection with one or more unrelated trades or businesses of a church if a majority of such employee's duties and responsibilities in the employ of the church are directly or indirectly related to the carrying on of such trades or businesses. Although an employee's duties and responsibilities may be insignificant with respect to any one unrelated trade or business, such employee will nonetheless be considered as employed in connection with one or more unrelated trades or businesses if such employee's duties and responsibilities with respect to all of the unrelated trades or businesses of the church represent a majority of the total of such person's duties and responsibilities in the employ of the church.

(c) *Plans of two or more employers.* The term "church plan" does not include a plan which, during the plan year, is maintained by two or more employers unless—

(1) Each of the employers is a church that is exempt from tax under section 501(a), and

(2) With respect to the employees of each employer, the plan meets the provisions of paragraph (b)(2)(ii) of this section or would be determined to be a church plan based on all the facts and circumstances described in paragraph (b)(2)(iii) of this section.

Thus, if with respect to a single employer the plan fails to meet any provision of this paragraph, the entire plan ceases to be a church plan unless that employer ceases maintaining the plan for all plan years beginning after the plan year in which it receives a final notification from the Internal Revenue Service that it does not meet the provisions of this paragraph. If the employer does cease maintaining the plan in accordance with this paragraph, the fact that the employer formerly did maintain the plan will not prevent the plan from being a church plan for prior years.

(d) *Special rule.* (1) Notwithstanding paragraph (c)(1) of this section, a plan maintained by a church and one or more agencies of such church for the employees of such church and of such agency or agencies, that is in existence on January 1, 1974, shall be treated as a church plan for plan years ending after September 2, 1974, and beginning before January 1, 1983, provided that the plan is described in paragraph (c) of this section without regard to paragraph (c)(1) of this section, and the plan is not maintained by an agency which did not maintain the plan on January 1, 1974.

(2) For the purposes of section 414(e) and this section, an agency of a church means an organization which is exempt from tax under section 501 and which is either controlled by, or associated with, a church. For example, an organization, a majority of whose officers or directors are appointed by a church's governing board or by officials of a church, is controlled by a church within the meaning of this paragraph. An organization is associated with a church if it shares common religious bonds and convictions with that church.

(e) *Religious orders and religious organizations.* For the purpose of this section the term "church" includes a religious order or a religious organization if such order or organization (1) is an integral part of a church, and (2) is engaged in carrying out the functions of a church, whether as a civil law corporation or otherwise.

(f) *Separately incorporated fiduciaries.* A plan which otherwise meets the provisions of this section shall not lose its status as a church plan because of the fact that it is administered by a separately incorporated fiduciary such as a pension board or a bank.

(g) *Cross reference.* (1) For rules relating to treatment of church plans, see section 410(c), 411(e), 412(h), 4975(g), and the regulations thereunder.

(2) For rules relating to church plan elections, see section 410(d) and the regulations thereunder.

[FR Doc. 80-9681 Filed 3-28-80; 8:45 am]
BILLING CODE 4830-01-M

---

## DEPARTMENT OF JUSTICE

## 28 CFR Part 0

[Tax Division Directive No. 36]

## Organization of the Department of Justice; Redelegation of Authority to Compromise and Close Civil Claims

**AGENCY:** Tax Division, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** This directive increases the redelegation to the Chief of the Review Section of the Tax Division, and eliminates the redelegation to the Director, Civil Litigation, of the Tax Division, of the authority to compromise, settle and close claims filed in behalf of the United States and claims against the United States. This directive supersedes Tax Division Directive No. 31.

**EFFECTIVE DATE:** This directive shall become effective March 31, 1980.

**FOR FURTHER INFORMATION CONTACT:** Mildred L. Seidman, Review Section, Tax Division, Department of Justice, Washington, D.C. 20530, 202-724-6567.

In appendix to Subpart Y—Redelegation of Authority to

# APPENDIX

I hereby certify that all of the materials required by Circuit Rule 30(a) and (b) are included in the Stipulated Joint Appendix.

Dated: April 6, 2015

s/ Amy L. Blaisdell

**STIPULATED JOINT APPENDIX**


| | |
|---|---|
| District Court Memorandum and Order Denying Motion to Dismiss (Dkt. #64, December 31, 2014) | APP1 |
| Minute Entry Granting Defendants' Motion for Interlocutory Appeal (Dkt. #75, January 13, 2015) | APP21 |
| District Court Order Certifying Order for Interlocutory Appeal (Dkt. #76, January 21, 2015) | APP22 |
| District Court Order Clarifying Certifying Order (Dkt. #85, February 2, 2015) | APP24 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA STAPLETON *et al.*, on behalf of themselves, individually, and on behalf of all others similarly situated, and on behalf of the Advocate Plan, | ) | |
| Plaintiffs, | ) | No. 14 C 01873 |
| v. | ) | Judge Edmond E. Chang |
| ADVOCATE HEALTH CARE NETWORK AND SUBSIDIARIES, *et al.*, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This action raises a question that has divided federal courts in recent years: whether religiously affiliated employers like hospitals and charities are exempt from federal regulation of their employee-benefits plans based on a statutory exemption created for churches. Plaintiffs are current and former employees of Defendant Advocate Health Care Network, a non-profit corporation affiliated with two Christian denominations. Advocate is Illinois's largest health-care provider. Plaintiffs allege that Advocate has not maintained its pension plan according to standards set by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and seek money damages and equitable relief. R.1, Compl.[1] Alternatively, Plaintiffs seek declaratory relief that ERISA's "church plan" exemption violates the First Amendment's Establishment Clause.

[1]The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Citations to the docket are noted as "R." followed by the entry number and a description of the document.

Advocate has moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), R. 34, Mot. Dismiss, arguing that its plan falls within the church plan exemption, which Advocate further asserts is constitutional as a matter of law. As explained in detail below, because statutory analysis reveals that the Advocate plan does not qualify as a church plan and is instead fully subject to ERISA's requirements, the motion is denied. The Court accordingly need not address Plaintiffs' constitutional challenge.

**I.**

Advocate operates 12 hospitals and more than 250 other inpatient and outpatient healthcare locations across northern and central Illinois, employing 33,300 people and generating $4.6 billion in annual revenue. Compl. ¶ 19.[2] It was formed in 1995 as a 501(c)(3) non-profit corporation and it competes with other non-profit as well as for-profit conglomerates in the commercial healthcare market. *Id.* ¶¶ 6, 40. Although it is affiliated with the United Church of Christ and the Evangelical Lutheran Church in America, Advocate is not owned or financially supported by either church. *Id.* ¶¶ 48-50. Advocate maintains a non-contributory, defined-benefit pension plan that covers substantially all of its employees. *Id.* ¶ 58.

Plaintiffs Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox are former and current Advocate employees with vested claims to benefits under that plan. *Id.* ¶¶ 14-17. They have brought their complaint as a proposed class

[2]Advocate is one of a number of parties named as defendants, including 60 Jane Does, for alleged involvement in the administration of the Advocate Plan. For the sake of convenience, the Court will refer to the defendants, who move together to dismiss the complaint, collectively as "Advocate."

action on behalf of all participants or beneficiaries of the Advocate plan. *Id.* ¶ 108. Plaintiffs allege that by unlawfully operating the plan outside the scope of ERISA, Advocate breached its fiduciary duties and harmed the plan's participants by: requiring an improperly long period of five years of service to become fully vested in accrued benefits; failing to file reports and notices related to benefits and funding; funding the plan at insufficient levels; neglecting to provide written procedures in connection with the plan; placing the plan's assets in a trust that do not meet statutory requirements; and failing to clarify participants' rights to future benefits. *Id.* (Counts One-Nine). Alternatively, even if Advocate can evade liability on these counts under the church plan exemption, Plaintiffs allege that this provision of ERISA is void as an unconstitutional violation of the First Amendment's prohibition on state establishment of religion. *Id.* (Count Ten). They therefore seek a declaration that the Advocate plan is a benefits plan covered by ERISA, or in the alternative, a declaration that the church plan exemption is unconstitutional, as well as an injunction requiring Advocate to reform the plan to comply with ERISA's requirements and an award of civil penalties. *Id.* (Prayer for Relief).

**II.**

A Rule 12(b)(6) motion "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*v. Twombly,* 550 U.S. 544, 570 (2007)). The court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2079 (2011). Nevertheless, the allegations "must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, and are entitled to an assumption of truth only so long as they are *factual* in nature, rather than mere *legal* conclusions. *Iqbal,* 556 U.S. at 678-79.

Rule 12(b)(1) provides the procedural vehicle by which the defendant may move a federal court to dismiss a claim or suit on the ground that the court lacks jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). Although Advocate premises its motion to dismiss on both a failure to state a claim under Rule 12(b)(6) and a lack of subject matter jurisdiction under Rule 12(b)(1), only the former is at play here.

It is true that in the past some courts portrayed dismissals of ERISA claims based on exempt plans as dismissals for want of "jurisdiction"—if the plan itself falls outside the scope of federal law, the thinking went, a federal court cannot entertain actions raised against it. *See, e.g., Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 623 (5th Cir. 2002) ("Where ... evidence fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject matter jurisdiction.") (quoting *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994)). But the Supreme Court and the Seventh Circuit have instructed in recent years that courts must take care not to conflate a jurisdictional threshold

with a plaintiff's initial burden to state a plausible claim.[3] To ask whether a federal law like ERISA reaches a certain actor or conduct in the first place is itself a *merits* question, not a jurisdictional one. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). Thus, where an action concerns allegations about a benefit plan's potential liabilities under federal law, "[a] federal district court is the right forum for a dispute about the meaning of ERISA." *NewPage Wisconsin Sys. Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC*, 651 F.3d 775, 777 (7th Cir. 2011) ("Whether a claim is good differs from the question whether a district court possesses jurisdiction, a matter of adjudicatory competence."); *see also Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 345 (5th Cir. 2014) (surveying case law in five circuits holding that whether benefits plan is exempt under ERISA implicates not jurisdiction but an element of claim). The test then for Plaintiffs' complaint is not whether it properly invokes jurisdiction, which it does, but rather whether it states a plausible right to relief in light of Advocate's claimed church plan exemption.

**III.**

**A.**

ERISA was enacted in 1974, Pub. L. No. 93-406, 88 Stat. 829 (1974), to protect "the interests of participants in employee benefit plans and their

---

[3]The distinction is not just semantic. Courts must be careful to frame defects as going to subject matter jurisdiction only where appropriate, given that subject matter jurisdiction flaws (unlike problems with pleadings) can never be waived. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010).

beneficiaries by setting out substantive regulatory requirements" for the plans. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (internal quotation marks and citations omitted). Although nothing in ERISA requires employers to create benefits plans in the first place or mandates any specific benefit that must be provided, the law seeks "to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (citations omitted); *see also Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 560 (7th Cir. 2011) ("ERISA was enacted to protect employees from employers who mismanaged or even looted funds set aside to provide employee benefits—both pension plans and welfare plans.") (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).

Congress explicitly exempted certain types of plans from the scope of ERISA, including those set up by federal, state, local, or tribal governments, 29 U.S.C. §§ 1002(32), 1003(b)(1), as well as any "church plan," 29 U.S.C. §§ 1003(b)(2). Section 1002(33)(A) of Title 29 states that a church plan is "a plan established and maintained ... for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax [ ]." 29 U.S.C. § 1002(33)(A). Subsection 33(C) then adds:

> (C) For purposes of this paragraph—
>
> (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a

> church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.
>
> (ii) The term employee of a church or a convention or association of churches includes—
>
> ...
>
> (II) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax [ ] and which is controlled by or associated with a church or a convention or association of churches[.]

29 U.S.C. § 1002(33)(C). The survival of Plaintiffs' action turns on whether the Advocate plan, as a matter of law, qualifies as a "church plan" under the terms of this statutory thicket.

**B.**

Advocate does not contend that it itself is a church, nor does it claim that a church or an association of churches initially established its pension plan. But Advocate is convinced that its plan qualifies under the plain language of subsection 33(C)(i), which sweeps into the exemption "a plan maintained by" a qualifying corporation. R. 35, Defs.' Br. at 12-15. Plaintiffs respond that subsection 33(C)(i) is not the safe harbor Advocate believes it to be, because its inclusion of plans "maintained" by a corporation does nothing to change the underlying requirement, articulated in subsection 33(A), that the plan must still be "established" by a church. R. 46, Pls.' Resp. Br. at 7-13. This issue has generated conflicting federal-court decisions and remains an open question in this Circuit. After reviewing the case law and employing the various tools of statutory interpretation available for guidance, the Court concludes that the Advocate plan is not a church plan.

**1.**

The Court begins, as it must in all cases of statutory construction, with the language of the statute. *See, e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). The "first step ... is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "Where Congress's intent is clear from that language, it must be given effect." *Arobelidze v. Holder*, 653 F.3d 513, 518 (7th Cir. 2011) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).

Subsection 33(A) defines a church plan as a "plan established *and* maintained" by a church. 29 U.S.C. § 1002(33)(A) (emphasis added). So far, the meaning is straightforward. Two separate elements must both be met for the exemption to apply: a church must first create (establish) the plan and then run (maintain) the plan. If the statute stopped there, then Advocate would clearly lose: *Advocate* established its plan, and therefore its plan was not established by a *church*. The statute, however, goes on and provides a basis for Advocate's argument, although ultimately an unpersuasive one. It is worth again setting forth subsection 33(C)(i), though this time, with a focus on the italicized prefatory text:

> (i) *A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches* includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(C)(i). The prefatory text should look familiar because it is essentially word-for-word the same as the definition of a "church plan" in subsection 33(A): a "'church plan' means a plan established and maintained ... for its employees (or their beneficiaries) by a church or by a convention or association of churches ..." § 1002(33)(A). So subsection 33(C)(i), in a roundabout way, in effect starts out by saying, "A church plan ...."

Advocate points out that, continuing on with subsection 33(C)(i)'s text, a church plan "includes a plan *maintained* by an organization," so long as that organization is associated with or controlled by a church and functions to administer a plan for church employees. 29 U.S.C. § 1002(33)(C)(i) (emphasis added). In Advocate's view, this provision "expands the definition of church plan" so that if an otherwise qualifying organization simply *maintains* the plan, it has fully satisfied all of subsection 33(A)—even though the plan was not also *established* by a church. Defs.' Br. at 13.

But this reading tries to make the statutory language say something it does not. Subsection 33(C)(i)'s use of the word "includes" (as in, "includes a plan maintained by an organization") means that it identifies a *subset* of plans that qualify for the church plan exemption as defined by subsection 33(A)—specifically, plans need not be maintained by a church, and instead may be maintained by a church-affiliated corporation. Note, however, that subsection 33(C)(i) says nothing about a plan *established* by an affiliated organization. If, as Advocate would have it, a plan could qualify solely on the basis of being maintained by a non-church entity

(the second element of subsection 33(A)), the "established by" requirement (the first element of subsection 33(A)), which is a separate, independent requirement under the terms of subsection 33(A), would become meaningless. That reading, therefore, violates a "cardinal principle of statutory construction ... to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (internal citations and quotation marks omitted); *accord United States v. Natour*, 700 F.3d 962, 973 (7th Cir. 2012) ("[C]ourts should strive to give meaning to every word and should reject any interpretation that renders any portion of the statute superfluous.").

As another district court writing on this issue recently noted, if "all that is required for a plan to qualify as a church plan is that it meet section [33(C)'s] requirement that it be maintained by a church-associated organization, then there would be no purpose for section A." *Rollins v. Dignity Health*, 19 F. Supp. 3d 909, 914 (N.D. Cal. 2013) ("[This] interpretation would reflect a perfect example of an exception swallowing the rule."). Contrary to Advocate's proposed interpretation, the plain language of subsection 33(C)(i) merely adds an alternative means of meeting *one* of subsection 33(A)'s two elements—and nothing more. *See Kaplan v. Saint Peter's Healthcare Sys.*, No. 13 CV 2941, 2014 WL 1284854, at *7 (D.N.J. Mar. 31, 2014) ("The term 'includes' merely provides an alternative to the maintenance requirement but does not eliminate the establishment requirement.").[4]

[4]Because Advocate's argument for dismissal at the pleading stage is rejected, there is no occasion to address, right now, the remaining elements listed by subsection 33(C)(i), *e.g.*, whether Advocate is associated with or controlled by a church.

For the same reason, Advocate's reliance on subsection 33(C)(ii)(II) is also misplaced. This provision, which states that employees of a qualifying, church-affiliated organization may be considered employees of a church for purposes of the exemption, operates only in the context of subsection 33(C)(i)'s modification of the "maintained by" requirement. Subsection 33(C)(ii)(II) specifies that a plan maintained by a qualifying corporation may also include employees of an affiliated, non-church organization, but like subsection 33C(i), it does nothing to render inoperative subsection 33(A)'s underlying requirement that the plan first be established by a church. *See Rollins*, 19 F. Supp. 3d at 915 ("Section C(ii) merely explains which employees a church plan may cover—once a valid church plan is established. It does nothing more."); *Kaplan*, 2014 WL 1284854, at *5 ("*Once a church plan is established* [by a church], subsection C(ii) delineates what individuals may participate in the church plan as employees of the church.") (emphasis added).

Decisions that have come to the opposite conclusion, respectfully, are not convincing. Discussing the church plan exemption in *Lown v. Cont'l Cas. Co.*, the Fourth Circuit suggested that a plan need only be established by an affiliated organization to qualify, but relied only on subsection 33(C)(i) without mentioning subsection 33(A) (arguably, the interpretation is *dictum* because *Lown* ultimately decided that the exemption did not apply on other grounds). 238 F.3d 543, 547 (4th Cir. 2001) (holding that a disability plan offered by hospital is not church plan based on employer's lack of association with or control by church); *cf. Chronister v.*

*Baptist Health*, 442 F.3d 648, 653-54 (8th Cir. 2006) (same). And most of the contrary district court cases similarly do not examine subsection 33(A) looking instead at subsection 33(C)(ii) in isolation. *See Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1127 (D. Minn. 2011) (holding that a corporation-established plan qualifies for church -plan exemption by focusing solely on whether employer was affiliated with church under section C(i)); *Hall v. USAble Life*, 774 F. Supp. 2d 953, 960 (E.D. Ark. 2011) (hospital's plan qualifies based on "ties" to Roman Catholic Church); *Rinehart v. Life Ins. Co. of N. Am.*, No. 08 CV 5486, 2009 WL 995715, at *3 (W.D. Wash. Apr. 14, 2009) (plan may qualify as church plan by "satisfy[ing] the narrower provision of § (33)(C)(i)"). Yet by premising eligibility for the exemption solely on subsection 33(C)'s criterion of whether the employer organization is properly affiliated with or controlled by a church, these courts are, in effect, taking an expansion of one element that need not even be reached (the maintenance element), as if it reformulated the original definition of the exemption and indeed removed the establishment element altogether. *Compare, e.g.*, *Catholic Charities of Maine, Inc. v. City of Portland*, 304 F. Supp. 2d 77, 85 (D. Me. 2004) ("ERISA brings a plan established *or* maintained by a non-church organization within the general definition of 'church plan.'") (emphasis added) *with* 29 U.S.C. § 1002(33)(A) (church plan is "a plan established *and* maintained" by a church) (emphasis added).

Two courts did address subsection 33(A), without which subsection 33(C)(i), as an elaboration on the former, makes no sense. One district court held that

subsection 33C(i) could redefine the church plan definition despite subsection 33(A), because the "established and maintained" language in the latter is a "singular requirement, a term of art," rather than two distinct elements. *Medina v. Catholic Health Initiatives*, No. 13 CV 01249, 2014 WL 4244012, at *2-3 (D. Colo. Aug. 26, 2014) (overruling Report and Recommendation of Magistrate Judge). In another case, *Overall v. Ascension*, the district court took the same tack, holding that a plan thus meets all of subsection 33(A) collectively so long as it meets subsection 33C(i)'s maintenance requirement. 23 F. Supp. 3d 816, 829 (E.D. Mich. 2014). But neither of these cases explain why "established and maintained" should be read as a singular term of art when, as a matter of grammar and practice, those two words have separate, ordinary meanings. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 282 (2006) ("We do not force term-of-art definitions into contexts where they plainly do not fit.").

In sum, none of this contrary authority adequately explains away subsection 33(A)'s distinct requirement that a church plan must be *established* by a church.[5] Instead, as the more persuasive decisions to have recently addressed the issue have emphasized, the straightforward statutory language of subsections 33(A) and (C), particularly in the context of legislation as complex as ERISA, must be assumed to reflect deliberate choices made by Congress. *See Kaplan*, 2014 WL 1284854, at *6 (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6

[5]Advocate also relies repeatedly on a decision issued by another court in this District, *Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969 (N.D. Ill. 1999). *See* Defs.' Br. at 1, 12, 15, 17, 18. But *Friend* is not nearly as relevant as Advocate suggests, holding simply that subsection 33(C)(i) does not require that a third party administrator necessarily be in charge of maintaining a benefits plan in order to meet the exemption. 68 F. Supp. 2d at 973.

(2000)). The absence of "established" in subsection C(i), in contrast to its presence in subsection 33(A), cannot be overlooked as easily as Advocate contends. "[W]e must presume that Congress acted intentionally in using the words 'establish and maintain' in section A as something only a church can do, as opposed to the use of only the word 'maintain' in section C(i) to refer to the capabilities of church-associated organizations." *Rollins*, 19 F. Supp. 3d at 915 ("To assert that any church-associated organization can establish its own church plan fails to appreciate the distinction drawn by Congress through its purposeful word choice."). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted).

This statutory-interpretation principle is particularly meaningful because, here, Advocate's proposed gloss would extend the benefits of the church plan exemption to an entirely new category of entity not envisioned by the primary definitional subsection, which is subsection 33(A). Given that ERISA is what is known as a "remedial" statute, any exemptions to which should be construed as narrowly as possible, this result would be particularly unfounded on such a tenuous basis. *See Kaplan*, 2014 WL 1284854, at *6 (citing *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 614 n.33 (1981)). If Congress had intended for the church plan exemption to apply to plans never actually set up by churches (and merely run by organizations claiming a later religious association, the terms of which are

undefined in the statute), it would not have evinced that intent in such a roundabout way.

**2.**

To the extent that legislative history is relevant to statutory interpretation, the statute's history further supports the correctness of the straightforward, rather than expansive, reading of subsection 33(A) and (C) discussed above. When making sense of a statute, of course, "the authoritative statement is the statutory text," but extrinsic materials like legislative history may be considered "to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Here, although the limited scope of the church plan exemption can be gleaned from the text alone, its legislative history does support the interpretation set forth above. Specifically, when ERISA was first passed in 1974, the church plan exemption was even narrower than after a later amendment; at first, the exemption comprised only "a plan established and maintained for its employees by a church or by a convention or association of churches." 29 U.S.C. § 1002(33)(A) (1976). As the district court in *Rollins*, sifting through records of testimony before Congress and versions of draft legislation, has explained in detail, this initial version created concern among a number of churches, whose benefit plans were in fact maintained not directly by them but by pension boards set up for that purpose. 19 F. Supp. 3d at 916 (citing Letter from Gary S. Nash, Secretary, Church Alliance for Clarification of ERISA, to Hon. Harrison A Williams, Jr., Chairman, Senate Committee on

Human Resources (August 11, 1978) and Senate committee statements). It was in response to this concern—namely, that these church-established but outsider-run plans were not in line with the exemption—that ERISA was ultimately amended to include the language now found in subsection 33(C)(i), passed in 1980 as part of the Multiemployer Pension Plan Amendments Act. *Id.*

Senator Herman E. Talmadge of Georgia, the originator of this amendment, explained that its purpose was to specify that the exemption explicitly included "church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church." *Id.* at 917 (quoting Senate Committee on Finance, Executive Session Minutes, June 12, 1980, at 40). By contrast, aside from including plans maintained by a non-church entity, the rest of the definition of church plan (*i.e.*, the *established*-by-a-church requirement) "would be continued." *Id.* (quoting Senate Labor and Human Resources Committee Report on H.R. 3904, August 15, 1980); *see also* 126 Cong. Rec. H23049 (daily ed. Aug. 25, 1980) (comments by Representative Ullman on House version of bill). In other words, faced with the fact that many churches delegated the actual management of benefits plans to associated third-party entities as a practical matter, Congress moved to ensure that the church plan exemption reflected this reality. Viewed in this context, Congress's purposeful choice to limit the wording of subsection 33(C)(i) to plans maintained by eligible organizations makes perfect sense, and its omission of those established by such entities appears deliberate.

Consistent with this purpose, too, was Congress' inclusion of subsection 33(C)(ii)(II). As initially enacted, ERISA's church plan exemption included plans benefitting both employees of churches as well as those of related church agencies, but the related-church part of the exemption was set to expire in 1982. Pub. L. 93-406, § 3(33)(C), 88 Stat. 829, 838 (1974). As Advocate points out, members of Congress became concerned that with the impending sunset of this provision, employees of church agencies, despite their work in roles directly tied to the mission of churches, would now fall into the reach of ERISA. Defs.' Br. at 19 (quoting 124 Cong. Rec. 12107 (May 2, 1978) (Rep. Conable)) ("Present law fails to recognize that the church agencies are parts of the church in its work of disseminating religious instruction and caring for the sick, needy and underprivileged."). Thus, subsection 33(C)(ii)(II) was enacted to extend permanently the exemption made for agency employees included within church plans. Advocate would have this amendment signify that Congress also now intended for a plan simply maintained by any self-affiliated organization to qualify (without the need for church establishment), Defs.' Br. at 19-20, but the legislative history does not support such a broad outcome.

Advocate's brief itself acknowledges that subsection 33(C)(ii)(II) protected employees of applicable, church-related organizations but otherwise "retain[ed] the basic definition of church plan as a plan established and maintained for its employees by a church." *Id.* at 19 (quoting 124 Cong. Rec. 12107 (May 2, 1978) (Rep. Conable)). The concern was to shield employees that did not directly work for the church, but for closely related agencies, and participated in the church's established

benefits plan. *See, e.g.*, *Hall*, 774 F. Supp. 2d at 959-60 (describing as church plan a pension plan for employees of hospital set up and run by Roman Catholic order of nuns). No part of the legislative record suggests an intent to allow a church-affiliated corporation to claim the exemption for a plan absent the *church*'s establishment of the plan, as required by the original definition in subsection 33(A).

The takeaway from the legislative history of subsection 33(C) is that it was added to ERISA in response to very specific concerns about existing church plans and their scope. So this legislative context supports the narrow scope of the church plan exemption suggested by the straightforward text of subsection 33(C) and adopted by the Court here.

**3.**

Finally, in support of its interpretation, Advocate relies on a letter issued to it by the Internal Revenue Service (IRS), R. 35-12, Exh. L, Undated letter from John G. Riddle, Jr., opining that Advocate's plan is a church plan under the tax code provision parallel to the relevant portion of ERISA. Defs.' Br. at 20-22. Advocate argues that the IRS letter-opinion is entitled to substantial deference, particularly where, as is the case here, it has been addressed directly to, and relied upon by, a party in the litigation. *Id.* at 20. Unfortunately for Advocate, the IRS opinion is not entitled to deference and its contents do not change the outcome.

Agency opinions expressed in letters are not owed the type of deference, explained in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984), that is owed when an administrative agency interprets a statute

through formal adjudication or rulemaking with a notice-and-comment process, *see Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citations omitted). Rather, letter-opinions are entitled to respect by courts "only to the extent that those interpretations have the 'power to persuade.'" *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 157 (1991) (agency enforcement guidelines are "not entitled to the same deference as norms that derive from the exercise of ... delegated lawmaking powers"). In other words, the IRS letter, which reflects merely an advisory opinion and not the product of formal adjudication or rulemaking, should be deferred to only if its interpretation of the statute is convincing. *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998) ("Neither the courts nor the IRS may rely on letter rulings as precedent."). Because the opinion relies on the same reasoning rejected above—a mistaken focus only on whether a church-affiliated organization maintains, rather than also established, the plan—it is not persuasive and is owed no deference.

**B.**

Because the Court concludes that the Advocate plan does not meet the criteria of an exempt church plan under ERISA, it need not reach Plaintiffs' argument in the alternative that the exemption provision violates the Constitution's Establishment Clause. Courts must "avoid constitutional questions if [they] can" and instead settle disputes on the basis of other, non-constitutional arguments. *United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001). The

constitutional question raised here, whether Congress may permissibly create within ERISA a religious-based exemption for certain employers, must await another day for resolution as Advocate's plan does not, in any event, so qualify.[6]

## IV. Conclusion

For the reasons set forth above, because Advocate's plan is not entitled to ERISA's church plan exemption as a matter of law, Advocate's motion to dismiss is denied. The Court anticipates one of two possible courses for this litigation to now take. First, Advocate could file an answer to the complaint, which might admit all of the material factual allegations, and the Plaintiffs would respond by moving for judgment on the pleadings. Alternatively, Advocate could move for leave to file an interlocutory appeal of the denial of the motion to dismiss. Or there might be a third option that the Court has not anticipated. In any event, the parties should be prepared to discuss how best to proceed at the next status hearing, which is accelerated to January 8, 2015, at 9 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 31, 2014

[6]The lack of a need to address the constitutional challenge means that the intervention of the United States, which was noticed but made contingent on whether statutory arguments would be sufficient to resolve the motion to dismiss, is unnecessary. *See* R. 41, Notice of Intervention. Additionally, there is no need for the Court to consider the amicus brief of the Becket Fund on the constitutional question. *See* R. 50, Dkt. Entry (granting motion to file amicus brief only if Establishment Clause issue reached).

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1**
**Eastern Division**

Maria Stapleton, et al.

Plaintiff,

v.

Case No.: 1:14–cv–01873
Honorable Edmond E. Chang

Advocate Health Care Network, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 13, 2015:

MINUTE entry before the Honorable Edmond E. Chang: Status and motion hearing held on Defendants' motion for interlocutory appeal and stay of proceedings [69]. For the reasons stated in open court, Defendants' motion for interlocutory appeal certification [69] is granted; a written order shall follow. On the motion to stay proceedings [69], Plaintiff's response to filed by 01/23/2015. Plaintiff shall include in the response a position statement on Defendants' motion [72] for extension of time to file an answer to the complaint. Defendants' reply due by 01/30/2015. Status hearing set for 02/19/2015 at 9:30 a.m. Emailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA STAPLETON *et al.*, on behalf of themselves, individually, and on behalf of all others similarly situated, and on behalf of the Advocate Plan,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE NETWORK AND SUBSIDIARIES, *et al.*,<br><br>Defendants. | ) | No. 14 C 01873<br><br>Judge Edmond E. Chang |

**ORDER**

Plaintiffs are current and former employees of Defendant Advocate Health Care Network, a non-profit corporation affiliated with two Christian denominations. (The defendants are actually comprised of related Advocate entities and individuals, but for convenience sake, the Order will refer simply to "Advocate.") In this lawsuit, Plaintiffs allege that Advocate has not maintained its pension plan according to standards set by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and seek money damages and equitable relief. R.1, Compl.

Advocate moved to dismiss the complaint for failure to state a claim, arguing that the church-plan exemption under ERISA, 29 U.S.C. § 1003(b)(2), applied to Advocate's pension plan.[1] After analyzing the statutory text, statutory framework, and relevant authorities, Opinion at 8-19, the Court concluded that, as defined by ERISA, 29 U.S.C. § 1002(33), in order for a plan to qualify as a "church plan," the plan must be *established* by a church. It is not enough for a plan to be maintained by a church-affiliated entity such as Advocate. Advocate's motion to dismiss was accordingly denied.

The Court agrees with the parties that it is appropriate to certify this question of statutory interpretation for an interlocutory appeal. 28 U.S.C. § 1292(b). Section 1292(b) permits a district judge to certify, and the Court of Appeals to

---

[1] Advocate also argued that the applicability of the church-plan exemption undermines subject matter jurisdiction, but the Opinion explained why the question over the exemption is really only a merits question, not a subject matter jurisdiction question. Opinion at 4-5.

accept (in its discretion), an interlocutory appeal if the "order involves a controlling question of law as to which there is substantial ground for difference of opinion," and if "an immediate appeal from the order may materially advance the ultimate termination of the litigation." § 1292(b). Ordinarily, interlocutory appeals are disfavored (more than disfavored—generally barred), but § 1292(b) is an exception, *Sterk v. Redbox Automated Retail LLC*, 672 F.3d 535, 536 (7th Cir. 2012), and the exception fits here. Advocate wishes to appeal the Court's interpretation of the church-plan exemption, and that interpretation does present a "controlling question of law," not a mere quarrel with some factual determination or with a characterization of the genuineness of a factual dispute. *See Ahrenholz v. Board of Trustees of University of Illinois*, 219 F.3d 674, 676 (7th Cir. 2000). There is also "substantial ground for difference of opinion," § 1292(b), as to the right answer to the question. As the Opinion explained, and again the parties acknowledge, federal court decisions are all over the map on what is the correct interpretation. Opinion at 11-13.

The final requirement of § 1292(b) is also met: an immediate appeal may materially advance the termination of the suit. If this Court's interpretation of the church-plan exemption is wrong, then the complaint should be dismissed and the case should end. So the question certified is this:

> In order for an employee benefit plan to qualify as a "church plan" under ERISA, 29 U.S.C. § 1003(b)(2) and § 1033, must the plan be established by a church (or by a convention or association of churches)?

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 21, 2015

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA STAPLETON *et al.*, on behalf of themselves, individually, and on behalf of all others similarly situated, and on behalf of the Advocate Plan,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE NETWORK AND SUBSIDIARIES, *et al.*,<br><br>Defendants. | ) | No. 14 C 01873<br><br>Judge Edmond E. Chang |

## ORDER

Plaintiffs have moved to clarify the Order of January 21, 2015, R. 76, which granted Defendants' motion to certify an interlocutory appeal under 28 U.S.C. § 1292(b). In the Order, the Court suggested that if its interpretation of Defendants' eligibility for the church-plan exemption is found to be incorrect by the Seventh Circuit, "then the complaint should be dismissed and the case should end." Order at 2. That statement is retracted and the motion to clarify [R. 77] is granted as follows.

It is true that, even if the defense qualifies for the church-plan exemption, the case would *not* necessarily end in Defendants' favor. First, Plaintiffs have raised an even-if argument that the church-plan exemption violates the Establishment Clause of the First Amendment. Second, Plaintiffs alleged that Defendants' plan does not satisfy the church-plan exemption because it is not maintained by an organization "the principal purpose or function of which is the administration or funding" of a benefits plan. 29 U.S.C. § 1002(33)(C)(i). Third and finally, the complaint alleged that Defendants' plan is not "controlled or associated or associated with a church or association of churches" under § 1002(33)(C)(ii)(II). These three claims would all require the litigation to go on, even if the Court's statutory interpretation is reversed.

Notwithstanding that the case would keep going even if there is a reversal of the Order, the Court continues to hold that the certification under 28 U.S.C. § 1292(b) is appropriate. The Order still "involves a controlling question of law as to which there is substantial ground for difference of opinion," and "an immediate appeal from the order may materially advance the ultimate termination of the

litigation." § 1292(b). The existence of the three in-the-alternative claims do not undermine that the Order turned on a "controlling question of law," not a factual dispute, over which there is a "substantial ground for difference of opinion." Most importantly for this clarification, the interlocutory appeal may materially advance the end of the case because (1) an affirmance would greatly accelerate the resolution of liability and narrow the defenses (if any) left to litigation; and (2) similarly, a reversal would materially narrow the theories of liability and, correspondingly, what discovery is necessary. The previously certified question remains certified, namely: in order for an employee benefit plan to qualify as a "church plan" under ERISA, 29 U.S.C. § 1003(b)(2) and § 1033, must the plan be established by a church (or by a convention or association of churches)?

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: February 2, 2015