# No. 15-1368

## UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

---

MARIA STAPLETON, et al.,

*Plaintiffs-Appellees*,

v.

ADVOCATE HEALTHCARE NETWORK AND SUBSIDIARIES, et al.,

*Defendants-Appellants*.

---

Appeal from the United States District Court
for the Northern District of Illinois,
Eastern Division, No. 1:14-cv-01873
The Honorable **Edmond E. Chang**, Presiding

---

## PLAINTIFFS-APPELLEES' BRIEF

---

**KELLER ROHRBACK L.L.P.**
Lynn L. Sarko
Erin M. Riley
Matthew M. Gerend
1201 Third Ave., Suite 3200
Seattle, Washington 98101
(206) 623-1900

**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600

**KELLER ROHRBACK L.L.P.**
Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, Arizona 85012
(602) 248-0088

**STEPHAN ZOURAS, LLP**
James B. Zouras
Ryan F. Stephan
205 N. Michigan Ave, Suite 2560
Chicago, Illinois 60601
(312) 233-1550

***Attorneys for Plaintiffs-Appellees***

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Lynn L. Sarko Date: 04/22/15

Attorney's Printed Name: Lynn L. Sarko

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ______ **No** X

Address: 1201 Third Avenue, Suite 3200
Seattle, WA 98101

Phone Number: 206-623-1900 Fax Number: 206-623-3384

E-Mail Address: lsarko@kellerrohrback.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Erin M. Riley Date: 04/22/15

Attorney's Printed Name: Erin M. Riley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 1201 Third Avenue, Suite 3200
Seattle, WA 98101

Phone Number: 206-623-1900 Fax Number: 206-623-3384

E-Mail Address: eriley@kellerrohrback.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Ron Kilgard Date: 04/22/15

Attorney's Printed Name: Ron Kilgard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012

Phone Number: 602-248-0088 Fax Number: 602-248-2822

E-Mail Address: rkilgard@kellerrohrback.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton v. Advocate Health Care Network

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cohen Milstein Sellers & Toll, PLLC

Stephen Zouras, LLP

Keller Rohrback LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Karen L. Handorf Date: 04/21/2015

Attorney's Printed Name: Karen L. Handorf

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ______ **No** X

Address: 1100 New York Ave. NW, Ste. 500 East Tower
Washington, DC 20005

Phone Number: 202-408-4600 Fax Number: 202-408-4699

E-Mail Address: khandorf@cohenmilstein.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton v. Advocate Health Care Network

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cohen Milstein Sellers & Toll, PLLC

Stephen Zouras, LLP

Keller Rohrback LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Michelle C. Yau Date: 04/21/2015

Attorney's Printed Name: Michelle C. Yau

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ______ **No** X

Address: 1100 New York Ave. NW, Ste. 500 East Tower
Washington, DC 20005

Phone Number: 202-408-4600 Fax Number: 202-408-4699

E-Mail Address: myau@cohenmilstein.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton v. Advocate Health Care Network

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cohen Milstein Sellers & Toll, PLLC

Stephen Zouras, LLP

Keller Rohrback LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Mary J. Bortscheller Date: 04/21/2015

Attorney's Printed Name: Mary J. Bortscheller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 1100 New York Ave. NW, Ste. 500 East Tower
Washington, DC 20005

Phone Number: 202-408-4600 Fax Number: 202-408-4699

E-Mail Address: mbortscheller@cohenmilstein.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ James B. Zouras    Date: 04/28/15

Attorney's Printed Name: James B. Zouras

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X **No** ______

Address: 205 N. Michigan Avenue, Suite 2560
Chicago, IL 60601

Phone Number: 312-233-1550    Fax Number: 312-233-1560

E-Mail Address: jzouras@stephanzouras.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Ryan F. Stephan Date: 04/28/15

Attorney's Printed Name: Ryan F. Stephan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** X **No** ____

Address: 205 N. Michigan Avenue, Suite 2560
Chicago, IL 60601

Phone Number: 312-233-1550 Fax Number: 312-233-1560

E-Mail Address: rstephan@stephanzouras.com

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1368

Short Caption: Stapleton, et al. v. Advocate Health Care Network and Subsidiaries, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Stephan Zouras, LLP

Keller Rohrback L.L.P.

Cohen Milstein Sellers & Toll, PLLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Matthew M. Gerend  Date: 05/06/15

Attorney's Printed Name: Matthew M. Gerend

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ____ **No** X

Address: 1201 Third Avenue, Suite 3200
Seattle, WA 98101

Phone Number: 206-623-1900  Fax Number: 206-623-3384

E-Mail Address: mgerend@kellerrohrback.com

rev. 01/08 AK

**TABLE OF CONTENTS**


STATEMENT CONCERNING ORAL ARGUMENT .................. xvii

JURISDICTIONAL STATEMENT ..................................................1

STATEMENT OF ISSUE PRESENTED FOR REVIEW ................3

STATEMENT OF THE CASE..........................................................4

I. Statutory Background: ERISA and the Church Plan Exemption ................................................................4

A. ERISA Requirements...............................................4

B. The Church Plan Exemption..................................6

II. Factual Background: Advocate and Its Plan............... 10

III. Procedural Background: The Complaint, Defendants' Motion, and the District Court's Order .......................................................................... 11

SUMMARY OF ARGUMENT ......................................................... 13

STANDARD OF REVIEW............................................................... 17

ARGUMENT ..................................................................................... 17

I. The Plan Is Not a Church Plan Because It Was Not Established by a Church....................................... 17

A. The Statutory Text Is Unambiguous: A Church Plan Must Be Established by a Church. ................................................................. 18

1. Section C(i) Does Not Change the "Established" Requirement........................ 19

2. Sections C(ii)(II) and C(iii) Do Not Change the "Established" Requirement ............................................ 25

3. Contrary Judicial Opinions Misconstrue the Text. ............................... 27

B. The District Court's Interpretation Is Consistent with the Principle that Exemptions from ERISA Are Narrowly Construed. ........................................................ 33

C. The Legislative History Supports the District Court's Conclusion. ............................... 35

1. The Legislative History of Section C(i) Is Clear. ..................................................... 36

2. The Legislative History of Sections C(ii)(II) and (iii) Is Clear. .......................... 39

3. Defendants Cannot Rewrite Legislative History. .................................. 41

D. Agency Interpretations Are Neither Controlling Nor Persuasive. ............................... 43

E. The District Court's Construction Is the Only One that Avoids Constitutional Doubts. ............................................................... 51

II. The Court Need Not Consider, in the First Instance, Whether Plaintiffs Plausibly Alleged Three Alternative Reasons Why the Plan Is Not Exempt from ERISA. .................................................. 55

A. Plaintiffs Have Plausibly Alleged that the Plan Is Not Maintained by Either a Church or a "Principal Purpose" Organization. ............. 57

B. Plaintiffs Have Plausibly Alleged that Advocate Is Not "Controlled by" or "Associated with" a Church Within the Meaning of ERISA. .......... 60

1. Defendants Improperly Ask this Court to Make Factual Conclusions.......... 61

2. Advocate Is Not Associated with any Church. .......... 63

C. Plaintiffs Have Plausibly Alleged that Application of the Church Plan Exemption to the Plan Is Unconstitutional.......... 67

1. An Exemption for the Plan Does Not Relieve any Religious Burden or Comport with any Valid Secular Purpose. .......... 69

2. An Exemption for the Plan Harms Nonadherents.......... 72

3. An Exemption for the Plan Creates Entanglement. .......... 73

CONCLUSION .......... 74

## TABLE OF AUTHORITIES

**Cases**

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) .......... 46

*Anderson v. UNUM Provident Corp.*,
369 F.3d 1257 (11th Cir. 2004) .......... 30, 58

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 354 (S.D.N.Y. 2010) .......... 28

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) .......... 12

*Arobelidze v. Holder*,
653 F.3d 513 (7th Cir. 2011) .......... 46

*Bd. of Educ. v. Grumet*,
512 U.S. 687 (1994) .......... 68, 73

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 20, 29

*Biblia Abierta v. Banks*,
129 F.3d 899 (7th Cir. 1997) .......... 17

*Bowen v. Kendrick*,
487 U.S. 589 (1988) .......... 71

*Brokaw v. Weaver*,
305 F.3d 660 (7th Cir. 2002) .......... 57

*Brown v. Gardner*,
513 U.S. 115 (1994) .......... 47

*Burgess v. United States*,
553 U.S. 124 (2008) .......... 18

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751 (2014) .......................................................................... 53

*Carlson v. Principal Fin. Grp.*,
320 F.3d 301 (2d Cir. 2003) .................................................................. 13

*Chevron, U.S.A. v. NRDC, Inc.*,
467 U.S. 837 (1984) .............................................................................. 44

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000) ........................................................................ 44, 45

*Chronister v. Baptist Health*,
442 F.3d 648 (8th Cir. 2006) ........................................................... 28, 64

*Clark v. Martinez*,
543 U.S. 371 (2005) .............................................................................. 51

*Clark v. Rameker*,
134 S. Ct. 2242 (2014) .......................................................................... 21

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) .............................................................................. 48

*Cook v. Winfrey*,
141 F.3d 322 (7th Cir. 1998) ................................................................. 61

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ........................................................................ 72, 73

*Cottage Savings Association v. C.I.R.*,
499 U.S. 554 (1991) .............................................................................. 49

*Covington v. Illinois Sec. Serv., Inc.*,
269 F.3d 863 (7th Cir. 2001) ................................................................. 62

*Curtiss–Wright Corp. v. Schoonejongen*,
514 U.S. 73 (1995) ................................................................................ 58

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ................................................................... 68, 69, 72

*D.C. v. Greater Washington Bd. of Trade*,
506 U.S. 125 (1992)....................................................................................5

*Daft v. Advest, Inc.*,
658 F.3d 583 (6th Cir. 2011)...........................................................................12

*Daniels–Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010)...........................................................................13

*Davis v. United States*,
495 U.S. 472 (1990)..........................................................................46, 47

*Demarest v. Manspeaker*,
498 U.S. 184 (1991)...................................................................................49

*Dixon v. United States*,
381 U.S. 68 (1965)....................................................................................50

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*,
687 F.3d 840 (7th Cir. 2012)...........................................................................69

*Doss v. Clearwater Title Co.*,
551 F.3d 634 (7th Cir. 2008)...........................................................................61

*Found. of Human Understanding v. United States*,
614 F.3d 1383 (Fed. Cir. 2010).......................................................................52

*Friend v. Ancilla Sys. Inc.*,
68 F. Supp. 2d 969 (N.D. Ill. 1999)................................................................32

*Gen. Council on Fin. & Admin. of United Methodist Church v. Super. Ct. of Cal., San Diego Cnty.*,
439 U.S. 1355 (1978)...................................................................................67

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997).........................................................................62

*Gonzales v. Oregon*,
546 U.S. 243 (2006)...................................................................................29

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982)....................................................................................55

*Groman v. Comm'r*,
302 U.S. 82 (1937)......................................................................................22

*Hall v. USAble Life*,
774 F. Supp. 2d 953 (E.D. Ark. 2011)........................................................32

*Hanshaw v. Life Insurance Company of North America*,
No. 14-216, 2014 WL 5439253 (W.D. Ky. Oct. 24, 2014)...........................59

*Hennessy v. Penril Datacomm Networks, Inc.*,
69 F.3d 1344 (7th Cir. 1995)........................................................................63

*Hightower v. Tex. Hosp. Ass'n*,
65 F.3d 443 (5th Cir. 1995)..........................................................................58

*Hobbie v. Unemployment Appeals Comm'n*,
480 U.S. 136 (1987)......................................................................................73

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
132 S. Ct. 694 (2012)..............................................................................66, 69

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)......................................................................................50

*Humphrey v. Sisters of St. Francis Health Servs., Inc.*,
979 F. Supp. 781 (N.D. Ind. 1997)..............................................................32

*Jama v. Immigration & Customs Enforcement*,
543 U.S. 335 (2005)......................................................................................48

*Jimmy Swaggart Ministries v. Bd. of Equalization*,
493 U.S. 378 (1990)......................................................................................69

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86 (1993)........................................................................................33

*Kaplan v. Saint Peter's Healthcare Sys.*,
No. 13-2941, 2014 WL 1284854 (D.N.J. Mar. 31, 2014) ...................... *passim*

*Khan v. United States*,
548 F.3d 549 (7th Cir. 2008), *as amended* (Dec. 4, 2008) ........................... 35

*Lann v. Trinity Health Corp.*,
No. 14-2237 (D. Md. Feb. 24, 2015) ........................................................... 30

*Larson v. Valente*,
456 U.S. 228 (1982) ........................................................................... 52, 53

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ................................................................. 68, 69, 72, 73

*Listecki v. Official Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ....................................................................... 66

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ............................................................................. 5, 59

*Lorillard v. Pons*,
434 U.S. 575 (1978) ................................................................................. 49

*Loughrin v. United States*,
134 S. Ct. 2384 (2014) ....................................................................... 25, 30

*Lown v. Continental Casualty Co.*,
238 F.3d 543 (4th Cir. 2001) ..................................................... 27, 28, 31, 64

*McCarthy v. Fuller*,
714 F.3d 971 (7th Cir. 2013) ....................................................................... 66

*McCreary Cnty. v. ACLU*,
545 U.S. 844 (2005) ................................................................................. 69

*Medina v. Catholic Health Initiatives*,
No. 13-1249, 2014 WL 4244012 (D. Colo. Aug. 26, 2014) ......................... 29

*Mohamad v. Palestinian Auth.*,
132 S. Ct. 1702 (2012) ............................................................................. 35

*NLRB v. Catholic Bishop*,
440 U.S. 490 (1979)........................................................................65

*Overall v. Ascension*,
23 F. Supp. 3d 816 (E.D. Mich. May 13, 2014) ..............................28, 29, 58

*Phelps-Roper v. Troutman*,
712 F.3d 412 (8th Cir. 2013)..........................................................................67

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
393 U.S. 440 (1969)........................................................................66

*Priests For Life v. U.S. Dep't of Health & Human Servs.*,
772 F.3d 229 (D.C. Cir. 2014) ...............................................................53, 54

*R.R. Ret. Bd. v. Alton R. Co.*,
295 U.S. 330 (1935)........................................................................23

*Rapanos v. United States*,
547 U.S. 715 (2006)........................................................................47

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
541 U.S. 1 (2004)........................................................................45

*Richmond Med. Ctr. For Women v. Herring*,
570 F.3d 165 (4th Cir. 2009)..........................................................................67

*Rinehart v. Life Ins. Co. of N. Am.*,
No. 08-5486, 2009 WL 995715
(W.D. Wash. Apr. 14, 2009) .........................................................................32

*Rollins v. Dignity Health*,
--- F. Supp. 2d ----, No. 13-1450,
2014 WL 3613096 (N.D. Cal. July 22, 2014)...............................................50

*Rollins v. Dignity Health*,
19 F. Supp. 3d 909 (N.D. Cal. 2013).....................................................*passim*

*Rumpke of Indiana, Inc. v. Cummins Engine Co.*,
107 F.3d 1235 (7th Cir. 1997).........................................................................56

*Russello v. United States*,
464 U.S. 16 (1983)....................................................................37, 38

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)....................................................................70

*Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich*,
426 U.S. 696 (1976)....................................................................66, 67

*Sierra Club v. Clark*,
755 F.2d 608 (8th Cir. 1985)....................................................................42

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................................................................45

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001)....................................................................47

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)....................................................................13

*Taylor v. Sisters of St. Francis Health Servs., Inc. Ltd. Trust Health Benefit Plan*,
No. 05-671, 2006 WL 2457202 (S.D. Ind. Aug. 23, 2006)..........................32

*Tex. Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989)....................................................................*passim*

*Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*,
764 F. Supp. 2d 1119 (D. Minn. 2011)..................................................27, 32

*Estate of Thornton v. Caldor, Inc.*,
472 U.S. 703 (1985)....................................................................68, 72

*Torres v. Bella Vista Hosp., Inc.*,
523 F. Supp. 2d 123 (D.P.R. 2007)..............................................61

*United States v. Franz*,
886 F.2d 973 (7th Cir. 1989)....................................................................37

*United States v. Jeffries*,
854 F.2d 254 (7th Cir. 1988) .......... 52

*United States v. Lee*,
455 U.S. 252 (1982) .......... 72

*United States v. Patel*,
778 F.3d 607 (7th Cir. 2015) .......... 17

*Univ. of Notre Dame v. Sebelius*,
743 F.3d 547 (7th Cir. 2014) .......... 53, 54

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
133 S. Ct. 2517 (2013) .......... 46

*Van Orden v. Perry*,
545 U.S. 677 (2005) .......... 68

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) .......... 59

*W. Air Lines, Inc. v. Bd. of Equalization*,
480 U.S. 123 (1987) .......... 39

*Wallace v. Jaffree*,
472 U.S. 38 (1985) .......... 71

*Walz v. Tax Comm'n*,
397 U.S. 664 (1970) .......... 73

*Ward v. Unum Life Insurance Co. of America*,
No. 09-431, 2010 WL 4337821
(E.D. Wis. Oct. 25, 2010) .......... 31, 32

*Welsh v. Ascension Health*,
No. 08-348, 2009 WL 1444431 (N.D. Fla. May 21, 2009) .......... 32

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) .......... 25

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996) .......... 16, 56

**Statutes**

22 U.S.C. § 288 .......... 24

26 U.S.C. § 170(b) .......... 52

26 U.S.C. § 401(a) .......... 26

26 U.S.C. § 414(e) .......... 49

26 U.S.C. § 508 .......... 52

26 U.S.C. § 514(b) .......... 52

26 U.S.C. § 3309(b) .......... 52

26 U.S.C. § 6033(a) .......... 41, 52

26 U.S.C. § 6043(b) .......... 52

26 U.S.C. § 6110(k) .......... 44

26 U.S.C. § 7611 .......... 51, 52

28 U.S.C. § 1292(b) .......... 1

28 U.S.C. § 1331 .......... 1

29 U.S.C. § 1144a .......... 48

45 U.S.C. § 231f .......... 23

ERISA § 2, 29 U.S.C. § 1001(a) .......... 4

ERISA § 3(2), 29 U.S.C. § 1002(2) .......... 26, 30

ERISA § 3(10), 29 U.S.C. § 1002(10) .......... 22, 23, 24

ERISA § 3(16), 29 U.S.C. § 1002(16) .......... 58

ERISA § 3(21), 29 U.S.C. § 1002(21) ........ 22

ERISA § 3(32), 29 U.S.C. § 1002(32) ........ 23, 24, 25

ERISA § 3(33), 29 U.S.C. § 1002(33) ........ *passim*

ERISA § 4, 29 U.S.C. § 1003 ........ 5

ERISA § 101, 29 U.S.C. § 1021 ........ 5

ERISA § 102, 29 U.S.C. § 1022 ........ 5

ERISA § 104, 29 U.S.C. § 1024 ........ 5

ERISA § 105, 29 U.S.C. § 1025 ........ 5

ERISA § 105, 29 U.S.C. § 1025 ........ 5

ERISA § 203, 29 U.S.C. § 1053 ........ 5

ERISA § 303, 29 U.S.C. § 1083 ........ 5

ERISA § 404, 29 U.S.C. § 1104 ........ 5

ERISA § 404, 29 U.S.C. § 1103 ........ 5

ERISA § 405, 29 U.S.C. § 1105 ........ 5, 22

ERISA § 406, 29 U.S.C. § 1106 ........ 5

ERISA § 409, 29 U.S.C. § 1109 ........ 5

ERISA § 502(e), 29 U.S.C. § 1132(e) ........ 1

ERISA § 514(c), 29 U.S.C. § 1144(c) ........ 23

ERISA § 4007, 29 U.S.C. § 1307 ........ 5

ERISA § 4021(b), 29 U.S.C. § 1321(b) ........ 6

ERISA § 4022, 29 U.S.C. § 1322 ........ 5

Church Plan Parity and Entanglement Prevention Act, Pub. L. No. 106-244 (2000) ....48

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364 (1980) ....7

Pub. L. No. 93-406, § 3(33) (1974) ....6

**Rules**

Fed. R. Civ. P. 12(b)(1) ....12, 13

Fed. R. Civ. P. 12(b)(6) ....12, 16, 61, 62

Fed. R. Civ. P. 12(d) ....62

Fed. R. Evid. 201(b) ....62

**Regulations**

12 C.F.R. § 701 (2013) ....63

29 C.F.R. § 2509.08-1 (2008) ....70

Treas. Reg. § 1.414(e)-1(f) (1980) ....37

**Legislative History**

124 Cong. Rec. 12,106 (1978) ....42

124 Cong. Rec. 12,107 (1978) ....*passim*

124 Cong. Rec. 12,108 (1978) ....38

124 Cong. Rec. 16,523 (1978) ....37, 39

124 Cong. Rec. S8089 (daily ed. June 7, 1978) ....36

125 Cong. Rec. 10,052 (1979) ....7, 9, 40, 42

125 Cong. Rec. 10,054 (1979) ....43

125 Cong. Rec. 10,054-58 (1979) ........................................................ 42

125 Cong. Rec. 10,055-56 (1979) ........................................................ 43

126 Cong. Rec. 19,599 (1980) ........................................................ 36, 39

126 Cong. Rec. 20,180 (1980) ........................................................ 41

126 Cong. Rec. 20,208 (1980) ........................................................ 39

S. Fin. Comm. Hr'g, June 12, 1980 ........................................................ 36, 40, 41, 42

S. Rep. No. 93-127 (1973),
*reprinted in* 1974 U.S.C.C.A.N. 4838 ........................................................ 33

S. Rep. No. 93-383 (1973),
reprinted in 1974 U.S.C.C.A.N. 4889 ........................................................ 6, 71

**Other Authorities**

Adam Geller, *Law shields churches,*
*leaves pension unprotected,* Associated Press,
Oct. 5, 2013, ........................................................ 34

D.O.L. Op. Ltr. 85-01A, 1985 WL 32792 (1985) ........................................................ 46

Guy Gugliotta, *Rural hospitals,*
*beset by financial problems, struggle to survive*,
Wash. Post, Mar. 15, 2015 ........................................................ 34

I.R.S. Gen. Couns. Mem. 39,007, 1983 WL 197946 (Nov. 2, 1982)
........................................................ 43, 44, 45, 46

I.R.S. Priv. Ltr. Rul. 9122078,
1991 WL 778797 (May 31, 1991) ........................................................ 46

I.R.S. Rev. Proc. 2015-1 § 2.01 ........................................................ 50

John H. Langbein et al., Pension and
Employee Benefit Law (5th ed. 2010) ........................................................ 4

Mark Miller, *COLUMN: Workers fight switch to church pension plans*, Reuters, Jan. 25, 2012 ........ 35

Mary E. O'Leary, *New Haven's St. Raphael workers face decision on pensions*, New Haven Register (July 18, 2013) ........ 34

Mary Williams Walsh, *I.R.S. Reversal on 'Church' Pension Plan Rescues a Fund*, N.Y. Times, Apr. 1, 2013 ........ 34

Reed Abelson, *Nonprofit Hospitals' 2013 Revenue Lowest Since Recession, Report Says*, N.Y. Times, Aug. 27, 2014 ........ 34

Value Healthcare Services, *Hospitals That Closed in 2014* ........ 34

Webster's Third New International Dictionary of the English Language (1986) ........ 30

## STATEMENT CONCERNING ORAL ARGUMENT

Plaintiffs-Appellees (collectively "Plaintiffs") respectfully submit that this case is appropriate for oral argument. This is one of several cases now pending in federal courts involving an important issue of federal pension law: the requirements for "church plans."[1] Church plans are exempt from the otherwise comprehensive federal regulation of pension plans, as set out in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This appeal requires the Court to resolve a threshold issue of statutory interpretation regarding the definition of a "church plan" set forth in section 3(33) of ERISA. 29 U.S.C. § 1002(33). This threshold issue—the only issue before the Court in this appeal—concerns whether a church plan may be established by an entity other than a church, such as a multi-billion dollar hospital conglomerate, or whether a church plan must be established by a church.

This question of statutory interpretation is of critical importance to the employees of Advocate Health Care Network ("Advocate") and

---

[1] *See* Brief of Defendants-Appellants ("Def. Br.") at xix n.1, Appeal Dkt. #7 (listing pending cases).

other hospitals claiming to sponsor church plans, as these employees have been deprived of critical ERISA protections. This issue is pending before three other United States Courts of Appeals,[2] and this Court has yet to interpret the ERISA church plan definition. Plaintiffs believe that oral argument could assist the Court in resolving this issue.

[2] *See Kaplan v. Saint Peter's Healthcare Sys.*, No. 15-1172 (3d Cir.); *Overall v. Ascension Health*, No. 14-1735 (6th Cir.); *Rollins v. Dignity Health*, No. 15-15351 (9th Cir.).

## JURISDICTIONAL STATEMENT

Defendants-Appellants' ("Defendants") jurisdictional summary is not complete and correct. The District Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because Plaintiffs filed suit to enforce ERISA. The District Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs allege, in the alternative, that application of the church plan exemption here would violate the Establishment Clause.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(b). On December 31, 2014, the District Court denied Defendants' motion to dismiss ("Order"), and on January 13, 2015, the District Court certified the Order for interlocutory appeal. Defendants filed their Petition for leave to appeal on January 23, 2015, which was granted on February 18, 2015.

Each Count in Plaintiffs' Complaint remains for disposition in the District Court. Count I seeks declaratory and other equitable relief to enforce ERISA. Counts II through IX address specific violations of ERISA. Count X alleges Plaintiffs' alternative, as-applied constitutional challenge to the church plan exemption.

The question on appeal does not "control[] whether Counts I-IX of the Complaint are viable." *Contra* Def. Br. 2. If the question on appeal is affirmed, the church plan exemption would not apply as a matter of law. However, reversal would not result in the dismissal of any Count because Plaintiffs have alleged three alternative theories—including their constitutional challenge—as to why ERISA applies in this case. The viability of these alternative theories was not addressed by the District Court and is not presently before this Court. *See infra* at 55-57.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

The District Court certified its Order for interlocutory appeal on the following issue:

> In order for an employee benefit plan to qualify as a "church plan" under ERISA, 29 U.S.C. § 1003(b)(2) and § [1002(33)], must the plan be established by a church (or by a convention or association of churches)?

Stipulated Joint Appendix ("APP") at 23.[3]

---

[3] Alternative issues addressed by Defendants are not fairly included within the certified order. *See infra* at 55-57.

## STATEMENT OF THE CASE

This appeal arises from a class action filed in the Northern District of Illinois by Plaintiffs Maria Stapleton, Judith Lukas, Sharon Roberts and Antoine Fox against the sponsor and fiduciaries of the Advocate Health Care Network Pension Plan (the "Plan"). Plaintiffs, who are participants in the Plan, allege that Defendants have failed to administer, fund, and insure the Plan in accordance with ERISA based on the erroneous contention that the Plan is exempt from ERISA as a "church plan." Complaint ("Compl.") ¶¶ 83-107.

### I. Statutory Background: ERISA and the Church Plan Exemption

#### A. ERISA Requirements

Congress enacted ERISA following several highly publicized failures of private pension plans,[4] recognizing that existing state and common law protections were insufficient to protect employee retirement security. *See* 29 U.S.C. § 1001(a) (noting "the lack of employee information and adequate safeguards," the "inadequacy of current minimum standards," and the "depriv[ation] of anticipated

---

[4] *See* John H. Langbein et al., Pension and Employee Benefit Law 78-83 (5th ed. 2010).

benefits" due to "the termination of plans before requisite funds have been accumulated."). The scope of the legislation is broad—"ERISA sets out a comprehensive system for the federal regulation of private employee benefit plans …." *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992). In particular, it covers both for-profit and non-profit employers. *E.g.*, 29 U.S.C. § 1003.

As the Supreme Court has explained, ERISA "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). ERISA accomplishes this through a number of key safeguards, including minimum funding and vesting requirements, insurance of plan benefits through the Pension Benefit Guarantee Corporation ("PBGC"), and rules concerning reporting, disclosures, and fiduciary responsibilities.[5]

Church plans are exempt from these requirements. They need not comply with ERISA's vesting, funding, disclosure, and fiduciary requirements, *see* 29 U.S.C. § 1003(b)(2) (exemption from Title I of

---

[5] *E.g.*, 29 U.S.C. §§ 1083, 1053, 1021-1026, 1104-1106, 1109, 1307, 1322.

ERISA), and do not insure plan benefits through the PBGC. *See* 29 U.S.C. § 1321(b)(3) (exemption from Title IV of ERISA).

### B. The Church Plan Exemption

When ERISA was enacted in 1974, Congress exempted church plans to avoid "examinations of books and records" that "might be regarded as an unjustified invasion of the confidential relationship … with regard to churches and their religious activities." S. Rep. No. 93-383 (1973), reprinted in 1974 U.S.C.C.A.N. 4889, 4965. The 1974 statute defined a church plan as "a plan established and maintained for its employees by a church or by a convention or association of churches." 29 U.S.C. § 1002(33)(A) (1974) (Plaintiffs' Addendum ("ADD") at 1) (attaching 1974 version of statutory text).[6] The 1974 legislation permitted pre-existing plans established and maintained by churches to cover employees of church-affiliated agencies, but only temporarily. The permission sunsetted at the end of 1982. *Id.* § 1002(33)(C) (ADD1).

[6] As used herein, "church" includes "a convention or association of churches."

Church groups had two primary concerns about this 1974 definition: (1) the sunset provision would preclude church plans from including employees of church agencies after 1982; and (2) the requirement that all church plans be "maintained" by a church concerned certain congregational churches that used distinct financial services organizations to maintain and administer their pension plans. To address these concerns, Senator Herman Talmadge and Representative Barber Conable co-sponsored amendments to the church plan definition, which were enacted as part of the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364 (1980). This 1980 amendment remains current law. (ADD2-3) (attaching current version of statutory text).

With respect to the first concern (regarding lay employees of church agencies), Senator Talmadge recognized that "Church agencies are essential to the churches' mission" and that church plans "have historically covered both ministers and lay employees of churches and church agencies." 125 Cong. Rec. 10,052 (1979) (ADD5). Talmadge noted that under the 1974 definition, "the churches must divide their plans into two so that one will cover church employees

and the other, agency employees" and expressed doubt that "the agency plans would survive subjection to ERISA." *Id.* Talmadge also noted that "[m]inisters and lay employees have a unique need to be covered by one plan." *Id.* Representative Conable shared these concerns.[7]

Accordingly, Senator Talmadge and Representative Conable proposed—and Congress enacted—language that amended the definition of "employee" under the church plan definition, such that an "employee of a church … includes … an employee of an organization … which is controlled by or associated with a church." 29 U.S.C. § 1002(33)(C)(ii)(II) (ADD2). Relatedly, the statute was amended to provide that "a church … shall be deemed the employer of any individual included as an employee under clause (ii)." *Id.* § 1002(33)(C)(iii). The result was that a "church plan"—which is still defined as a "a plan established and maintained … for its employees by a church," *id.* § 1002(33)(A)—now could include employees of church-associated organizations indefinitely.

[7] *See, e.g.*, 124 Cong. Rec. 12,107 (1978) (ADD13).

With respect to the second concern of church groups (regarding what entities could "maintain" a church plan), Representative Conable recognized that the 1974 definition created a "technical problem[]" because "[t]he large majority of church plans of the congregational denominations are administered by a pension board, a unit separate from, but controlled by, the denomination." 124 Cong. Rec. 12,107 (1978) (ADD13). Conable noted that the 1974 statutory language "raises a question whether a plan maintained by a pension board is maintained by a church." *Id.* Senator Talmadge also shared these concerns.[8]

Accordingly, Senator Talmadge and Representative Conable proposed—and Congress enacted—language that amended the meaning of "a plan established and maintained … by a church" to "include[] a plan maintained by an organization … *the principal purpose or function of which is the administration or funding of a plan* or program for the provision of retirement benefits or welfare benefits, or both, … if such organization is controlled by or associated with a church." 29 U.S.C. § 1002(33)(C)(i) (emphasis added) (ADD2).

[8] 125 Cong. Rec. 10,052 (1979) (ADD5).

Thus, a church-established plan could be maintained by either a church or a church-associated "principal purpose" entity, such as a pension board.

## II. Factual Background: Advocate and Its Plan

Advocate is an Illinois non-profit corporation and is the largest healthcare provider in Illinois, operating 12 hospitals and more than 250 healthcare facilities. Compl. ¶¶ 19, 40. In 2012, Advocate had operating revenues of $4.6 billion and assets of $7.8 billion. *Id.* ¶¶ 19, 41. Like other large non-profit hospital systems, Advocate relies upon revenue bonds to raise money. *Id.* ¶ 45.

Advocate provides retirement benefits for its more than 33,000 employees through the Plan, a defined benefit pension plan. *Id.* ¶ 42, 58. The Plan was established by Advocate's predecessor, and is maintained by Advocate; Advocate is responsible for funding the Plan and has the power to continue, amend, or terminate the Plan. *Id.* ¶¶ 57, 155. Advocate is not—and its predecessor was not—a church. *Id.* ¶¶ 87, 89.

Advocate and the other fiduciary Defendants do not fund, insure, or administer the Plan in accordance with ERISA. Plaintiffs' pensions

are not: (i) fully vested; (ii) correctly funded; (iii) insured by the PBGC; or (iv) protected by other crucial ERISA requirements. *Id.* ¶¶ 63-64, 129-212.

Advocate is not owned, operated, or funded by any church, *id.* ¶ 6, and no denominational requirement exists for Advocate employees or patients. *Id.* ¶¶ 54-55.

## III. Procedural Background: The Complaint, Defendants' Motion, and the District Court's Order

The Complaint alleges, first and foremost, that the Plan does not satisfy the statutory definition of a church plan because it was not "established" by a church. *See* 29 U.S.C. § 1002(33)(A) (ADD2). Affirmance of this statutory construction would end the inquiry, as the Plan would not be a church plan as a matter of law.

However, if the Court concludes that a non-church entity can establish a church plan, Plaintiffs have alleged that the Plan does not satisfy the statutory definition for two alternative reasons. First, because the Plan is maintained by Advocate, it cannot meet the requirement that a church plan be "maintained" by a either a church or a "principal purpose" organization. *See id.* §§ 1002(33)(A) & (C)(i) (ADD2). Second, because the participants in the Plan are employees

of Advocate and because Advocate is not "controlled by or associated with" a church within the meaning of ERISA, the Plan fails the requirement that "substantially all" plan participants be employees of either a church or a church-associated organization. *See id.* §§ 1002(33)(B)(ii) & (C)(ii)(II) (ADD2).

Finally, even if the Plan satisfied the definition of a church plan, it nonetheless is subject to ERISA because application of the church plan exemption to the Plan is an unconstitutional religious accommodation. If Plaintiffs prevail on any of these theories, they are entitled to declaratory and other equitable relief requiring the Plan to comply with ERISA.

Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),[9] arguing that Plaintiffs failed to state claims both that the Plan was not a church plan,[10] and that the church plan exemption was

---

[9] *See* (Dkt. #34). Unless otherwise specified, citations to "Dkt. #" refer to document numbers in the District Court docket.

[10] Defendants' Motion suggested, in a footnote, that the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because the Plan was exempt from ERISA. (Dkt. #34 at 9 n.15). However, a plan's status as an ERISA plan "must be considered an element of a plaintiff's claim under [ERISA], not a prerequisite for federal jurisdiction." *Daft v. Advest, Inc.*, 658 F.3d 583, 590-91 (6th Cir. 2011) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006)).

unconstitutional as applied.[11] The District Court denied Defendants' Motion, holding that the Plan "is not entitled to ERISA's church plan exemption as a matter of law" because the statutory definition required a church plan to be established by a church. (APP20). Because the Plan failed to satisfy this threshold statutory requirement, the District Court did not consider the viability of Plaintiffs' two alternative statutory claims or their as-applied constitutional claim.

**SUMMARY OF ARGUMENT**

ERISA section 3(33)(A) defines a "church plan" as a plan "established and maintained … for its employees … by a church." 29 U.S.C. § 1002(33)(A) (hereinafter "section A"). In 1980, the statute was amended to provide that a church plan could be "maintained" by

---

*Accord Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 307 (2d Cir. 2003); *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 997 (9th Cir. 2010); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (jurisdiction exists if "the right of [Plaintiff] to recover . . . will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another") (citation omitted).

[11] Defendants also moved to dismiss Plaintiffs' alternative constitutional claim for lack of standing pursuant to Rule 12(b)(1), (Dkt. #34 at 25-27), but the District Court did not consider this argument, (APP19), and Defendants do not raise it in this appeal.

a "principal purpose" administrative organization, *see id.* § 1002(33)(C)(i) (hereinafter "section C(i)"), and could include as participants employees of entities "controlled by or associated with" a church. *See id.* §§ 1002(33)(C)(ii)(II) and (iii) ((hereinafter "sections C(ii)(II) and (iii)"). However, these amendments did not alter the requirement in section A that a church plan must be established by a church.

Accordingly, three federal district courts, including the District Court below, recently concluded that plans established by nonprofit healthcare conglomerates like Advocate are not church plans. *See Rollins v. Dignity Health*, 19 F. Supp. 3d 909, 917 (N.D. Cal. 2013) ("both the [statutory] text and the [legislative] history confirm that a church plan must still be established by a church"); *Kaplan v. Saint Peter's Healthcare Sys.*, No. 13-2941, 2014 WL 1284854, at *5 (D.N.J. Mar. 31, 2014) (same).[12]

Although other district courts reached a contrary conclusion, they misconstrued—and in some instances misstated—the statutory text,

[12] These cases are currently before the Third and Ninth Circuits on interlocutory appeal. *See supra* n.2.

often ignoring entirely section A's definition of what the term "church plan" *means*. Similarly, although the Internal Revenue Service ("IRS") and Department of Labor ("DOL") have issued a number of informal opinions that ignored the requirement that a church plan be established by a church, these contain little or no statutory analysis and lack any power to persuade.

Unable to comply with the unambiguous statutory text, Defendants and their *amici* rely on distortions of legislative history and specious constitutional concerns. However, Congress never intended to allow an entity other than a church to establish a church plan. And the requirement that church plans be established by churches neither creates government entanglement in religion nor discriminates between religious denominations; indeed, removing this requirement would violate the Establishment Clause.

Because a church plan must be established by a church, the Plan is not a church plan as a matter of law and the District Court's Order should be affirmed.

Moreover, reversal would not result in the dismissal of any Count, *contra* Def. Br. 6, because Plaintiffs have asserted three alternative

theories regarding why the Plan is not exempt from ERISA.[13] These alternative theories were not considered by the District Court, and the sufficiency of Plaintiffs allegations regarding these alternative theories is not material to the District Court's statutory construction. Thus, these theories are not "fairly included within the certified order," *see Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996), and Defendants' request for the Court to resolve these issues in the first instance is misguided.[14]

Nonetheless, Defendants' arguments regarding these alternative theories are critically flawed, as they: (i) misconstrue the terms "maintained" and "associated"; (ii) distort both Plaintiffs' allegations and First Amendment jurisprudence; and (iii) ignore that this case is on appeal from an order denying a Rule 12(b)(6) motion and that Plaintiffs have not yet been afforded discovery.[15] Ultimately, because

---

[13] *See* (APP24) (Plaintiffs' three alternative claims "would all require the litigation to go on, even if the Court's statutory interpretation is reversed.").

[14] *See* Def. Br. 4 (statement of issues); *id.* at 46-49 (addressing "maintained" requirement); *id.* at 50-53 (addressing "associated" requirement); *id.* at 69-74 (addressing Plaintiffs' constitutional claim).

[15] *See* (Dkt. #40) (Order staying discovery until resolution of Defendants' Motion to Dismiss).

Plaintiffs have plausibly alleged that the Plan fails both the "maintained" and the "controlled by/associated with" requirements, and that the church plan exemption would be unconstitutional as applied, Defendants' Motion to Dismiss was properly denied.

## STANDARD OF REVIEW

This Court "review[s] issues of statutory construction de novo." *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015). Similarly, the Court "review[s] a district court's decision to grant or deny a motion to dismiss under 12(b)(6) *de novo*, accepting the well-pled allegations in the complaint as true and drawing all inferences in favor of the non-moving party." *Biblia Abierta v. Banks*, 129 F.3d 899, 902-03 (7th Cir. 1997).

## ARGUMENT

### I. The Plan Is Not a Church Plan Because It Was Not Established by a Church.

The plain language of the statutory church plan definition is clear: only a church can establish a church plan. This is consistent with the principle that ERISA exemptions are to be construed narrowly, and is supported by the legislative history. Although Defendants rely on

contrary opinions from administrative agencies, these opinions are neither binding nor persuasive.

### A. The Statutory Text Is Unambiguous: A Church Plan Must Be Established by a Church.

"The term 'church plan' means a plan established … by a church …." 29 U.S.C. § 1002(33)(A). "As a rule, a definition which declares what a term 'means' … excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (citations and quotations omitted). No other statutory provision addresses which entities may "establish" a church plan. Thus, "[a] straightforward reading of this section is that a church plan 'means,' and therefore by definition, *must be* 'a plan established … by a church.'" *Rollins*, 19 F. Supp. 3d at 913.

Defendants seek to avoid this requirement by repeatedly stating the exemption extends to "plans of" church-associated entities. *E.g.*, Def. Br. 4, 12, 26, 38. But the words "plans of" do not appear in the statute. The statute was amended in 1980 to permit church plans to be "*maintained*" by "principal purpose" entities, 29 U.S.C. § 1002(33)(C)(i), and to include the *employees* of church-associated

entities, *id.* § 1002(33)(C)(ii)(II), but the text still requires a church plan be "*established*" by a church. *Id.* § 1002(33)(A).

### 1. Section C(i) Does Not Change the "Established" Requirement.

Defendants' reliance on section C(i) is misplaced. Section C(i) states:

> A plan established and maintained … by a church … includes a plan maintained by an organization, … the principal purpose or function of which is the administration or funding of a plan … , if such organization is controlled by or associated with a church ….

*Id.* § 1002(33)(C)(i). Section C(i) begins by repeating the words "established and maintained" from section A. This repetition makes clear that the section A definition of a church plan still applies—and thus needs not be "inferred" or otherwise written into section C(i), *contra* Def. Br. 34-35—and can be modified only to the extent provided by the remainder of section C(i). However, the remainder of section C(i) recognizes only that a church plan "includes" a plan "*maintained*" by a church-associated "principal purpose" entity; it does *not* state that a church plan includes a plan "*established*" by such an entity. *See Rollins*, 19 F. Supp. 3d at 915 ("we must presume that Congress acted intentionally in using the words 'establish and

maintain' in section A as something only a church can do, as opposed to the use of only the word 'maintain' in section C(i) to refer to the capabilities of church-associated organizations"); *Kaplan,* 2014 WL 1284854, at *5.

To read section C(i) as extending church plan status to any plan maintained by a "principal purpose" entity, "regardless of whether [it] was established by a church," would "violate[] long-held principles of statutory construction." *Rollins*, 19 F. Supp. 3d at 914. When it added section C(i), "Congress chose to retain the language in section A, that the '[t]he term 'church plan' means a plan established and maintained by a church.'" *Id.* Thus:

> To completely ignore the language of section A—language that Congress actively retained—violates the principle to give effect to every clause and word and the related principle "not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."

*Id.* (citation omitted); *see also Bennett v. Spear*, 520 U.S. 154, 173 (1997). As the District Court correctly explained, "[i]f … a plan could qualify solely on the basis of being maintained by a non-church entity (the second element of subsection 33(A)), the 'established by' requirement (the first element of subsection 33(A)), which is a

separate, independent requirement … , would become meaningless." (APP9-10). *Accord Kaplan*, 2014 WL 1284854, at *6.

Unlike Defendants' reading, the District Court's interpretation gives meaning to both sections A and C(i). Specifically, it respects the requirement in section A that a plan be "established" by a church while recognizing that section C(i) permits a church-established plan to "be maintained by a church-affiliated" principal purpose entity. (APP9). "[A]s between one interpretation that would render statutory text superfluous and another that would render it meaningful yet limited, … the latter [is] more faithful to the statute Congress wrote." *Clark v. Rameker*, 134 S. Ct. 2242, 2249 (2014).

Defendants read too much into the word "includes." Contrary to Defendants' suggestion, Def. Br. 30-33, the District Court recognized that the word "includes" expands subsection 33(A)'s definition of a church plan: "subsection 33(C)(i) … adds an alternative means of meeting one of subsection 33(A)'s two elements," specifically the requirement that a church plan be "maintained" by a church. (APP10). However, the District Court recognized that section C(i) does "nothing more." *Id.* The word "'includes' merely provides an

alternative to the maintenance requirement but does not eliminate the establishment requirement." *Kaplan*, 2014 WL 1284854, at *7.

This is consistent with the use of the term "includes" elsewhere in ERISA. *Contra* Def. Br. 30-33. When ERISA uses the word "includes" in reference to a term defined by the statute,[16] it is used to clarify the original definition—elaborating or expanding the scope of the definition *only to the extent expressly provided*, while leaving all other aspects of the definition intact. For example, ERISA section 3(21)(A), which defines a "fiduciary" as a person performing at least one of three functions, 29 U.S.C. § 1002(21)(A), clarifies that this definition "includes" persons *to whom these fiduciary functions are delegated. Id.* ("including" persons "designated" pursuant to 29 U.S.C. § 1105(c)(1)(B) to perform fiduciary functions). It does not include individuals "regardless" of whether they perform a fiduciary function. *Contra* Def. Br. 31. Similarly, the definition of "State" in ERISA

[16] In *Groman v. Comm'r*, 302 U.S. 82, 86 (1937), the "includes" clause enlarged, beyond common understanding, the meaning of a term *not defined in the statute. Id.* Importantly, the Court distinguished situations where, like here, a statutory definition uses the term "means," which the Court explained is used to connote "an exclusive definition." *Id.*

section 3(10) is expanded by section 514(c)(2) to "include" agencies or instrumentalities *of an entity defined* in section 3(10). Thus, far from supplanting the definition of state in section 3(10), the type of entities "included" in section 514(c)(2) are *limited* by the definition provided in section 3(10). *See* 29 U.S.C. §§ 1002(10), 1144(c)(2).

The use of the term "includes" in the definition of "governmental plan" also does not supplant the basic definition. *Contra* Def. Br. 32-33. ERISA defines a governmental plan as a plan "established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). This definition then states that it "includes" plans subject to the Railroad Retirement Act of 1935, or 1937,"[17] plans of certain "international organization[s],"[18] and plans "established

[17] Plans subject to the Railroad Retirement Act are established by federal statute and run by the United States Railroad Retirement Board, a federal agency. *See R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 344-45 (1935) (explaining Railroad Retirement Act of 1934); *see also* 45 U.S.C. § 231f (current authorization and powers of Railroad Retirement Board).

[18] Section 1002(32) addresses organizations "exempt from taxation under . . . the International Organizations Immunities Act," which

and maintained by an Indian tribal government." By including these entities, Congress elaborated upon the meaning of a "plan established or maintained" by "the government of any State" or by "any agency or instrumentality" thereof. 29 U.S.C. § 1002(32).[19]

Use of the term "includes" in section C(i) is fully consistent with these examples. Section C(i) clarifies that a church may "maintain" a church plan indirectly through a church-associated "principal purpose" entity. But because section C(i) does not address who may establish such a plan, the original definition in section A regarding the establishment of a church plan remains unaltered. Thus, the District Court correctly concluded that section C(i) identifies a "*subset* of plans that qualify for the church plan exemption as defined by subsection 33(A)." (APP9). *Contra* Def. Br. 34.

The comparison to the governmental plan exemption is helpful for another reason. Specifically, unlike section C(i) of the church plan exemption—which "includes" only plans "*maintained*" by another

---

covers "public international organization[s] in which the United States participates." 22 U.S.C. § 288.

[19] ERISA does not define what the term State "means," *see* 29 U.S.C. § 1002(10), but rather provides only a non-exclusive list of what the term "includes." *See supra* n.16.

entity—the governmental plan exemption "includes" plans "*established and* maintained" by other entities. 29 U.S.C. § 1002(32) (emphasis added). "[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (citation omitted).

Ultimately, "Congress … does not alter the fundamental details of a regulatory scheme in vague terms"; *i.e.*, it does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). If Congress intended to permit a church-associated hospital or school to *establish* its own church plan, it would have done so in clearer terms than through a provision permitting a church plan to be *maintained* by a discrete "principal purpose" entity. 29 U.S.C. § 1002(33)(C)(i). *See* (APP9); *Rollins*, 19 F. Supp. 3d at 914-15; *Kaplan*, 2014 WL 1284854, at *6.

#### 2. Sections C(ii)(II) and C(iii) Do Not Change the "Established" Requirement.

Sections C(ii)(II) and (iii) provide only that *employees* of an organization "controlled by or associated with a church" can be

*included* in *that* church's plan. *See* 29 U.S.C. §§ 1002(33)(C)(ii), (iii). This is accomplished as follows: section C(ii)(II) defines "employee of a church" to include employees of a church-associated organization, and section C(iii) deems the church to be the employer of these newly defined "employees." *Id.*

This redefinition of "employee" and "employer" was necessary because both ERISA and the Internal Revenue Code ("IRC") require a "plan" be sponsored by an *employer* for the benefit of *its employees.* 29 U.S.C. § 1002(2); 26 U.S.C. § 401(a). If a plan established by a church covered employees of church-associated organizations, it would lose its status as a "plan"—for the purposes of both ERISA and tax-qualification requirements of the IRC—unless those employees were deemed employees of that church and that church was deemed their employer.

Thus, the District Court correctly concluded that "Subsection 33(C)(ii)(II) specifies that a plan … may also include employees of an affiliated, non-church organization, but … it does nothing to render inoperative subsection 33(A)'s underlying requirement that the plan

first be established by a church." (APP11); *Accord Rollins*, 19 F. Supp. 3d at 915.

Defendants recognize that a church plan must be established by an employer for its employees, Def. Br. 38-39, but then erroneously argue that this somehow permits a church-associated hospital to establish a "church plan" for its employees. *Id.* Not only is this inconsistent with the clear requirement of section A that a church plan be established by a church, but it ignores that the *church* is deemed the *employer* for the purposes of the church plan exemption. *See* 29 U.S.C. § 1002(33)(C)(iii). Because the church-associated organization loses its status as employer for the purposes of the church plan exemption, it cannot "establish" a church plan.

#### 3. Contrary Judicial Opinions Misconstrue the Text.

No appellate court has held that a non-church entity can establish a church plan. *Contra* Def. Br. 41-42. The Fourth Circuit stated in *dicta*, and *without explanation or analysis*, that "a plan established by a corporation associated with a church can still qualify as a church plan," *Lown v. Continental Casualty Co.*, 238 F.3d 543, 547 (4th Cir. 2001), but it then held that the plan at issue was *not* a church plan

based on a factual determination that the employer was not associated with a church. *Id.* at 547-48. And *Chronister v. Baptist Health*, 442 F.3d 648, 651-53 (8th Cir. 2006), did not discuss who may establish a church plan. *See Kaplan*, 2014 WL 1284854, at *7 (*Lown* and *Chronister* "were not faced with the legal issue" presented here).

A number of district courts have extended the church plan exemption to plans established by church-associated organizations, Def. Br. 37 n.13, 39-42, 47-49, 67, but these opinions are not persuasive.[20] First, *Overall v. Ascension*, 23 F. Supp. 3d 816 (E.D. Mich. May 13, 2014), assumes its conclusion. Its summary of section C(i)—that "if A is exempt and A includes C, then C is also exempt"—assumes that C (a plan "maintained" by a "principal purpose" organization) need not be "established" by a church. But *Overall* provides no support for this assumption. As the District Court noted,

[20] *See generally Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354, 357, 371-72 (S.D.N.Y. 2010) (noting phenomenon of "unwitting perpetuation of error" and refusing to adopt statutory interpretation "perpetuated from opinion to opinion with little second-guessing" despite being "unsupported by the … plain language [and] its legislative design").

*Overall* ignores "33(a)'s distinct requirement that a church plan must be *established* by a church." (APP13).

Second, in *Medina v. Catholic Health Initiatives*, No. 13-1249, 2014 WL 4244012 (D. Colo. Aug. 26, 2014), the court relied on the unsupported assertion that "subsection (C) affirms that 'established' and 'maintained' are not two distinct elements, but rather a singular requirement, a term of art, as used in the statute." *Id.* at *2. Not only would this render words superfluous, *contra Bennett*, 520 U.S. at 173, but as the District Court noted, *Medina* fails to "explain why 'established and maintained' should be read as a singular term of art when, as a matter of grammar and practice, those two words have separate, ordinary meanings." (APP13) (citing *Gonzales v. Oregon*, 546 U.S. 243, 282 (2006) ("We do not force term-of-art definitions into contexts where they plainly do not fit.")).

The *Medina* court speculated that "it is not clear what establishment might mean without the additional requirement of maintenance," 2014 WL 4244012, at *2, but to "establish" a plan is to

bring it into existence,[21] whereas to "maintain" a plan is to continue it, including by funding it.[22] ERISA repeatedly uses the verbs "establish" and "maintain" separately, phrased in the *disjunctive*.[23] Because section A of the church plan definition uses the words "establish" and "maintain" *conjunctively*, it can be "'presume[d]' that Congress intended a difference in meaning." *Loughrin*, 134 S. Ct. at 2390 (citation omitted).

Third, in *Lann v. Trinity Health Corp.*, No. 14-2237 (D. Md. Feb. 24, 2015), the only case decided after the District Court's opinion below, the court granted defendants' limited motion to dismiss without written explanation or analysis, based entirely on deference to authority in that Circuit.[24]

---

[21] Webster's Third New International Dictionary of the English Language 778 (1986) (defining "establish" to mean "to bring into existence, create, make, start, originate, or build").

[22] Webster's Third New International Dictionary of the English Language 1362 (1986) (defining "maintain" to mean to "carry on," "keep up," or "continue"; and "to provide for" or "bear the expense of"); *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1265 (11th Cir. 2004) (to "maintain" a plan "means to 'continue' a plan") (citation omitted).

[23] *See, e.g.*, 29 U.S.C. § 1002(2)(A) (term "pension plan" means a plan "established *or* maintained") (emphasis added).

[24] At oral argument, the court explained it was dismissing plaintiff's statutory construction based "primarily" on the fact that the court

Defendants also state that four district courts in this Circuit "concluded," before the current wave of church plan litigation, that plans of church-associated healthcare organizations "fell within" the church plan definition. Def. Br. 42. But only one of these cases considered whether a church plan needs to be established by a church. That case, *Ward v. Unum Life Insurance Co. of America*, No. 09-431, 2010 WL 4337821, at *2 (E.D. Wis. Oct. 25, 2010), erroneously relied on section C(i), ignoring that section C(i) addresses only what type of entity may "maintain" a church plan and, further, that such an entity must have a "principal purpose or function" of

---

felt bound by the decision in *Lown*. (Hr'g Tr. 46:11-47:1, Feb. 23, 2015) (ADD60-61). The court did not decide whether the language in *Lown* was *dicta*, but explained that "[y]ou may not be required to follow the dicta [of] appeals courts, but you're wary about straying too far from them when you're a district judge." (Hr'g Tr. 25:18-21) (ADD39).

plan funding or administration.[25] The other cases from within the Seventh Circuit ignored the "established" requirement entirely.[26]

District court opinions from within other Circuits are similarly flawed.[27] Indeed, some cases misstate critical portions of the statute. *See Welsh v. Ascension Health*, No. 08-348, 2009 WL 1444431, at *7 (N.D. Fla. May 21, 2009) (misconstruing section A as describing a plan "established and maintained *for* the employees of a church") (emphasis added); *Rhinehart*, 2009 WL 995715, at *2 (misquoting section A as describing a plan "established *or* maintained" by a church) (emphasis added).

---

[25] In a footnote, the court stated that "courts have not applied this requirement . . . on the grounds that the definition of 'employee of a church' broadens the scope of the church plan definition significantly," *Ward*, 2010 WL 4337821, at *2 n.1, but as explained above, this conflates the issues of who may be *included* as participants in a church plan with who may establish and maintain a church plan.

[26] *See Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969, 972 (N.D. Ill. 1999); *Humphrey v. Sisters of St. Francis Health Servs., Inc.*, 979 F. Supp. 781, 786 (N.D. Ind. 1997); *Taylor v. Sisters of St. Francis Health Servs., Inc. Ltd. Trust Health Benefit Plan*, No. 05-671, 2006 WL 2457202, at *1 (S.D. Ind. Aug. 23, 2006).

[27] *See Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1126-27 (D. Minn. 2011) (failing to examine section A); *Hall v. USAble Life*, 774 F. Supp. 2d 953, 960 (E.D. Ark. 2011) (same); *Rinehart v. Life Ins. Co. of N. Am.*, No. 08-5486, 2009 WL 995715, at *3 (W.D. Wash. Apr. 14, 2009) (same).

### B. The District Court's Interpretation Is Consistent with the Principle that Exemptions from ERISA Are Narrowly Construed.

ERISA coverage should be construed "liberally" to provide "maximum" protections for workers, and "exemptions should be confined to their narrow purpose." S. Rep. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4854, 1973 WL 12550; *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97 (1993) (the court is "inclined, generally, to tight reading of exemptions from comprehensive schemes of this kind"). Thus, as the *Kaplan* court explained:

> The Court cannot conclude that Congress intended to create this slippery slope, especially considering that the point of enacting ERISA was to promote the interest of employees and their beneficiaries. Opening the door to expand the church plan exemption to this extent would place more employees at risk of having insufficient benefits upon retirement. *What must be kept in mind is that ERISA is a remedial statute, so any exemptions included thereunder should be construed narrowly. Defendants' interpretation would achieve quite the opposite.*

2014 WL 1284854, at *6 (citation omitted) (emphasis added).

Indeed, ERISA protections are particularly important to employees in the healthcare industry, as healthcare providers operate in a

challenging market. Financial instability[28] and insolvency[29] are not unknown. ERISA's importance in this context is illustrated by the recent experience of former employees of the Hospital Center at Orange ("HCO"), an entity purportedly associated with a church. After receiving a letter ruling from the IRS finding that the HCO pension plan was a church plan, HCO shut down in 2004 due to financial troubles, leaving its employees with a severely underfunded and completely uninsured pension plan.[30] And, like the Plan here,

---

[28] *See, e.g.*, Reed Abelson, *Nonprofit Hospitals' 2013 Revenue Lowest Since Recession, Report Says*, N.Y. Times, Aug. 27, 2014, at B9, *available at* http://www.nytimes.com/2014/08/27/business/nonprofit-hospitals-2013-revenue-lowest-since-recession-report-says.html.

[29] *See, e.g.*, Value Healthcare Services, *Hospitals That Closed in 2014*, http://valuehealthcareservices.com/education/hospitals-that-closed-in-2014/; Guy Gugliotta, *Rural hospitals, beset by financial problems, struggle to survive*, Wash. Post, Mar. 15, 2015, *available at* http://www.washingtonpost.com/national/health-science/rural-hospitals-beset-by-financial-problems-struggle-to-survive/2015/03/15/d81af3ac-c9b2-11e4-b2a1-bed1aaea2816_story.html.

[30] *See, e.g.*, Mary Williams Walsh, *I.R.S. Reversal on 'Church' Pension Plan Rescues a Fund*, N.Y. Times, Apr. 1, 2013, at B3, *available at* http://www.nytimes.com/2013/04/02/business/an-irs-reversal-rescues-a-pension-fund.html.; *see also See* Adam Geller, *Law shields churches, leaves pension unprotected*, Associated Press, Oct. 5, 2013, http://bigstory.ap.org/article/law-shields-churches-leaves-pensions-unprotected; Mary E. O'Leary, *New Haven's St. Raphael workers face decision on pensions*, New Haven Register (July 18, 2013),

because no church established the HCO plan, there was no church to accept responsibility for the fate of participants' retirement benefits.[31]

### C. The Legislative History Supports the District Court's Conclusion.

Because the statutory text is unambiguous, the court need not consider the legislative history. *See, e.g.*, *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012).[32] Nonetheless, the "legislative history also strongly supports [the District Court's] reading." *Rollins*, 19 F. Supp. 3d at 916. The legislative history reflects two narrow purposes of the 1980 amendments: (1) section C(i) was added to include "church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a

---

http://www.nhregister.com/general-news/20130718/new-havens-st-raphael-workers-face-decision-on-pensions.

[31] According to James Keightley, a former PBGC general counsel, "[t]he key problem is that the IRS is using a standard that allows these affiliate organizations to become church plans when there is no economic substance to their relationship with churches." *See* Mark Miller, *COLUMN: Workers fight switch to church pension plans*, Reuters, Jan. 25, 2012, http://www.reuters.com/article/2012/01/25/us-retirement-churchplans-idUSTRE80O25I20120125.

[32] Differing judicial interpretations demonstrate ambiguity only if those constructions are "plausible." *Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008), *as amended* (Dec. 4, 2008).

church,"[33] and (2) sections C(ii) and (iii) were added "so that a church plan which covers the employees of a church agency generally would be exempt from … ERISA."[34]

### 1. The Legislative History of Section C(i) Is Clear.

The *Rollins* court summarized the legislative history regarding section C(i) as follows:

> Prior to the amendment, because the statute read that a church plan was one "maintained by a church or by a convention or association of churches," churches whose plans were managed by pension boards were concerned about their status….

19 F. Supp. 3d at 916 (citing 124 Cong. Rec. S8089 (daily ed. June 7, 1978) (statement of Sen. Talmadge)). Senator Talmadge introduced legislation that would "retain the definition of church plan as a plan established and maintained for its employees by a church," but would clarify that "a plan or program funded or administered through a pension board … will be considered a church plan" if the board's "principal purpose or function" was the administration or funding of the church plan and the board was "controlled by or associated with a

[33] S. Fin. Comm. Hr'g 40, June 12, 1980 (ADD66).
[34] 126 Cong. Rec. 19,599 (1980) (official summary) (ADD69).

church." 124 Cong. Rec. 16,523 (1978) (ADD71); *accord* 124 Cong. Rec. 12,107 (1978) (statement of Rep. Conable) (ADD13).[35]

Whether the statutory text rendered a Treasury regulation "redundant," Def. Br. 59, is no reason to infer broad legislative intent. Courts have long recognized that a statute should not be construed to render *statutory* words or phrases redundant, *see, e.g.*, *United States v. Franz*, 886 F.2d 973, 978 (7th Cir. 1989), but Defendants cite no authority supporting their theory that a statute should be construed to avoid rendering a *regulation* redundant. Nonetheless, the statutory text is broader than the Treasury regulation—the regulation addressed only plans "administered" by a separate entity, Treas. Reg. § 1.414(e)-1(f) (1980), not plans "maintained" or "funded" by other entities. *See* 29 U.S.C. § 1002(33)(C)(i).

Differences between the final text and earlier drafts of the 1980 amendments, Def. Br. 56-57, also do not support an inference of broad Congressional intent. Indeed, *Russello v. United States*, 464 U.S. 16,

[35] Although Representative Conable and Senator Talmadge referred to such entities as "pension boards," neither Plaintiff nor the District Court suggest that section C(i) applies only to entities labeled "pension boards." *Contra* Def. Br. 58.

23-24 (1983), supports the opposite inference. In *Russello*, the Court noted that "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Id.* Here, an earlier version of section C(i) expanded the church plan exemption to "include" plans "*established and* maintained" by "principal purpose" entities. Def. Br. 56-57 (citing 124 Cong. Rec. 12,108). However, the final version omitted the words "established and", thus altering only the scope of which entities could "maintain" a church plan. Thus, the Court may presume that an expansion of entities that could "establish" church plans "was not intended." *Russello*, 464 U.S. at 23-24.

Defendants correctly note that the earlier version would have prohibited church-established plans from being maintained by a "principal purpose" entity. Def. Br. 57. But the elimination of the word "established" in section C(i) reflects an intent to permit *church-established* plans to be maintained by a "principal purpose" entity. It does not follow that the elimination of the word "established" in section C(i) permitted a new, unspecified type of entity to establish a church plan.

### 2. The Legislative History of Sections C(ii)(II) and (iii) Is Clear.

The legislative history makes clear that sections C(ii)(II) and C(iii) were added in 1980 to make permanent the sunset provision in the 1974 church plan definition, which permitted church plans to include employees of church-related organizations only until the end of 1982:

- "The present law definition of the term 'church plan' is continued … so that a church plan which covers the employees of a church agency generally would be exempt from … ERISA." 126 Cong. Rec. 19,599 (1980) (ADD69); and
- "The bill would permit a church plan to cover employees of a tax-exempt agency controlled by or affiliated with a church …." 126 Cong. Rec. 20,208 (1980) (official summary) (ADD72).[36]

Nothing in the legislative history suggests that Congress intended to address these—or any other—concerns by permitting church-associated organizations to establish their own church plans.[37]

---

[36] *See also* 124 Cong. Rec. 16,523 (1978) (remarks of Sen. Talmadge) (ADD71); 124 Cong. Rec. 12,107 (1978) (remarks of Rep. Conable) (ADD13).

[37] Any "attempt at the creation of legislative history through the *post hoc* statements of interested onlookers is entitled to no weight." *W. Air Lines, Inc. v. Bd. of Equalization*, 480 U.S. 123, 130 (1987). *Contra* Def. Br. 12 n.10; *Amicus Curiae* Brief of Guidestone Financial Resources ("Guidestone Br.") at 11-12, Appeal Dkt. #16.

Defendants cite language addressing the importance of certain church-associated organizations, Def. Br. 11, 55, but Senator Talmadge and Representative Conable made these comments only in the context of explaining why *employees* of such organizations should be *included* in church-established plans. *See* 125 Cong. Rec. 10,052 (1979) (ADD5); 124 Cong. Rec. 12,107 (1978) (ADD13). Indeed, in the very same statement quoted by Defendants, Talmadge explained that, "[u]nder the provisions of our proposals, … a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan." 125 Cong. Rec. 10,052 (1979) (ADD5). *Accord* 124 Cong. Rec. 12,107 (1978) (Rep. Conable) (ADD13).

Defendants also misconstrue statements from the opponents of the 1980 amendments. Def. Br. 11-12, 56. Daniel Halperin from the Treasury Department did not address whether the bill would exempt "plans of church-affiliated hospitals and schools," *contra* Def. Br. 11-12, but instead expressed opposition to the provisions that would *include employees* of such organizations in church plans. S. Fin.

Comm. Hr'g 40 (ADD66). Similarly, Senator Javits was concerned only that the exemption would "exempt[] those *who work for* schools and similar institutions." 126 Cong. Rec. 20,180 (1980) (emphasis added) (ADD74). Nothing in the record suggests that either opponent understood the amendment to permit such organizations to establish their own church plans. Indeed, Halperin expressed his concerns shortly after Senator Talmadge explained that the amendment would "continue" to allow a church plan to "*cover the employees* of a church-related hospital, university or retirement home," which was "a common practice *of many churches*." S. Fin. Comm. Hr'g 40 (emphasis added) (ADD66).

### 3. Defendants Cannot Rewrite Legislative History.

Fundamentally, Defendants base their argument on a gross distortion of the impetus for the 1980 amendments. These amendments were not enacted "in response to" concerns regarding IRS inquiries into whether entities qualified as churches. *Contra* Def. Br. 11. For one thing, there are many contexts in which Congress requires the IRS to distinguish between churches and non-church religious organizations. *See, e.g.*, 26 U.S.C. § 6033(a)(3)(A). Moreover,

Defendants' narrative is based solely on a selective reading of letters *from religious groups* that were published in the Congressional record. *See* Def. Br. 9-10 (citing letters published at 125 Cong. Rec. 10,054-58 (1979)); *id.* 55-57 (same). *But see Sierra Club v. Clark*, 755 F.2d 608, 617 (8th Cir. 1985) ("[T]he views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill."). Defendants do not cite a single statement from any member of Congress sharing these concerns or expressing an intent to address IRS inquiries.[38]

Notably, none of these letters asked Congress to permit church-associated entities to *establish their own* church plans, and instead recognized the legislation would resolve their concerns by allowing

[38] Congressional concerns regarding government entanglement in religion related to concerns regarding subjecting legitimate church plans to ERISA's reporting requirements. *Contra* Def. Br. 55; Brief *Amicus Curiae* of Catholic Health Association ("CHA Br.") at 16, Appeal Dkt. #19. If church-established plans were not allowed to continue covering employees of church-associated organizations, the original entanglement concern would reemerge because church-established plans would lose the exception if they continued covering agency employees. *See, e.g.*, 124 Cong. Rec. 12,106 (1978) (Rep. Conable) (ADD12); 125 Cong. Rec. 10,052 (1979) (Sen. Talmadge) (ADD5); S. Fin. Comm. Hr'g 41 (Sen. Talmadge) (ADD67).

employees to *participate* in church-established plans.[39] Indeed, the Pension Board of the United Church of Christ ("UCC"), one of the churches with which Advocate claims an affiliation, did not even address IRS inquiries in its letter, and instead explained that it understood the 1980 amendment as "intended to clarify the exemption of *churches* from the provisions of ERISA and to provide for *coverage* of church agencies and ministers, wherever carrying out their ministry, within *the church plan*." 125 Cong. Rec. 10,055-56 (1979) (emphasis added) (ADD8-9).

### D. Agency Interpretations Are Neither Controlling Nor Persuasive.

Defendants rely on the erroneous statutory construction in a 1982 IRS General Counsel Memorandum ("GCM"), Def. Br. 13-14, 63-64, which was followed without analysis in subsequent private letter

[39] *E.g.*, 125 Cong. Rec. 10,054 (1979) (Letter from the Rabbinical Pension Board asking, in part, for legislation providing that church agencies "are entitled to *participate* in … a church plan.") (emphasis added) (ADD7); *id.* at 10,055 (Letter from the American Lutheran Church) (same) (ADD8); *id.* at 10,056 (Letter from the Annuity Board of the Southern Baptist Convention) (same) (ADD9); *id.* (Letter from the Christian Reformed Church) (same); *id.* at 10,057 (Letter from The Church Pension Fund of the General Convention of the Episcopal Church) (same) (ADD10).

rulings ("PLRs"). *Id.* at 60. *See also id.* at 67 (citing a similar DOL advisory opinion ("AO")). This construction is not entitled to deference.

First, because the intent of Congress is clear from the statutory text, contrary agency interpretations are not entitled to deference. *See Chevron, U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984). Second, even if the text were unclear, the GCM, PLRs, and AOs are not entitled to *Chevron* deference because the statutory construction contained therein was not arrived at through "a formal adjudication or notice-and-comment rulemaking." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Indeed, the 1982 GCM explicitly states: "[t]his document is not to be relied upon or otherwise cited as precedent by taxpayers." 1983 WL 197946, at *6 (Nov. 2, 1982).[40]

"[I]nterpretations contained in formats such as opinion letters are 'entitled to respect,'" but "only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (citing

[40] *See also* 26 U.S.C. § 6110(k)(3) ("a written determination may not be used or cited as precedent").

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[41] Among the factors that give an interpretation the "power to persuade" are the "thoroughness evident in its consideration" and the "validity of its reasoning." *Skidmore*, 323 U.S. at 140.

Here, the GCM—and the PLRs and AOs that followed—lack any power to persuade, as they "conflict[] with the plain text of the statute," "lack[] any statutory analysis," and were "issued in a non-adversarial setting." *Kaplan*, 2014 WL 1284854, at *10; *see also Rollins*, 19 F. Supp. 3d at 913 n.3. The GCM assumed its conclusion, without any review of the text or analysis of the relationship between sections C and A. 1983 WL 197946, at *4-6.[42] As the Seventh Circuit has explained, an agency's statutory construction is not persuasive where its "analysis occupied all of a paragraph," the agency "made no effort to consider how its interpretation … harmonized (or failed to

---

[41] The DOL advisory opinion in *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 20 (2004)), interpreted a DOL *regulation*. *Id.* An informal agency interpretation of its own regulation is entitled to more respect than is an informal interpretation of a statute. *See Christensen*, 529 U.S. at 587-88.

[42] The IRS did not evaluate the legislative history, *contra* Def. Br. 64, but instead merely misconstrued the statement from Senator Javits. *Compare* 1983 WL 197946, at 6 n.1, *with supra* at 40-41.

harmonize) with the other … subsections," and the agency "did not address … the tension between [its] reading and the fact that the [statute] was meant to be an ameliorative statute, applying to as many parties as practicable." *Arobelidze v. Holder*, 653 F.3d 513, 521 (7th Cir. 2011).

The PLRs are no more persuasive, as they merely follow the conclusion of the GCM, without analysis. *Compare* I.R.S. Priv. Ltr. Rul. 9122078, 1991 WL 778797 (May 31, 1991), *with* GCM, 1983 WL 197946, at *4-6. And the AO cited by Defendants deferred to PLRs, again without any analysis. *See* Mr. Stephen D. Lowry, D.O.L. Op. Ltr. 85-01A, 1985 WL 32792, at *3 (1985).

"Longstanding" informal agency interpretations of are entitled to respect, Def. Br. 65-66, only if "cogent" and "well-reasoned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487-88 (2004) (citations omitted). *See also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (declining to defer to "longstanding agency views" that "lack[ed] persuasive force."). Similarly, the Supreme Court in *Davis v. United States*, 495 U.S. 472, 484 (1990), gave weight to a "contemporaneous" agency construction, but that

construction was issued by the Commissioner and was consistent with the "accepted meaning" of the relevant statutory term. *Id.* at 482, 484. Conversely, Defendants rely on a construction issued in a general counsel memorandum that is inconsistent with the statutory text.

Congress has neither acquiesced to, nor "approved" of, these informal, non-precedential opinions. *Contra* Def. Br. 67. Congress has not amended the church plan definition since 1980, but Congressional acquiescence to an agency's statutory construction may be inferred only where there is "'overwhelming evidence' that Congress considered and failed to act upon the 'precise issue' before the Court." *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality op.) (citation omitted); *accord Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). Here, no such evidence exists. And "congressional silence 'lacks persuasive significance' …, particularly where administrative regulations are inconsistent with the controlling statute …." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (citations omitted).

Similarly, although Congress amended *other* provisions of ERISA and incorporated the church plan exemption into *other* federal statutes, it has not "revisit[ed]" the church plan definition itself.[43] *Contra* Def. Br. 67 (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)). *Schor* is also inapposite because it addressed a *formal regulation* (regarding CTFC jurisdiction over counterclaims), and "Congress explicitly affirmed the CFTC's authority to dictate the scope of its counterclaim jurisdiction." 478 U.S. at 846.

Defendants also cite inapposite cases finding Congress to have approved a prevailing interpretation upon the *reenactment* of a statute. *See* Def. Br. 67-68. But Congress has not reenacted 29 U.S.C. § 1002(33) since 1980. *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 349 (2005) (reenactment of the same section is one of the "two requirements for congressional ratification"). Although the Tax Reform Act of 1986 re-designated the

---

[43] The Church Plan Parity and Entanglement Prevention Act, Pub. L. No. 106-244 (2000), did not "specifically amend[] the 'church plan' definition." *Contra* Def. Br. 68. Rather, this statute merely clarified the application of state insurance laws to certain church plans. *See* 29 U.S.C. § 1144a.

Internal Revenue Code as the Internal Revenue Code of 1986, that act did not restate 26 U.S.C. § 414(e).

Nonetheless, Congressional approval should not be inferred where, as here, "[t]here is no indication that Congress was aware of" the agency's interpretation when it reenacted a statute. *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). In *Lorillard v. Pons*, 434 U.S. 575, 581 (1978), which addressed a *judicial* construction of a statute, "Congress exhibited both a detailed knowledge of the [statutory] provisions and their judicial interpretation." *Id.* In *Cottage Savings Association v. C.I.R.*, 499 U.S. 554, 561-62 (1991), Congress was found to have codified certain tax realization principles that were first recognized in a series of "landmark" Supreme Court cases that formed the "contemporary legal context" in which Congress enacted the relevant provision. *Id.* Here, there exist no "landmark" judicial decisions and no indication that Congress was aware of the informal agency interpretation on which Defendants rely.

Finally, that certain PLRs address the Plan, Def. Br. 66, is of no consequence. A taxpayer may rely on a PLR only *vis-à-vis the IRS*

and only *with respect to tax liability*. *Contra* Def. Br. 62 n.23, 69.[44] Defendants cite no authority suggesting that a taxpayer may use an unpersuasive PLR to defend itself in litigation brought by a private party unrelated to tax liability. "An erroneous IRS ruling … should not be permitted to trump a Court's interpretation of a statute … and certainly should not be permitted to persist indefinitely simply by virtue of having come first." *Rollins v. Dignity Health*, --- F. Supp. 2d ----, No. 13-1450, 2014 WL 3613096, at *2 (N.D. Cal. July 22, 2014) (citing *Dixon v. United States*, 381 U.S. 68, 74 (1965) (IRS rule "out of harmony with the statute[] is a mere nullity.")). And reliance on these PLRs does not entitle Advocate to an extra-statutory exemption from ERISA. *See, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (ERISA "should not be supplemented by extratextual remedies ….").

[44] A "letter ruling" is a response to a taxpayer's inquiry "about its status for tax purposes or the tax effects of its acts or transactions." Rev. Proc. 2015-1 § 2.01; *see also id*. § 11.03 (field office will use letter ruling "in examining the taxpayer's return" and in "determining the taxpayer's liability.").

### E. The District Court's Construction Is the Only One that Avoids Constitutional Doubts.

Defendants cannot rely on the canon of constitutional avoidance, Def. Br. 45-46, 69-70, because the statute is not "susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). But if the statute were ambiguous, the canon of constitutional avoidance compels *Plaintiffs'* construction because an exemption from ERISA for Advocate violates the Establishment Clause. *See infra* at 67-74.

The attempts of Defendants and their *amici* to demonstrate countervailing constitutional concerns fail. First, they complain that the District Court's interpretation compels governmental inquiries into whether entities are churches. Def. Br. 70; CHA Br. 18; Guidestone Br. 23. But Defendants' interpretation requires this same inquiry—a court must determine whether there is a "church" with which an entity is "associated." And Congress has long required the IRS to distinguish between churches and other religious entities without constitutional concern. *See, e.g.*, 26 U.S.C. § 7611 (restricting IRS inquiries into a "church" or "convention or association of churches," but not into other religious entities). The term "church or a

convention or association of churches," with minor variation, appears in numerous sections of the Code,[45] and Courts evaluate whether institutions qualify according to neutral principles. *See, e.g.*, *United States v. Jeffries*, 854 F.2d 254, 258 (7th Cir. 1988) (applying criteria to "distinguish a church from some other form of religious enterprise"); *see also Found. of Human Understanding v. United States*, 614 F.3d 1383, 1388 (Fed. Cir. 2010) ("courts … largely agree that 'Congress intended a more restricted definition for a 'church' than for a 'religious organization.'") (citation omitted).[46]

Second, the requirement that a church plan be established by a church does not discriminate against any denomination. *Contra* Def. Br. 42-45, 70-71; CHA Br. 20-21; Guidestone Br. 6. "[O]ne religious denomination cannot be officially preferred over another," *Larson v. Valente*, 456 U.S. 228, 244 (1982), but a religious accommodation does not violate this principal of neutrality where, as here, "distinctions [are] based on organizational form and purpose, and not religious

[45] *E.g.*, 26 U.S.C. §§ 170(b)(1)(A)(i), 508, 514(b)(3)(E), 3309(b)(1), 6033(a)(3)(A)(i), 6043(b)(1), 7611(h)(1)(B).

[46] Neither these cases, nor the District Court, suggest that a "church" must be limited to a "brick-and-mortar building." *Contra* Def. Br. 19; CHA Br. 1-2.

belief or denomination." *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 273 (D.C. Cir. 2014) (distinguishing *Larson* on this basis).[47] *Accord Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 560 (7th Cir. 2014) *cert. granted, judgment vacated on other grounds sub nom. Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015).[48]

The church plan definition, as interpreted by the District Court, is available to all religious denominations; indeed, the language regarding "conventions or associations of churches" was added to section 3(33)(A) to ensure that both hierarchical and congregational denominations would be included. *See, e.g.*, Guidestone Br. 7-8. The church plan definition treats all churches (or conventions or associations of churches) identically and all church-associated entities

---

[47] The statute at issue in *Larson* treated "religious organizations" of some denominations differently than others, and the legislative history reflected "the explicit intention of including particular religious denominations and excluding others." 456 U.S. at 254.

[48] *Notre Dame* was vacated and remanded for consideration of whether its analysis of substantial burden under the Religious Freedom Restoration Act was consistent with *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). *Hobby Lobby* did not address the constitutionality of distinctions based on organizational form or purpose.

identically, and the distinction between churches and church-associated entities reflects the "long-recognized and permissible distinction between houses of worship and religious nonprofits." *Priests For Life*, 772 F.3d at 272.

Churches benefit from "tax advantages that have long been available to houses of worship, but not other types of religious organizations," and "[t]hose tax advantages have not been thought to violate the Establishment Clause." *Id.* at 273 n.29. Each of these tax advantages could be said to benefit some denominations more than others—including, for example, denominations that include schools within the same corporation as the "steeple," *see* Def. Br. 70-71—but these differences are constitutionally permissible because they are based only on organizational structure and purpose rather than religious denomination or beliefs. *See Priests For Life*, 772 F.3d at 272-73; *see also Univ. of Notre Dame*, 743 F.3d at 560 ("A law exempting churches … from property taxes will benefit religious denominations that own a great deal of property, to the disadvantage of denominations with modest property holdings (such as storefront churches). This unequal effect does not condemn the law.").

Thus, Defendants' "holy corners" illustration, Def. Br. 42-44, would prove too much, as it would invalidate as "absurd" or "unjust" every distinction between churches and religious organizations that exists throughout the tax code. Furthermore, a court may avoid a statutory construction that produces "absurd" results only if "alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). As demonstrated above, nothing in the statutory text nor legislative history demonstrates a legislative purpose to allow entities other than churches to establish church plans.

## II. The Court Need Not Consider, in the First Instance, Whether Plaintiffs Plausibly Alleged Three Alternative Reasons Why the Plan Is Not Exempt from ERISA.

If the Court reverses and concludes that a church plan need not be *established* by a church, Plaintiffs have alleged that the Church Plan exemption does not apply for three alternative reasons: (1) The Plan is not "maintained" by a permissible entity; (2) Advocate, the employer of the Plan participants, is not "controlled by or associated with a church"; and (3) application of the church plan exemption to the Plan is unconstitutional. Due to its construction of the statute,

the District Court did not consider any of these alternative allegations. (APP8, APP10 n.4).

Yet, Defendants suggest that the Court should make *factual findings,* in the first instance, that the Plan is maintained by a proper entity, Def. Br. 46-49, and that Advocate is associated with a church. Def. Br. 50-53.[49] Defendants then argue that the Court should consider—again in the first instance—the validity of Plaintiff's constitutional claim. Def. Br. 71-74.

However, because the sufficiency of these allegations is not material to whether a church plan must be established by a church, these issues are not "fairly included within the certified order." *Contra Yamaha Motor Corp.*, 516 U.S. at 205.[50] Should the Court reverse the District Court's ruling that only a church can establish a church plan, Plaintiffs respectfully request that the Court remand to the District Court for further consideration of these inherently factual

---

[49] The issue of association does not "raise[] a jurisdiction question." *Contra* Def. Br. 50 n.18. *See supra* n.10.

[50] In *Rumpke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1239 (7th Cir. 1997), the validity of plaintiff's alternative, *non-contribution* claim would have mooted the question addressed by the district court of whether their *contribution* claim was precluded by a settlement agreement.

questions. *See generally Brokaw v. Weaver*, 305 F.3d 660, 671 n.8 (7th Cir. 2002) (alternative arguments raised "without having given the district court or the plaintiff an opportunity to present contrary factual and legal arguments" were "not appropriately before this court and should be considered in the first instance by the district court on remand"). Nonetheless, Plaintiffs have pleaded plausible claims as to each of these three alternative claims.

### A. Plaintiffs Have Plausibly Alleged that the Plan Is Not Maintained by Either a Church or a "Principal Purpose" Organization.

A church plan must be "maintained" by either a church, *see* 29 U.S.C. § 1002(33)(A), or a church-associated entity whose "principal purpose or function … is the administration or funding of a plan." *Id.* § 1002(33)(C)(i). Because the Plan is maintained by Advocate, it is not maintained by either type of entity. Comp. ¶¶ 87-90. Advocate is not—and does not claim to be—a church, *id.* ¶ 48, and the "principal purpose or function" of Advocate is not the "administration or funding" of retirement plans, but the provision of healthcare. *Id.* ¶¶ 40-43, 46.

Defendants attempt to dodge this requirement by equating the concepts of "maintaining" and "administering" a plan, Def. Br. 46, but "maintain" and "administer" have distinct meanings under ERISA. *Compare* 29 U.S.C. § 1002(16)(B) (defining "plan sponsor" as the entity that "established or maintained" the plan), *with id.* § 1002(16)(A) (defining plan "administrator"). To "maintain" a plan means to "continue" a plan. *See supra* n.22. To continue a plan, an entity must have authority to modify or terminate it. *See Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (5th Cir. 1995); *Anderson*, 369 F.3d at 1267. Here, Advocate is the sponsor of the Plan, Compl. ¶ 72, and has the right to amend and terminate the Plan. *Id.* ¶ 57. Thus, regardless of whether it is "administered" by the "Administrative Committee," Def. Br. 46, the Plan is "maintained" by Advocate.[51]

Defendants' conflation of settlor functions (*i.e.*, establishing and maintaining a plan) with fiduciary functions (*i.e.*, managing and administering a plan) violates basic ERISA principles. *See Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 82 (1995)

[51] The *Overall* court failed to consider the meaning of "maintain" in section C(i) and instead assumed, without analysis, that administration was sufficient. 23 F. Supp. 3d at 829.

(contrasting plan sponsors' settlor functions of plan adoption, modification, and termination with the fiduciary function of plan administration); *see also Lockheed*, 517 U.S. at 889-91 (extending "settlor-fiduciary distinction" analysis from welfare plans to pension plans) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996)).

This distinction between administering and maintaining is reflected in *Hanshaw v. Life Insurance Company of North America*, No. 14-216, 2014 WL 5439253, at *8 (W.D. Ky. Oct. 24, 2014), which held that a plan maintained by a church-associated hospital cannot qualify as a church plan because the hospital's "principal purpose is the provision of healthcare, not the administration of a benefits plan." *Id*. Importantly, the court did not look to which entity *administered* the plan—as the relevant plan was administered by Life Insurance Company of North America, *id.* at *5—but relied upon the fact that the plan was *maintained* by the employer, St. Claire Medical Center.

Yet even if "administration" was sufficient, section C(i) does not permit a church plan to be maintained by a sub-committee of an entity whose principal purpose is not plan administration. *See Rollins*, 19 F. Supp. 3d at 914 ("While its Retirement Plans Sub–

Committee's purpose is plan administration, the statute does not say that the organization may have a subcommittee who deals with plan administration. Rather, the statute dictates that organization itself must have benefits plan administration as its 'principal purpose,' which Dignity plainly does not.").

### B. Plaintiffs Have Plausibly Alleged that Advocate Is Not "Controlled by" or "Associated with" a Church Within the Meaning of ERISA.

The Plan also does not qualify as a church plan because the Plan participants are not employed by an entity that is "controlled by" or "associated with" a church. *Contra* 29 U.S.C. §§ 1002(33)(B)(ii), (C)(ii)(II), & (C)(iii). Defendants do not claim Advocate is controlled by any church—indeed, it is difficult to fathom how a single hospital conglomerate could be controlled by two different churches. Instead, they improperly ask this Court to ignore the appropriate pleading standard and conclude that Advocate is associated with the UCC and the Evangelical Lutheran Church in America ("ELCA"). Def. Br. 50-53. Plaintiffs have pleaded ample facts supporting a plausible inference that Advocate is not associated with any church within the meaning of ERISA, and Defendants' suggestion that these allegations

are outside of the purview of federal courts is based on a distortion of First Amendment jurisprudence. Def. Br. 50, 52-53.

### 1. Defendants Improperly Ask this Court to Make Factual Conclusions.

Defendants ask the Court to conclude *as a matter of fact*—based on extrinsic documents—that Advocate is associated with the UCC and ELCA. Def. Br. 50-53. This would improperly require the Court to rely on evidence to resolve factual disputes on a motion to dismiss. *Contra Cook v. Winfrey*, 141 F.3d 322, 330 (7th Cir. 1998) (criticizing the court for resolving "factual issues that should not be reached on a motion to dismiss under Rule 12(b)(6)"); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008) (the court's "principal mistake was in thinking that it was entitled to rely on the deed of sale attached to the defendants' Rule 12(b)(6) motion"). Defendants' attempt to litigate the merits is particularly improper given the factual nature of the control and association inquiry. *See Torres v. Bella Vista Hosp., Inc.*, 523 F. Supp. 2d 123, 135 (D.P.R. 2007) (whether the plan is a church plan "should be presented in a format better designed for a full airing of the issues").

Defendants' factual assertions are based on Yearbooks from the UCC and ELCA and certain covenantal agreements between Advocate and the UCC and ELCA. Def. Br. 51. These documents were not attached or referenced in the Complaint, and thus may be considered on a Rule 12(b)(6) motion only if they are judicially noticeable. *See, e.g.*, *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).[52] Judicial notice "merits the traditional caution it is given," *id.* at 1081, and is proper only if a fact is "not subject to reasonable dispute." Fed. R. Evid. 201(b). The factual assertions on which Defendants rely are subject to considerable dispute.

For example, although Defendants argue that the covenantal agreements "bind[]" Advocate to the "shared mission" of the ELCA and UCC, Def. Br. 51, factual questions remain regarding how these

[52] Because Plaintiffs have not been afforded any discovery, they cannot present all material pertinent to the issue of association, and conversion of Defendants' motion to one for summary judgment is improper. Fed. R. Civ. P. 12(d). *See also Covington v. Illinois Sec. Serv., Inc.*, 269 F.3d 863, 865 (7th Cir. 2001) ("the district court should permit the parties to engage in discovery before converting . . . a motion to dismiss into one for summary judgment").

agreements are enforced. Moreover, these agreements state that Advocate is "fully responsible for [its] own management and fiscal affairs," Dkt. #35-8 (ELCA Covenant) at 1; Dkt. #35-9 (UCC Covenant) at 1), which is inconsistent with the test for association under ERISA. *See infra* at 63-64.

Although the Yearbooks purport to list entities "affiliated" with the UCC and ELCA, Def. Br. 51, factual questions remain regarding the meaning of the term "affiliated" and whether the standard for inclusion in these Yearbooks is consistent with the standard for "association" under ERISA. *See, e.g.*, *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (judicial notice was not proper where there existed "considerable argument over the significance" of the SEC filing at issue).

### 2. Advocate Is Not Associated with any Church.

An organization is "associated with" a church only if it "shares common religious bonds and convictions with that church." 29 U.S.C. § 1002(33)(C)(iv).[53] The only two Circuit courts that have considered

[53] In federal financial contexts "common bond" has been narrowly construed. *See* 12 C.F.R. § 701 (2013), App. B, Ch. 2, ¶ III.A.3 (despite Lutheran Church hierarchy in America, a common bond

ERISA's church plan exemption have adopted an objective, three-factor test for association, which evaluates: "1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization." *See Lown*, 238 F.3d at 548; *Chronister*, 442 F.3d at 653.

Here Advocate fails all three factors. Advocate is an independent organization constituted under Illinois law. Compl. ¶¶ 19-20. It is not owned or operated by any church, it does not receive funding from any church, and its employees are not required to be members of any church. *Id.* ¶¶ 47-55.

Whether Advocate, the UCC, and the ECLA have a "shared mission" in the provision of healthcare, Def. Br. 51, does not mean Advocate is "associated with" either church. *See Chronister*, 442 F.3d at 652-53 (no association *despite* facts that "Baptist Health's management is instructed to follow religious principles" and that

---

does not exist for "All Lutherans in the United States," which is too broadly defined).

"under Baptist doctrine, operating a facility for health care is part of the healing ministry of the church.").

Defendants state that the "First Amendment precludes review of a church's determination that an organization is associated with it pursuant to ERISA § 3(33)(C)(iv)." Def. Br. 50. But Defendants cite no document indicating that the UCC or ELCA determined that Advocate is "associated" with either church as that term is defined in ERISA. *Contra* Def. Br. 50. And the First Amendment does not preclude evaluations of whether a non-church entity is associated with a church.

Defendants cite *NLRB v. Catholic Bishop*, 440 U.S. 490, 495, 503 (1979), which addressed governmental evaluations of whether an entity is "religious." But the Court need not evaluate whether Advocate is religious. Association under ERISA requires only factual determinations of whether a church is involved in an organization's governance, whether a church provides the organization with financial assistance, and whether there exists any denominational requirement for the organization's employees or clients.

Defendants' reliance on *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013), also fails. *McCarthy*, like a number of other cases cited by Defendants, addressed only the narrow issue of judicial interference in an *internal* church dispute regarding a *church's* application or interpretation of church doctrine. *Id.* (dispute challenging church authority's determination that an individual was not a sister or a nun in the Roman Catholic Church).[54] *See also Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 742 (7th Cir. 2015) (citing *McCarthy* and *Hosanna-Tabor* and explaining that "those cases relate only to intrachurch disputes.").

[54] *See also Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich* (*"Milivojevich"*), 426 U.S. 696 (1976) (action related to whether defrockment of a Bishop was based an arbitrary interpretation of church canon law *by the church judicatory*); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 441, 450-51 (1969) (property dispute between a general church and local churches within the same church hierarchy regarding "whether the general church abandoned or departed from the tenets of faith and practice"); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 704 (2012) (it is "impermissible for the government to contradict a church's determination of who can act as its ministers").

These cases have no application to claims brought by lay Plan participants regarding a pension plan sponsored by an entity that is not a church. As Chief Justice Rehnquist once explained:

> [T]his Court never has suggested that those ["interchurch"] constraints similarly apply outside the context of such intraorganization disputes.... Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which ... statutory violations are alleged.

*Gen. Council on Fin. & Admin. of United Methodist Church v. Super. Ct. of Cal., San Diego Cnty.*, 439 U.S. 1355, 1372-73 (1978) (Rehnquist, Circuit Justice, in chambers) (citing *Milivojevich*).

### C. Plaintiffs Have Plausibly Alleged that Application of the Church Plan Exemption to the Plan Is Unconstitutional.

Although a "facial" constitutional challenge may in some cases raise only legal issues, an as-applied challenge must be evaluated "based on a developed factual record and the application of a statute to a specific person." *Richmond Med. Ctr. For Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009); *see also Phelps-Roper v. Troutman*, 712 F.3d 412, 417 (8th Cir. 2013) (remanding to district court for development of factual record on as applied challenged). Plaintiffs

have alleged facts supporting a plausible inference that a church plan exemption for the Plan would violate the Establishment Clause.

Congress may not favor "religious adherents collectively over nonadherents." *Bd. of Educ. v. Grumet*, 512 U.S. 687, 696 (1994). Although the government may accommodate religious adherents when necessary to alleviate substantial governmental burdens on religious exercise, where, as here, a regulatory exemption provided exclusively to religious adherents does *not* alleviate a substantial burden on religious exercise, it violates the Establishment Clause if it imposes burdens on nonadherents or creates greater entanglement with religion. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005); *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 15, 18 n.8 (1989) (plurality opinion); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708-09 (1985).

Defendants ignore this precedent and instead advocate a mechanical application of the "test" in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). However, "the factors identified in *Lemon* 'serve as no more than helpful signposts,'" *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality op.) (citation omitted), and are not compelled in

cases involving religious accommodations. *See, e.g.*, *Cutter*, 544 U.S. at 717 (declining to apply *Lemon* in religious accommodation Establishment Clause challenge); *cf. Hosanna-Tabor*, 132 S. Ct. at 705-707 (deciding Establishment Clause claim with no reference to *Lemon*).[55]

### 1. An Exemption for the Plan Does Not Relieve any Religious Burden or Comport with any Valid Secular Purpose.

ERISA is indistinguishable from an array of neutral enactments that do not significantly burden religious exercise when applied to commercial activities. Compl. ¶ 215(D). *See, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 391-94 (1990) (even "substantial administrative burdens … do not rise to a constitutionally significant level").[56] Indeed, Advocate elected ERISA status for multiple other plans. Compl. ¶ 215(D). Defendants' focus on

[55] *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012), did not involve a challenge to a religious accommodation.

[56] Thus the exemption also fails *Lemon*'s "purpose" prong. "[I]mplementation of the statute" can reveal an impermissible purpose. *McCreary Cnty. v. ACLU*, 545 U.S. 844, 862 (2005). An exemption for religious entities that "cannot reasonably be seen as removing a significant state-imposed" religious burden, "cannot but 'conve[y] a message of endorsement.'" *Tex. Monthly*, 489 U.S. at 15 (citation omitted).

IRS inquiries, Def. Br. 73, is a red herring, as IRS inquiries occur only when entities claim an ERISA *exemption*.

Defendants suggest that ERISA may limit the ability of churches to "use socially responsible investment practices," *id.*, but do not suggest Advocate uses any such practices. Nonetheless, this argument is legally erroneous, as ERISA does not prohibit screening morally objectionable investments as long as alternative investments perform on par with screened investments. 29 C.F.R. § 2509.08-1 (2008). And because this standard is implicit in the duty to act in the "exclusive" benefit of plan participants, *id.*, which Advocates' own Trust Agreement already requires, (Dkt. #35-13 at §1.2); *see also* (Dkt. #35-2 § 17.12), ERISA would not impose any *additional* religious burden. Indeed, Advocate already must comply with the same standards—including 29 C.F.R. § 2509.08-1— when selecting investment options in its defined contribution plan, which is not exempt from ERISA. Compl. ¶¶ 81-82.

An exemption for the Plan also does not comport with any valid secular purpose for which the exemption was enacted. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000) (policy "not

necessary to further any of [the stated secular] purposes"); *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988). The church plan exemption was enacted to avoid "examination of books and records" that "might be regarded as an unjustified invasion of the confidential relationship … with regard to churches and their religious activities."[57] An exemption for the Plan does not comport with this purpose. Advocate participates in Medicare and Medicaid and issues tax exempt bonds; thus it already discloses its financial records and relationships in detail. Compl. ¶ 215(A). When application of a religious accommodation does not advance the accommodation's secular purposes, "only two conclusions" are possible: that it is intended to "convey a message of state endorsement and promotion of" religion, or that it has "no purpose." *Wallace v. Jaffree*, 472 U.S. 38, 59 (1985).

Defendants' suggestion that the exemption simply "allows churches to advance religion," Def. Br. 72, is a fallacy, as Advocate is not a church and "[a]lmost any government benefit to religion could be recharacterized as simply 'allowing' a religion to better advance

[57] S. Rep. No. 93-383 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4889, 4965, 1973 WL 12551.

itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 347 (1987) (O'Connor, J., concurring in the judgment). Unlike here, the accommodation at issue in *Amos* was permissible because it alleviated substantial burdens on religious exercise.[58]

### 2. An Exemption for the Plan Harms Nonadherents.

"[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter*, 544 U.S. at 720 (citing *Thornton*, 472 U.S. 703); *accord Tex. Monthly*, 489 U.S. at 15. An exemption harms Plan participants by denying them all ERISA protections, Compl. ¶ 215(B), and disadvantages other hospitals because money that otherwise would fund the Plan and pay PBGC premiums can be used by Advocate to drive its growth strategy. *Id.* ¶ 215(C).[59] *See also United States v. Lee*, 455 U.S. 252, 261 (1982) ("[A]n exemption from social security taxes [for] an

---

[58] *Amos* found that allowing an LDS gymnasium to fire an employee who was violating church doctrine relieved a burden on religious practice. 483 U.S. at 336.

[59] These third party harms also demonstrate an impermissible effect under *Lemon*. 403 U.S. at 612.

employer operates to impose the employer's religious faith on the employees.").

Defendants note other instances in which Congress has exempted religious organizations for certain laws, but they ignore that the exemptions in those cases were necessary to alleviate a substantial burden on religion, *see, e.g. Amos,* 483 U.S. at 336; *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 (1987), or did not harm third-parties.[60]

### 3. An Exemption for the Plan Creates Entanglement.

Although ERISA compliance requires zero entanglement with religion, an exemption for the Plan requires courts and agencies to assess whether entities are "controlled by or associated with" a church. *See supra* 60-67. *Contra Tex. Monthly*, 489 U.S. at 20.[61]

---

[60] The property tax exemption in *Walz v. Tax Comm'n*, 397 U.S. 664 (1970), did not harm employees and was sustained "in part because the State had 'not singled out one particular church or religious group or even churches as such,' but had exempted 'a broad class of property owned by nonprofit, quasi-public corporations.'" *Bd. of Educ. v. Grumet*, 512 U.S. 687, 704 (1994) (quoting *Walz*, 397 U.S. at 673).

[61] For this reason, an exemption for the Plan also fails *Lemon*'s government entanglement factor. 403 U.S. at 620.

Defendants argue that the 1980 amendment reduced entanglement, Def. Br. 73, but the relevant inquiry is whether an exemption creates more government entanglement *than would compliance with ERISA*. *Tex. Monthly*, 489 U.S. at 20. In any event, the 1980 amendment did not eliminate inquiries into whether entities qualify as churches. *See supra* at 51-52.

## CONCLUSION

For the reasons stated above, the judgment of the District Court should be affirmed.

RESPECTFULLY SUBMITTED this 6th day of May, 2015.

**KELLER ROHRBACK L.L.P.**

*By: s/ Lynn L. Sarko*
Lynn L. Sarko
Erin M. Riley
Matthew M Gerend
1201 Third Ave., Suite 3200
Seattle, Washington 98101
(206) 623-1900

**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600

**KELLER ROHRBACK L.L.P.**
Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, Arizona 85012
(602) 248-0088

**STEPHAN ZOURAS, LLP**
James B. Zouras
Ryan F. Stephan
205 N. Michigan Ave, Suite 2560
Chicago, Illinois 60601
(312) 233-1550

***Attorneys for Plaintiffs-Appellees***

## CERTIFICATE OF COMPLIANCE

I, Lynn L. Sarko, certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) & (C) because this brief contains 13,977 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 14-point Century Schoolbook font.

Dated this May 6, 2015.

By *\/s/Lynn L. Sarko*

Lynn L. Sarko
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by first-class U.S. Mail postage prepaid to the following non-CM/ECF participants:

*/s/ Lynn L. Sarko*

# ADDENDUM

## TABLE OF CONTENTS

Page No.

Full Text of 1974 Church Plan Definition,
Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974) ............................ADD1

Full Text of Current Church Plan Definition,
ERISA § 3(33), 29 U.S.C. § 1002(33) ..............................................ADD2

125 Cong. Rec. 10,042, 10,052-58 (1979)..........................................ADD4

124 Cong. Rec. 12,106-08 (1978)....................................................ADD12

Hearing Transcript, *Lann v. Trinity Health Corp.*,
No. 14-2237 (D. Md. Feb. 24, 2015) .............................................. ADD15

Senate Committee on Finance,
Executive Session Minutes, June 12, 1980 ....................................ADD63

126 Cong. Rec. 19,599 (1980) .........................................................ADD69

124 Cong. Rec. 16,522-23 (1978)....................................................ADD70

126 Cong. Rec. 20,208 (1980) .........................................................ADD72

126 Cong. Rec. 20,179-80 (1980)....................................................ADD73

**1974 Version of Church Plan Definition**

**(A)** The term "church plan" means

(i) a plan established and maintained for its employees by a church or by a convention or association of churches which is exempt from tax under section 501 of the Internal Revenue Code of 1954, or

(ii) a plan described in subparagraph (C).

**(B)** The term "church plan" (notwithstanding the provisions of subparagraph (A)) does not include a plan

(i) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of the Internal Revenue Code of 1954), or

(ii) which is a plan maintained by more than one employer, if one or more of the employers in the plan is not a church (or a convention or association of churches) which is exempt from tax under section 501 of the Internal Revenue Code of 1954.

**(C)** Notwithstanding the provisions of subparagraph (B)(ii), a plan in existence on January 1, 1974, shall be treated as a "church plan"

if it is established and maintained by a church or convention or association of churches for its employees and employees of one of more agencies of such church (or convention or association) for the employees of such church (or convention or association) and the employees of one or more agencies or such church (or convention or association), and

if such church (or convention or association) and each such agency is exempt from tax under section 501 of the Internal Revenue Code of 1954.

The first sentence of this subparagraph shall not apply to any plan maintained for employees of an agency with respect to which the plan was not maintained on January 1, 1974. The first sentence to this subparagraph shall not apply with respect to any plan for any plan year beginning after December 31, 1982.

Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974) (indentations added for clarity).

**Current Version of Church Plan Definition**

**(A)** The term 'church plan' means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

**(B)** The term 'church plan' does not include a plan--

**(i)** which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of Title 26), or

**(ii)** if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C) (or their beneficiaries).

**(C)** For purposes of this paragraph--

**(i)** A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

**(ii)** The term employee of a church or a convention or association of churches includes--

**(I)** a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

**(II)** an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches; and

**(III)** an individual described in clause (v).

**(iii)** A church or a convention or association of churches which is exempt from tax under section 501 of Title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

**(iv)** An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

**(v)** If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches, the church plan shall not fail to meet the requirements of this paragraph merely because the plan--

**(I)** retains the employee's accrued benefit or account for the payment of benefits to the employee or his beneficiaries pursuant to the terms of the plan; or

**(II)** receives contributions on the employee's behalf after the employee's separation from such service, but only for a period of 5 years after such separation, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7) of Title 26) at the time of such separation from service.

**(D)** **(i)** If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26 fails to meet one or more of the requirements of this paragraph and corrects its failure to meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this paragraph for the year in which the correction was made and for all prior years.

**(ii)** If a correction is not made within the correction period, the plan shall be deemed not to meet the requirements of this paragraph beginning with the date on which the earliest failure to meet one or more of such requirements occurred.

**(iii)** For purposes of this subparagraph, the term "correction period" means—

**(I)** the period ending 270 days after the date of mailing by the Secretary of the Treasury of a notice of default with respect to the plan's failure to meet one or more of the requirements of this paragraph; or

**(II)** any period set by a court of competent jurisdiction after a final determination that the plan fails to meet such requirements, or, if the court does not specify such period, any reasonable period determined by the Secretary of the Treasury on the basis of all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or

**(III)** any additional period which the Secretary of the Treasury determines is reasonable or necessary for the correction of the default,

whichever has the latest ending date.

ERISA § 3(33), 29 U.S.C. § 1002(33)

CONSOLIDATED REPORT OF EXPENDITURE OF FOREIGN CURRENCIES AND APPROPRIATED FUNDS FOR FOREIGN TRAVEL BY MEMBERS AND EMPLOYEES OF THE U.S. SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION, EXPENDED BETWEEN JAN. 1 AND MAR. 31, 1979

| | | Per diem | | Transportation | | Miscellaneous | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Name and country | Name of currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency |
| Barclay, Charles M.: Jamaica | U.S. dollars | | 375.00 | | | | | | 375.00 |
| Cannon, Howard W.: Jamaica | U.S. dollars | | 225.00 | | | | | | 225.00 |
| Total | | | 600.00 | | | | | | 600.00 |

HOWARD W. CANNON
Chairman, Committee on Commerce, Science, and Transportation.

Apr. 4, 1979.

CONSOLIDATED REPORT OF EXPENDITURE OF FOREIGN CURRENCIES AND APPROPRIATED FUNDS FOR FOREIGN TRAVEL BY MEMBERS AND EMPLOYEES OF THE U.S. SENATE COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON IMMIGRATION AND REFUGEES, EXPENDED BETWEEN NOV. 12 AND DEC. 19, 1978

| | | Per diem | | Transportation | | Miscellaneous | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Name and country | Name of currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency |
| Sidney B. Rawitz | | | | | | | | | |
| Portugal | Escudo | 10,472 | 225.00 | | 700.00 | | | | 925.00 |
| England | Pound | 213.03 | 426.60 | | | | | | 426.60 |
| Switzerland | Swiss franc | 352.40 | 218.00 | | 1,588.00 | | | | 1,806.00 |
| France | French franc | 1,134.75 | 267.00 | | | | | | 267.00 |
| Jerry M. Tinker: Switzerland | Swiss franc | 486.65 | 285.00 | | 1,121.00 | | | | 1,406.00 |
| Total | | | 1,421.60 | | 3,409 | | | | 4,830.06 |

EDWARD M. KENNEDY,
Chairman.

Apr. 23, 1979.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second time by unanimous consent, and referred as indicated:

By Mr. GOLDWATER:

S. 1077. A bill to amend the Act of December 22, 1974, and for other purposes; to the Select Committee on Indian Affairs.

By Mr. JAVITS (for himself, Mr. GOLDWATER, Mr. DOMENICI, Mr. WILLIAMS, and Mr. PELL):

S. 1078. A bill to amend the Internal Revenue Code of 1954 to provide for the the taxation of artists' income and estates; to the Committee on Finance.

By Mr. PRESSLER (for himself and Mr. YOUNG):

S. 1079. A bill to amend the Internal Revenue Code of 1954 to permit farmers and small businesses to obtain the investment credit for used section 38 property acquired from a related party; to the Committee on Finance.

By Mr. RIBICOFF (by request):

S. 1080. A bill to amend the Energy Reorganization Act of 1974, as amended, to provide for statutory creation of the Office of Inspection and Enforcement of the Nuclear Regulatory Commission; to the Committee on Governmental Affairs.

By Mr. COHEN:

S. 1081. A bill to terminate the authorization for the Dickey-Lincoln School project, Saint John River, Maine; to the Committee on Environment and Public Works.

By Mr. GRAVEL:

S. 1082. A bill to repeal limits placed on public compensation for personal and property damage caused by nuclear power accidents; to the Committee on Environment and Public Works and the Committee on Energy and Natural Resources, jointly, provided that if and when ordered reported by one committee, the other committee have 60 days to report, exclusive of any period the Senate is not in session for more than 3 days, by unanimous consent.

By Mr. BAUCUS:

S. 1083. A bill to amend section 5 of the Department of Transportation Act, relating to rail service assistance; to the Committee on Commerce, Science, and Transportation.

By Mr. RIBICOFF (by request):

S. 1084. A bill to amend Section 201(a) (1) of the Energy Reorganization Act of 1974, as amended, 42 U.S.C. 5841(a) (1); to the Committee on Governmental Affairs.

By Mr. COCHRAN (for himself and Mr. CHAFEE):

S. 1085. A bill to amend the Internal Revenue Code of 1954 to provide that the mileage rate used to determine the amount allowable as a deduction for the business use of automobiles shall be the same as the rate used to reimburse Federal employees; to the Committee on Finance.

By Mr. McGOVERN:

S. 1086. A bill for the relief of Bharat Persaud; to the Committee on the Judiciary.

S. 1087. A bill for the relief of Kenneth Robert Gibb; to the Committee on the Judiciary.

By Mr. CRANSTON (for himself and Mr. LUGAR):

S. 1088. A bill to amend the National Housing Act in order to improve the mobile home financing programs administered by the Department of Housing and Urban Development; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. BENTSEN:

S. 1089. A bill to amend the Internal Revenue Code of 1954 and the Employee Retirement Income Security Act of 1974 to simplify compliance with Federal employee benefit plan requirements; to the Committee on Finance and the Committee on Labor and Human Resources, jointly, by unanimous consent.

By Mr. TALMADGE (for himself, Mr. BENTSEN, and Mr. BOREN):

S. 1090. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance and the Committee on Labor and Human Resources, jointly, by unanimous consent.

S. 1091. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance.

S. 1092. A bill to amend section 403(b) of the Internal Revenue Code of 1954 with respect to computation of the exclusion allowance for ministers and lay employees of the church, and to amend sections 403(b) (2) (B), 415(c) (4), 415(d) (1), and 415(d) (2) and to add a new section 415(c) (8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

By Mr. PRESSLER (for himself and Mr. MATHIAS):

S.J. Res. 74. Joint resolution authorizing and requesting the President to issue a proclamation designating May 11, 1979, as "CARE Day"; considered and passed.

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. GOLDWATER:

S. 1077. A bill to amend the act of December 22, 1974, and other purposes; to the Select Committee on Indian Affairs.

### AMENDMENT OF THE NAVAHO-HOPI SETTLEMENT ACT OF 1974

● Mr. GOLDWATER. Mr. President, today I am introducing legislation to amend the Navaho-Hopi Settlement Act of 1974. This public law was the result of congressional attempts to resolve a 100-year-old dispute between the Navahos

clusion allowance for ministers and lay employees of the church, and to amend sections 403(b)(2)(B), 415(c)(4), 415(d)(1), and 415(d)(2) and to add a new section 415(c)(8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

LEGISLATION REGARDING CHURCH PENSION PLANS AND RELATED REFORM OF ERISA

● Mr. TALMADGE. Mr. President, with my colleagues Senators BENTSEN and BOREN, I am reintroducing legislation to amend the definition of "church plan" found at section 414(e) of the Internal Revenue Code and section 3(33) of the Employee Retirement Income Security Act of 1974, which I introduced in the 95th Congress. All of the major church denominations in this country—Protestant, Catholic, and Jewish—are of one accord in this matter. They need and desire relief.

When we enacted ERISA in 1974, we set 1982 as the date beyond which a church plan could no longer provide retirement and welfare benefits for employees of church agencies. We also forbade the church plans to provide any new agency coverage after 1974. Moreover, as I will explain later, the church plan definition is so narrow that it almost completely fails to consider the way our church plans have for decades operated. At this moment our churches are justifiably concerned that their plans do not meet the church plan requirements and are, therefore, subject to ERISA. In 1974, we did not recognize the unique character and needs of our church plans.

The church plans in this country have historically covered both ministers and lay employees of churches and church agencies. These plans are some of the oldest retirement plans in the country. Several date back to the 1700's. The average age of a church plan is at least 40 years. To comply with ERISA by 1982, the churches must divide their plans into two so that one will cover church employees and the other, agency employees. It is no small task to break up a plan that has been in existence for decades, even centuries.

The estimated legal, actuarial, and accounting costs of the initial division of church plans and the additional continuing costs of maintaining two separate plans are so significant that reduced retirement and other benefits may result unless they can be assimilated. To offset these additional costs, the churches are confronted with a very large, and possibly not absorbable, economic burden, merely to provide pre-ERISA level of benefits. There is no imposition by ERISA of such moment on the plans of other organizations.

Church agencies are essential to the churches' mission. They are for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA has made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

Ministers and lay employees have a unique need to be covered by one plan. Employment is extremely fluid within our denominations. A minister will frequently move from church to agency, or wherever his services are most needed. If he cannot be covered by one plan, gaps in coverage may occur because the agency may not have a plan or may have a waiting period before participation. If the church plan definition is allowed to remain, ministers and lay employees will not be able to pursue their missions nearly as freely as they have in the past. It is inescapable that the way our churches have functioned will be directly affected.

As I mentioned earlier, the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated. For example, this definition can be interpreted to require a minister or lay employee of a church to be a current employee. Many ministers serve their faith outside the denominational structure—as chaplains in prisons, hospitals, universities, and elsewhere. Evangelist ministers are usually self-employed and have no employer. There is no valid reason for denying these persons the benefits of retirement and welfare coverage.

This type of problem is less apt to occur in a hierarchical denomination because a minister may continue to be considered an employee even though he is serving outside the church structure.

Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination. Under the church plan definition, there is a question whether the plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. In this type of church, the denomination has little, if any, control over the local churches. Some differences in plan provisions occur, because the denomination cannot enforce uniformity, and the question whether the plan is maintained by the denomination or by the local churches is raised.

The inability of a congregational denomination to control its agencies makes it difficult to see how the church agency plan could meet the requirements of ERISA. In a corporate structure lines of authority are clear. One plan covering the employees of a parent and its subsidiaries can easily meet the requirements of law because of the control executed by the parent. As I have stated, a congregational denomination cannot force the agencies to observe the requirements of ERISA. Accordingly, there is little hope that a plan established by a congregational church for its agencies could comply with ERISA.

Mr. President, these and other problems over the church plan definition under present law confront the churches today. They are worried that their plans do not now meet the church plan requirements and concerned over the impending restructuring of their plans. It is time we remove the churches from this statutory cloud. If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive Government entanglement with religion.

Under the provisions of our proposals, effective as of January 1, 1974, a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan. Our legislations retains the definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churchs exempt from tax under section 501. However, to accommodate the differences in beliefs, structures, and practices among our religious denominations, all employees are deemed to be employed by the denomination. The term employee is also redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and third, certain former employees who participated in the church plan before separation from service.

Under our legislation an organization is "associated" with a church if it shares common religious bonds and convictions with that church. Thus, by including an ordained minister as an employee without the requirement of an actual employment relationship, the church plan may continue to cover a minister who serves outside of the denominational structure, provided the service is in the exercise of his ministry. Accordingly, a minister serving as a prison chaplain or teaching religious studies at a university or an evangelist minister by who no employer would be entitled to participate in the church plan.

Under our legislation a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. There

is no real reason why a church plan should be forced to pay a former employee his accrued benefit in cash and, thus, destroy his retirement benefits. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service. A minister or lay employee may reach a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the church. During this period the denomination may permit the individual to continue to be covered by the church plan even though he is separated from service. Under our legislation a church plan may continue to receive contributions for an individual who is a participant in the church plan at the time of his separation from service but only for a period of 5 years. A time limit is not placed upon employees who separated from service because of disability.

A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501. No church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in the plan provisions among the local employers.

Our legislation also corrects a very harsh position taken by the Treasury Department in its proposed regulations defining church plans. These proposed regulations provide that once a church plan fails to meet the requirements of church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

Our proposals provide a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the legislation is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. President, with my distinguished colleagues Senators BENTSEN and BOREN, I today reintroduce legislation to amend several provisions of the Internal Revenue Code that inequitably prevent the satisfactory accumulation of retirement benefits for the majority of clergymen and lay employees of church denominations in this country. This legislation is a large step in the direction of assuring our ministers and lay employees of an adequate retirement allowance.

It is well known that clergymen and lay employees are not well compensated. The beginning salary for a minister may be from $5,000 to $10,000 a year. Prior to retirement his salary may have increased to $15,000 or $20,000. Lay employees generally receive less compensation than ministers. Moreover, the retirement incomes of ministers and lay employees from church retirement plans are very small, being on the order of from $2,000 to $3,000 a year.

Most of our church denominations provide for the retirement of their ministers and lay employees in the form of annuities governed by section 403(b) of the code. The amount that can be contributed for the purchase of such an annuity, without income tax consequences to the employee, is limited by the "exclusion allowance" of section 403(b)(2). The amount of the exclusion allowance for any year is the excess of (1) 20 percent of the employee's includable compensation for the year times the employee's years of service with his or her employer over (2) the aggregate tax-sheltered contributions made by the employer for the employee in prior years. The exclusion allowance is designed to permit larger than usual retirement annuity contributions to be made late in the employee's career to compensate for the years when contributions may not have been possible. These are called catchup contributions. The opportunity for making catchup contributions is extremely important to poorly paid persons such as ministers and lay employees. A minister who is paid $7,500 a year at the beginning of his career will need all of his income for many years to support his family and educate his children. During these years, because of the minister's low level of salary, pension contributions made on his behalf by his church will be minimal. However, when he reaches 50 years or so, his living expenses will tend to decrease. Then he or his employer may be in a position to make significant catchup contributions to his retirement annuity.

However, two provisions of the code inequitably prevent the making of catchup contributions in the case of many ministers and lay employees. In 1974 when we enacted section 415(c)(1) of the code, we placed a limitation on the amounts that can be contributed to a defined contribution plan, such as a 403(b) annuity arrangement. This limitation, which operates independently of the exclusion allowance, is the lesser of $25,000 (adjusted by increases in the cost of living) or 25 percent of the participant's compensation. In imposing this limitation, we recognized that it would have a serious effect on the ability to make catchup contributions and provided in section 415(c)(4) certain elections that a participant could make in order to override the 25-percent ceiling. However, these elections are available only to employees of educational organizations, hospitals, and home health service agencies. Obviously, we were not then aware of the extensive use of section 403(b) annuities by our churches.

The second problem area is the provision in section 403(b)(2) which limits the "years-of-service" factor of the exclusion allowance to years of service with the employee's current employer. In computing the exclusion allowance for any year, the employee is not given credit for any years of service with prior employers. It is common in many denominations for a minister or lay employee to move from one church to another within the denomination or among various agencies of the denomination during the course of their careers. Under current law each church or denominational agency for which the minister or lay employee works is treated as a separate employer for purposes of the years-of-service factor. The minister or lay employee is accordingly not given credit for all of his or her services with the denomination in the computation of the exclusion allowance. For an employee who has changed jobs frequently, as do the ministers and lay employees of many denominations, this rule severely reduces the exclusion allowance and the ability to make catchup contributions.

Mr. President, our legislation would correct the first inequity by extending the right to make the elections in section 415(c)(4) to employees of churches, and their agencies. We believe that these persons should have the right to make the same elections as employees of educational organizations, hospitals, and home health service agencies. Our legislation also provides a de minimis amount of $10,000 which may be contributed, subject to the exclusion allowance, without the necessity of making the section 415(c)(4) elections. This de minimis amount is parallel to the de minimis amount provided for defined benefit plans in section 415(b)(4) of the code. The term "agency" of a church is also defined in our legislation as an exempt organization which is either controlled by or associated with a church or a convention or association of churches. We further provide that an organization is "associated" with a church or a convention or association of churches if it shares common religious bonds and convictions with that church.

Our legislation also would treat the service of a minister or lay employee with any church or church agency of a religious denomination as the service with a single employer for purposes of computing the exclusion allowance. All

the years of service of a minister or lay employee for churches or agencies of the denomination would be aggregated in determining the exclusion allowance for taxable years beginning after 1977. It would make no difference whether the years of service being aggregated occurred before 1978 or after 1977. Our legislation will enable contributions to be made by and on behalf of ministers and lay employees in order to provide them with retirement benefits based upon the years of service with the denomination, rather than with the current employer.

Mr. President, I have received numerous letters from officials of various denominations endorsing the legislative proposals I am making today regarding church pension plans and related reform of ERISA. I ask unanimous consent that they be printed at this point in the RECORD.

There being no objection, the letters were ordered to be printed in the RECORD, as follows:

THE RABBINICAL PENSION BOARD,
*New York, N.Y., May 2, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Union of American Hebrew Congregations was incorporated in 1873 by an act of the Ohio Legislature for the purpose of . . .

"To encourage and aid the organization and development of Jewish Congregations.

To promote Jewish education and to enrich and intensify Jewish life.

To maintain the Hebrew Union College-Jewish Institute of Religion."

Some 35 years ago, the Union of American Hebrew Congregations and the Central Conference of American Rabbis organized the Rabbinical Pension Board for the purpose of administering pensions and other group insurance plans for the benefit of rabbis, religious educators, congregational administrators and other synagogue professionals who are engaged in work on behalf of the Reform Jewish Movement within the United States.

The Rabbinical Pension Board, through its two parent bodies, represents some eight hundred Reform Jewish congregations and some eleven hundred participating rabbis and other congregational professionals. The Rabbinical Pension Board is managed by a Board of Trustees elected by the Board of the Union of American Hebrew Congregations and the Central Conference of American Rabbis.

Mr. Robert L. Adler of Chicago, the chairman of the Rabbinical Pension Board, and I, share a great concern about the facts of the Employee Retirement Income Security Act of 1974 ("ERISA") on our retirement annuity and welfare benefit program. We are particularly concerned about the "intrusion of the Internal Revenue Service into the affairs of church groups and their agencies by presuming to define what is and what is not an integral part of these religious groups" and we are supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that agencies such as ours are recognized as part of a church or convention of churches and are entitled to participate in such a church plan."

We appreciate your introducing and cosponsoring with Senator Lloyd Bentsen last year legislation designed to clarify and define the church plan and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced in this legislative session in the House of Representatives by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA, of which we are a member, during this session of the Congress will be most appreciated.

We feel that it is most important that this be accomplished as speedily as possible.

Sincerely,

THEODORE K. BROIDO,
*Secretary, Rabbinical Pension Board.*

---

JOINT RETIREMENT BOARD,
OF RABBINICAL ASSEMBLY,
*New York, N.Y., April 27, 1979.*

Senator HERMAN TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I wish to thank you for having introduced legislation in the 95th session of Congress sponsored by the Church Alliance for Clarification of ERISA and showing your interest in helping the millions of participants in Church and Synagogue sponsored pension plans.

I would very much appreciate it and would deem it an honor if you could find time to introduce and sponsor similar legislation in the 96th session of Congress.

If there is any way we can be of help, please do not hesitate to let us know.

Sincerely,

LEO. J. LANDES.

---

WORKER BENEFIT PLANS,
*St. Louis, Mo., April 20, 1979.*

Hon. HERMAN E. TALMADGE,
*U.S. Senate*
*Washington, D.C.*

DEAR SENATOR TALMADGE: First, I want to express on behalf of our church body my deep appreciation to you for the interest and efforts you demonstrated on behalf of the church pension programs by introducing legislation in the last session of Congress which would have benefited the many workers presently enrolled in the various denominational pension programs.

If the present definition of "church plan" as same is contained in the Employee Retirement Income Security Act of 1974 ("ERISA") is not changed as was outlined in the legislation you introduced into the Senate last year, the pension program of The Lutheran Church-Missouri Synod will have to be divided into two programs, one for ministers who are serving church agencies and another for those ministers serving what the present definitions call "church". This splitting up of our programs is going to be a costly procedure and can only be borne out of the program monies, which means out of the pension monies available to our already underpaid church workers. Our church body certainly does not look favorably upon the fact that the Internal Revenue Service is attempting to define what is and what is not "church" and how the mission of the church is to be carried out.

Senator Talmadge, The Lutheran Church-Missouri Synod pension programs are not the only church pension programs facing a problem over the effects of ERISA. All major denominations are involved as evidenced by the formation of the Church Alliance for Clarification of ERISA. Your assistance is needed and we certainly hope you will again introduce and co-sponsor legislation to clarify the church plan definition of ERISA and also allow church workers to have greater retirement benefits.

Your continued interest and support in this matter is greatly appreciated.

Sincerely yours,

EARL E. HAAKE,
*Administrator.*

---

PRESBYTERIAN CHURCH IN AMERICA,
*Columbus, Ga., April 27, 1979.*

Senator HERMAN TALMADGE
*Washington, D.C.*

DEAR MR. TALMADGE: The Presbyterian Church in America has expressed its support of the various bills being suggested to exempt the church pension funds from the provisions of ERISA.

Whatever you can do to help us would be greatly appreciated.

Yours truly,

Dan M. Moore,
*Business Administrator.*

---

THE BOARD OF PENSIONS,
*Philadelphia, Pa., April 18, 1979.*

Hon. HERMAN E. TALMADGE,
*U.S. Senate,*
*Washington, D.C.*

MY DEAR SENATOR: On behalf of the Board of Pensions of the United Presbyterian Church in the U.S.A., may I express to you our sincere appreciation for your introduction and co-sponsorship last year of legislation designed to clarify the ERISA definition of a "church plan." From the standpoint of this Board and similar units of other religious denominations, such clarifying legislation is essential to remove the present uncertainty concerning the intent of this definition.

Absent the needed clarification, church plans will be unable to serve all employees of churches and church agencies without becoming subject to the administrative requirements of ERISA. The expenses that would result from meeting these administrative requirements would necessarily result in a reduction of the pension benefits that would otherwise be payable to plan beneficiaries. Because of the low salaries paid to church workers, their pensions are already small—they can ill afford to be reduced.

We believe that the legislation you sponsored last year would correct important defects of ERISA. Therefore, we urge you to reintroduce and co-sponsor similar legislation in the present session of Congress. In so doing you will be helping to assure that church pension plans will be able to maintain their service to church workers and their families on an efficient, cost-effective basis.

Very truly yours,

ARTHUR W. BROWN,
*President, Board of Pensions.*

---

BOARD OF PENSIONS,
LUTHERAN CHURCH IN AMERICA,
*Minneapolis, Minn., April 18, 1979.*

SENATOR HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Last year you introduced and co-sponsored legislation with Senator Lloyd Bentsen designed to clarify the church plan definition of the Employee Retirement Income Security Act of 1974 (ERISA) and to allow denominational workers to have greater retirement annuity benefits. Clergy and lay members of the Board of Pensions of the Lutheran Church in America appreciate your efforts and only regret that the legislation failed to be enacted.

Companion legislation has now been reintroduced in this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578.

You have already received a summary statement of some of the problems related to ERISA and church plans that require legislative attention. An additional copy of that

summary prepared by the 25 denominational members of the Church Alliance for Clarification of ERISA is enclosed for your review.

We are deeply concerned about the effects of ERISA on our denomination's retirement annuity benefit programs. Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA in this session will be appreciated.

Such support will be considerable help to us and other church pension plans in utilizing as much of available resources as possible for the benefit of our many retired ministers and church lay workers.

Sincerely,

MANFRED HOLCK, Jr.,
*Comptroller.*

PENSION FUND OF THE CHRISTIAN CHURCH,
*Indianapolis, Ind., April 12, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Every religious communion that has been around long has a church pension plan. One needn't wonder why for long, when they understand the nature and commitment of the ministry and others who serve the Church, plus the desire of the Church to be true to its teachings in social and economic practices. This, I am confident, is true for all groups, be they Catholic, Protestant, or Hebrew.

By and large these institutions are served by devoted persons who make sacrifices—rarely own property—live on limited income—and serve wherever they are called.

Early in our history, the need arose for the provisions for them in case of their age or disability or their survivors in time of death. Consequently, Church pension plans are older than the life insurance industry in the United States.

Because the communion I serve is one of the younger communions, our Board began its operation in 1895 and has operated under a charter here in Indiana since then.

Because of certain things included and also omitted in the Employee Retirement and Income Security Act of 1974 (ERISA), this denomination, along with most other denominations, has become increasingly aware of the effect that is occurring upon our church pension plan and benefit programs.

The effect is a strange one. As a matter of fact, in regard to vesting and funding, our plans exceed the requirements expected under ERISA. However, in regard to reporting requirements in relationship to the units serving the Church in its various benevolent, missionary and educational enterprises, the law as now written would separate us from almost a century of service to such institutions by 1982. In addition to that, there are other injustices placed upon ministers and church employees who are not accorded the same retroactive computation advantages for their employers to build up their pensions in their final years that are accorded employees of other institutions.

This concern was registered and expressed by a resolution passed in the last General Assembly of the Christian Church (Disciples of Christ) meeting in Kansas City, Missouri in October, 1977.

We are grateful to you and Senator Bentsen, as well as Representative Conable, of New York, for introducing legislation in the last session that would have corrected many of these ills. We are calling upon many of our concerned senators and representatives to join you in this session to see that this matter does have the legislative correction so sorely needed. Along with representatives of some twenty-five or thirty other denominations participating in the Church Alliance for Clarification of ERISA, we have been attempting to express a mutual concern, since we have no regular Church organization of this broad base—Catholic, Protestant and Jewish, in order to make such a presentation to those who can correct this situation by legislation.

Your introduction and co-sponsoring of the legislation needed in this session is most appreciated.

Cordially yours,

WILLIAM MARTIN SMITH.

THE AMERICAN LUTHERAN CHURCH,
*Minneapolis, Minn., April 18, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Lutheran Church (ALC) has been established as a "union of congregations to which the Gospel of reconciliation has been given," the specific purposes to be "the proclamation and propagation of the christian faith, and the quickening and sanctification of the members of its congregations through the use of the means of Grace."

A copy of the stated purpose, chapter 2 of the Constitution of The ALC, is enclosed with this letter for your information. Please note that Section 2.28 specifically recognizes the establishment and maintenance of the work of the Board of Pensions by The ALC.

Many people of our 2.4 million member church body are deeply concerned about the seeming intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan." We share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been introduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of our twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA. Our Pension Board is an active participant.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

HENRY F. TREPTOW,
*Executive Secretary.*

REORGANIZED CHURCH OF JESUS CHRIST, OF LATTER DAY SAINTS,
*April 27, 1979.*

Re: Church Plans
Hon. HERMAN E. TALMADGE,
*U.S. Senate, Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Reorganized Church of Jesus Christ of Latter Day Saints was organized in accordance with the laws of New York on June 6, 1830 as a religious organization. Since the early days of the Church, ministers and other denominational workers have been provided for prior to and upon retirement.

As Presiding Bishop and Chief Financial Officer of the Reorganized Church of Jesus Christ of Latter Day Saints, I have a concern about the effects of the Employee Retirement Income Security Act of 1979 (ERISA) on our denomination's retirement annuity and welfare benefit programs. We are also concerned about the Internal Revenue Service's attempt to define what is and what is not a part of our denomination's mission.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits. Comparable legislation has been reintroduced this session by Representative Barber B. Conable, Jr. of New York as HB 1576, 1577, and 1578 which we support.

Your introduction and co-sponsoring the legislation is supported by the Reorganized Church of Jesus Christ of Latter Day Saints and is most appreciated.

Sincerely,

F. E. HANSEN,
*Presiding Bishop.*

THE PENSION BOARDS,
UNITED CHURCH OF CHRIST,
*April 17, 1979.*

Re: Employee Retirement Income Security Act of 1974 and church plans
Hon. HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Pension Boards of the United Church of Christ include three pension corporations and a common investment corporation that had been individually or jointly serving the ministry and the employees of the United Church of Christ since 1914.

The United Church of Christ is a denomination formed out of the merger of the Congregational Christian Church and the Evangelical and Reformed Church. Both of these denominations date back to colonial times, the Congregational Christian Church growing out of the church of the Pilgrims, while the Evangelical and Reformed Church grew out of the colonial settlers coming from Germany and other parts of middle Europe.

Over the years that the Pension Boards have served the ministers and employees of the United Church of Christ, their record has been outstanding in providing benefits for those participants who are covered under the program. The Pension Boards have been ahead of their time in facing up to the responsibility of providing retirement income for their employees and have maintained standards that, in most areas, were ahead of those required by the Employee Retirement Income Security Act of 1974, long before that Act was even contemplated by the Congress. When that Act was ultimately passed by the Congress, one of the first actions by the Pension Boards was to review that Act and assure that we met the standards of vesting and non-discrimination established by the Act, even though, as a church plan, we were probably not covered by the Act during the current years.

Notwithstanding our general compliance with the intent of the Act, many of the Act's provisions would be a substantial detriment to the Pension Boards, and a dissipation of the funds of the Pension Boards for administrative detail that will neither serve the participants, nor the Government. In addition, the Pension Boards carry on a substantial relief function of the Church which cannot be accommodated within the strict provisions of ERISA. For these reasons, and others, we greatly appreciated your introducing and co-sponsoring during the last session of the Congress, legislation intended

to clarify the exemption of churches from the provisions of ERISA and to provide for the coverage of church agencies and ministers, wherever carrying out their ministry, within the church plan.

As you are aware, Senator Talmadge, the major religious denominations have a substantial concern over the effects of ERISA, and have joined together to form the Church Alliance for the Clarification of ERISA. The legislation desired by the Church Alliance for the Clarification of ERISA, which you introduced in the Senate last year, and which was introduced in the House last year by Representative Barber B. Conable, Jr. of New York, has been reintroduced in the House by Barber Conable in this legislative session. We sincerely hope that you will introduce and co-sponsor that legislation in the Senate during this session. Copies of the legislation have been forwarded to you by Mr. Darold H. Morgan, President of the Annuity Board of the Southern Baptist Convention.

Thank you for your consideration in this matter.

Sincerely,

JOHN D. ORDWAY,
*Executive Vice President.*

---

THE PENSION DEPARTMENT OF THE A.M.E. CHURCH,
*Nashville, Tenn., April 17, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I am writing you in reference to bill H.R. 1576 as it relates to Church Pension Plans and ERISA. We appreciate your efforts heretofore in meeting with church representatives to get a clear understanding of difficulties imposed on the church by the government. Your effort on our behalf has been deeply appreciated and we continue to ask your support in the passage of bill H.R. 1576 in this Congress.

Yours sincerely,

J. M. GRANBERRY, Jr.,
*Secretary-Treasurer.*

---

ANNUITY BOARD OF THE SOUTHERN BAPTIST CONVENTION,
*Dallas, Tex., April 4, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Southern Baptist Convention was incorporated in 1845 by an act of the Georgia legislature for "the purpose of eliciting, combining, and directing the energies of the Baptist Denomination of Christians for the propagation of the gospel."

In 1918, what is now the Annuity Board of the Southern Baptist Convention was chartered to provide relief, support benefits and annuities for ministers of the gospel and other denominational workers within the of the Southern Baptist Convention. Our Annuity Board is managed by a Board of Trustees elected annually by action of the Southern Baptist Convention.

Dr. Jimmy Allen, the President of the Southern Baptist Convention (the present pastor of the First Baptist Church of San Antonio), Dr. Porter Routh, the Executive Secretary of the Executive Committee of the Southern Baptist Convention headquarters in Nashville, Tennessee, and I share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

The messengers to the 1976 annual session of the Southern Baptist Convention adopted resolutions (copies enclosed) protesting "the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission" and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Enclosed as exhibits to this letter are texts of remarks made last year when similar legislation was first introduced. Also enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

DAROLD H. MORGAN,
*President, Annuity Board of the Southern Baptist Convention.*

---

CHRISTIAN REFORMED CHURCH IN N.A. MINISTERS' PENSION FUND,
*April 25, 1979.*

Re Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Christian Reformed Church was determined to be exempt from Federal Income Tax under section 501 (c) (2) on October 7, 1971 as a non-profit corporation organized for the purpose of propagation of the Christian gospel.

As of January 1, 1970, the Christian Reformed Synod appointed a Ministers' Pension Committee to administer for Synod a pension plan for retired and disabled ministers or their widows.

Our Christian Reformed Church Ministers' Pension Committee is responsible to the Christian Reformed Synod. It is greatly concerned about the effects of the Employee Retirement Income Security Act of 1974 (ERISA) on our denomination's benefit programs. The Christian Reformed Church Ministers' Pension Committee asked me as Administrator of the Ministers' Pension Plan to register our protest against a possible intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We sincerely appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement benefits.

We are pleased that companion legislation has been reintroduced this legislative session in the House by Representative Barber D. Conable, Jr. of New York as HR 1576, 1577 and 1578. Our church envisions problems related to ERISA particularly in the administrative details required.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed indivigradually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

GARRETT C. VAN DE RIET,
*Administrator.*

---

THE MINISTERS AND MISSIONARIES BENEFIT BOARD OF THE AMERICAN BAPTIST CHURCHES,
*New York, N.Y., April 23, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Baptist Churches Ministers and Missionaries Benefit Board serves ministers, missionaries and lay employees of churches and institutions related to the American Baptist Churches. Our denomination is composed of approximately 6,000 churches with 1½ million members. The Ministers and Missionaries Benefit Board provides a variety of benefits for the protection of over 9,000 active and retired members, including surviving spouses and dependent children. These benefits include the ABC Retirement Plan, The Annuity Supplement, the Death Benefit Plan, The American Baptist Medical Plan and a wide variety of non-contractual supplementary benefits funded by the Board's endowment.

We were most appreciative of your leadership in introducing and co-sponsoring legislation with Senator Bentsen last year which, if enacted, would clarify the implication of ERISA for the American Baptist Churches. Present ER'SA legislation and the proposed regulations issued by the Internal Revenue Service creates serious problems for us. Unless clarified by legislation, the proposed regulations could result in reduced benefits for our members. Your remarks in introducing this legislation last year, as published in the Congressional Record, indicated an understanding of these problems.

We are writing to encourage you to reintroduce this legislation in the Senate as a companion to H.R. 1576, 1577 and 1578 introduced in the House by Representative Barber B. Conable, Jr. of New York with whom we have been working.

We join with the members of the Church Alliance for the Clarification of ERISA, which represents every major religious group in the United States, in expressing our appreciation for assisting us in this effort.

Sincerely yours,

DEAN R. WRIGHT,
*Executive Director.*

---

THE CHURCH PENSION FUND,
*April 27, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: In 1914, The Church Pension Fund was created by The General Convention of The Episcopal Church to provide pension benefits for aged and disabled ministers of the Episcopal Church. Our Board is managed by a Board of Trustees elected triennially by action of the General Convention.

We share the concern of all denominational pension boards about the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission. We completely supported the introduction in the last legislative session of legislation to

amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan.

We greatly appreciated your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Members of over twenty-five religious denominations have expressed their concerns about the effects of ERISA on traditional church pension programs through the Church Alliance for Clarification of ERISA.

On behalf of the Trustees of The Church Pension Fund and the active and retired ministers of the Episcopal Church, I most earnestly appeal for your continued support of all clergy and all religious organizations by re-introducing and co-sponsoring in this session the legislation supported by the Church Alliance for Clarification of ERISA.

Sincerely,

ROBERT A. ROBINSON,
*President.*

---

UNITARIAN UNIVERSALIST ASSOCIATION,
*Boston, Mass., April 30, 1979.*

Re Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Last year the Universalist Association (UUA) joined the Church Alliance for Clarification of ERISA because of its concern about the many questions raised of the impact of ERISA on church pension plans, such as the one maintained by the UUA.

Your support of the clarifying legislation last year was greatly appreciated; and the dicision by you to reintroduce the legislation this year would also be much appreciated.

I am scheduled to meet with the Pension Plan Study Committee that was appointed by the UUA Board of Trustees at its January 26, 1979 meeting on May 24, 1979. If you have decided to re-file the legislation prior to that date, please let me know so that I can inform the Committee members of our favorable action.

Thank you for your consideration of these matters.

Very truly yours,

WILLIAM B. DUFFY, Jr.,
*General Counsel.*

---

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS,
*Washington, D.C., April 18, 1979.*

Subject: Church Retirement Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Seventh-day Adventist Church was one of the first religious or business organizations to initiate a private pension plan for the benefit of its employees. Our retirement plan was started in 1911 and has been a continuous operation since then. As of December 31, 1978 approximately 35,000 clergy and lay employees of our church and agencies were covered by this plan and 5,500 were receiving retirement benefits. During 1978 benefit payments amounted to just over $26 million.

Our retirement plan is a "promise to pay" type plan and would technically be classified as an "unfunded" type retirement plan since we do not keep individual accounts for covered employees and no attempt has been made to fund the liabilities on an accrual basis. The cost of the yearly benefits is considered a current operating expense of the Church. However, a reserve equivalent to three years benefit expense is kept on hand at all times. Our Church feels that it is just as much obligated to pay retirement benefits as to pay the salaries of active employees. The entire assets of the Church are back of the retirement plan and its has always lived up to its obligations in this regard.

The Seventh-day Adventist Church, along with over twenty-five other religious denominations, has a major concern about the effects that the Employee Retirement Income Security Act 1974 (ERISA) would have on the operation of our retirement plan. We have been an active member of the Church Alliance for the Clarification of ERISA and fully support the efforts of this association to effect needed changes in the Act. For one thing, the funding requirements would be a major problem for us if we have to comply with ERISA requirements. They would place an oppressive burden on the Church as large sums of money would have to be taken from the funding of other church ministries and used instead to fund the past service liabilities for the retirement benefits of employees of church agencies.

The possibility of having to separate the employees of the so-called church agencies from our retirement plan is another of our major concerns.

Our Church has always considered its agencies as directly involved in the total ministry and outreach of the Church. In our theology and philosophy of church operations our institutions have from their inception been integral parts of the Church, direct instruments in the carrying out of its divine commission. Those who serve in these institutions of the Church, whether in the fields of publishing, health, education, or any other, have dedicated their lives to the Church's mission. To separate these workers from the Church plan will create a problem of portability as there is considerable movement of employees from one type of organization to another.

The efforts of the Internal Revenue Service to define what constitutes a church and what does not in our opinion is a violation of the principle of separation of church and state, but has characterized our nation from its beginning. If the church can be trusted to administer pension benefits for its ministers and other employees who in the opinion of government are working directly for the church, it would seem that the church could also be trusted to provide retirement benefits for employees of its agencies without being regulated by the government.

Our Church plan is presently being revised to comply with nearly all of the standards of ERISA regarding eligibility and benefits. In addition it provides many additional benefits that are not mandated by ERISA, such as an annual cost of living increase. Coming under the jurisdiction of ERISA will not really benefit our employees, but instead the excessive administration and reporting burdens would no doubt result in a reduction in the pension benefits of our employees.

We appreciated very much your introducing and co-sponsoring legislation with Senator Lloyd Bentson last year designed to clarify the church plan definition of ERISA and to bring about other needed corrections in this Act. Your introducing and co-sponsoring similar legislation in this session of Congress will be greatly appreciated.

Sincerely,

K. H. EMMERSON,
*Treasurer.*

---

GENERAL BOARD OF PENSIONS OF
THE UNITED METHODIST CHURCH,
*Evanston, Ill., May 1, 1979.*

Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The general United Methodist denomination is a voluntary religious movement and connectional network of millions of persons, known as "members," and literally tens of thousands of units, variously designated as local churches, charges, conferences, boards, commissions, councils, and agencies. These many units operate in religious service and mission throughout the United States of America and numerous foreign countries. They are related and brought together in worship and service through local Church, Charge, District, Annual, Jurisdictional (regional), and the General Conference in a connectional manner which is fundamentally characteristic of the denomination in its entirety. To assist in its work, the denomination known as the United Methodist Church, through an "Administrative Order," has created certain organizations at a denominational level to assist all other units in performing certain specialized tasks. One such General Agency is the General Board of Pensions of the United Methodist Church. In writing to you in support of legislation proposed by the Church Alliance for Clarification of ERISA, the General Board of Pensions of the United Methodist Church is acting within its specific and delegated authority, on behalf of all persons and organizations which comprise the denomination known as the United Methodist Church.

A fundamental tenet of the United Methodist doctrine is that the "wholeness of the gospel is manifest in the totality of the Church." From its earliest days, United Methodists have been active in the support of many institutions, of education, health care, and in other areas, and millions of persons have benefited from these efforts over the years. The legislation which we now support, in our opinion, will aid our denomination and other religious denominations in continuing such work (much of which is of such special benefit to individual persons in this country).

We would not presume to suggest that, because the United Methodist denomination is identified as a "church," it is therefore "above the law," "outside the law," or entitled to "special treatment by the law". Nevertheless, the fact remains that churches, even more than non-profit organizations in general, by their very nature, organization, and function are unique. I daresay that no two religious denominations are organized or function in exactly the same manner. Efforts, by legislatures or other bodies, to lump all "churches" together for identical treatment, particularly when legislation has been drafted initially to deal primarily with the commercial or business world, pose very serious and, we presume, generally unintended difficulties for such church groups. We respectfully submit that the Congress has a clear and justifiable interest in seeing that legislation passed by it presents no unnecessary handicap to *bona fide* religious denominations for the work of their denominations in the areas affected by such laws. If, because of the unique structure and operation of the various individual churches, specific legislation is required in order to minimize or eliminate such undue restrictions on churches, then we feel that specific legislation should receive the prompt and careful attention of all members of the Congress.

In the interest of time, we shall mention only two (of the many) instances in which the proposed legislative changes would be of special significance with respect to the United Methodist denomination. "The itinerant system is the accepted method of The United Methodist Church by which ministers are appointed by the bishops to fields of labor." As presently provided, the law would require the General Board of Pensions of the United Methodist Church to switch its ordained clergy in and out of differing pension plans each time such ministers changed appointments from local churches into what

are known as "special appointments," in such areas as the chaplaincy, church-related and other educational institutions, and other areas of work. Such a requirement—to move a person in and out of a "church plan"—is unduly burdensome and provides no benefit for the individual involved. The proposed legislation would permit the inclusion of ordained ministries in a single pension plan regardless of where those ministers are serving at any given point in time.

Along the same line, the present definition of a "church plan" is too restrictive. The present definition simply will not accommodate the needs of the United Methodist denomination in its efforts to provide pensions for its ordained clergy and lay employees of churches and church-related institutions. The United Methodist Church has licensed clergy, two levels of ordination, a separate Diaconal ministry classification, and lay employees in various degrees of relationship to the various units of the church. To require a multitude of different pension plans, each having to be tailored for the specific status of each such group is again unduly burdensome and provides no benefits for the individuals concerned. The legislation proposed, by broadening the definition of a "church plan" would permit the General Board of the General Board of the United Methodist Church to consolidate the number of different pension plans it must administer, thus providing a multitude of benefits for the plan participants.

For these, and other similar reasons, we urge your support of the legislation proposed and submitted under the Church Alliance for Clarification of ERISA.

Yours sincerely,

JAMES M. WALTON-MYERS.

---

BOARD OF PENSIONS OF THE CHURCH OF GOD,
*Anderson, Ind., April 17, 1979.*

Re Church Plans.
Senator HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Thank you for introducing in last year's Senate the legislation supported by the Church Alliance for Clarification of ERISA. Since the Senate did not have time to act on this legislation, it is our hope and prayer that you will reintroduce the legislation this year.

The Church of God Pension Plan came into existence in 1948. We are a small church in comparison to many large denominations, yet our heritage dates back 100 years. We have approximately 4,000 ministers and congregations. Our ministers have never earned large salaries, and retirement benefits for them will be minimal in comparison to many persons who have worked for industry and who have gone on pension.

If our church plan is required to abide by all the demands of ERISA after 1982, we will have to lower our retirees' retirement income even more for there is no way we can take on added work-loads without increasing the operational costs to run our plan.

Since our plan is only 30 years old, and a voluntary plan, many of our ministers have a very small accumulation in their retirement fund. Our hope is that Government regulations will permit churches like educational institutions to make retro-active (tax-sheltered) contributions to a minister's retirement account for years of service when he was not a member of the voluntary pension program sponsored by his denomination.

If the Senate does not permit Church Agencies to remain a part of our Church Pension Plan, our office will find it necessary to run two pension programs. Operational costs will nearly double and our low income church employees and ministers will again be made to suffer.

From the foregoing information, you can readily see the frustrations we face as Church Pension Plans. Our ministers and church employees, even though academically qualified and often highly trained have been underpaid during their working days because they found themselves in service oriented positions, and they will also find themselves short-changed in retirement.

Our Communion and I'm sure all churches affiliated with the Alliance for Clarification of ERISA will be most appreciative for any help you give us in the Legislature pertaining to these matters.

Sincerely yours,

HAROLD A. CONRAD,
*Executive Secretary.*

---

CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA,
*Omaha, Nebr., May 3, 1979.*

Re: Church Plan
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Catholic Mutual Relief Society is a nonprofit, charitable, religious and benevolent association organized in 1889 by an ecclesiastical body of members of the hierarchy of the Roman Catholic Church in North America for the purpose of protecting and preserving properties of such Church and to further aid and assist the Members of the Hierarchy and Religious in the discharge of their Canonical Duties. The management of this Society is vested in a Board of Trustees, all of whom must be Archbishops or Bishops of the Roman Catholic Church. Currently there are twenty-one Bishops and Archbishops acting as Trustees of the Society.

Through its many members, the Society has learned of the concern of church groups and their agencies for their continued operation in the face of increasing interference by the Internal Revenue Service. As a service to our members, we have helped support the Church Alliance For The Clarification of ERISA in its attempts to amend ERISA to at least recognize the present state of church retirement plans for churches and their agencies.

We thank you for your co-sponsorship of the legislation with Senator Bentsen in the last session of Congress attempting to clarify the church plan definition contained in ERISA and allowing greater retirement annuity benefits to those people working within the denominations. While ours is a Roman Catholic organization, our association with the Church Alliance has made us aware of the many problems caused by ERISA to our brothers in the Protestant and Jewish organizations.

You are aware of the many problems created by ERISA which the Church Alliance has addressed. Your continued support and co-sponsorship of legislation proposed by the Church Alliance For The Clarification of ERISA is very much appreciated. We would respectfully urge you to reintroduce the Church Alliance legislation in this session of Congress.

Sincerely,

THOMAS J. HANRAHAN,
*Executive Vice President.*

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that a bill introduced by Mr. TALMADGE, for himself and others, relating to ERISA, be jointly referred to the Committee on Finance and the Committee on Labor and Human Resources.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

By Mr. PRESSLER (for himself and Mr. MATHIAS):

S.J. Res. 74. Joint resolution authorizing and requesting the President to issue a proclamation designating May 11, 1979, as "CARE Day"; considered and passed.

(The remarks of Mr. PRESSLER when he introduced the joint resolution appear elsewhere in today's proceedings.)

---

## ADDITIONAL COSPONSORS

S. 80

At the request of Mr. NELSON, the Senator from Kentucky (Mr. HUDDLESTON) was added as a cosponsor of S. 80, a bill to amend section 201 of the Agricultural Act of 1949, as amended, to extend until September 30, 1981, the requirement that the price of milk be supported at not less than 80 per centum of the parity price thereunder.

S. 199

At the request of Mr. INOUYE, the Senator from Virginia (Mr. WARNER) was added as a cosponsor of S. 199, a bill to amend the Shipping Act, 1916, to strengthen the provisions prohibiting rebating practices in the U.S. foreign trades.

S. 446

At the request of Mr. WILLIAMS, the Senator from Iowa (Mr. JEPSEN) was added as a cosponsor of S. 446, the Equal Employment Opportunity for the Handicapped Act of 1979.

S. 582

At the request of Mr. NELSON, the Senator from California (Mr. CRANSTON) was added as a cosponsor of S. 582, the Farm Entry Assistance Act.

S. 715

At the request of Mr. BELLMON, the Senator from West Virginia (Mr. RANDOLPH) was added as a cosponsor of S. 715, a bill to authorize the Robert A. Taft Institute of Government Trust Fund.

S. 819

At the request of Mr. PRESSLER, the Senator from Indiana (Mr. LUGAR) and the Senator from Nevada (Mr. LAXALT) were added as cosponsors of S. 819, a bill to amend the Clean Air Act to promote the use of alcohol as a motor fuel and as an additive to motor vehicle fuels, and for other purposes.

S. 918

At the request of Mr. HUDDLESTON, the Senator from Arkansas (Mr. BUMPERS), the Senator from Montana (Mr. BAUCUS), the Senator from Alabama (Mr. STEWART), the Senator from Michigan (Mr. LEVIN), the Senator from Utah (Mr. HATCH), the Senator from New Mexico (Mr. SCHMITT), and the Senator from Montana (Mr. MELCHER) were added as cosponsors of S. 918, a bill to authorize the Small Business Administration to establish small business development centers.

S. 1006

At the request of Mr. COCHRAN, the Senator from North Dakota (Mr. YOUNG), the Senator from Texas (Mr. TOWER), and the Senator from Alabama (Mr. HEFLIN) were added as cosponsors of S. 1006, to permit the emergency use of the pesticide mirex on imported fire ants in accordance with health and safety standards of the EPA.

legislation which provides the vehicle for establishing integrated resource and environmental data on the natural and managed rivers as well as other North Coast watersheds and tributaries. The investigations and surveys we have underway are:

Northern California Streams.

The Humboldt Bay Baseline Survey.

The Russia River Basin Comprehensive Investigation.

The Eel River Streambank Erosion Demonstration Project.

Eel River Delta Alternatives to Levees.

The Eel River Comprehensive Basin Investigation.

The latter study and the Russian Comprehensive were unique in that it provided the Corps a new role in water resource planning and assistance. These basin resolutions direct the Corps to investigate all facets of the watershed, from forestry and fishing to water quality and flood control.

For the Eel Delta, we've authorized the Corps to evaluate and develop non-structural flood control alternatives such as flood proofing of buildings, possible relocation, dredging, channel stabilization and cattle evacuation plans. While it would not control a major flood such as in 1964, it could minimize damage and afford some protection and security from the lesser floods that occur.

In Lake County, there has also been a concentrated effort to deal with the water quality and supply problems at Clear Lake with nonstructural alternatives. In this endeavor, EDA, EPA, Bureau of Reclamation and the Corps have all been involved.

These ideas of a new and more flexible role for the Corps are being accepted. Recently, Lt. General John Morris, Chief of Engineers, in a speech to the Water Resources Congress, entitled "Where are We Headed" noted, "Water resources problems will continue to arise from population growth, economic expansion and unpredictable natural events will force more effective national water conservation measures supported by a proper blend of structural and non-structural solutions which are well engineered and developed. The key to resolving water resource problems is the formulation of clear, comprehensive national water policies which are in tune with today's public and national objectives." These changes in thinking by the Corps are indicative of the re-evaluations of National Water Policy currently taking place in the Congress and the Administration. One administration report advises the President to propose laws and adopt procedures that would require federal and state planners to consider much more carefully the building of huge government-financed water projects. This same report also recommends that states should be required to pay in advance 10% of the cost of the new water projects that they want built. Of course, Congress would have to assist and/or approve the establishment of any new water policy.

This Congress has approved our committee's new "clean water" program which authorizes comprehensive waste water management and includes my new innovative technology incentives amendments for communities that develop re-cycling, re-use and land treatment management alternatives.

The implications of all of this are far-reaching. For sure, it points to the need for building a cohesive political support group in the North Coast that will be able to articulate representative and clearly defined positions on the water related issues that affect you. I believe that your joint-powers agreement is the first step toward meeting that objective. Your program is a program *of*, *by* and *for* the areas of origin on the North Coast . . . you have perceived the potential for action by other interests in the state and you are taking early-on action to make sure that our interests are protected. It is not a narrow, parochial, "them versus us" interest, but the legitimate interest in seeing that you have a say in what affects our communities . . . and the North Coast.

Your joint-powers agreement is properly predicated on the strong role that local government should and must play in determining public policy that you will establish and implement and I totally support the fundamental concepts of your agreement. The real challenge to all of us will come when we develop the specifics of our plan of action.

The Miami and Muskingum watershed conservancy programs in Ohio are excellent examples of what can be done by local units of government joining together to address common water resource related problems. These organizations were initially formed to control the tremendous floods that used to frequent the Miami and Muskingum Valleys in Ohio. Over the years, they have matured into multi-purpose water management organizations whose primary goal was flood control and the maintenance of water quality in their regions. They are actively involved in waste management, flow-augmentation, stream appearance, recreation facilities and other problems that affect water quality. I would strongly recommend that those who will be immediately involved in directing your joint-powers agreement look to the Miami and Muskingum programs as models of what can be done.

The Corps will cooperate with you in developing its studies and resource inventories. Last week in Washington I met with Colonel John Atsid, of the San Francisco District. We talked of this joint-powers agreement and he re-affirmed his commitment to provide support. He also indicated that Charlie Elmore, whom most of you know and who is here today, would be designated as the Corps' liaison person to work directly with you. I think the Corps is the best federal agency to provide coordination in this area because of its long-standing knowledge of our region and its water resources.

We also have in our own area tremendous talent and human resources that you can tap in developing your information base. I have discussed with the Presidents of Humboldt State, Sonoma State and the Community Colleges in the North Coast the idea of involving their forestry, fishery, remote sensing, environmental science and biology departments in your efforts. They have all expressed a ready willingness to participate.

Given such a broad-based support effort we can continue to work at the Federal level to provide a mechanism to consolidate the tremendous amount of information that would be forthcoming. Several ideas that I have in mind might be the construction of a hydrology model of our North Coast, similar to the San Francisco Bay Model that the Corps operates in Sausalito. Or a computer simulation model of the region, like the one used to monitor water quality in the Miami Conservancy Program.

Only after the establishment of such a data base and resource inventory will you be in a position to make the kinds of management and policy decisions that you envision in your joint-powers agreement.

So, in conclusion, let us restate our purposes and objectives.

As I stated in my 1971 speech advocating the Basin Watershed Conservancy concept, "The challenge to the North Coast is to strike a balance between conservation and development of our natural resources. The present and future economy of our area is tied directly to the way in which we meet this challenge."

I want to assure you that I fully support your actions to date and I believe we are in unison toward meeting this challenge.

The purposes of the Watershed Conservancy program is to provide information, direction and expertise necessary for the continued management, development, use and treatment of the surface and ground water of the Russian and Eel Basin so as to meet the water quality standards set by the State and approved by the federal government under our "Clean Water" program.

Simply put, our objectives are to say that the waters of the Russian and Eel Watersheds must be suitable for all uses at all places at all times.

Water quality is everybody's business.

Water management is our mutual responsibility.

Water is one of this nation's treasures. We cannot survive without it.

A nation is no more than the sum of its natural resources and its people and only when the people and their governments properly manage their natural resources can they or the nation survive.

Working together, we, on the North Coast of California, can demonstrate to our people the kind of enlightened leadership required to meet this challenge. The people we are privileged to represent have a right to expect the best from all of us. Give us at the state and federal level a vehicle to work with and maybe we can supply some of the fuel. But, you the elected representatives of the North Coast will be in the drivers seat.

In addition to the water management I've discussed, I look forward to working with you on transportation and economic development programs that will revitalize and diversify the economies of our area.●

## PENSION PLANS OF CHURCHES AND CHURCH-RELATED ORGANIZATIONS

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from New York, (Mr. CONABLE) is recognized for 10 minutes.

● Mr. CONABLE. Madam Speaker, I wish to discuss a bill, H.R. 12172, which I recently introduced to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan. The major church denominations of this country all agree that they are seriously affected by the definition of church plan we provided in section 414(e) of the Internal Revenue Code.

For many years our church plans have been operating responsibly and providing retirement coverage and benefits for the clergymen and lay employees of the churches and their agencies. Some of the church plans are extremely old, dating back to the 1700's. The median age of church plans is at least 40 years. Churches are among the first organizations to found retirement plans in the United States.

In 1974, when we enacted the Employee Retirement Income Security Act of 1974, popularly called ERISA, we exempted church plans from the provisions of the act to avoid excessive Government entanglement with religion in violation of the first amendment to the Constitution. We provided that a church plan is a plan established and maintained for its employees by a church or by a convention

or association of churches which is exempt from tax under section 501. At the same time we provided that a church plan, if it were to continue to be identified as such, could not provide coverage to employees of church agencies not participating in the plan in 1974, nor could it provide coverage for employees of any agencies after 1982.

Mr. Speaker, I believe that our definition of church plan should be revised. It does not take into account the special needs of our churches, ministers, and lay persons, or the structural differences of our denominations.

Under the existing definition of church plan, the churches must by 1982 divide their plans into two parts, one covering employees of the church and one covering employees of church agencies. Present law fails to recognize that the church agencies are parts of the church in its work of disseminating religious instruction and caring for the sick, needy, and underprivileged. Estimates of the intial costs of the division of church plans that have been in existence for many years and of the additional continuing costs of maintaining two separate plans are so significant that reduced benefits may result.

Some of these additional costs must of necessity be shifted to the local churches and agencies. Churches and church agencies are often very small and operate marginally, being staffed by two or three persons who work at a personal sacrifice. Plan contributions for churches and agencies are generally dependent upon tithes and offerings. There is virtually no way to pass on higher plan costs to the consumer as businesses can. If forced by the 1982 deadline to establish a retirement plan separate from the denominational plan and to comply with the paperwork and other requirements of ERISA, many of the agencies might decide to abandon their retirement plans.

Mr. Speaker, the division of the church plans will also hurt the work of our churches. The churches consider their agencies as an extension of their mission. A significant number of ministers and lay employees move frequently from church to agency and back in pursuance of their careers. A church may ask a rabbi to serve in an agency where his services are most needed. The rabbi may then return to pulpit work. The present definition of church plan does not satisfy the unique need of our churches to cover continuously their employees in one plan. If ministers and lay persons cannot be continuously covered by one plan, gaps in coverage will result, and they will not be free to pursue their work for the denomination as they should.

Also, many ministers serve their faith outside of the denominational structure as chaplains in prisons, universities, hospitals, and elsewhere. In some cases the employment relationship is not easily discernible or does not exist. For example, evangelist ministers may have no employer. The present definition of church plan could be interpreted to exclude them from coverage either now or in 1982.

One of the most important binding influences within a religious denomination is the pension and welfare benefits program. The division of the church plans may lessen the unity of the church. Some churches fear that division of their plans will destroy the sense of oneness within the church and weaken the dedication of agency employees to the denomination.

Moreover, in a congregational denomination, if the plan covering the agencies is required to comply with ERISA, the denomination would not be able to require an agency either to join in the plan or to observe the requirements of ERISA. In the congregational type of denomination, the local churches and agencies are self-governing. Unlike corporate structures, no lines of authority exist from the denomination.

The existing definition of church plan has also created many technical problems. The large majority of church plans of the congregational denominations are administered by a pension board, a unit separate from, but controlled by, the denomination. It is not clear whether a plan administered by a pension board of a congregational church is a plan established and maintained for its employees by a church. A pension board is usually incorporated because the church does not want the funds set aside for retirement purposes to be subject to the general creditors of the church.

This structure raises a question whether a plan maintained by a pension board is maintained by a church. In the congregational denominations, ministers and lay employees are considered employees of the local churches and other units, rather than of the denomination. As mentioned, congregational churches have little control over local churches and agencies. Some differences in plan provisions, therefore, necessarily occur, and the question is also raised whether the plan is maintained by the church (denomination) for its employees or by a local church for its employees.

Under section 1 of the bill, effective as of January 1, 1974, a church plan may continue after 1982 to cover the employees of its church-associated organizations, both those participating in 1974 and those that begin participation after 1974. This recognizes the special nature of church agencies and of their special problems in complying with ERISA. It also recognizes the unique needs of ministers and denominational employees to move about within the denominational structure and still stay within the church plan.

The bill achieves this result by retaining the basic definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churches exempt from tax under section 501. The term "employee", however, is redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and third, certain former employees who participated in a church plan before separation from service. Under the bill an organization is "associated" with a church if it shares common religious bonds and convictions with that church.

For purposes of section 414(e), all such employees are deemed to be employed by the denomination. The combined effect of these provisions is to treat both hierarchical and congregational denominations in the same manner for purposes of the church plan definition. The bill, thus, accommodates the differences in beliefs, structures, and practices among our religious denominations.

By including ordained ministers within the definition of employee without requiring an employment relationship, the bill permits a church plan to continue to cover a minister who serves in the exercise of his ministry outside of the denominational structure. Thus, a minister serving as a prison chaplain or teaching religious studies in a university could receive coverage. An evangelist minister who has no employer would also be entitled to participate in the church plan.

The bill provides that a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service.

A typical example would be a minister or lay employee who reaches a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the denomination. During such a transitional period, the denomination may permit the individual to continue to be covered by the church plan for a time even though he has separated from service.

The bill would permit a church plan to continue to receive contributions for an individual who is a participant in a church plan at the time of his separation from service, but only for a period of 5 years. No such time limit is placed upon employees who are separated from service because of disability.

The bill also recognizes pension boards as acceptable funding media for church plans. A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of this organization is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church.

The organization must also be controlled by or associated with a church exempt from tax under section 501(a). It is intended that no church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in plan provisions among the local employers.

The bill also corrects a very harsh position taken by the Treasury Department

in its proposed regulations defining church plan which provide that once a church plan fails to meet the requirements of a church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

My bill provides a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the bill is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. Speaker, I believe that when we enacted ERISA, we required far more of our churches than we intended. We certainly did not in 1974 intend to draft a definition of church plan that fails to take into consideration the way our church plans are operated or that is disruptive of church affairs. Our 1974 legislation requires the church plans to reconstitute their plans after decades, even centuries, of responsible experience.

The problems the churches face are immediate. They are concerned today that their plans may be presently disqualified as church plans. This is a matter we must not put off until 1982.

Therefore, Mr. Speaker, I urge my distinguished colleagues to support this measure, and I ask unanimous consent that the bill be printed in the RECORD.

The bill follows:

H.R. 12172

A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. Section 414(e) of the Internal Revenue Code of 1954 is amended to read, as follows:

"(e) CHURCH PLAN.—

"(1) IN GENERAL.—For purposes of this part the term 'church plan' means a plan established and maintained (to the extent required in paragraph (2)(B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501.

"(2) CERTAIN PLANS EXCLUDED.—The term 'church plan' does not include a plan—

"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513); or

"(B) which includes individuals less than substantially all of whom are described in paragraphs (1), (3)(B), or (3)(E) (or their beneficiaries).

"(3) DEFINITIONS AND OTHER PROVISIONS.—For purposes of this subsection—

"(A) A plan established and maintained by a church or by a convention or association of churches shall include a plan established and maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

"(B) The term 'employee' of a church or a convention or association of churches shall include—

"(i) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

"(ii) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 and which is controlled by or associated with a church or a convention or association of churches; and

"(iii) an individual described in paragraph (3)(E).

"(C) A church or a convention or association of churches which is exempt from tax under section 501 shall be deemed the employer of any individual included as an employee under paragraph (3)(B).

"(D) An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

"(E) If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization described in clause (ii) of paragraph (3)(B), the church plan shall not fail to meet the requirements of this subsection merely because it—

"(i) retains his accrued benefit or account for the payment of benefits to him or his beneficiaries pursuant to the terms of the plan; or

"(ii) receives contributions on his behalf after his separation from such service, but only for a period of five years after the employee's separation from service, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7)) at the time of such separation from service.

"(4) CORRECTION OF FAILURE TO MEET CHURCH PLAN REQUIREMENTS.—If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 fails to meet one or more of the requirements of this subsection and corrects its failure to meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this subsection for the year in which the correction was made and for all prior years. If a correction is not made within the correction period, the plan shall not be deemed to meet the requirements of this subsection beginning with the date on which the earliest failure to meet one or more of such requirements occurred. The term 'correction period' means the period ending with the later of the following: (1) 270 days after the date of mailing by the Secretary of a notice of default with respect to the plan's failure to meet one or more of the requirements of this subsection; (2) such period as may be set by a court of competent jurisdiction after a determination that has become final that the plan fails to meet such requirements, or, if the final court determination does not specify such period, a reasonable period depending upon all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or (3) any additional period which the Secretary determines is reasonable or necessary for the correction of the default."

SEC. 2. The amendments made by this Act shall be effective as of January 1, 1974.●

## HALL PEOPLE

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Illinois (Mr. MICHEL) is recognized for 15 minutes.

● Mr. MICHEL. Madam Speaker, yesterday I inserted in the RECORD a Washington Post article that gave a disturbing and enlightening look at Washington, D.C., education. Today I am going to offer the second in that series. This time we follow the aimless wanderings of a student called "Frank." Frank wants to be famous, rich, and successful. But he feels he should not be asked to work or study or in any way make any serious effort to accomplish his goals. He skips most of his classes and spends most of his time in the hallways of his school avoiding schoolwork. He is yet another in a generation that has been led to believe life owes him fame and fortune. At the same time he has been given the impression that working for such success is a sign of shame.

Perhaps we should call Frank a member of the "time-bomb" generation. The inevitable frustration he will feel when he discovers his current values are useless in dealing with reality will eventually explode in anti-societal behavior. And he is not alone.

At this point I wish to insert in the RECORD, "Hall People Are Rarely in Class," from the Washington Post, May 1, 1978:

[From the Washington Post, May 1, 1978]

"HALL PEOPLE" ARE RARELY IN CLASS

(By Juan Williams)

Frank rolled over and sighed. His eyes quickly opened, then closed. Something had awakened him. "... Get up, Frank, you'll be late," his mother yelled again. He let his eyes slide back into a light sleep. She yelled upstairs once more, and he pulled the blanket tight. Frank was going to be late again for the start of classes at Eastern High School.

"We can't get him in the bed and when we get him in . . ." Frank's father said, "we can't get him out of bed."

Out of bed and standing in Eastern High's hallway in an olive Army fatigue jacket, smoking cigarettes, maybe a joint, or looking

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

ANITA LANN, et al., Civil No. PJM-14-2237

Plaintiffs,

v. Greenbelt, Maryland

TRINITY HEALTHCARE CORPORATION, et al., February 23, 2015

Defendants. 10:00 a.m.

--------------------------/

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Cohen Milstein Sellers and Toll
By: KAREN HANDORF, ESQUIRE
MARY BORTSCHELLER, ESQUIRE
MICHELLE YAU, ESQUIRE
1100 New York Avenue NW
Suite 500
Washington, D.C. 20005

For the Defendants: Proskauer Rose LLP
By: HOWARD SHAPIRO, ESQUIRE
650 Poydras Street
New Orleans, Louisiana 70130

Ogletree Deakins Nash Smoak Stewart
By: ROBERT NICCOLINI, ESQUIRE
1909 K Street, NW
Suite 1000
Washington, D.C. 20006

Court Reporter Lisa K. Bankins RMR FCRR
United States District Court
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Proceedings recorded by mechanical stenography, transcript produced by notereading.

P R O C E E D I N G S

THE CLERK: The matter now pending before this Court is Civil Action Number PJM-14-2237, Anita Lann, et al. versus Trinity Health Corporation, an Indiana non-profit corporation, et al. The matter now comes before this Court for a motions hearing.

THE COURT: All right. Counsel, identify yourselves. First for plaintiffs and then for defendants.

MS. HANDORF: Your Honor, Karen Handorf for plaintiffs. I'm from the law firm of Cohen Milstein Sellers and Toll. And I have with me Mary Bortscheller and Michelle Yau.

THE COURT: All right.

MR. SHAPIRO: Good morning, Your Honor. Howard Shapiro, Proskauer Rose, New Orleans on behalf of the defendants except for the United States.

MR. NICCOLINI: And good morning, Your Honor. Rob Niccolini from Ogletree Deakins, also on behalf of the defendants.

THE COURT: All right. We are here on the defendants' motion to dismiss. So I'll hear you on that.

MR. SHAPIRO: Thank you, Your Honor.

Good morning, Your Honor. May it please the Court, Howard Shapiro, Proskauer Rose on behalf of the defendants.

Your Honor, this litigation challenges whether defendant, Trinity Health Corporation's pension plan qualifies under the church plan exemption set forth at ERISA Section 3(33). We have provided Your Honor with our principal authorities. That statutory provision is at -- pardon me, Your Honor. It's at Tab 8 of your materials and I'll be focusing on --

THE COURT: You are talking about the ERISA statute?

MR. SHAPIRO: I'm sorry, Your Honor?

THE COURT: The ERISA statute?

MR. SHAPIRO: Yes.

THE COURT: Yeah. I have it.

MR. SHAPIRO: Your Honor, we start from the proposition that with respect to the church plan exemption, the Fourth Circuit has already construed this provision and the Fourth Circuit, Your Honor, in Lown versus Continental Casualty which can be found at Tab 1 of our materials has already held, Your Honor, in favor of the defendants' position that a plan established by a corporation associated with a church can still qualify as a church plan. That statute defines church plans to include plans maintained by an organization whether civil corporation or otherwise that is controlled by or associated with a church.

If Your Honor looks at the statute itself, you will see that in Subsection A of the statute, Your Honor, it states that a church plan is a plan established and maintained for its employees by a church and then the critical piece of the statute for Trinity's purposes, Your Honor, is (C)(i).

(C)(i) starts off, Your Honor, with the same -- let me not use that, Your Honor. (C)(i) starts off, Your Honor, with the exact same language that is used in A where (C)(i) says a plan established and maintained for its employees by a church includes a plan maintained by an organization. And then it goes on, Your Honor, to say "the principal purpose of which is administration or funding of a plan or a program for the provision of retirement benefits if such organization is controlled by or associated with a church."

The key word there, Your Honor, from defendants' perspective is the word "includes." And that word means, Your Honor, that (C)(i) by its operation and its wording is included in the definition of what a church plan is.

The word "includes" is used again, Your Honor, in (C)(ii) where it says the term "employee of a church includes," again adds to, an additive construct, "the employee of an organization controlled by or associated with a church." So we have two separate parts of

Subsection C where the word "includes" adds to the meaning of who is covered by a church plan and what a church plan is, Your Honor.

THE COURT: Of course, Judge Wilkerson didn't address that in Lown, did he?

MR. SHAPIRO: I'm sorry, Your Honor?

THE COURT: Judge Wilkerson didn't go through that analysis in Lown, did he?

MR. SHAPIRO: Lown didn't specifically hold that, Your Honor. But the plaintiffs' counsel in Lown, Ms. Lown briefed that issue. We have appended that in Exhibit K of our materials. For the Lown court to get to the scenario where it says that -- and I am quoting from Lown. You can find Lown, Your Honor, at Tab 1 and at Tab 1, Your Honor, bottom right, page 5, the court says that "a plan established by a corporation associated with a church can still qualify as a church plan."

To reach the holdings, Your Honor, that Lown considered and ruled upon, it is a necessary predicate for the Lown panel to have construed (C)(i) and determine that the language includes a plan in (C)(i) means a church plan includes a plan established and maintained for employees by an organization controlled by or associated with the church. So the Lown majority, Your Honor, could not get to where it had to go without resolving that point and

making that determination.

It didn't specifically write about it as my learned counsel would ask that it be debated by the majority. But that doesn't mean that it wasn't considered Your Honor. That doesn't mean it wasn't construed, particularly when the evidence, Your Honor, in Exhibit K to the plaintiff's brief in Lown shows that she raised that specific issue.

And, Your Honor, the plaintiffs following the question that the Court posed want to treat Lown as an insignificant event for this proceeding. They ask the Court not to follow Lown. We respectfully believe, Your Honor, that would be error. But the plaintiffs describe this as dicta and they say that issue was enjoined.

Well, Your Honor, even if Lown is treated as dicta and we disagree with plaintiffs' characterization and hope we answer the Court's question to its satisfaction, even if it is dicta, Your Honor, it must be followed unless it is clearly wrong. And we have cited cases, Your Honor, that say that the dictum of the Fourth Circuit should be considered presumably correct -- presumptively correct. And, Your Honor, the legislative history here and what occurred in the creation of this expanded exemption shows that Lown has it exactly right.

If you look, Your Honor, at the legislative

history, plaintiffs go to great lengths to counter what defendants write about the legislative history. Your Honor, the legislative history is somewhat of a jumble. But that doesn't mean that just because it's a jumble that Congress didn't think that it was expanding the church plan exemption. Congress when it considered the church plan exemption did consider the pension board issue that plaintiffs raised. But it also specifically considered and it specifically dealt with and debated including plans like that of Trinity Healthcare. And the proof of that, Your Honor, can be found at Tab 10 of your materials.

We have provided the Court with testimony before the United States Senate Committee on Finance. If the Court will look at pages 40 and 41 -- the page number, Your Honor, is in the upper right hand corner -- you'll see that Daniel Halperin -- let me pause to say that among the treasury, Daniel Halperin was one of the most well-known and highly regarded spokespersons for the Department of Treasury during this time. And what does Mr. Halperin say about the amendment that is under consideration? He says to the chairman and I quote, "we have objected to certain provisions of that bill and let me point out what we see as the most serious concern." I'm on page 41, Your Honor. What that bill would permit, it would exclude church agencies from the protection of

ERISA, meaning an entity like Trinity, Your Honor. And that would mean that if somebody works for a hospital or a school that happens to be affiliated with a church that is Trinity's status, Your Honor, it would be permissible for that plan to provide no retirement benefits until the -- I'm paraphrasing -- they work until age 65, for example. Halperin knew that this bill would add under (C)(i) entities like Trinity to fit within, to include within the church plan exemption.

And Senator Javits, who is regarded as the father of ERISA during this period of time, if you will look at Tab 11 of our materials, Your Honor, at page 2180, the page number is in the upper left hand corner, Senator Javits says "as to pension plans, I might say that I am not too happy about these as it exempts those who work for schools and similar institutions, which are church related. Nevertheless, if we want to build there, there were some things we had to give up and that was one of them and I was very unhappy with it."

So here you have two of the leading spokespeople in Congress, well, Senator Javits in Congress, Daniel Halperin from the I.R.S. saying unequivocally they recognize that the language of the amendment will expand the entities covered by a church plan.

That is followed immediately, Your Honor, in

1982 by an Internal Revenue Service General Counsel memo. And this document, Your Honor, which can be found at Tab 5 of defendants' materials is of critical import. The treasury opposed during the legislative process the expansion of the church plan coverage provided for in (C)(i). Halperin spoke against the expansion of church plan coverage, Your Honor, during that Senate finance committee. And yet, you have in 1982, November of 1982, a general counsel memorandum issued by the service which can be found at Tab 5.

If the Court would look at the materials at page number 4 and I'm using the page number at the lower right hand corner, Your Honor, you will see that the summary, the IRS's summary of what the amendment to the church plan means is the IRS finds that a non-church entity that is affiliated with, controlled by or associated with a church may in fact qualify as a church plan.

So you have the contemporaneous statement of the entity that is most knowledgeable about retirement benefits in the context of making their statement and, by the way, changing the I.R.S.'s position immediately after the legislative events leading to the expansion of the church plan exemption.

Now we have, Your Honor, cited several cases that describe how the church plan statute is most properly

read and we believe, Your Honor, that one of the best examples of that in addition to Lown, Your Honor, because Lown specifically states that an organization like Trinity, which is affiliated with, associated with or controlled by a church, Lown specifically states that that entity may be covered as a church plan, even though not a church.

THE COURT: Let me stop you there. Maybe appropriate to ask that. Trinity existed before a merger with one of the Catholic entities or was it a Catholic --

MR. SHAPIRO: I'm sorry, Your Honor?

THE COURT: Trinity's organization was affiliated with the church from the beginning --

MR. SHAPIRO: Yes, sir.

THE COURT: -- or did it merge with a group that was in fact affiliated with --

MR. SHAPIRO: Trinity was created, Your Honor, by Sisters Religious in the past, in the 1940's I believe if I have this right. That is an issue, of course, Your Honor, that we'll get to in the next set of motion practice. And Trinity operates this plan through what is known as a public juridict person, Catholic Health Ministries. Catholic Health Ministries, Your Honor, forms the administrative committee --

THE COURT: You don't need to get into that. I

was really more concerned about whether at one time or another Trinity was in fact independent of any affiliation with the church and was ever covered by ERISA.

MR. SHAPIRO: I don't know the answer to your question, Your Honor. But I do know that Trinity has always been affiliated with the Catholic church.

THE COURT: You say always. I mean --

MR. SHAPIRO: Has always been affiliated with. Yes, Your Honor.

THE COURT: Now the reason I raise that question is -- and I'm not sure it's part of this case, but it may well be -- even if you allow that an agency could be covered by a church plan if it was affiliated with a church, suppose it wasn't before it merged with a church plan? If there was an obligation to be covered by ERISA or in fact it was covered by ERISA, would there be vested rights for somebody who was covered by the plan before it merged with a religious affiliate?

MR. SHAPIRO: Well --

THE COURT: You don't need to answer that at this stage, but it's an interesting issue when you talk about maintained. Whether at some point it becomes maintained and stops being in effect an ERISA-type program, what effect there?

MR. SHAPIRO: I look forward to getting into

those issues. Those issues are not the subject, Your Honor --

THE COURT: Right.

MR. SHAPIRO: -- of this round of briefing. And candidly, Your Honor, and I said this to you on the phone when we were agreeing that we would limit this round of briefing to the issue of whether a church must establish a church plan or an entity controlled by or associated with a church may establish a church plan, we believe that that should be the next set of motion practice before the Court assuming that the Court agrees with our view of the statute.

THE COURT: Well, but there's this intermediate step. Suppose that it was at one time not affiliated with the church and became affiliated with the church, what effect there? Any vested rights for people who would have been covered before it affiliated and after? Anyway, you don't need to answer that now. It just occurs to me as we're talking about maintained. Does that maintained at any point in time or --

MR. SHAPIRO: I will be pleased to deal with that, Your Honor, when the time comes --

THE COURT: All right.

MR. SHAPIRO: -- procedurally.

So going back to the legislative history, we

concur with plaintiffs. There was interest in the pension board issue. But there was also clear interest among the legislature and among the Internal Revenue Service as to this expansion of the definition of entities that could be covered by the church plan exemption.

Your Honor, we have presented as part of our principal materials in Tab 2, Overall versus Ascension. And Your Honor, in that case, District Judge Avern Cohn, District of Michigan, granted a motion to dismiss because he recognized that what the statute meant is and I am quoting, "as Ascension puts it under the rules of glamour and logic, A is not a gatekeeper to C. Rather if A is exempt, i.e., if A is exempt as a church plan and A includes C, which is what the language of C says, then C is also exempt."

And, Your Honor, if you take a look at the statute itself, we submit that this is the correct statutory interpretation. A defines a church plan established and maintained by a church. C then says a plan established and maintained for its employees by a church includes a plan maintained by an organization. So that's an even broader statement. And, of course, going back to Judge Cohn's position, if A is exempt and A includes C, C is also exempt. And we think, Your Honor, that the statutory discussion there is -- that pretty much

cinches it and that is consistent with Lown, Your Honor, and it is consistent with all of the other cases that were decided over a 30-year period before plaintiffs' counsel brought this series of cases.

Your Honor, I'd ask the Court and I'm sure that Ms. Handorf will ask the Court to take a look at Stapleton versus Advocate Healthcare because Stapleton is a case, Your Honor, where we believe the district judge wrongly concluded that only a church may establish a church plan. It was decided in plaintiff's favor on December 31, 2014. It was a petition for interlocutory appeal. The Seventh Circuit has already granted the petition for interlocutory appeal.

So just as an aside, Your Honor, the Third Circuit has granted a petition for interlocutory appeal in Kaplan versus St. Peter's. The Sixth Circuit has Overall versus Ascension on appeal because of defendant's victory on motion to dismiss followed by plaintiff's appeal. In the Seventh Circuit, the district judge there within two weeks after issuing the decision granted his imprimatur for an interlocutory appeal. And the Seventh Circuit last week said yes, we will decide this matter as an interlocutory appeal.

And in the Ninth Circuit, Your Honor, the other case that plaintiff will speak a lot about, Rollins versus

Dignity, Judge Henderson has granted interlocutory appeal. The Ninth Circuit is considering whether to take interlocutory appeal.

Your Honor, Stapleton, coming back to Stapleton, Stapleton is the most honest exposition of how district judges come to err in saying that Section A of the statute is the gatekeeper and controls Section C because in Stapleton, what the district judge does is he assumes that the word "includes" which is in the second line of (C)(i), the Stapleton district judge assumes includes must be read to mean that church-affiliated plans in Section (C)(i) are a subset of plans referred to in Section A. But that, Your Honor, tortures the word "includes" and it doesn't do justice to the concept of includes as in your adding to and that's exactly what Congress did in enacting not only (C)(i) where it used includes and added more plans to the category of church plans, but also in (C)(ii) where it defines employees and adds more employees to employees who are covered.

One of the things that's interesting is the government plan exemption, Your Honor. It also uses the word includes to construct a broader interpretation of that exemption. Includes under the government plan exemption brings in railroad plans where the railroads finance their contributions through contributions to the

Railroad Retirement Act. It includes the plans of certain Indian tribes. It again uses includes as an additive as we believe includes has to be used for this statute.

THE COURT: I need you to wind up in the next couple of minutes because I'm basically allowing about a half-hour per side.

MR. SHAPIRO: Okay. Let me, if I may, I think that our response to Stapleton in our briefs really carries through why the plaintiffs have this wrong and why Lown and Ascension are the correct results. Does the Court have any questions?

THE COURT: Not at this point. Let's hear from the plaintiffs.

MR. SHAPIRO: Thank you, Your Honor.

THE COURT: Thank you. Ms. Handorf?

MS. HANDORF: Your Honor, good morning. The question before this Court is whether the pension plan of Trinity Healthcare is exempt from ERISA as a church plan. The answer to that question is of great importance to the more than 56,000 individuals who rely on Trinity for their retirement.

As the complaint alleges, Trinity's pension plan is underfunded by over $600 million. The Trinity plan requires participants to complete five years of service in order to vest; when ERISA only requires three years. And

if the plan fails, there's nothing to back up these benefits as there would be if the plan was covered by ERISA.

Today, I want to highlight three points. First, the Lown decision is not controlling because statements made about the scope of the church plan exemption were not necessary to the decision in Lown. Second, as three well-reasoned district court decisions have held, after applying canons in statutory construction, the relevant statutory language establishes that only a church can establish a church plan. And third and finally, agency interpretations of the church plan exemption are not controlling and should not be given deference because they conflict with the statutory language.

For some background, ERISA does not require employers to establish pension plans for their employees. However, employers provide those types of benefits in order to obtain and to retain qualified workers. Benefits are part of an employees' compensation package. They're what the worker works for. ERISA was designed to ensure that once a worker retires, the benefits are there for him. And ERISA does that in a variety of ways. It requires minimum levels of funding. It establishes minimum vesting standards. It requires plans to be managed by fiduciaries that are subject to very strict

fiduciary standards. And it insures plan's benefits through the PBGC insurance program.

ERISA's coverage is broad. It covers both nonprofit and for profit organizations and it excludes from coverage very narrow categories, which as any remedial statute should be construed is very narrow.

ERISA excludes church plans from coverage because Congress wanted to avoid excessive entanglement in churches. Congress recognized that churches rely upon their members for funding. And it is for churches to determine how those dollars are being spent. Requiring a church to fully fund its pension plan and to report its finances to the federal government would intrude upon the church's decision as to how to spend its money.

But as the complaint alleges, Trinity is not a church. It is the tenth largest healthcare system in the country. And to answer a question this Court asked earlier, Trinity was really established much later, like the late 1990's and it was formed by a number of hospital systems that going back to their earliest days were established by Sisters Religious. But in the 1990's when the Trinity Corporation was established, it conglomerated all of these different systems together and became a much different system.

THE COURT: It gathered in some that had never

had religious affiliation prior?

MS. HANDORF: Well, that is not clear. We don't know that yet from the -- because we haven't done discovery. But that fact is true of many of the other defendants --

THE COURT: Well, that's going to be a significant issue from my standpoint to try and understand exactly whether groups that are brought under the umbrella of a religious organization are affiliated in any way lose prior ERISA status if you will or ERISA eligible or ERISA requirement status and not only can the plan be transferred, but what rights may vest under certain individuals who would have been covered before the mergers.

MS. HANDORF: Yes.

THE COURT: But you don't need to answer that now, but --

MS. HANDORF: But that is a significant problem and what we have seen is that what you see is a lot of plans that were ERISA-covered plans and suddenly decided they want to be church plans often because consultants go around the country and tell them that this is really a cost-effective way of running their plans, which is part of the reason we have this litigation today.

Trinity itself is a large corporation. It has

$12.4 billion in assets and operating revenue of approximately $9 billion. Neither Trinity nor its pension plan receive funding from any church. In fact Trinity relies instead upon revenue bonds to raise its money and it receives most of its funds from the Medicare and Medicaid system.

THE COURT: Well, some of this goes to the issue of whether in fact it is a church plan, not whether an agency could be. We're only I think at the legal issue at this point. Factually, they still have to demonstrate that they are a church plan or somebody does.

MS. HANDORF: Yes.

THE COURT: The defendants are going to have to explain to me. And that's one of the factors obviously, their source of funding among others. But I don't think we need to address that particularly today.

MS. HANDORF: Yes, Your Honor. But Trinity is not a church. It's plainly not a church and --

THE COURT: And they're not claiming that it is. I think they're claiming it's affiliated with a church. Associated.

MS. HANDORF: So going to the statutory issue, according to the statutory issue, you must in fact look at the statute to determine whether or not that this is a church plan. And we believe that the statutory language

and its legislative history supports the conclusion that only a church can establish a church plan. And that is in fact is what the three district courts that we rely upon, Rollins versus Dignity Health, Kaplan versus St. Peter's Healthcare System and Stapleton versus Advocate Health have all decided based upon a careful analysis of the statutory language and application of the canons of construction.

THE COURT: Let me ask you though, are the circuits in which those district courts are located, have they addressed the issue in the way that Lown has in the Fourth Circuit?

MS. HANDORF: No, Your Honor. But let me turn to Lown and explain to you why I don't think that the Lown decision is really binding on this court. The Lown decision treated the exemption very narrowly. It discussed it in very narrow language. But you have to understand what was happening in Lown.

Lown involved the disability plan established by the Baptist Healthcare system and the plaintiff participant asserted that the plan was a church plan because she could then bring the case in state court and her claim would have been subject to a contract law interpretation rather than the more deferential standard of review that is applicable in ERISA plans.

Unlike the situation here, the plan through its insurance carrier, Continental Casualty, asserted that an ERISA covered plan -- that the plan was an ERISA-covered plan and not a church plan. So it's a complete reverse of the roles of the parties. And Continental Casualty argued in its brief that the Baptist healthcare plan was not a church plan because Baptist healthcare was not associated or controlled by the Baptist church.

And the defendants point to the plaintiffs' brief to establish that the court really was -- that the issue as to whether the church plan exemption can apply to plans established by something other than churches. But in fact the plaintiff wasn't asserting that the plan was covered by ERISA. The plaintiff wanted the plan to be a church plan. It was the defendants' brief that you have to look at. And if you look at the defendants' brief, the defendants never argued that only a church can establish a church plan. Instead they argue that the plan, Baptist Health, was not associated or controlled by the Baptist church. So that issue would have been presented by the defendant, not the plaintiff and in fact, the defendant never raised the issue.

In the Fourth Circuit, a statement in an opinion that could have been deleted without seriously impairing the analytical foundation of the holding is dictum because

it may not have received the full and fair consideration of the court. This definition comes from the Fourth Circuit's decision in Pittson Company versus the United States, which is one of the cases that we have given to you. And Lown's statement that a plan established by a corporation associated with the church can still qualify as a church plan is just that. It's dictum.

The Fourth Circuit could have decided the case on one of two alternative grounds. It could have decided legally that only a church can establish the church plan, but none of the parties raised that issue. Alternatively, it could have decided factually that Baptist Healthcare was not associated with or controlled by the Baptist church, the issue that was actually litigated by the parties --

THE COURT: Let me stop you on the first point. If the court had decided that only a church can establish a church plan, you're saying then the result would have been the same. Is that it? That they still would have found that it was a non-ERISA plan because it wasn't church related.

MS. HANDORF: Well, what I'm saying, Your Honor, is they could punt, which they in effect could have done even if it had been raised to the court and could have said we don't care whether only a church can establish a

church plan --

THE COURT: But wouldn't that have -- if they had said that, wouldn't that automatically be enough to just give the wind to the defendant in that case? In other words --

MS. HANDORF: Yes. It would have --

THE COURT: -- this is not a church plan and therefore, there's really not much more to talk about. I mean why get into all the factors?

MS. HANDORF: Right. It could have done that. But it was never raised.

THE COURT: It didn't do that so.

MS. HANDORF: It wasn't raised. Undoubtedly, it wasn't raised because nobody had ever argued that. The case law went one way. The I.R.S. opinions went one way. And Continental Casualty apparently figured that it had a pretty strong argument that Baptist Healthcare was not associated or controlled by the Baptist church.

So both the courts in Kaplan and Stapleton looked at the Lown decision and they said -- the court decided it on the factual issues and never really had to reach the legal issue and there is no discussion of the legal issue. And matter of fact, even though the court in -- the defendants suggests that well, you should follow the dictum anyway because it's correct. But in fact the

dictum is not correct because it doesn't follow the statutory language. It doesn't really discuss anything.

Now on top of that, if you look at it carefully, it does two things that show pause in that opinion. Number one, it looks at (C)(i), but it doesn't look at the language about that requires that the organization must be -- its principal purpose must be the administration or funding of a plan. Second, it cites a regulation, but the regulation it cites is a pre-amendment regulation. It applies to plans that were in existence before the statute was amended to change the church plan definition. So it shows that the court really wasn't focusing on the issue that is now before this Court because it simply didn't need to. The question before it was whether Baptist Healthcare was associated or controlled by the Baptist church. So we believe it's dictum and it doesn't control the issue in this case.

THE COURT: You may not be required to follow the dicta appeals courts, but you're wary about straying too far from them when you're a district judge. Just a reality that you have to acknowledge.

MS. HANDORF: I can appreciate that, Your Honor. I can appreciate that.

THE COURT: Judge Wilkerson would probably be very defensive of his opinion I suspect if it went up on

argument.

MS. HANDORF: Well, Your Honor --

THE COURT: Lown presents a problem for you, frankly. Right or wrong. I mean there's some logic to the way you argue the case writing on a clean slate, which is why I asked you whether any of the district court opinions were in circuits that had held otherwise. Well, when you're doing that, you can write what you want. But part of the deal here is that I'm supposed to follow the Fourth Circuit decisions.

MS. HANDORF: Yes. I can appreciate that, Your Honor.

THE COURT: Well, even strong dicta. I mean it's really the way we operate as district judges, most of the time. It's a bold district judge who takes on the Fourth Circuit.

There's sort of a practical issue here as well and maybe there's more politics to this than I really can appreciate. But suppose I were to hold in your favor and write an extensive opinion that basically follow the rationale of the three district court cases. And essentially, then the matter is over as far as the defendant is concerned so they appeal that issue that they've effectively lost it.

You'll probably get an opinion in about two

years on that issue where the high prospect is it would probably be reversed and come back here. And maybe that's all you want. But in terms of the real dynamics of a case like this, it's going to be a long time before you get to some of these thornier issues, which I think we've raised this morning to make this point now.

You've made a good argument and as I say, not unpersuasive in the sense that on a clean slate, one could come out the way you do. But I don't know that it's any more compelling to say that A is the gateway or A includes C. I mean it's just two logical approaches of a statutory analysis.

MS. HANDORF: Well, I'd like to persuade you that our position is the correct one.

THE COURT: I'm not saying that it's unreasonable.

MS. HANDORF: Right.

THE COURT: I mean I think I'm more hemmed in by the fact that there is some fairly strong language from the Fourth Circuit that goes this way and the practical aspect of it from your standpoint is that it's a long way home to get that decision made and reviewed and written and then come back and see what else remains.

I think, for example, this last issue that I've raised about whether there were other entities here that

were ERISA-type entities that merged here. That's a very thorny issue in this case. Just what effect will that have? And maybe instead of 56,000 people, maybe the number is 22,000, I don't know, that are covered. I haven't really looked at the legal aspects of it so I don't want to speculate.

MS. HANDORF: Well, part of the problem, Your Honor, is they haven't -- Trinity Healthcare plan has never filed 5500's. So none of the information is that readily available. The 56,000 people are actually just the employees.

THE COURT: Well, you may be entitled to some discovery on this. I'm not saying you won't be.

MS. HANDORF: Yes. Right, Your Honor. But I think that the issue as to whether the statute can be read as saying that only a church can establish a church plan, actually if it goes up, it would help clarify everything in the case going forward. If in fact --

THE COURT: It certainly would create a conflict causing the Supreme Court to take cert I suppose. Right now you don't have a circuit split, do you?

MS. HANDORF: No, we don't. We have two decisions in the Courts of Appeals. One is Lown. One is Chronister in the Eighth Circuit. The issue as to whether only a church can establish a church plan was not squarely

presented in either case. So it's really kind of an issue of first impression.

We believe that the Fourth Circuit hasn't decided in Lown. And that the Fourth Circuit should be given an opportunity to decide it in the context of briefs that address the question squarely and go through the legislative history and --

THE COURT: The question is really, you know, the only way we'd get it immediately is if I were to rule in your favor though. I mean if I rule against you on this point, you've still got to go through the rest of the trial or aspects I assume.

MS. HANDORF: Well, Your Honor could in fact -- we could ask this Court to take it up on an interlocutory appeal as well which would take it to the Fourth Circuit more quickly. To some extent that would be -- save a lot of people a lot of time and effort because if in fact we're correct, then all of the discovery about the connection between Trinity and the Catholic church and the way the plan is run could be for nothing if in fact the Fourth Circuit ultimately decided that we're correct and only a church can establish a church plan. So our preference would be for it to go up one way or the other, simply to save the parties a lot of time that might not be worthwhile time.

But let me get to why I think the statutory language can only be read the way the plaintiffs read it and that is that when you look at the statute, if you look at Section 33(a), it talks about what a church plan means and it says a church plan means a plan established and maintained by a church. It doesn't say that it means a plan established and maintained by a church or by an organization which is associated or controlled by a church. If that's what Congress wanted, it could have easily said it in A. It wouldn't have had to have C at all. So that is what we believe 33(a) means. That is what the courts in the three decisions that rule in our favor say that it means.

So then you get to the next question which is what is (C)(i) there for. And we've described in our briefs and quite extensively that the reason the court put (C)(i) in was for the limited purposes of clarifying the church pension boards could in fact maintain a plan and it would still be included under the category of A to be a church plan.

And it's telling that in C, the court -- that Congress didn't say a plan established and maintained by a church includes a plan established and maintained by an organization which has the principal purpose or function of administering or funding the plan. It only said

maintained. And one would assume that when Congress decided to limit it to maintain, it meant to do that for a reason. And if you read it other than that, then you've got Subsection (C)(i) completely annihilating Subsection A because it would mean that there is no reason why you have to define the church plan in Subsection A because Subsection C completely abrogates it and has its own definition of what is a church plan.

If you look at (C)(ii) and 3, really what was happening there is that Congress was concerned that church agencies wouldn't have pension plans and it was concerned because the original statutory provision required church plans that covered agency employees to eliminate those church agency employees by 1983. And the churches were very worried about this because they believed that if the agencies had to establish their own church plans that they just wouldn't be able to do it. And so Congress fixed this by putting in (C)(ii) and C-3 that employees of church agencies would be deemed to be employees of the church and the church would be deemed to be their employer.

Now Congress wouldn't have had to do that if the church agencies could have established their own church plans. It did it because it wanted to allow churches to cover plans -- to cover the employees of the church

agencies. That is all of what was happening.

Now going back to the word "includes." Defendants suggest that the governmental plan exemption is a perfect example of a provision including things that aren't covered in the original provision. But if you look very carefully at the governmental plan exemption, that is simply not the case. The governmental plan exemption defines governmental plans as plans established or maintained by governmental entities or by their instrumentalities or agencies.

And the three types of plans that it covers under that governmental plan exemption to include them are plans under the Railway Retirement Act, which are administered by a government agency, the Railroad Retirement Board. It covers plans such as the World Bank Plan that pursuant to congressional enactments or treaties, the United States contributes for its own citizens and it includes tribal governments, which by their very nature are governmental plans. So all of the entities that are listed as included under the governmental plan exemption are in fact governmental in nature. And that therefore, the governmental plan exemption, just simply the three -- it's just illustrative of what are governmental plans.

But importantly, the things that are included if

you -- they don't contradict the original definition which is that it must be a plan established or maintained by a government.

The defendants' analysis wipes out the original definition. It contradicts it. It says that a church plan is one that is maintained by something that is in a church, which is completely contradictory to the original 33(a) that defines what a church plan is. And so for this reason, the governmental plan exemption simply does not support the defendants' position.

And finally, I'd like to go to the government agency's pronouncement. The government agencies made their pronouncement shortly after the statute was passed and it has been going on for 30 years. But as this Court I'm sure knows, the governmental pronouncements are only good if they don't contradict the language of the statute and we believe that they contradict the language of the statute. We don't believe that they should be given deference because -- certainly should not be given Chevron deference because Chevron deference is only given if you've gone through a process of rule making and notice and comment which was not the case with any of these agency interpretations.

Nor do we think they should be given persuasive deference because they happened to be the opinions of the

government because deference in that situation should only be given if in fact they are persuasive and they go through some analytical analysis of the statute, which in fact they don't. So as the courts in Kaplan, Rollins and Stapleton have all held, this Court should not give those decisions deference. Nor should the fact that there were subsequent enactments of Congress that dealt with church plans mean anything because there's absolutely no evidence that the government's interpretation of the church plan definition was even before the Congress or that Congress even knew the breadth of that definition.

So we believe that the statutory language need not reach the legislative history which defendants rely upon extensively because the statute on its face says that only a church can establish a church plan. It then goes on to say that a church plan can be maintained by something like a church pension board and that employees of agencies, but can be included in the church plan.

But there's absolutely no reason why Congress would have included entities like Trinity Healthcare in the church plan exemption. It proves nothing. It serves no purpose and certainly not the purpose that Congress enacted the church plan definition to deal with. Thank you.

THE COURT: All right. Mr. Shapiro?

MR. SHAPIRO: Your Honor, very briefly. First of all, Your Honor, the Court asked about some of the history of Trinity healthcare and thankfully my co-counsel remembered that at page 2 of our original brief filed on October 6, 2014, we point out that Trinity was formed from the merger of Healthcare Ministries of Catholic Religious Orders, the sisters of Holy Cross and the sisters of Mercy which began their work as healing ministries in the United States in the 1840's. That is on as part of the introduction, Your Honor, to our initial brief.

Second point. There's been discussion about Lown. And Ms. Handorf tries to get the Court to believe that because the defendants didn't raise the church plan issue, there is something out of kilter. In fact, the party with the burden of proof trying to raise the church plan issue was the plaintiff. And what does the plaintiff write in Exhibit K to our motion to dismiss at page 20? She writes that "church plans is much broader than the scope of organizations qualifying as churches." And she goes on from there. She goes on for three-quarters of a page or so talking about this issue of what does (C)(i) mean. So we submit that that issue was before the Fourth Circuit.

And this Court is correct. The Fourth Circuit would not have gone into the rest of the facts and

circumstances test that it reached if it simply could say this is not a church plan because Baptist Healthcare was not a church. So I think we've laid that to rest.

The statute itself, Your Honor, plaintiff makes this argument about pension boards as she just did. The word "pension board" is nowhere in the statute, Your Honor. And our reading of (C)(i) does not obliterate Section A. It doesn't wipe it out. All it does is it says you can have a church plan that's established by a church, but you can also have a church plan when it's established and maintained for employees and that includes a plan maintained by an organization controlled by or associated with a church. The fact that there are two different ways to constitute a church plan doesn't obliterate the meaning of A. That's all I have, Your Honor.

THE COURT: All right. Any further comment, Ms. Handorf?

MS. HANDORF: Your Honor, I would just reiterate that the plaintiff had no interest in going into this in any great depth. She wanted it to be a church plan. She was hardly going to say that only a church can establish a church plan. That would have been for the plan to make the point about. And there's no evidence that the plan ever said only a church can establish a church plan. It

felt that it could rely upon the fact that it wasn't associated or controlled by the Baptist church. So whatever the plaintiff said about the background of the church plan amendment really doesn't really say anything. She just was reiterating what she thought the statute meant. And as I said again, she wanted it to be a church plan. She wasn't about to argue that only a church can establish a church plan.

THE COURT: But the defendant didn't want it to be so they expanded the argument.

MS. HANDORF: Well, the defendant didn't expand the argument. The defendant, if you look at the defendants' -- we cite to the defendants' brief in our brief and if you look at that brief, they never mention the fact that only a church can establish a church plan. They simply argued that Baptist Healthcare was not associated or controlled by a church.

THE COURT: Well, as I indicated in our earlier phone conference, we're going to have to approach this case in phases. And the first phase that I did direct the parties to brief has to deal with whether an agency that is affiliated or associated with the church can still qualify for the church plan exemption under ERISA. And as far as the state of the pleadings is concerned, the argument is from the plaintiffs in this case that the

defendants in this case do not qualify as a church plan because the applicable ERISA statute does not literally permit that. This is ERISA Section 3(33) at 29 United States Code, Section 1002(33). The position of the defendant is that a group that is associated with or affiliated with an organization that is a church organization can qualify for the exemption.

The arguments that are made here are interesting, I must say, and as I've observed I think in the course of argument of counsel, if I were writing on a clean slate, I'd be in a much different position today than I am I think in view of Lown versus Continental Casualty Company, which appears at 238 F.3rd 543 from the Fourth Circuit in 2001. And there, the court really did have to make a decision as to whether it had jurisdiction in the case by looking at whether the plan of the defendant in that case was a church plan as opposed to an ERISA plan.

And the Fourth Circuit goes on to say that church plans are not ERISA plans, citing at 29 USC, Section 1000(b)(2). "A church plan means a plan established and maintained for its employees or their beneficiaries by a church or by a convention of churches. A church plan does not include all plans maintained by a church. The statute specifically excludes plans

established and maintained primarily for the benefit of those who are employed in connection with unrelated trades or businesses."

And then the key language in the opinion is "despite this exception to the definition of a church plan, a plan established by a corporation associated with a church can still qualify as a church plan." The statute defines church plans to include plans "maintained by an organization whether a civil, law or corporation or otherwise if such organization is controlled by or associated with a church or a convention or association of churches."

Going on to say, "an organization is controlled by a church when, for example, a religious institution appoints a majority of the organization's officers or directors, the corporation must share common religious bonds and convictions with that church or convention or association of churches" and so on. And the court specifically says "our jurisdiction in this case thus turns on whether at the expiration of Lown's coverage under the plan in 1997, the disability plan was an ERISA plan or a church plan." And then goes on to cite various factors finding that Baptist Healthcare was not controlled by the South Carolina Baptist convention, citing various factors.

So that's where we end up in this case even though one can argue that the briefs said this or didn't say that. Judges who are reading cases don't get the benefit of reading briefs that are filed in courts. You read opinions. That's what directs your decision making in these cases. And I can see the argument. There's some logic. There's some policy support for the proposition that the statute in question that maybe Subsection A is just a gateway as opposed to being further defined by Subsection (C)(i) and (ii) and so on of the statute. But I think the Fourth Circuit has pretty much put that to rest at this point. And it really doesn't bear in my opinion a lot of explanation or analysis to go beyond that.

The matter has been well briefed. It's there to be up on appeal. I would say that the Fourth Circuit is very loathed to take especially certified questions. I think in the 21 years that I've been on the bench, maybe it's taken it twice in my experience. It's a rare, rare thing to happen. I just don't think that's a high prospect in any case.

So my decision really doesn't require me to examine the three district court decisions and ascribe whether they're right or wrong or whatever. I mean there is some support for the defendants' position in some of

the legislative history for what that's worth. There is some support. It doesn't have to be Chevron-type deference for the way in which the I.R.S. has applied the statute in the past. None of this is binding. It's all very suggestive. But to suggest that it's simply against the plain and unambiguous meaning is a large proposition that I'm not prepared to embrace.

So I will to that extent grant a partial motion to dismiss I think is the proper way to style this because we have other issues we have to look at. I'm not dismissing the case outright at this point because a lot depends on where we go with the actual facts that are going to be developed by this defendant and whether not only today are they in fact affiliated with a religious organization, but are its component parts historically also affiliated? Were there ERISA plans in place as to those entities and what effect if any would that have on the merger of those entities into a larger entity. I know the proposition that's just been floated by me Mr. Niccolini is that or through Mr. Shapiro that it's always been religious affiliated. Well, I don't know that for sure at this point. We haven't established it.

So the motion to dismiss is granted -- partial motion to dismiss is granted. And we move now to the next phase of the proceeding. And perhaps you want to

articulate how you would propose to do it. Let me ask you, Ms. -- well, it would be presumably as a motion to dismiss. So what do you, Mr. Shapiro, see as the next phase?

MR. SHAPIRO: Well, the first thing I would say, Your Honor, is I don't wish to delay things. But I'm not sure whether Ms. Handorf's side contemplates filing for an interlocutory appeal on the church must establish issue. So I would like the opportunity to perhaps take a week and report back to the Court perhaps in a conference call or if the Court would like to see us in person, again I'm glad to come up.

From the defendants' point of view, so that the Court and Ms. Handorf know what the defendants are thinking, we believe, Your Honor, that the next set of issues as well association with and controlled by under the legal standards may also be tested under a motion to dismiss without discovery. And we also believe the constitutional issue which is the third issue in the case may also be resolved on a motion to dismiss standard. Of course, the plaintiffs are going to disagree with what I've said and the Court has its own views.

THE COURT: Well, maybe not on the constitutional issue, but maybe -- I will have to see what Ms. Handorf says.

MR. SHAPIRO: So I would ask Your Honor for a week, ten days to consult with my learned colleagues and then perhaps get back to the Court. But we believe another motion to dismiss is feasible to resolve the rest of the issues unless plaintiff intends to file a petition for interlocutory appeal and then my principals would have to consider whether they will support that or whether they will contest that, Your Honor. Any questions from the Court?

THE COURT: Ms. Handorf, do you have any sense of this now? And maybe the best way to handle it is to defer a bit and let you talk about it. But what's your sense right now?

MS. HANDORF: Well, Your Honor, we -- first of all, I wasn't quite clear whether you intend to write a written order?

THE COURT: No. This is my opinion. The order will simply say granted for the reasons -- with regard to this issue, the motion to dismiss is granted in part.

MS. HANDORF: And standing here today, I would say that the plaintiff is likely to ask the Court to certify that question. I understand from what you're saying that the Fourth Circuit is loathed to take those certified. But we'd like to try.

THE COURT: Well, the decision, of course, is

mine for the most part and not the court's.

MS. HANDORF: Yes.

THE COURT: You have to convince me that I should be doing this for some reason and then the Fourth Circuit makes its own ruling. What I was pointing out to you is I haven't done it very often and they rarely grant it in this circuit, but so be it. I mean you can file your motion however you care to proceed.

MS. HANDORF: Thank you, Your Honor. And as to the other issues, I'd certainly have to see what defendants wrote in terms of -- I don't see it as being -- the other two issues being ones that can be resolved on a motion to dismiss. But I don't quite know what --

THE COURT: Well, constitutionality may be. It's just an extension of the argument we just made I assume.

MS. HANDORF: Well, the constitutional argument also has to do with whether there's entanglement and whether it harms individuals. How much we actually have to have evidence in the record on that, I think is --

THE COURT: All right. Well, let me not prejudge that. You'll have to I think look at that issue. If your next step is to file a motion to certify, you can do that in the normal course. What kind of timeline are you on -- do you want to be on?

MS. HANDORF: Well, we can do it promptly. I think that the general rule is that it should be -- one should file promptly after the --

THE COURT: Can you do it within 20 days?

MS. HANDORF: Yes. We definitely can.

THE COURT: All right. And then your response, Mr. Shapiro?

MR. SHAPIRO: Two weeks to respond, Your Honor?

THE COURT: 20 days is fine.

MR. SHAPIRO: 20 days. That's fine.

THE COURT: 20 days to file your motion to certify.

MR. SHAPIRO: Your Honor, let me --

THE COURT: Let me just finish.

MR. SHAPIRO: I'm sorry, Your Honor.

THE COURT: 20 days to respond and then 10 days to reply. Go ahead.

MR. SHAPIRO: Your Honor, let me be candid with the Court. There is a possibility that after Ms. Handorf and I speak and I consult with my principals, the defendants may say we will not oppose the petition. That is a possibility, Your Honor.

THE COURT: All right. It doesn't make easier for me or for the Fourth Circuit.

MR. SHAPIRO: That I understand, Your Honor. I

just wanted -- since I was in front of the Court, I wanted to explain what could be a position --

THE COURT: Well, find however you will.

MR. SHAPIRO: Thank you, Your Honor.

THE COURT: All right. Anything further?

MS. HANDORF: That's fine.

THE COURT: All right. No. The orders will read simply for the reasons stated on the record, partial motion to dismiss is granted with respect to the given issue and then we'll go on into the next step.

MS. HANDORF: And, Your Honor, perhaps, I don't need to know this, but are you basing it on the fact that you believe that you are bound by the decision in Lown?

THE COURT: Yes.

MS. HANDORF: Thank you.

THE COURT: Yes. I think that's a fair statement. But not to say that there isn't other logic beyond it. I think I did make some reference to the fact that there is some legislative history that supports the Lown rationale and there also is the agency decisions I said for whatever they're worth, not necessarily requiring Chevron deference.

MS. HANDORF: Thank you.

THE COURT: I don't want to hem myself in by saying that's the sole and exclusive reason I'm doing it.

But primarily for sure. All right. Anything else?

MR. SHAPIRO: No, Your Honor.

THE COURT: All right. Thank you very much, counsel.

MR. SHAPIRO: Thank you, Your Honor.

(Proceedings concluded.)

CERTIFICATE OF REPORTER

I, Lisa K. Bankins, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that I reported, by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the motions hearing in the case of the Anita Lann, et al. versus Trinity Health Corporation, et al., Civil Action Number PJM-14-2237, in said court on the 23rd day of February, 2015.

I further certify that the foregoing 47 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, together with the backup tape of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 5th day of March, 2015.

*Lisa K. Bankins*

Lisa K. Bankins
Official Court Reporter

Reproduced at the National Archives

ORIGINAL

#14

Stenographic Transcript Of

HEARINGS

Before The

COMMITTEE ON FINANCE

# UNITED STATES SENATE

EXECUTIVE SESSION

Washington, D. C.

June 12, 1980

Alderson Reporting Company, Inc.

Official Reporters

300 Seventh St., S. W. Washington, D. C.

ADD63

Reproduced at the National Archives



scione/
ell

ce 1
A

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

EXECUTIVE SESSION

- - -

THURSDAY, JUNE 12, 1980

- - -

United States Senate,
Committee on Finance,
Washington, D. C.

The committee convened at 10:05 a.m., in Room 2221, Dirksen Senate Office Building, the Hon. Herman Talmadge presiding.

Present: Senators Talmadge, Nelson, Bentsen, Moynihan, Matsunaga, Baucus, Boren, Bradley, Dole, Packwood, Heinz, Chafee, and Durenberger.

Senator Talmadge. The committee will please come to order. We have two back-to-back votes in the Senate at 12:00. That means for all practical purposes we will have to try to finish this bill by 12:00. I would suggest that we follow the procedure of letting the staff proceed as they did on Tuesday, with the staff recommendations, and then vote on them, and then vote on any amendments that may be offered by members of the committee. Is that agreeable?

Senator Packwood. Mr. Chairman, that is agreeable if we can finish this by 12:00. I am going to Oregon this afternoon for some hearings on the damage to the Columbia River because of the Mt. St. Helens eruption. If there is a possibility. If we get to about eleven o'clock and it appears we might not make it, I

Reproduced at the National Archives



over a private transit system, in the State of New Jersey. And the state will not accept the responsibility for the unfunded pension payments. The private corporation that is selling it says that they will. I just want to nail down that when the state takes over the stock of the company and the private company says they will continue to assume the liability for the unfunded pension payments, that when they make those payments they will be able to get that tax deduction.

Senator Bentsen. Mr. Chairman, that certainly appears to be equitable.

Senator Talmadge. Any objection? Without objection it is agreed to. Now, Senator Packwood I believe had something.

Senator Packwood. My amendment relates to Senator Durenberger's presentation, and I will wait until he comes back.

Senator Talmadge. All right. Now I have one. I will state it very briefly. This is cosponsored by Senator Bentsen and Boren, working closely with representatives of 27 major church denominations from across the nation. I introduced this 1090 and its companion tax bill, S. 1091, to protect the viability of church retirement plans.

The problem that church plans face is one of definition. Under current law, both ERISA and the Internal Revenue Code, define such plans to include not only church plans covering church employees but also plans covering employees of church-affiliated organizations.

Reproduced at the National Archives



For example, the church plan might cover the employees of a church-related hospital, university or retirement home. As you might expect, this is a common practice of many churches throughout the United States. However, unless we act to preserve the longstanding definition of church plans, the law as it currently reads will phase out this definition beginning in 1983.

S. 1090 and S. 1091 make the amendments necessary to continue the current church plan definition. The definition would also be expanded to include church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church.

In addition, the definition of the term "employee of a church" would be expanded to include a church minister in the exercise of his or her ministry regardless of the source of compensation, as well as certain former church plan participants.

The bills would also create a notice and correction procedure for the amendment of a church plan.

Senator Dole.

Senator Dole. I just want to say as a cosponsor I support everything you said.

Senator Talmadge. Any objection? Mr. Halperin of the Treasury Department.

Mr. Halperin. Mr. Chairman, we have objected to certain provisions of that bill, and let me just point out what we see

Reproduced at the National Archives



as the most serious concern.

What that bill would permit, it would exclude church agencies from the protection of ERISA, and that would mean that if somebody works for a hospital or a school that happens to be affiliated with a church it would be permissible for that plan to provide no retirement benefits unless they work until age 65, for example.

So it could deny benefits for people who might have 20 or 30 or even more years of service with the school or the hospital. Now maybe they don't want to go that far, and we have had conversations with these people for a number of years and we have always offered to talk about each particular provision of ERISA and find out which of them create problems for them because it certainly would be reasonable to modify some of them to deal with the particular problems of churches. But to say that the vesting provisions, the eligibility provisions do not apply across the board so that we can return to the situation where long-service employees get no pensions seems to us to be objectionable, Mr. Chairman.

Senator Talmadge. I think we have got a question of separation of church and state here, number one, gentlemen, and, number two, I don't believe we ought to get a row with every religious faith in the country -- Jewish, Catholic, Protestant, and otherwise.

All in favor please say "aye."

Reproduced at the National Archives



(A chorus of "ayes.")

Opposed, "no."

(No response.)

The "ayes" have it, and the amendment is agreed to.

Senator Dole. Mr. Chairman?

Senator Talmadge. Senator Dole.

Senator Dole. I was going to propose, I don't see it in the staff recommendations, and that would be a sunset date on this legislation of June 30, 1983. I think what we are looking about we talked about sunset legislation in the general sense. I am not certain this legislation will answer all the concerns we have. It will force Congress to take another look at it, give us time to see how it works, and give us time to make any necessary changes. I might add that 1983 is a nonpolitical year.

We want to make certain that we provide income security to employees, but if employers cannot survive, then we are goin to have a question of PBGC paying substantial benefits. This may require very high premiums or could even in some circumstances lead to going to the general revenues for funding.

I haven't discussed this amendment with the staff or with PBGC, but I think what we need to --

Senator Talmadge. What date in 1983 do you suggest, Senat Dole?

Senator Dole. June 30.

the date on which a multiemployer plan terminates.

In the case of a terminated plan from which all employers have not withdrawn, the bill requires that employers who continue to maintain the plan continue to fund the plan in accordance with the minimum funding standards of ERISA and also requires that plan contributions continue at not less than the highest rate applicable during the last five plan years ending on or before the date of termination. A reduction of contributions is permitted, with the approval of the PBGC, where the plan is becoming fully funded.

The bill authorizes the PBGC to prescribe reporting requirements and rules for the administration of terminated multiemployer plans where such reports or rules are needed to protect the interests of plan participants or to protect the PBGC against unreasonable losses.

5. Termination insurance premiums.

Under present law, a multiemployer plan which is subject to the termination insurance program is required to pay annual premiums to the PBGC at the rate of $.50 per plan participant. The premium rate may be changed by the PBGC with the approval of the Congress by a concurrent resolution. (Such a resolution is required to be referred to the tax committees and labor committees of the Senate and of the House of Representatives.) Also, the PBGC is authorized to set premium rates for insurance of nonbasic benefits and to develop a risk-related premium schedule.

The bill provides that the annual per participant premium for multiemployer plans is to increase from the present $.50 rate to $2.60 over a 9-year period. However, under standards set forth in the bill, the PBGC may increase the premium at a more rapid rate, but not to an amount in excess of $2.60. The premium may also be increased automatically, under a formula provided by the bill, to a rate not in excess of $2.60 per year, per participant. Also, the bill continues the authority of the PBGC to prescribe regulations under which the premium rate for multiemployer plans will not apply to the same participant in a multiemployer plan more than once for any plan year.

In addition, the bill modifies the authority of the PBGC to establish alternative premium rates and bases for basic benefits (subject to Congressional approval) by deleting specific restrictions on the computation of such premiums. Generally, basic benefits consist of certain vested retirement benefits.

With respect to nonbasic benefits guaranteed under a multiemployer plan, the bill provides that premium rates prescribed by the PBGC may reflect any reasonable consideration that the PBGC determines to be relevant. Supplemental benefits (retirement benefits in excess of basic benefits) are required to be guaranteed by the PBGC only at the election of a plan. The bill provides for Congressional review of premiums for supplemental benefit guarantees. The separate funds of the PBGC for the guarantee of supplemental benefits and for reimbursement of withdrawal liability are not to borrow from, or lend to, the PBGC or any fund maintained by the PBGC.

The bill does not affect premium rates for single-employer plans. Also, receipts and disbursements of the PBGC will be included in the budget of the United States Government (i.e., PBGC would be "on budget").

Since ERISA was enacted in 1974, the payment of guaranteed benefits under terminated multiemployer plans has been within the discretion of the PBGC, subject to statutory standards. The guarantee of benefits under single-employer plans is not discretionary. The guarantees, which are subject to the same maximum limits under multiemployer and single-employer plans, extend only to basic benefits, determined before plan termination. Basic benefits are insured by the PBGC to the extent of the lesser of $750, adjusted for inflation since 1974 ($1,159.09 for 1980) or a participant's average high 5-year compensation. The insurance of benefits is generally phased in over a 5-year period. The insurance for multiemployer plans would be mandatory for the plans and for the PBGC beginning August 1, 1980, and would be provided whether or not premiums are paid.

Under the bill, certain prior service benefits eliminated or cancelled because of the cessation of an employer's contributions to the plan are not guaranteed by the PBGC.

Under the bill, the first $5 of monthly basic benefits earned per year of a participant's service is generally fully guaranteed and 75 percent of the next $15 of monthly basic benefits is generally guaranteed. The 75-percent guarantee is reduced to 65 percent under plans which did not meet specified funding requirements. Payments under the guarantees are made by the PBGC only in the event of the insolvency of a multiemployer plan. As under present law, the bill does not extend guarantees to plan benefits of certain substantial owners of an employer.

The bill continues the requirement of present law that PBGC premium increases beyond $2.60 must be approved by the Congress. However, the bill adds a new procedure for periodic Congressional review of premium and guarantee levels.

The bill authorizes the PBGC to guarantee non-basic benefits subject to terms and conditions imposed by the PBGC. Supplemental benefits under a plan are guaranteed if the plan elects such coverage.

The bill limits the aggregate benefit provided by the PBGC with respect to any participant to the same level provided by present law except that, under PBGC regulations, financial assistance provided by the PBGC to a plan is considered the provision of guaranteed benefits.

7. Annual report of plan administrator.

Under ERISA, a plan administrator is required to report the occurrence of specified reportable events to the PBGC. Also, the plan administrator of a plan to which more than one employer contributes is required to notify each substantial employer annually that it is a substantial employer. In addition, reports are required to be filed with the payment of premiums (Form PBGC–1).

The bill adds a requirement that annual report of a plan administrator, with respect to a plan subject to termination insurance, include such information with respect to the plan as the PBGC determines is necessary for enforcement purposes and is required by PBGC regulations. The bill provides that the information required may include (1) a statement by the plan's enrolled actuary relating to the value of plan assets and liabilities, and (2) a statement by the plan administrator relating to withdrawal liability.

8. Contingent employer liability insurance.

ERISA provides for a program designed to permit an employer to insure against the contingent employer liability (up to 30 percent of the employer's net worth) arising out of the termination of a plan with insufficient assets to provide benefits at the level guaranteed by the PBGC. Under ERISA, the contingent employer liability insurance (CELI) may be developed by the PBGC in conjunction with private insurors. The PBGC is authorized to provide premium rates and collect premiums under the CELI program. The CELI program has not been implemented by the PBGC for lack of feasibility.

The bill repeals the contingent employer liability insurance provisions of ERISA for multiemployer plans and single-employer plans.

9. Miscellaneous Multiemployer Plan Provisions.

Under the bill, the PBGC is required to study the subject of union-mandated withdrawals from multiemployer plans to determine whether special rules are necessary and, if the PBGC determines that they are needed, to make recommendations with respect to such rules.

In addition, the Department of Labor is required by the bill to study the feasibility and desirability of requiring employers and unions to bargain over both benefits and contributions and to provide the Congress with recommendations within three years.

The General Accounting Office is required to conduct a study and report to Congress no later than June 30, 1985, on the effects of the bill on parties affected by the bill (e.g., participants, employers and unions) and the self-sufficiency of the PBGC insurance fund. Congressional hearings are required on the study and GAO recommendations.

10. Miscellaneous ERISA Provisions.

The present law definition of the term "church plan" is continued without reference to dates, so that a church plan which covers the employees of a church agency generally would be exempt from the provisions of ERISA. In addition, certain definitions relating to church plans are clarified.

A company that sells a business to a State government can claim a current tax deduction under the bill for contributing the amount necessary to avoid PBGC liability to its single-employer plan.

The Secretary of Labor is authorized by the bill to treat certain severance pay plans and supplemental income plans as welfare plans rather than as pension plans under ERISA, so long as such treatment is consistent with the purposes and standards of ERISA.

The bill provides that the law of the State of Hawaii with regard to health insurance plans maintained by employers generally would not be preempted by ERISA.

---

BACKGROUND

The Employee Retirement Income Security Act of 1974 (ERISA) established a program of insurance for employee benefits under most tax-qualified, private, domestic, defined benefit pension plans.[1] The program is administered by the Pension Benefit Guaranty Corporation (PBGC), a corporation within the Department of Labor. The Board of Directors of the PBGC consists of the Secretary of Labor (Chairman), the Secretary of the Treasury, and the Secretary of Commerce.

The PBGC maintains a trust fund and a revolving fund for insurance of benefits under terminated multiemployer defined benefit pension plans (multiemployer plans), as well as a trust fund and a revolving fund for insurance of benefits under all other terminated defined benefit pension plans (referred to as "single-employer plans"). The PBGC presently is not "on budget", and the United States is not liable for debts of the PBGC.

The insurance program (referred to as "termination insurance") is supported by (1) premiums paid by plans, (2) assets of plans that have terminated with insufficient funds to provide guaranteed benefits, (3) payments by employers who maintained plans which terminated with insufficient

---

[1] See ERISA sec. 4021. A defined benefit pension plan provides a specified level of benefits for participants. A church pension plan is generally exempt from the insurance program unless the plan has elected to be subject to ERISA standards. (If a church plan covers employees of a church agency, the exemption expires for plan years beginning after 1982.) Also, plans of certain professional service employers are excluded from the program.

secondary school credit and postsecondary programs, fine arts programs, recreation and health programs, and curriculum development for all these programs; (2) standard and innovative vocational training programs; (3) library development and services; (4) training, including inservice training, for personnel specializing in correctional education; (5) education release programs, with special emphasis on work release; (6) remodeling of education facilities especially vocational training facilities; (7) guidance programs; (8) supportive services with special emphasis upon job placement and coordination of educational services with other social services; (9) incentive programs; (10) research and experimental programs to develop new approaches and techniques in correctional education; and (11) evaluation programs to test the effectiveness of corrections education programs, particularly programs assisted under the Act.

SECTION 6—APPLICATION

Provides that for a State to receive a grant under the Act it must submit an application to the Commissioner of Education at such time, in such manner, and containing or accompanied by whatever information the Commissioner requires.

Requires that each application must: (1) provide that the programs or projects assisted under the Act will be administered or supervised by the State educational agency; (2) set forth a program for carrying out the purposes of the Act, including the methods to be used in administering the program; (3) assure that no person with responsibilities in the operation of the program will discriminate against any program participant or employee because of race, color, creed, national origin, sex, political affiliation or beliefs, (4) provide for fiscal control and fund accounting for Federal funds paid under the Act; and (5) provide for making annual program and fiscal reports required by the Commissioner of Education, and for keeping such records and for affording access to those records as the Commissioner finds necessary.

Provided that applications may be approved by the Commissioner if the Commissioner determines that the application meets all requirements set forth in the Act and the application does not exceed 90 percent of the cost of carrying out the proposed program. Contributions by or on behalf of the State may be in cash or in kind, including real or personal property or any combination thereof, or services.

SECTION 7—PAYMENTS AND WITHHOLDING

Provides that the Commissioner of Education shall pay to each State whose application has been approved an amount not to exceed 90 percent of the sum expended by the State for purposes set forth in its application.

If the Commissioner determines that any program or project which has received assistance under the Act has been changed so that it no longer complies with the Act's provisions, or that in its operation the program or project has substantially failed to comply with any of the provisions, then after reasonable notice and opportunity for a hearing, the Commissioner shall notify the State of the findings and no further payments shall be made to the State until the noncompliance has been or will promptly be corrected. Authorizes the Commissioner to continue payments to any projects funded under the Act which are not involved in the noncompliance. ●

---

By Mr. TALMADGE (for himself and Mr. BENTSEN):

S. 3172. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance.

S. 3182. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance and the Committee on Human Resources, jointly, by unanimous consent.

DEFINITION OF CHURCH PLAN

Mr. TALMADGE. Mr. President, with my colleague, Senator BENTSEN of the State of Texas, I am introducing bills to amend the definition of "church plan" found at section 414(e) of the Internal Revenue Code and section 3(33) of the Employee Retirement Income Security Act of 1974. All of the major church denominations in this country—Protestant, Catholic, and Jewish—are of one accord in this matter. They need and desire relief.

When we enacted ERISA in 1974, we set 1982 as the date beyond which a church plan could no longer provide retirement and welfare benefits for employees of church agencies. We also forbade the church plans to provide any new agency coverage after 1974. Moreover, as I will explain later, the church plan definition is so narrow that it almost completely fails to consider the way our church plans have for decades operated. At this moment our churches are justifiably concerned that their plans do not meet the church plan requirements and are, therefore, subject to ERISA. In 1974, we did not recognize the unique character and needs of our church plans.

The church plans in this country have historically covered both ministers and lay employees of churches and church agencies. These plans are some of the oldest retirement plans in the country. Several date back to the 1700's. The average age of a church plan is at least 40 years. To comply with ERISA by 1982, the churches must divide their plans into two so that one will cover church employees and the other, agency employees. It is no small task to break up a plan that has been in existence for decades, even centuries.

The estimated legal, actuarial, and accounting costs of the initial division of church plans and the additional continuing costs of maintaining two separate plans are so significant that reduced retirement and other benefits may result unless they can be assimilated. To offset these additional costs, the churches are confronted with a very large, and possibly not absorbable, economic burden, merely to provide pre-ERISA level of benefits. There is no imposition by ERISA of such moment on the plans of other organizations.

Church agencies are essential to the churches' mission. They care for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA has made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

Ministers and lay employees have a unique need to be covered by one plan. Employment is extremely fluid within our denominations. A minister will frequently move from church to agency, or wherever his services are most needed. If he cannot be covered by one plan, gaps in coverage may occur because the agency may not have a plan or may have a waiting period before participation. If the church plan definition is allowed to remain, ministers and lay employees will not be able to pursue their missions nearly as freely as they have in the past. It is inescapable that the way our churches have functioned will be directly affected.

As I mentioned earlier, the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated. For example, this definition can be interpreted to require a minister or lay employee of a church to be a current employee. Many ministers serve their faith outside the denominational structure—as chaplains in prisons, hospitals, universities, and elsewhere. Evangelist ministers are usually self-employed and have no employer. There is no valid reason for denying these persons the benefits of retirement and welfare coverage.

This type of problem is less apt to occur in a hierarchical denomination because a minister may continue to be considered an employee even though he is serving outside the church structure.

Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination. Under the church plan definition, there is a question whether the plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. In this type of church, the denomination has little, if any, control over the local churches. Some differences in plan provisions occur, because the denomination cannot enforce uniformity, and the question whether the plan is maintained by the denomination or by the local churches is raised.

The inability of a congregational denomination to control its agencies makes

it difficult to see how the church agency plan could meet the requirements of ERISA. In a corporate structure lines of authority are clear. One plan covering the employees of a parent and its subsidiaries can easily meet the requirements of law because of the control executed by the parent. As I have stated, a congregational denomination cannot force the agencies to observe the requirements of ERISA. Accordingly, there is little hope that a plan established by a congregational church for its agencies could comply with ERISA.

Mr. President, these and other problems over the church plan definition under present law confront the churches today. They are worried that their plans do not now meet the church plan requirements and concerned over the impending restructuring of their plans. It is time we remove the churches from this statutory cloud. If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive government entanglement with religion.

Under the provisions of our bills, effective as of January 1, 1974, a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan. The bills retain the definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churches exempt from tax under section 501. However, to accommodate the differences in beliefs, structures, and practices among our religious denominations, all employees are deemed to be employed by the denomination. The term employee is also redefined to include: One, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; two, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and three, certain former employees who participated in the church plan before separation from service.

Under the bill an organization is "associated" with a church if it shares common religious bonds and convictions with that church. Thus, by including an ordained minister as an employee without the requirement of an actual employment relationship, the church plan may continue to cover a minister who serves outside of the denominational structure, provided the service is in the exercise of his ministry. Accordingly, a minister serving as a prison chaplain or teaching religious studies at a university or an evangelist minister who has no employer would be entitled to participate in the church plan.

Under the bills a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. There is no real reason why a church plan should be forced to pay a former employee his accrued benefit in cash and, thus, destroy his retirement benefits. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service. A minister or lay employee may reach a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the church. During this period the denomination may permit the individual to continue to be covered by the church plan even though he is separated from service. Under the bills a church plan may continue to receive contributions for an individual who is a participant in the church plan at the time of his separation from service but only for a period of 5 years. A time limit is not placed upon employees who separated from service because of disability.

A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501. No church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in the plan provisions among the local employers.

The bill also corrects a very harsh position taken by the Treasury Department in its proposed regulations defining church plans. These proposed regulations provide that once a church plan fails to meet the requirements of church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

Our bills provide a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the bill is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Therefore, Mr. President, I urge my distinguished colleagues to support these measures and I ask unanimous consent that the bills be printed in the RECORD.

There being no objection, the bills were ordered to be printed in the RECORD, as follows:

S. 3172

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. Section 414(e) of the Internal Revenue Code of 1954 is amended to read, as follows:

"(e) CHURCH PLAN.—

"(1) IN GENERAL.—For purposes of this part the term 'church plan' means a plan established and maintained (to the extent required in paragraph (2)(B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501.

"(2) CERTAIN PLANS EXCLUDED.—The term 'church plan' does not include a plan—

"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513); or

"(B) which includes individuals less than substantially all of whom are described in paragraphs (1), (3)(B), or (3)(E) (or the beneficiaries).

"(3) DEFINITIONS AND OTHER PROVISIONS.—For purposes of this subsection—

"(A) A plan established and maintained by a church or by a convention or association of churches shall include a plan established and maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or fundng of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

"(B) The term 'employee' of a church or a convention or association of churches shall include—

"(i) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

"(ii) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 and which is controlled by or associated with a church or a convention or association of churches; and

"(iii) an individual described in paragraph (3)(E).

"(C) A church or a convention or association of churches which is exempt from tax under section 501 shall be deemed the employer of any individual included as an employee under paragraph (3)(B).

"(D) An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

"(E) If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization described

ing will not continue in the future. The Committees intend that in fulfilling these requirements, an enrolled actuary will make appropriate inquiries of plan sponsors but will not be required to make further inquiry unless, under the circumstances, further inquiry is considered necessary because of information already known to the actuary. The Committees expect that material failure to comply with the provision could be an important factor to be considered by the Joint Board for the Enrollment of Actuaries in a disenrollment proceeding. The Committees do not intend the provision to cause an actuary to assume the role of an auditor.

U. Mistaken Contributions.

Present Law.

Under present law, employer contributions to pension plans are generally not allowed to be returned to the employer. However, a contribution made because of a mistake of fact is permitted to be returned if it is returned within one year after the date it is made.

Reason for Change.

The Committees believe that for a multiemployer plan the requirement that a contribution be made due to mistake of fact in order to be returned to the employer is too narrow. Accordingly, the Committees have concluded that a contribution made due to mistake of fact or mistake of law should be eligible for return to the employer if specified conditions are met.

Explanation of Provision.

Under the bill, in the case of a contribution to a multiemployer plan which was made because of a mistake of law or fact, the contribution may be returned without penalty within six months after the date the plan administrator determines that the contribution resulted from a mistake of law or fact. For this purpose, a mistake of law relating to plan qualification under the Code is not considered a mistake of law.

The bill provision is retroactive with respect to its application to multiemployer plans. For such plans the date the plan administrator determines that the contribution resulted from a mistake of law or fact is deemed to be the later of (1) the date of the actual determination, or (2) the date of enactment.

V. Church Plans Permitted to Continue After 1982 to Provide Benefits for Employees of Organizations Controlled by or Associated with Churches.

Present law.

Under present law, the standards provided by the labor law provisions of ERISA generally do not apply to the pension plan of a church for its employees. Church plans are also generally exempt from the tax qualification standards which correspond to the labor standards.

Under present law, a church plan may cover employees of a tax-exempt agency related to a church only if the plan was in existence on January 1, 1974. For taxable years beginning after December 31, 1982, a church plan no longer will be able to cover such employees.

Reason for change.

The Committees believe that plans maintained by churches should be allowed to cover all employees of related tax-exempt agencies.

Explanation of the bill.

The bill would permit a church plan to cover employees of a tax-exempt agency controlled by or affiliated with a church or a convention or association of churches. This would include ministers and other clerical employees as well as lay employees of the church agency. Thus, for plans in existence on January 1, 1974, present law would be continued after December 31, 1982, and for other plans present law would be modified. Also, the bill would provide a period of time during which a plan intended to qualify as a church plan but failing to do so could be amended to so qualify without penalty.

Effective date.

The provisions of the bill would be effective as of January 1, 1974.

W. Contribution Deduction Where Company is Sold to a State Government.

Present law.

Under present law, annual deductions for contributions to pension plans are subject to statutory limitations.[1] Accordingly, a contribution to a pension plan maintained by a business which is being sold will be deductible in the year made only to the extent it does not exceed the limitations.

Reason for change.

The Committees believe that a company selling a public transportation system to a State Government should be encouraged to fully fund its pension plan in connection with the sale.

Explanation of the bill.

Under the bill, where the stock or assets of a corporation operating a public transportation system are sold to a State (or State agency or instrumentality), a current deduction is allowed for a contribution to fully fund accrued benefits of plan participants who are employed by the corporation.

Effective date.

The provision applies to payments made after June 30, 1980.

X. Severance Pay Arrangements and Supplemental Retirement Income Payments.

Present law.

Under present law, if an arrangement (1) provides retirement income or (2) results in deferral of income to or beyond covered employment, it is considered a pension plan subject to the standards of ERISA. The Department of Labor has determined that certain severance pay arrangements and certain supplemental retirement income payments are not pension plans under this rule.

Reasons for change.

The Committees believe that the Department of Labor should have the discretion to treat severance pay arrangements as welfare plans where it determines that such treatment is consistent with the standards and purposes of title I of ERISA.

In addition, the Committees recognize that during periods of high inflation, retired persons living on fixed incomes are confronted with severe financial problems. Many employers feel an obligation to their retirees to provide voluntary payments, supplemental to such retirees' normal pensions, to enable retirees to better cope with inflation.

Explanation of provisions.

The bill would allow the Department of Labor to prescribe rules, consistent with the standards and purposes of title I of ERISA, under which certain categories of (1) severance pay arrangements, and (2) supplemental retirement income payments, would be treated as welfare plans rather than pension plans.

For example, as supplemental income payments, an employer might provide for the payment of monthly supplemental amounts to retirees based on a formula amounting to 3 percent, multiplied by the retiree's monthly pension benefit, multiplied by the number of years that such retirees' pension benefit has been in pay status.

The Committees expect that in prescribing regulations applicable to such supplemental payments, the Secretary of Labor will take into account the overall percentage of retirees' total retirement benefits represented by such payments.

Also, in order to protect plan participants and beneficiaries against an erosion of ERISA's standards, supplemental retirement income payments or a severance pay arrangement, a principal effect of which is the evasion of the standards or purposes of title I of ERISA is treated under the bill as a pension plan rather than a welfare plan. Thus, it is subject to the ERISA standards (e.g., vesting, funding) applicable to pension plans.

Effective date.

The provisions would be effective upon the date of enactment.

Y. Waiver of preemption in case of Hawaii health care plan (Sec. 409 of the bill and Sec. 514 of ERISA).

Present law.

Section 514 of ERISA presently provides that (with certain exceptions) all State laws related to employee benefit plans are preempted by ERISA.

Reason for change.

The Committees believe in the merits of comprehensive Federal preemption with regard to employee benefit plans because preemption eliminates the possibility of varied compliance standards in different States. However, ERISA has had the effect of preempting the Hawaii Prepaid Health Care Law which provides that all employers in the State must provide certain health benefits for their workers. As a result, Hawaii cannot require employers to provide health benefits for their workers.

Explanation of provision.

The bill allows a very limited exception from preemption for the Hawaii Prepaid Health Care Law and requires a study by the Department of Labor. The Committees are concerned that this provision should not be interpreted as a precedent for subsequent exceptions for individual States. While subsequent exceptions may result from a study of the Hawaiian plan, the result may also be a repeal of the exception and a return to total preemption.

The Committees anticipate that the Department of Labor will work with Hawaii to assure that Hawaii has adequate information to enforce its standards.

The bill requires the Secretary of Labor to report to Congress in two years on the effect of the exception. The Secretary is expected to make recommendations in that report as to whether the exception should be expanded to other States' health laws.

Effective date.

The provision is effective on the date of enactment.

Z. Effective Date.

1. General effective date.

The provisions of the bill generally apply on the date of enactment. One exception is that the withdrawal liability rules take effect as of April 29, 1980. For purposes of determining whether an employer has withdrawn from a multiemployer plan, the definition of multiemployer plan in effect at the time of the withdrawal is to be applied. Another exception is that the reorganization provisions take effect on the first day of the first plan year beginning after the earlier of (1) the expiration date of the last collective bargaining agreement in effect on the date of enactment of the bill or (2) 3 years after the date of enactment of the bill.

Under the bill, in the case of employers that withdraw from multiemployer plans covering employees in the seagoing industry on the Pacific Coast of the United States, the withdrawal liability provisions become effective May 3, 1979. In this case all of the provisions of the bill relating to withdrawal liability (including the rules which allocate the liability and which reduce the liability) are to be modified by the PBGC to reflect the earlier effective date. This retroactive application of the withdrawal liability effective date is applied only in the case of the seagoing industry because of specific problems in that industry.

Also, the bill provides that where an employer has withdrawn from a multiemployer plan before the date of enactment of the bill, and a bond or escrow has been provided by the employer under present law, the PBGC is to pay the bond or escrow to the plan if,

[1] See Code sec. 404(a)(1)(A) and Proposed Reg. sec. 1.404(a)-14.

arm's-length sale of assets to an unrelated party to be relieved of his liability.

In order to encourage new employers to join multiemployer plans, a "free look" rule is provided under which a new employer who does not contribute for more than 6 consecutive plan years may leave a plan without incurring liability when several conditions are satisfied.

The bill imposes a periodic payment cap on the amount of withdrawal liability of 20 annual payments of an amount determined on the basis of the employer's contributions over the 5 years preceding the withdrawal. Additionally, liability limitations are provided as follows: First, the liability of an insolvent employer undergoing liquidation or dissolution would be limited to the sum of 50 percent of the liability plus that portion of 50 percent of the liability which does not exceed the liquidation or dissolution value; second, the liability of an individual (sole proprietor or partner) would not reach personal assets exempt under bankruptcy law; and third, where all or substantially all of an employer's assets are transferred in a bona fide sale in an arm's-length transaction to an unrelated party, the liability would not exceed, where the liquidation or dissolution value of the employer does not exceed $2 million, the greater of first, 30 percent of the liquidation or dissolution value or second, the liability attributable to the employer's employees.

For sales in which the liquidation value exceeds $2 million, the 30-percent limitation would be incrementally increased as in a tax table so that it would reach 80 percent for a liquidation value exceeding $10 million. Any dispute over an employer's withdrawal liability must be resolved through arbitration.

The bill provides for three types of withdrawal liability—related funds in which a multiemployer may voluntarily participate. The first is a PBGC fund to reimburse plans for withdrawal liability that is uncollectible because an employer is involved in bankruptcy or insolvency proceedings. The second is a reinsurance fund which may be established by plan sponsors to relieve employers of portions of withdrawal liability that would have been paid by other employers had it not been forgiven, by the 20-year periodic payment cap, de minimus rule, and so forth, or which are unattributable, uncollectible, or attributable to the employer. The bill also permits the establishment of a third type of reinsurance fund in which employers in the construction industry may participate.

The effective date for the imposition of withdrawal liability is April 29, 1980. The committees decided in part to move up the date from February 27, 1979, the date contained in earlier versions of the bill, because the original purpose of a retroactive effective date—namely, to avoid encouragement of employer withdrawals while the bill was being considered—has been achieved. It should also be noted that the April 29 effective date is the product of strong political pressures by certain withdrawing employers who were caught by the earlier date. I realize that permitting these employers to avoid liability only increases the burdens of those employers remaining with the plans in question, but it appears necessary to accept the April 29 date in order to enact the bill before the August 1 deadline for action.

The bill also contains provisions dealing with mergers and transfers of assets and liabilities as well as with plan partitions. In those cases where an employer withdrew from a multiemployer plan prior to the effective date of withdrawal liability, the PBGC would continue to have its partition authority under ERISA section 4063(d) and its authority to guarantee benefits under the terminated plan under the full ERISA section 4022 single-employer plan guarantee.

For multiemployer plans experiencing financial difficulty, the bill provides mandatory reorganization under which plans are required to meet a special faster funding requirement called the minimum contribution requirement (MCR). Employers who remain with a plan in reorganization are protected from too rapid increases in funding under the MCR through an overburden credit and a safe harbor provision. The overburden credit, which is applied to reduce a plan's accumulated funding deficiency, is available to plans with more retirees than active participants for a plan year. I am pleased to note that the permissive reduction of certain recently granted benefits by plans in reorganization has been deleted in the compromise bill.

If, despite reorganization, a plan becomes unable to meet benefit payments, those payments would have to be suspended until they are supportable by employer contributions and other plan assets. If such an insolvent plan is unable to pay benefits at the levels guaranteed under the bill, the PBGC would make up the difference through financial assistance insolvency insurance.

The level of guarantee provided by the bill has been a subject of much debate. The original administration proposal was to guarantee 100 percent of the first $5 of pension accrual per month per year of service and 60 percent of the next $15 per month per year of service. The original proposal at the March 24 Senate Labor Committee markup of S. 1076 was 100 percent of the first $5 and 75 percent of the next $15. The 75 percent figure would be reduced to 65 percent for those plans which did not meet certain minimal pre-ERISA funding requirements.

At the markup, I opposed both the administration and the committee proposals and offered an amendment to raise the guarantee to 100 percent of the first $5 and 85 percent of the next $15. The 85 percent would be reduced to 80 percent for those plans which did not meet certain nominal pre-ERISA funding requirements.

My efforts to raise the guarantee were supported by the American Association of Retired Persons, the United Food and Commercial Workers International Union, and the United Mine Workers of America. With the assistance of the Senator from Rhode Island (Mr. PELL) a compromise guarantee was approved which was 100 percent of the first $5 and 80 percent of the next $15, with certain modifications in meeting special situations.

For those plans not meeting the specific pre-ERISA funding requirements, the 80-percent figure would be reduced to 70 percent. As with all compromises I was not fully satisfied with the 80–70 percent figure we settled on, but it was better than the original proposal. Subsequently, in order to get a joint bill to the Senate floor, it was unfortunately necessary to reduce the guarantee to 100 percent of the first $5 and 75 percent/65 percent of the next $15. This guarantee reduction was ameliorated somewhat by the elimination of the permissive authority of plans in reorganization to eliminate certain accrued benefits.

Even though I believe that the bill's provisions on lower guarantee levels are too severe, I believe they are the best that are possible of agreement. I urge my Senate colleagues and affected workers and retirees to join in opposing proposals for guarantees lower than the Senate committee's guarantee level, as already approved by the House of Representatives.

I should add that the bill requires the PBGC to propose a feasible supplemental guarantee program for that portion of a participant's benefit that is not guaranteed because of the partial guarantee of the accrual rate in excess of $5.

In order to pay for the proposed termination insurance program, the bill would raise the present premium of 50 cents per participant per year to $2.60 over 9 years. The PBGC would be required to increase the premium automatically if it projects that for any year its assets are less than twice what it paid out in the preceding year. The PBGC would have discretion to accelerate the premium if the board of directors determines that increased premium income is necessary to provide assistance to plans which are receiving assistance and to plans the board finds are reasonably likely to require assistance.

The premium in S. 1076 is less than the premium permitted in the Senate Labor Committee bill which could have risen to $3.40 in the 10th year. Without actual experience under a mandatory program, it is not possible to say with assurance what the premium should be. I believe that the premium settled on in the joint bill is on the low side, but only experience will tell what the appropriate premium level should be.

The bill also contains a number of proposals based upon certain provisions of S. 209, the Williams-Javits ERISA Improvements Act of 1979. These proposals treat delinquent contributions, return of mistaken contributions, the preemption of the Hawaii prepaid health care law, and severance pay and supplemental retirement income arrangements. The bill

also contains proposals on church plans and program oversight. As to the church pension plans, I might say that I am not too happy about those as it exempts those who work for schools and similar institutions which are church-related. Nonetheless, if we want a bill there where some things we had to give and that was one of them and I was very unhappy with it.

S. 1076 represents years of hard work and debate by interested parties across the country and four committees of Congress. There may be areas where the legislation can be improved, but I believe that is the best that can be produced at this time.

Multiemployer plan insurance protection in my judgment is a vital element of ERISA's basic objectives affecting over 8 million plan participants. The time has come while we still remain in balance among the many diverse interests to adopt these amendments and to enact them into law, and I am satisfied that it is best to do that to insure a pension guarantee program which provides mandatory benefit guarantees to the millions of workers who are affected.

Mr. President, that completes my statement.

Mr. MATSUNAGA. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. MATSUNAGA. Mr. President, I rise in support of the pending measure and I wish to commend and congratulate both the Senator from New Jersey (Mr. WILLIAMS) and the Senator from New York (Mr. JAVITS). They have put in a tremendous amount of work into this bill with so much understanding, with so much yielding here and yielding there to the wishes of others Senators, but always with judiciousness.

I, for one, with Hawaii particularly in mind had the occasion to appear before their committee and also to deal with them on a personal basis outside of committee meetings. I must say that I was met with only understanding and with a cooperative spirit of trying to do what was right, and for this I am truly grateful to both the Senator from New Jersey and the Senator from New York and I express on behalf of the people of Hawaii my deepest gratitude and mahalo.

I wish also to commend the chairman of the Finance Committee, the distinguished Senator from Louisiana (Mr. LONG), the ranking minority member of the committee, the distinguished Senator from Kansas (Mr. DOLE), and the chairman of the Finance Subcommittee on Pensions, the distinguished Senator from Texas (Mr. BENTSEN) for their Herculean effort in bringing to this floor a sensible, acceptable measure. To them also I extend the appreciation and thanks they so well deserve.

If the floor manager will yield further, the recourse available to multiemployer pension plans under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly.

May I inquire of the floor manager, does the bill improve the legal recourse available to plans against delinquent employers?

Mr. WILLIAMS. Yes, it does. We have appreciated the opportunity to work with the Senator in connection with a situation that arose in Hawaii that had a great deal of appeal to those of us who are on the Labor and Human Resources Committee. We, of course, had the Hawaiian preemption question before us. In the process of considering it we have had the pleasure of discussion with our good friend from Hawaii and his ideas were so well received that others wanted to join in, as a matter of fact, but it was so unique and so good that we wanted to make sure it was preserved. We deal with it that way, as exclusive to Hawaii.

Mr. MATSUNAGA. Again I express my appreciation.

Mr. WILLIAMS. On this whole question of delinquent contributions and the withdrawal liability collection, the bill provides a direct and I suggest unambiguous cause of action under ERISA to a plan against a delinquent employer.

Mr. MATSUNAGA. If I may pose a further question, in some recent cases such as the Washington Area Carpenters Fund Overhead Door Co. case, a simple collection action brought by plan trustees has been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise of contributions and the plan's entitlement to the contributions. Would the bill correct this situation?

Mr. WILLIAMS. I feel that it would correct the situation. It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises.

Further, plan participants for whom the employer promises to make pension contributions to the plan in exchange for their labor are entitled to rely on their employer's promises. The bill clarifies the law in this regard by providing a direct ERISA cause of action against a delinquent employer without regard to extraneous claims or defenses.

Mr. MATSUNAGA. The Senator, of course, will agree that the provisions for employer withdrawal liability are central to this legislation. Will these same principles applv to claims by a plan for withdrawal liability?

Mr. WILLIAMS. Affirmative. Like suits to collect delinquent contributions, it is intended that a plan's claim for withdrawal liability not be subject to extraneous claims and defenses.

Mr. MATSUNAGA. One final question, if the Senator will yield further.

The bill directs the courts in delinquency cases to award a plan which wins judgment not only the delinquent contributions, but other costs and damages as well. Do those provisions constitute a maximum as well as a minimum restriction on the relief available to plans?

Mr. WILLIAMS. Those provisions, as we drafted and intended them, are a minimum but not a maximum.

Mr. MATSUNAGA. I do appreciate the response of the floor manager. May I enter into a colloquy with the floor manager on another matter relative to the withdrawal and partial withdrawal rules as applied to the shipbuilding industry.

Mr. WILLIAMS. I would be happy to proceed with the colloquy on this part, on this impact of the legislation.

Mr. MATSUNAGA. Will the floor manager of the bill clarify the substitute provisions for withdrawal and partial withdrawal liability?

Mr. WILLIAMS. Yes.

Mr. MATSUNAGA. The original measure considered by the Senate Finance Committee contained a special rule for the construction industry. In committee, I raised the shipbuilding industry's concern with the general withdrawal and partial withdrawal provisions.

The shipbuilding industry is cyclical and has problems of intermittent employment as does the construction industry. For example, in good times with new ships being built, a shipyard will hire a number of workers; the shipyard's work force will be greatly increased. But in bad times, once the shipyard completes its existing contracts for new ships, it will begin to lay off workers; there is no work to maintain the work force.

As soon as a new order is received, the shipyard will rehire the workers. The shipyard, unlike construction sites in the building trades, will remain. The investment in docks, dock cranes, and shipbuilding equipment is not easily moved. Once shipbuilding resumes, the shipyard will increase the number of its workers, but until that time, the shipyard workers will be laid off.

Since the shipbuilding industry faces the same cyclical problem as the construction industry, I suggested that the committee broaden the construction industry rule to include ship building. Various committee members had similar concerns for other industries. Rather than specifically providing for these industries and unintentionally neglecting other industries not mentioned in committee, the staff recommended a general provision to cover all industries similarly situated.

I note that the substitute bill establishes a special withdrawal liability rule for the construction industry as an exception to the general withdrawal and partial withdrawal rules. The substitute bill in section 104 allows the Pension Benefits Guaranty Corporation to extend the special withdrawal liability rule to other industries whose characteristics make the special rule appropriate. Is it the floor manager's understanding that this provision will permit the shipbuilding industry to seek such relief from the Pension Benefit Guaranty Corporation? In other words, the Pension Benefits Guaranty Corporation may extend the special withdrawal liability rule to the shipbuilding industry upon review of the facts presented by that industry?

Am I correct?

Mr. WILLIAMS. Yes, these relief provisions permit the special withdrawal liability rules to be applied to other industries such as the shipbuilding industry.

Mr. MATSUNAGA. I thank the Senator.

Will the Pension Benefit Guaranty